## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON
CASE NUMBER: 2:21-CV-00137-DBL-CJS

ANTHONY MARIO WYNN,          PLAINTIFF,

vs.

CITY OF COVINGTON, et al.,        DEFENDANTS.


* * * * * * * *
DEPONENT:    ANTHONY MARIO WYNN
DATE:     October 23, 2023
* * * * * * * *

LEE ANN GOFF
COURT REPORTER


B a r l o w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

## Page 2

1    The deposition of ANTHONY MARIO WYNN, taken for
2  the purpose of discovery and/or use as evidence in
3  the within action, pursuant to notice, heretofore
4  taken at the Campbell County Detention Center, 601
5  Central Avenue, Newport, Kentucky 41071, on
6  October 23, 2023, at 9:00 a.m., upon oral
7  examination, and to be used in accordance with the
8  Federal Rules of Civil Procedure.
9
10        * * * * * * * *
11        APPEARANCES
12
13  REPRESENTING THE PLAINTIFFS:
14  Jamir Davis, Esq.
    J. Davis Law Firm, PLLC
15  P.O. Box 122123
    Covington, Kentucky 41011
16
    REPRESENTING THE DEFENDANTS:
17
    Jennifer L. Langen, Esq.
18  Adams, Stepner, Woltermann & Dusing, PLLC
    40 West Pike Street
19  Covington, Kentucky 41011
20
21
22        * * * * * * * *
23
24
25

## Page 3

1        I N D E X
2
3  Examination of ANTHONY MARIO WYNN          Page
4  BY MS. LANGEN:                    6
5  BY MR. DAVIS:                    234
6  BY MS. LANGEN:                   240
7
8
9
10        E X H I B I T S
11
12  Exhibit                  Page
13  Defendant's Exhibit Number 1          42
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

CERTIFIED QUESTIONS

3  Page 201, Line 9.
4      Q.  Okay.  And in your federal criminal
5  case, you filed a motion to suppress the items
6  that were found on you in the course of the
7  August 28th, 2020 traffic stop, didn't you?
8
9  Page 201, Line 22.
10     Q.  And along those same lines, you were
11 present when Officer Ullrich testified at the
12 hearing on your motion to suppress the evidence
13 collected from August 28th, 2020, weren't you?
14
15 Page 202, Line 3.
16     Q.  And Officer Elsbernd testified in that
17 same hearing, didn't he?
18
19 Page 202, Line 7.
20     Q.  Are you aware that the magistrate
21 recently recommended that the judge in your
22 federal case deny your motion to suppress?
23
24 Page 202, Line 13.
25     Q.  So if the judge adopts the magistrate's

Page 5

1  recommendation, the items that Officer Ullrich
2  found during a search of you on August 28th,
3  2020, are going to be allowed as evidence in the
4  trial of the federal charges. Is that your
5  understanding of that motion?
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1          ANTHONY MARIO WYNN
2  called on behalf of the Defendants, after having
3  been first duly sworn, was examined and testified as
4  follows:
5          CROSS-EXAMINATION
6  BY MS. LANGEN:
7      Q.  Sir, could you state your name for the
8  record, please?
9      A.  Anthony Mario Wynn.
10     Q.  Mr. Wynn, my name is Jennifer Langen and
11  I'm an attorney representing the City of
12  Covington and the officers who you've sued in the
13  lawsuit which brings us here today.
14         Have you ever had your deposition taken
15  before?
16     A.  No, ma'am.
17     Q.  Just because you haven't had your
18  deposition taken before, let me go over a couple
19  of ground rules so that we're all on the same
20  page here today; okay? We have a court reporter
21  as you can see, and so we need to do some things
22  to try to make her job a little bit easier. One
23  of them is we need to speak up and speak as
24  clearly as we can. So can you do that for me?
25     A.  Yes, ma'am.

Page 7

1      Q.  Okay. And also, we can't both talk at
2  the same time, so if you'll let me finish my
3  question before you start your answer, I'll also
4  try to let you finish your answer before I start
5  my question. And that will make it a lot easier
6  for her to get down what we each say today; okay?
7      A.  Yes, ma'am.
8      Q.  Okay. Also, try to answer verbally
9  instead of shaking your head or nodding your head
10  or saying uh-huh or huh-uh or whatever isn't
11  going to be clear on the record; okay?
12     A.  Yes, ma'am.
13     Q.  Does that make sense?
14     A.  Yes, ma'am.
15     Q.  Okay. And finally, the most important
16  rule, I tend to ask some questions that maybe
17  make sense in my head, but maybe not make sense
18  to everybody else in the room. So if that
19  happens and you don't understand a question that
20  I've asked, stop me, ask me to repeat it or
21  rephrase it or define a word or whatever it is
22  that makes it a question that's hard to
23  understand; okay?
24     A.  Yes, ma'am.
25     Q.  If you don't do that, I'm going to

Page 8

1  assume that you understood the question and
2  answered it to the best of your ability. Fair?
3      A.  Yes, ma'am.
4      Q.  Okay. What did you do to prepare for
5  the deposition today?
6      A.  Nothing really.
7      Q.  Okay. Did you review any documents at
8  all?
9      A.  Yes, ma'am.
10     Q.  What documents did you review?
11     A.  Body cam footage.
12     Q.  So you reviewed some videos?
13     A.  Yes.
14     Q.  I'm talking about paper documents. Did
15  you review any paper documents at all?
16     A.  Just the ones me and my lawyer went over
17  with.
18     Q.  Okay. I don't want to know anything
19  that your lawyer told you, okay, because I'm not
20  allowed to, but can you describe what the
21  document was that you looked at?
22     A.  This was a questionnaire.
23     Q.  A questionnaire?
24     A.  Yes, ma'am.
25     Q.  Do you know if it was a document that

2 (Pages 5 to 8)

Page 9

1  was generated by the City of Covington?
2       A.  Yes, ma'am.
3       Q.  Okay.  What kind of questions were on
4  that document?
5       A.  Questions pertaining to the case.
6       Q.  Oh, are you talking about
7  interrogatories; okay?  Like discovery requests
8  and so forth?
9       A.  Yes, ma'am.
10      Q.  Okay.  I've gotcha.  Any other documents
11 that you looked at?
12      A.  No, ma'am.
13      Q.  Okay.  And you said you reviewed some
14 videos?
15      A.  Yes, ma'am.
16      Q.  Okay.  What were the videos of?
17      A.  Body cam footage.
18      Q.  Did they pertain to the New Year's Eve
19 2021 issue or the January 16th, 2021 issue or
20 something else?
21      A.  Both.
22      Q.  Both.  Okay.  Let's just talk about the
23 ones that related to the New Year's Day issue;
24 okay?
25      A.  Yes, ma'am.

Page 10

1       Q.  How many of those did you review?
2       A.  Two.
3       Q.  Two.  Do you know which officers that
4  came from?
5       A.  No, I don't recall that.
6       Q.  Okay.  How many videos did you review
7  from the January 16th issue?
8       A.  It was a few of them, probably three, I
9  think.
10      Q.  Three?
11      A.  It's been a while.
12      Q.  Okay.  Do you know which officers those
13 body camera footages came from?
14      A.  Elsbernd, Murphy, and I can't remember
15 the other one.
16      Q.  Okay.  Do you have an independent
17 recollection of the events of New Year's Day
18 2021?
19      A.  I'm sorry.  Can you --
20      Q.  Yeah.  So if you hadn't seen the videos,
21 do you have -- do you recall enough about that
22 date to be able to testify about it?
23      A.  Yes, ma'am.
24      Q.  Okay.  Do you have an independent
25 recollection of the events of January 16th, 2021?

Page 11

1       A.  Yes, ma'am.
2       Q.  Okay.  To prepare for this deposition,
3  did you speak with anyone who was present for
4  your interaction with the Covington police
5  officers on New Year's Day of 2021?
6       A.  Can you -- can you repeat the question?
7  I'm sorry.
8       Q.  Sure.  I'm still trying to find out what
9  you did to prepare for the deposition today, so I
10 was just curious if you had spoken with anyone
11 who was present on New Year's Day of 2021 at that
12 apartment?
13      A.  No.
14      Q.  Okay.  Did you speak with anyone who was
15 present for your interaction with the Covington
16 police officers on January 16th of 2021?
17      A.  Did I speak with somebody that was
18 there?
19      Q.  Yes.
20      A.  No, ma'am.
21      Q.  Okay.  To prepare for your deposition,
22 did you speak with anybody who was employed by
23 the City of Covington?
24      A.  No, ma'am.
25      Q.  To prepare for your deposition, did you

Page 12

1  speak with anyone else other than your attorney?
2       A.  No, ma'am.
3       Q.  Okay.  So obviously we're here today at
4  the Campbell County Detention Center taking this
5  deposition.  Are you here on -- pending trial on
6  federal charges?
7       A.  Yes, ma'am.
8       Q.  Okay.  Are you currently charged with
9  possession of a firearm by a convicted felon?
10      A.  Yes, ma'am.
11      Q.  And are you currently charged with
12 possession of a firearm in furtherance of drug
13 trafficking?
14      A.  Yes, ma'am.
15      Q.  And are you currently charged with
16 possession of cocaine with the intent to
17 distribute?
18      A.  Yes, ma'am.
19      Q.  Is the Campbell County Detention Center
20 the only jail you've been in after your arrest on
21 those federal charges?
22      A.  After I was arrested on federal?
23      Q.  Yes.
24      A.  No, ma'am.
25      Q.  Where else have you been?

3 (Pages 9 to 12)

Page 13

1     A.  No, this -- I'm sorry.  This is the only
2  jail I've been to since then.
3     Q.  Okay.  Was it around July 18th of 2022
4  that you were brought here?
5     A.  Yes, ma'am.
6     Q.  Okay.  Where were you living before you
7  were arrested on these pending federal charges?
8     A.  Cincinnati, Ohio.
9     Q.  What was the address?
10    A.  3558 Washington Avenue.
11    Q.  What part of Cincinnati is that in?
12    A.  Avondale.
13    Q.  Who owns that, that -- I'm sorry, let
14  back up.
15       Is that a house or an apartment?
16    A.  Apartment.
17    Q.  Okay.  What unit number?
18    A.  12.
19    Q.  Okay.  Who else --
20    A.  My mother.
21    Q.  I'm sorry.  Can you let me finish if you
22  don't mind.
23    A.  Oh.
24    Q.  Who else lives at that apartment?
25    A.  My mother.

Page 14

1     Q.  Okay.  During what period of time have
2  you lived there?
3     A.  Since 2019.
4     Q.  Okay.  Besides yourself and your mother,
5  was anybody else living in that apartment?
6     A.  No, ma'am.
7     Q.  Okay.  Where else have you lived as an
8  adult?
9     A.  35 -- 3584 Harvey Avenue.  I'm -- yeah,
10  that's right.
11    Q.  And is that also in Cincinnati?
12    A.  Yes, ma'am.
13    Q.  In the Avondale neighborhood?
14    A.  Yes, ma'am.
15    Q.  Okay.  Was that an apartment or a home?
16    A.  A home.
17    Q.  A home.  Who did you live there with?
18    A.  My grandma.
19    Q.  Do you know if your grandma owned that
20  home or was renting it?
21    A.  I'm not sure.
22    Q.  How long did you live with your grandma
23  in the Harvey Avenue apartment?
24    A.  Since I was a kid.
25    Q.  If you were to get out of jail today,

Page 15

1  where would you go to live?
2     A.  With my mother.
3        MR. DAVIS:  I'm going to object.  Calls
4  for speculation, but go ahead.
5     Q.  If you were to get out of jail today,
6  who would you go to live with?
7     A.  My mother.
8     Q.  At the Washington Avenue apartment?
9     A.  No, ma'am.  She got a different
10  apartment.
11    Q.  Okay.  Where does she live now?
12    A.  I don't know the address.
13    Q.  Okay.  You said you had lived with your
14  grandma as a kid; is that right?
15    A.  Yes, ma'am.
16    Q.  Okay.  Was that at the Harvey Avenue
17  house?
18    A.  Yes, ma'am.
19    Q.  Okay.  What is your mother's name?
20    A.  Cindy Wynn.
21    Q.  What was your grandma's name?
22    A.  Dorothy Wynn.
23    Q.  What's your father's name?
24    A.  Anthony Parker.
25    Q.  Anthony Carter?

Page 16

1     A.  Parker.
2     Q.  Parker, P-A-R-K-E-R?
3     A.  Yes, ma'am.
4     Q.  Do you have any brothers or sisters?
5     A.  Yes, ma'am.
6     Q.  How many brothers do you have?
7     A.  Two.
8     Q.  What are their names?
9     A.  Anthony and Ronnie.
10    Q.  What is Anthony's last name?
11    A.  Parker.
12    Q.  And Rodney's?
13    A.  Wynn.
14       COURT REPORTER:  I'm sorry.  You said
15  Rodney or Ronnie?
16    A.  Ronnie.
17    Q.  R-O-N-N-I-E?
18    A.  Yes, ma'am.
19    Q.  How many sisters do you have?
20    A.  Three.
21    Q.  Three.  What are their names?
22    A.  Amanda, Brittney, Antonette.
23    Q.  And what's Amanda's last name?
24    A.  They all Wynns.
25    Q.  They're all Wynns, okay.  Do any of them

Page 17

1    live in Covington?
2        A.   No, ma'am.
3        Q.   Or northern Kentucky at all?
4        A.   No, ma'am.
5        Q.   What's the last grade that you attended
6    in school?
7        A.   In school?  Some college.
8        Q.   Okay.  So if you took some college, I
9    assume you graduated from high school?
10       A.   Yes, ma'am.
11       Q.   What high school did you go to?
12       A.   North Central Hardin Academy -- I mean,
13   North Central Hardin Public.
14       Q.   Where is that located?
15       A.   Elizabethtown.
16       Q.   So was there a period of time that you
17   lived in Elizabethtown?
18       A.   Yes, ma'am.
19       Q.   And is that Kentucky?
20       A.   Yes, ma'am.
21       Q.   Okay.  Who were you living with in
22   Elizabethtown?
23       A.   I was incarcerated.
24       Q.   Okay.  Where were you incarcerated down
25   there?

Page 18

1        A.   I mean, I don't remember what that place
2    was called.  It was the juvenile detention
3    center.
4        Q.   Okay.  What brought you to the juvenile
5    detention center?
6        A.   I don't remember.
7        Q.   Okay.  So when you say you graduated
8    from North Central Hardin Public, was that
9    through a program at the juvenile detention
10   center?
11       A.   Yes, ma'am.
12       Q.   And you have a diploma from there?
13       A.   Yes, ma'am.
14       Q.   And you said you attended some college.
15   What college -- where did you go?
16       A.   Antonelli.
17       Q.   What did you study there?
18       A.   IT.
19       Q.   IT?
20       A.   Yes, ma'am.
21       Q.   For how many --
22       A.   Informational technology.
23       Q.   Sure.  Thank you.  How many academic
24   years did you go there?
25       A.   Just one.

Page 19

1        Q.   One, okay.  Do you know how many credits
2    you have there?
3        A.   No, ma'am.
4        Q.   And you don't have a degree from there;
5    is that right?
6        A.   Yes, ma'am.
7        Q.   Since you left school, have you ever had
8    a job?
9        A.   Yes, ma'am.
10       Q.   Where is the most recent place that
11   you've worked?
12       A.   Eagle.
13       Q.   Say that again.
14       A.   Eagle.
15       Q.   Eagle.  What is -- what business is
16   Eagle in?
17       A.   It's a factory job, deal with engine
18   blocks.
19       Q.   Were you actually an employee of Eagle
20   or were you there through a temp service?
21       A.   Through a temp service.
22       Q.   What was the temp service?
23       A.   Crown.
24       Q.   Crown?
25       A.   Yes, ma'am.

Page 20

1        Q.   Over in Cincinnati?
2        A.   Over in Kentucky.
3        Q.   In Kentucky, okay.
4        A.   Irving Street.
5        Q.   Did you say Irving Street?
6        A.   Yes, ma'am.
7        Q.   How long were you at that factory job
8    with Eagle?
9        A.   At Eagle, like seven months.
10       Q.   Do you remember when you started there?
11       A.   No, ma'am.
12       Q.   Can you give me a ballpark of a year
13   when you worked --
14       A.   2019.
15       Q.   2019.  Where did you work before Eagle?
16       A.   Bosch.
17       Q.   Bosch.  B-O-S-C-H?
18       A.   Yes, ma'am.
19       Q.   And was that also through Crown?
20       A.   Yes, ma'am.
21       Q.   What did you do at Bosch?
22       A.   I was in -- it's a warehouse.  I was
23   taking out the trash, delivering parts and stuff.
24       Q.   Okay.  How long did you work at Bosch
25   through Crown?

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 21

1      A.  Like eight months.
2      Q.  Did you go directly from the Bosch
3  assignment to the Eagle assignment or was there a
4  gap?
5      A.  There was a gap.
6      Q.  How long was the gap?
7      A.  A couple months.
8      Q.  Were you somewhere working before you
9  were assigned to Bosch?
10     A.  Yes, ma'am.
11     Q.  Where?
12     A.  I don't remember the exact name.  It was
13  through Crown.
14     Q.  Okay.  Has all of your employment been
15  through Crown?
16     A.  Yes, ma'am.
17     Q.  Okay.
18     A.  No, ma'am.  I'm sorry.
19     Q.  Where else has your employment been
20  through?
21     A.  I worked for a guy doing home -- home
22  repair.
23     Q.  What was his name?
24     A.  David.
25     Q.  What's his last name?

Page 22

1      A.  I don't remember it.
2      Q.  Where -- where was he located?
3      A.  In Cincinnati.
4      Q.  When was it that you were working with
5  this David?
6      A.  In 2020.
7      Q.  2020.  How long did you work for him?
8      A.  A couple months.
9      Q.  Was it full-time work?
10     A.  Yes, ma'am.
11     Q.  And what was your role working for him?
12     A.  Digging holes.
13     Q.  Was he digging holes for some like
14  residential construction or commercial venture?
15  Do you know?
16     A.  It was commercial.
17     Q.  Okay.  Where was -- where were you
18  physically located when you were digging holes?
19     A.  Different -- traveled from different
20  places, from house to house.
21     Q.  Okay.  So from -- not at one specific
22  location the whole time?
23     A.  Yes, ma'am.
24     Q.  Gotcha.  How much did you earn working
25  for David?

Page 23

1      A.  15 an hour.
2      Q.  And I forgot to ask you that question
3  with Crown.  When you were working for Bosch or
4  for Eagle through Crown, what were you making?
5      A.  13.50.
6      Q.  Why did you stop working for David?
7      A.  I got fired.
8      Q.  What happened that got you fired?
9      A.  Showed up late.
10     Q.  More than once?
11     A.  Yes, ma'am.
12     Q.  Why did you stop working for outfits
13  through Crown?
14     A.  My fiancee that I was engaged to, day
15  care -- the day care closed down so I stopped
16  working to watch her kids.
17     Q.  So you stopped working through Crown to
18  watch her kids?
19     A.  Yes.
20     Q.  Do you have any kids?
21     A.  Yes, ma'am.
22     Q.  What are your kids' names?
23     A.  Kimora Lee.
24     Q.  Can you spell that for me?
25     A.  K-I-M-O-R-A.

Page 24

1      Q.  Okay.  Is your fiancée whose kids that
2  you stopped working for, to watch her kids, is
3  that fiancée the mother of Kimora?
4      A.  No, ma'am.
5      Q.  Who is the mother of Kimora?
6      A.  Dashon Holder.
7      Q.  Can you spell that for me?
8      A.  D-A-S-H-O-N.
9      Q.  And last name?
10     A.  Holder.
11     Q.  Holder.  H-O-L-D-E-R?
12     A.  Yes, ma'am.
13     Q.  Is that -- is Kimora your only child?
14     A.  Um-hmm.  Yes, ma'am.
15     Q.  Other than working through Crown and
16  working for David, did you have any other
17  employers since you left school?
18     A.  No, ma'am.
19     Q.  What year did you finish high school?
20     A.  2009.
21     Q.  So I think you said you had worked at
22  Bosch just before you worked at Eagle in 2019; is
23  that right?
24     A.  Yes, ma'am.
25     Q.  So did you go from 2009, when you

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 25

1  finished Antonelli -- or finished --
2      A.  High school.
3      Q.  I'm sorry, strike that.
4          Did you go directly from the juvenile
5  detention center high school program to Antonelli
6  College?
7      A.  Yes, ma'am.
8      Q.  So would that have been about 2010 that
9  you were at Antonelli?
10     A.  Yes, ma'am.  No, ma'am, not 2010.  I'm
11 sorry.
12     Q.  What year?
13     A.  It was 2011.
14     Q.  Okay.  And your testimony is that you
15 didn't work anywhere between the time you left
16 Antonelli in 2011 and the time you started Crown
17 in about 2019?
18     A.  Yes, ma'am.
19     Q.  Okay.  Your lawsuit describes you as --
20 and it says, quote, a man with a troubled past,
21 unquote.  What do you mean when you say you are a
22 man with a troubled past?
23         MR. DAVIS:  I'm going to object to that.
24 It calls for speculation.
25     Q.  It's in the complaint and obviously the

Page 26

1  complaint means something.  So when you said
2  you're a man with a troubled past, what do you
3  mean by that?
4      A.  Do I have to answer?
5      Q.  Yes.  Unless he tells you not to, in
6  which case we'll certify it and make you come
7  back and answer it again.
8      A.  I just -- I've been incarcerated.
9      Q.  I understood you to say that you
10 were in a juvenile detention facility in
11 Elizabethtown, Kentucky; right?
12     A.  Yes, ma'am.
13     Q.  Okay.  Other than that, have you been
14 incarcerated?
15     A.  Yes, ma'am.
16     Q.  Okay.  Following the Elizabethtown
17 juvenile detention program that you were in, what
18 was the next incarceration you had?
19     A.  When I was an adult in 2009.
20         COURT REPORTER:  I'm sorry?
21     A.  When I was an adult in 2009.
22     Q.  I didn't understand that.  Can you say
23 it again?  You were --
24     A.  In 2009.
25     Q.  In 2009, where were you?

Page 27

1      A.  Here.
2      Q.  Oh, at Campbell County?
3      A.  Yes, ma'am.
4      Q.  Was that in connection with a conviction
5  for trafficking a controlled substance in the
6  first degree?
7      A.  Yes, ma'am.
8      Q.  How long were you in Campbell County
9  Detention Center in connection with that
10 conviction?
11     A.  A little bit over two years.
12     Q.  When were you released from jail for
13 that conviction?
14     A.  2011.
15     Q.  2011, okay.  And is that when you went
16 to Antonelli then?
17     A.  Yes, ma'am.
18     Q.  Okay.  Were you also convicted of
19 facilitation of robbery in the first degree in
20 Campbell County for that stint that you did in
21 jail from 2009 to 2011?
22     A.  Yes, ma'am.
23     Q.  Okay.  Were you -- were you convicted at
24 some point of trafficking in a controlled
25 substance in the first degree in Kenton County?

Page 28

1      A.  Yes, ma'am.
2      Q.  Was that on or about June 26th of 2015?
3      A.  Yes, ma'am.
4      Q.  Okay.  What sentence did you receive for
5  that conviction?
6      A.  Eight years.
7      Q.  Where were you imprisoned for that?
8      A.  I was bouncing around, like different
9  counties.
10     Q.  Okay.  Can you name some of the counties
11 you were in?
12     A.  Logan County and Christian County.
13     Q.  Were you in any others as a result of
14 that Kenton County conviction?
15     A.  Hopkins County.
16     Q.  Say that again?
17     A.  Hopkins County.
18     Q.  Oh, Hopkins County, thank you.  Any
19 others?
20     A.  No, ma'am.
21     Q.  When were you released from jail for
22 that conviction?
23     A.  2018.
24     Q.  Was that March of 2018?
25     A.  Yes, ma'am.

7 (Pages 25 to 28)

Page 29

1    Q.   Okay.  That answers my next question.
2        Other than those two convictions, have
3    you been convicted of any other crime in
4    Kentucky?
5        A.   No, ma'am.
6        Q.   Have you had any other periods of
7    incarceration other than the two we just
8    discussed, plus the Elizabethtown?
9        MR. DAVIS:  Object to the compound --
10   just the form of the question.
11       Q.   Okay.  So you said you were in the
12   Campbell County Detention Center on convictions
13   of trafficking in a controlled substance and
14   facilitation of robbery.  Then we also talked
15   about the time that you were in the various
16   county jails following your conviction in Kenton
17   County on trafficking a controlled substance.
18       Have you had any other convictions in
19   Kentucky?
20       A.   No, ma'am.
21       Q.   Okay.  Have you ever had any other
22   periods of incarceration in Kentucky?
23       A.   Yes, ma'am.
24       Q.   When else were you incarcerated in
25   Kentucky?

Page 30

1        A.   2021.
2        Q.   Is that a result of the New Year's
3    Eve -- or New Year's Day 2021 or the January
4    16th, 2021 events?
5        A.   Both.
6        Q.   Both, okay.  We'll cover that in a
7    minute, but other than, you know, the times that
8    you were in jail following those events and the
9    two other times that you were in jail that we've
10   talked about already, have you been in jail?
11       A.   No, ma'am.
12       Q.   Okay.  Have you been convicted of any
13   crimes in Ohio?
14       A.   No, ma'am.
15       Q.   Have you been convicted of any crimes in
16   any state other than Ohio or Kentucky?
17       A.   No, ma'am.
18       Q.   Have you ever previously been convicted
19   of a federal charge?
20       A.   No, ma'am.
21       Q.   Have you ever sued anyone before this
22   lawsuit?
23       A.   No, ma'am.
24       Q.   Have you ever been sued by anyone
25   before?

Page 31

1        A.   No, ma'am.
2        Q.   Okay.  I want to turn your attention to
3    your interaction with Covington police officers
4    on New Year's Day of 2021; okay?
5        A.   Yes, ma'am.
6        Q.   That interaction with Covington police
7    officers happened at an apartment in a building
8    located at 177 Promontory Drive; is that correct?
9        MR. DAVIS:  I'm going to object.
10   Assumes facts that are not entered into evidence
11   yet, but go ahead.
12       Q.   Okay.  Where did that interaction occur?
13       A.   In an apartment.
14       Q.   Okay.  And what was the address of that
15   apartment?
16       A.   117.
17       Q.   117?
18       A.   Promontory Drive.
19       Q.   Whose apartment was that?
20       A.   Mother of my daughter.
21       Q.   Say it again?
22       A.   The mother of my daughter.
23       Q.   Oh, your mother and your daughter?
24       A.   Mother of my daughter.
25       Q.   Oh, the mother of your daughter.  And

Page 32

1    you said her name was Dashon Holder --
2        A.   Um-hmm.
3        Q.   -- if I remember correctly.  Were you
4    involved in a relationship with her at the time
5    other than her being the mother of your daughter?
6        A.   Yes, ma'am.
7        Q.   So was she also your girlfriend at that
8    point?
9        A.   Yes, ma'am.
10       Q.   Okay.  About what time did Covington
11   police officers arrive at that apartment?
12       A.   I don't recall the exact time.
13       Q.   Can you ballpark it?  I'm not going to
14   hold you to the minute, but if you can give me an
15   approximate time, that would be great.
16       A.   It was --
17       MR. DAVIS:  I'm going to just object to
18   the form.  Speculative, but go ahead.
19       Q.   Well, he was there.  So what --
20   approximately what time did the police officers
21   arrive?
22       A.   After 12.
23       Q.   After midnight?
24       A.   After 12.
25       Q.   Can you estimate how long after

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 33

1    midnight?
2        A.  No, ma'am.  I can't recall.
3        Q.  Okay.  Did you also live at the
4    Promontory Drive apartment on New Year's Day of
5    2021?
6        A.  No, ma'am.
7        Q.  Okay.  Where were you living on New
8    Year's Day 2021?
9        A.  Living with my mother.
10        Q.  Okay.  And that was at 3558 Washington
11    Avenue?
12        A.  Yes, ma'am.
13        Q.  How did you get to the Promontory Drive
14    apartment on New Year's Day, 2021?
15        A.  I drove.
16        Q.  Whose car did you drive?
17        A.  Mine.
18        Q.  What were you driving back then?
19        A.  Infiniti.
20        Q.  What model year?
21        A.  2014.
22        Q.  What time did you arrive at the
23    Promontory Drive apartment?
24        A.  After 12.
25        Q.  After 12?

Page 34

1        A.  (Witness nodded head.)
2        Q.  Did anyone come with you from your
3    apartment to the Promontory Drive apartment?
4        A.  Yes, ma'am.
5        Q.  Who?
6        A.  There was two people with me.
7        Q.  Who were they?
8        A.  Yusef Davis and Ricardo Hollis.
9        Q.  Was anyone else already at the apartment
10    when you arrived?
11        A.  Yes, ma'am.
12        Q.  Who was already there?
13        A.  Dashon and her friends.
14        Q.  Who were her friends?
15        A.  I don't recall their names.
16        Q.  How many of them were there?
17        A.  Two.
18        Q.  Were they both female?
19        A.  Yes, ma'am.
20        Q.  Were they female friends of hers that
21    you had previously met or --
22        A.  (Witness nodded head.)
23        Q.  Yes?
24        A.  Yes, ma'am.
25        Q.  Okay.  And you just don't recall their

Page 35

1    names?
2        A.  Yes, ma'am.
3        Q.  Have you seen them since?
4        A.  No, ma'am.
5        Q.  What had you all been doing in the -- or
6    what had you been doing in about the 12 hours or
7    so before you arrived at the Promontory Drive
8    apartment?
9        A.  Before I arrived?
10        Q.  Yeah, before you arrived.
11        A.  I don't recall.
12        Q.  Okay.  Did you go directly from your
13    mother's apartment to Promontory Drive?
14        A.  No.
15        Q.  What did you do in between?
16        A.  Stopped at my brother's house.
17        Q.  Okay.  Was that on your -- that was on
18    your way to the Promontory Drive apartment?
19        A.  (Witness nodded head.)
20        Q.  Which brother?
21        A.  Anthony.
22        Q.  What was the purpose of stopping at
23    Anthony's?
24        A.  A New Year's gathering.
25        Q.  I didn't understand that.

Page 36

1        A.  A New Year's gathering.
2        Q.  Oh, a New Year's gathering.  How long
3    were you at your brother's apartment, or your
4    brother's place?
5        A.  Probably an hour.
6        Q.  An hour?
7        A.  Yes, ma'am.
8        Q.  What were you all doing there?
9        A.  Just kicking it, watching a game,
10    waiting for the ball to drop.
11        Q.  Okay.  Did you consume any alcohol or
12    drugs during that time?
13        A.  No, ma'am.
14        Q.  Okay.  You said you arrived at the
15    Promontory Drive apartment at a little -- or at
16    some point after midnight; correct?
17        A.  Yes, ma'am.
18        Q.  Okay.  How long after you arrived did
19    you become aware of police officers at the
20    apartment?
21        MR. DAVIS:  I'm going to object.  That
22    assumes facts not in evidence.
23        Q.  Do you dispute that police officers
24    arrived at that apartment on New Year's Day of
25    2021?

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 37

1    A.  I'm sorry.  Can you --
2    Q.  Do you dispute that police officers
3  arrived at the Promontory Drive apartment
4  sometime after midnight New Year's Day 2021?
5    A.  What do you mean by dispute?
6    Q.  If I said that they did not, would you
7  argue with me?
8    A.  That they didn't show?
9    Q.  Yeah.
10    A.  No, ma'am.
11    Q.  You -- is it your contention in this
12  lawsuit that there were police officers at the
13  Promontory Drive apartment shortly after midnight
14  on New Year's Day of 2021?
15    MR. DAVIS:  I'm going to object again.
16  It assumes facts not in evidence.
17    MS. LANGEN:  I'm pretty sure he just
18  testified that police officers showed up a little
19  bit after midnight at that apartment.
20    MR. DAVIS:  I don't think he testified
21  to that.
22    MS. LANGEN:  Can you read that back?
23  It's been a while.
24    (Off the record.)
25  BY MS. LANGEN:

Page 38

1    Q.  I'm going to ask you again, what time
2  was it -- strike that.
3    How long after you arrived at the
4  Promontory Drive apartment did you become aware
5  that there were police officers present?
6    A.  How long after I arrived?
7    Q.  Yeah.
8    A.  Like an hour or so.
9    Q.  What did you see, hear, or otherwise
10  observe that made you first aware that there were
11  police officers in the area?
12    A.  Kicking at the door.
13    Q.  Did you hear anyone out in the hallway
14  identify themselves as police?
15    A.  I didn't hear that.  The only thing I
16  remember was them kicking the door.
17    Q.  You just remember the kicking?
18    A.  Yes, ma'am.
19    Q.  Okay.  Who all was present inside the
20  apartment when you became aware of the presence
21  of police officers, like when you heard that
22  kicking?
23    A.  My friends and Dashon's friends.
24    Q.  So Ricardo, if I remember correctly,
25  Yusef, Dashon, and her two friends?

Page 39

1    A.  Yes, ma'am.
2    Q.  What had you and those people been doing
3  from the time you arrived at the apartment until
4  that time that you heard the banging on the door?
5    A.  Listening to music.
6    Q.  Had you all been drinking or --
7    A.  No, ma'am.
8    Q.  -- taking any drugs or anything?
9    A.  No, ma'am.
10    Q.  Do you know what led the police officers
11  to come to the apartment on New Year's Day of
12  2021?
13    MR. DAVIS:  Objection.  Calls for
14  speculation.
15    Q.  I'm just asking if he knows.
16    Do you know?
17    A.  No, ma'am.
18    Q.  Prior to the police officers' arrival, I
19  think you said there was music playing in the
20  apartment.  How would you describe the volume of
21  the music that was playing during that time?
22    A.  It was up loud.
23    Q.  In your estimation was the music being
24  played loud enough to be heard by the neighboring
25  apartment?

Page 40

1    A.  No, ma'am.
2    Q.  Prior to the police officers' arrival,
3  had anyone inside the apartment been having any
4  verbal disagreements?
5    A.  No, ma'am.
6    Q.  Prior to the police officers' arrival,
7  had anyone inside the apartment been talking on
8  their phone?
9    A.  Yes, ma'am.
10    Q.  Do you know who they were talking to?
11    A.  No, ma'am.
12    Q.  At any point in time before the police
13  arrived, did you kick in the door to the
14  bathroom?
15    A.  No, ma'am.
16    Q.  Did you see anybody else do that?
17    A.  No, ma'am.
18    Q.  Did anything happen to the sliding glass
19  door or the blinds that were on that door while
20  you were in the apartment?
21    A.  Not that I recall.
22    Q.  Did you or anyone else push a dresser
23  over while you were in the apartment?
24    A.  No, ma'am.
25    Q.  Do you know -- I'm just asking if you

10  (Pages 37 to 40)

1  know, and if you don't, just tell me.  Do you
2  know whether anyone from somewhere else in the
3  building had called the police to report trouble
4  coming from the apartment that you were in?
5      A.  No, ma'am.
6      Q.  Okay.  I'm going to slide a piece of
7  paper and a pen down your way, and what I'm going
8  to ask you to do is draw a rough sketch of the
9  layout of the apartment; okay?  So if you can
10 take that pen and just draw the general shape of
11 the apartment, and draw it as big as you can that
12 the paper allows.
13     A.  So what like you mean, the layout?
14     Q.  Like was it generally in a square shape
15 or a rectangle shape or, you know, just the
16 general outline of the apartment.  And draw it as
17 big as you can on that paper because I'm going to
18 ask you to do some other things on there.
19     A.  (Witness complied.)
20     Q.  You've finished drawing the rough
21 outline of it?
22     A.  (Witness nodded head.)
23     Q.  Okay.  Can you please place lines to
24 signify approximately where the walls of the
25 various rooms inside the apartment were, so like

1  the bedroom, the kitchen, whatever was in there.
2      A.  (Witness complied.)
3      Q.  Did you label the living room, the
4  kitchen, whatever else?
5      A.  Yes, ma'am.
6      Q.  Okay.  Can you -- I'm just going to get
7  up if you don't mind, if you can show me where
8  the front door was, just because I can't see from
9  that far away.
10     A.  Front door.
11     Q.  Front door was right there?
12     A.  (Witness nodded head.)
13     Q.  Does that say sliding door?
14     A.  Yes, ma'am.
15     Q.  Okay.  We're going to mark that as
16 Exhibit 1 to the deposition, and just keep it
17 handy because I may ask you to draw some other
18 things on there; okay?
19         (Defendant's Exhibit Number 1
20         was marked for identification.)
21     A.  Yes, ma'am.
22     Q.  Okay.  So you previously testified that
23 you became aware of the police officers' presence
24 when you heard banging at the door; is that
25 right?

1      A.  Kicking at the door.
2      Q.  Kicking.  I'm sorry, kicking at the
3  door.  What room were you in at that time?
4      A.  The back.
5      Q.  The bath?
6      A.  The back bedroom.
7      Q.  Oh, the back bedroom.  Did you put more
8  than one bedroom on there?
9      A.  Yes, ma'am.
10     Q.  Can you label one of them as one and the
11 other as two?
12     A.  I did.
13     Q.  Were you in bedroom one or bedroom two?
14     A.  Bedroom one.
15     Q.  You were in bedroom one, okay.  What
16 were you doing in the bedroom?
17     A.  Me and my girlfriend was talking.
18     Q.  Was what?
19     A.  We was talking.
20     Q.  Talking, okay.  So your girlfriend was
21 in there with you?
22     A.  (Witness nodded head.)
23     Q.  While you were in the bedroom, did
24 police officers call for you to come out of the
25 bedroom?

1      A.  Yes, ma'am.
2      Q.  What exactly did the police officers say
3  in calling for you to come out of the bedroom?
4      A.  Everybody step -- everybody come out.
5      Q.  Did you come out the first time an
6  officer asked you to?
7      A.  Yes, ma'am.
8      Q.  Did any police officer use force to make
9  you come out of the bedroom?
10     A.  No, ma'am.
11     Q.  Do you know the name of the police
12 officer who -- well, strike that.  Let me back
13 up.
14        You said you heard police officers
15 calling for you to come out of the back bedroom.
16 How many police officers were there that were
17 calling for you to do that?
18     A.  Like three or four.
19     Q.  Three or four of them?
20     A.  (Witness nodded head.)
21     Q.  Okay.  Do you know any of their names?
22     A.  I think it was Murphy, Morris.  I don't
23 recall the -- I can't remember the other one's
24 name.
25     Q.  Okay.  What -- the police officer who

Page 45

1  you're saying is Murphy, what did he look like?
2      A.  A little short guy, had -- he was the
3  only one dressed in a blue uniform.  He had a
4  blue shirt on.
5      Q.  Okay.  How do you know that Murphy was
6  his name?
7      A.  Because I think it was on his name tag.
8      Q.  Okay.  Are you basing your naming of the
9  police officers on just your own recollection of
10 the events or on the video that you watched?
11     A.  On my own recollection and the videos.
12     Q.  Both of them?
13     A.  Yes, ma'am.
14     Q.  And what did you say the other
15 officer's name was that you could remember?
16     A.  Morris.
17     Q.  Morris, okay.  How do you know what his
18 name was?
19     A.  Because I think it was on his name tag.
20     Q.  Okay.  What do you recall him looking
21 like, the one that you're saying is Morris?
22     A.  He was like -- probably 180 pounds but
23 like 5 -- 5'9", 5'10".
24     Q.  Okay.  Was he White or Black or some
25 other --

Page 46

1      A.  White.
2      Q.  White.  Okay.  Do you remember anything
3  about his hair?
4      A.  No, ma'am.
5      Q.  About how old do you think he was?
6      A.  I don't --
7      Q.  Young, old?
8      A.  Mid age.
9      Q.  Middle age?
10     A.  (Witness nodded head.)
11     Q.  Okay.  Was there anything distinctive
12 about this officer that you think is Morris?
13     A.  I don't remember.
14     Q.  You didn't see a scar or a tattoo, or
15 notice anything like an accent or anything?
16     A.  No, ma'am.
17     Q.  And what kind of uniform was he wearing?
18     A.  Regular uniform.
19     Q.  Say that again?
20     A.  Regular uniform.
21     Q.  I thought you said that Murphy was the
22 only one wearing the regular blue uniform?
23          MR. DAVIS:  Objection.  Calls -- or
24 misstates testimony.
25     Q.  What did you say that Murphy was

Page 47

1  wearing?
2      A.  A blue shirt, blue uniform shirt.
3      Q.  Blue uniform shirt.  What was he wearing
4  on the bottom?
5      A.  Regular like police pants.
6      Q.  So are you saying you believe that
7  Morris was wearing the same thing?
8      A.  No.
9      Q.  Okay.  How was Morris' uniform different
10 than what -- than Murphy's?
11     A.  Because you've got a uniform shirt, then
12 you've got a regular tee shirt with police on it.
13     Q.  Okay.  So which of them was wearing the
14 regular shirt that had police on it?
15     A.  Murphy.
16     Q.  Murphy.  Okay.  And other than Morris
17 and Murphy, were there any other officers that
18 were calling you out of the bedroom?
19     A.  There was a Black one.
20     Q.  A Black officer?
21     A.  (Witness nodded head.)
22     Q.  Do you know his name?
23     A.  No, ma'am.
24     Q.  Did you know -- did you see anything
25 distinctive about him?

Page 48

1      A.  He's Black.
2      Q.  Other than that?  Tattoo, scar, talk
3  funny, anything like that?
4      A.  No, ma'am.
5      Q.  Okay.  And then did you say there were
6  more officers or just those three?
7      A.  There was more officers.
8      Q.  Okay.  Who were the other officers?
9      A.  I think that one was Ullrich.
10     Q.  That was calling you out of the bedroom?
11     A.  No.
12     Q.  Okay.  So this is later.  So I'll ask
13 you about that in a minute; okay?
14     A.  (Witness nodded head.)
15     Q.  So just to be clear, which officers were
16 actually calling you out of the bedroom, that you
17 remember?
18     A.  Them -- it was like four of them.  I
19 don't -- I can't pinpoint who exactly voice
20 called me out because I was in the back room.
21     Q.  Okay.  So when you came out of the back
22 room, who did you see standing there?
23     A.  Murphy, Morris, the Black cop, and there
24 was another cop.
25     Q.  Describe for me what the other cop

Page 49

```
 1   looked like.
 2       A.  He was White.
 3       Q.  He was White, okay.  About how old was
 4   he?
 5       A.  I don't recall.
 6       Q.  About how tall was he?
 7       A.  I don't recall.
 8       Q.  About how much did he weigh?
 9       A.  I don't recall.
10       Q.  Do you remember if he was built small,
11   heavy, medium?
12       A.  Medium.
13       Q.  Okay.
14       A.  Like average.
15       Q.  Average build, okay.  Did you notice
16   anything distinctive about this fourth officer?
17       A.  No, ma'am.
18       Q.  No.  Okay.  Do you remember what kind of
19   uniform he was wearing?
20       A.  Regular uniform.
21       Q.  When you say regular uniform, describe
22   that for me.
23       A.  Navy blue -- I mean, dark blue
24   button-down.
25       Q.  What about on bottom?
```

Page 50

```
 1       A.  Same thing.
 2       Q.  Okay.  Did you happen to notice any,
 3   like, insignias or anything on his uniform?
 4       A.  No, ma'am.
 5       Q.  Like any sergeant stripes or anything
 6   like that?
 7       A.  No, ma'am.
 8       Q.  Did you say anything to the police
 9   officers as you were coming out of the back
10   bedroom?
11       A.  No, ma'am.
12       Q.  You didn't say -- not even one word?
13       A.  No, ma'am.
14       Q.  Where did you go after you came out of
15   the back bedroom?
16       A.  To the living room.
17       Q.  Can you put a W on the sketch to signify
18   where you went immediately after coming out of
19   the bedroom?
20       A.  (Witness complied.)
21       Q.  Okay.  How did you get from the back
22   bedroom to that point where you put the W?
23       A.  Walking with my hands behind my head.
24       Q.  Say that again?
25       A.  Walked with my hands behind my head.
```

Page 51

```
 1       Q.  You walked with your hands behind your
 2   head the whole time?
 3       A.  Um-hmm.
 4       Q.  Did you put your arms down at all?
 5       A.  No, ma'am.
 6       Q.  Okay.  Up to that point in time that you
 7   went from -- up to the point in time that you
 8   arrived at where you put the W on the sketch in
 9   the living room, had you been handcuffed?
10       A.  Once I made it in the living room,
11   that's when they handcuffed me.
12       Q.  Okay.  Who handcuffed you?
13       A.  I don't really recall exactly which
14   officer handcuffed me.
15       Q.  Okay.  How long did you remain in the
16   location where the W is on that sketch?
17       A.  Like 20, 30 minutes.
18       Q.  20, 30 minutes, okay.  Was any officer
19   stationed right next to you for any part of that
20   time?
21       A.  They took the other individuals into the
22   kitchen.  They tried to separate the three males.
23   I was in the living room.  Yusef was in the
24   living room.  And they took Ricardo, Ricco to the
25   kitchen.
```

Page 52

```
 1       Q.  Okay.  And was any officer stationed
 2   right next to you for any part of that time that
 3   you were in the living room in the location where
 4   that W is?
 5       A.  Yes, ma'am.
 6       Q.  What did that officer look like?
 7       A.  I -- it was a Black one and then there
 8   was a White cop.
 9       Q.  So were there two police officers
10   stationed at the same time next to you?
11       A.  Yes, ma'am.
12       Q.  Okay.  So the -- is it the same Black
13   officer you described before?
14       A.  Yes, ma'am.
15       Q.  Who was calling you out of the bedroom?
16       A.  It was one of them that was calling me
17   out of the bedroom.
18       Q.  Right.  And that officer was also
19   stationed next to you when you were in the place
20   where you have the W on that sketch?
21       A.  Yes, ma'am.
22       Q.  Okay.  And then you said there was a
23   second officer and he was White?
24       A.  Um-hmm.
25       Q.  Okay.  Can you describe him beyond that?
```

13  (Pages 49 to 52)

Page 53

1      A.  Hmm-um.
2      Q.  Did you happen to see his name tag?
3      A.  No, ma'am.
4      Q.  Did you happen to see the name tag of
5  the Black officer?
6      A.  No.
7      Q.  You said that the officers separated the
8  three males who were in the apartment; right?
9      A.  Yes, ma'am.
10     Q.  Okay.  And where did you say Yusef went?
11     A.  He was in the living room as well.
12     Q.  How far away from you was he?
13     A.  By the sliding doors.
14     Q.  By the sliding doors.  Okay.  Was there
15  an officer next to him?
16     A.  Yes, ma'am.
17     Q.  What did that officer look like?
18     A.  I don't recall.
19     Q.  Did you happen to see that officer's
20  nameplate?
21     A.  No, ma'am.  At that time we was --
22  that's when everything started happening.
23     Q.  Okay.  But that officer who was with
24  Yusef was male; correct?
25     A.  Yes, ma'am.

Page 54

1      Q.  Okay.  White or Black?
2      A.  White.
3      Q.  Okay.  Do you remember anything about
4  his haircut?
5      A.  No, ma'am.
6      Q.  Do you remember anything about his
7  voice?
8      A.  No, ma'am.
9      Q.  Do you remember how tall he was?
10     A.  No, ma'am.
11     Q.  How he was built?
12     A.  No.  I wasn't paying too much attention
13  to him.
14     Q.  Okay.  What about the police officer
15  that was with Ricardo?  What -- where was
16  Ricardo, first of all?
17     A.  He was in the kitchen.  They drug him in
18  the kitchen.
19     Q.  Okay.  So he was in the kitchen when you
20  were in the living room; right?
21     A.  Yes, ma'am.
22     Q.  Okay.  Was there a police officer with
23  him?
24     A.  Yes, ma'am.  They drug him in there.
25     Q.  Okay.  What -- what did the police

Page 55

1  officer look like who was with Ricardo in the
2  kitchen?
3      A.  It was Murphy at one point in time, he
4  was in there.
5      Q.  Okay.
6      A.  But I don't know the other one -- I
7  can't recall who else was in the kitchen then.  I
8  just know Murphy stood out because he had a blue
9  shirt on.
10     Q.  Okay.  Was there just one other officer
11  besides Murphy in the kitchen at different
12  points?
13     A.  No, at different points -- they was
14  rotating around.
15     Q.  Okay.  So one would come in, another
16  would go out?
17     A.  (Witness nodded head.)
18     Q.  How many do you believe were in the
19  kitchen at some point?
20     A.  Two.
21     Q.  Two.  Okay.  And one of those two was
22  Murphy?
23     A.  Yes, ma'am.
24     Q.  Okay.  And the other one -- do you
25  remember whether he was White or Black?

Page 56

1      A.  White.
2      Q.  Do you remember what he looked like at
3  all?
4      A.  No, ma'am.
5      Q.  Did you see his nameplate at all?
6      A.  No, ma'am.
7      Q.  Okay.  Your lawsuit alleges that a
8  police officer grabbed you and threw you down
9  into your girlfriend's glass coffee table.
10     A.  Yes, ma'am.
11     Q.  We'll talk about that allegation in a
12  minute, but I just want to make sure from the --
13  I want you to focus on the time from when you
14  came out of the back bedroom until the time that
15  you were sitting in that place where the W is,
16  did anything significant to your lawsuit happen?
17     A.  Can you repeat that?
18     Q.  Yeah.  So you testified that you had
19  been in the back bedroom at one point; right?
20     A.  (Witness nodded head.)
21     Q.  And you went to the living room in the
22  location on the sketch where the W is; correct?
23     A.  Yes, ma'am.
24     Q.  So between the time you were in the
25  bedroom and the time that you got to the location

14  (Pages 53 to 56)

Page 57

1   where that W is, did anything significant to your
2   lawsuit happen?
3       A.   What do you mean by that?
4       Q.   Are you suing these officers for
5   anything that happened between those two points
6   in time?
7       A.   Yes, ma'am.
8       Q.   What are you suing them for that
9   happened between the time that you left the
10  bedroom and the time that you first got to the W?
11      A.   When I -- as soon as I got to the W,
12  that's when they started beating me up and
13  throwing me down.
14      Q.   Are you referring to the coffee table
15  incident?
16      A.   Yes, ma'am.
17      Q.   Okay.  I'm not there yet.  I'm just
18  talking about from the time you left the bedroom
19  till the time you got to the place where the W
20  is, did anything significant to your lawsuit
21  happen?
22      A.   Yes, ma'am.  That's when they first
23  grabbed me up.
24      Q.   Sometime between your walk from the
25  bedroom to where the W is?  Is that what you're

Page 58

1   saying?
2       A.   Yes, ma'am.
3       Q.   Okay.  At what point in that process did
4   somebody touch you?
5       A.   As soon as I got to the W.
6       Q.   Okay.  Before you got to the W, did
7   anything significant happen to your lawsuit?
8       A.   That's when they was calling everybody
9   out of the back -- out of the bedrooms and stuff.
10      Q.   Okay.  Are you suing them for the fact
11  that they called you out of the back bedroom?
12      A.   That's a -- that's a -- to add on to it,
13  yes, ma'am.  They was calling us out of the
14  bedroom.  They didn't have no reason to call us
15  out.  They didn't have no reason to enter the
16  house.
17      Q.   Okay.  So -- okay.  So I understand that
18  that's what you're alleging.  All right.  So did
19  you say that an officer -- strike that.
20          When was the first time that a police
21  officer put his hands on you?
22      A.   As soon as I got to the W.
23      Q.   Okay.  But not before; right?
24      A.   No, ma'am.
25      Q.   Okay.  So are we talking -- or I

Page 59

1   mentioned that your lawsuit said that a police
2   officer grabbed you and threw you down into your
3   girlfriend's glass coffee table.  Is that what
4   you're talking about when you say that they put
5   their hands on you for the first time?
6       A.   Yes, ma'am.
7       Q.   Okay.  At what point -- I'm sorry, let
8   me ask it this way:  How long had you been in the
9   location of where the W is on your sketch before
10  they put their hands on you?
11      A.   Instantly.
12      Q.   It was immediate?  As soon as you got to
13  that spot?
14      A.   Yes, ma'am.
15      Q.   Okay.  How many officers were involved
16  in grabbing you and throwing you into the coffee
17  table?
18      A.   Two.
19      Q.   Two, okay.  Let's talk about one of
20  them.  First of all, what did that police officer
21  look like?
22      A.   White.
23      Q.   White, okay.  Do you remember if he was
24  tall or short?  How tall he was?
25      A.   No, ma'am.

Page 60

1       Q.   Do you remember how he was built?
2       A.   No, ma'am.  I don't recall.
3       Q.   Can you describe him in any way other
4   than saying he was White?
5       A.   No, ma'am.
6       Q.   Did you see his nameplate at any point?
7       A.   No, ma'am.
8       Q.   Okay.
9       A.   I was -- I couldn't see.  They was
10  tussling me.
11      Q.   Okay.  Let's talk about the second
12  officer.  What did he look like?
13      A.   I think he was -- it was a White
14  officer.
15      Q.   Okay.  So the second officer was also
16  White?
17      A.   Yes, ma'am.
18      Q.   Okay.  Can you remember anything
19  descriptive about that second police officer
20  other than that he was White?
21      A.   No, ma'am.
22      Q.   Okay.  Did you happen to see his
23  nameplate?
24      A.   No, ma'am.
25      Q.   What position were you in when they

Barlow Reporting & Video Services, LLC
(859) 261-8440

1    first put their hands on you?
2        MR. DAVIS: I'm going to object as it's
3    confusing.
4        Q.  Are you confused by the question?
5        A.  Sort of.  Kind of.
6        Q.  Okay.  So when the first police officer
7    put his hands on you to throw you down into the
8    coffee table, were you standing?  Were you
9    kneeling?  What position were you in?
10       A.  I was standing.
11       Q.  You were standing.  Okay.  Was the
12   officer in the process of handcuffing you just
13   prior to putting his hands on you?
14       A.  Um-hmm.
15       Q.  Is that a yes?
16       A.  Yes, ma'am.
17       Q.  Had the officer asked to you sit down
18   just prior to throwing you into the coffee table?
19       A.  No, ma'am.
20       Q.  What, if anything, were you saying or
21   doing when the -- while the officer was trying to
22   handcuff you?
23       A.  I was yelling for my girlfriend.
24       Q.  Okay.  Were you saying anything else?
25       A.  Hmm-um.

1        Q.  Were you doing anything else?
2        A.  (Witness shook head.)
3        Q.  Were you moving your hands?
4        MR. DAVIS: Just remember to say yes or
5    no.
6        A.  Oh, yes.
7        Q.  You have to answer out loud.
8        A.  I'm sorry.
9        Q.  So were you moving your hands at all?
10       A.  No, ma'am.  I was cuffed.
11       Q.  I'm talking about while they were trying
12   to put you in the handcuffs.
13       A.  No.
14       Q.  While they were trying to put you in
15   handcuffs, were you moving your hands at all?
16       A.  No, ma'am.
17       Q.  Were you moving any part of your body at
18   all while they were trying to handcuff you?
19       A.  No, ma'am.
20       Q.  Okay.  Were you trying to take any steps
21   anywhere --
22       A.  No, ma'am.
23       Q.  -- while they were trying to handcuff
24   you?
25       A.  No, ma'am.

1        Q.  So your testimony is you were just
2    standing completely and totally still?
3        A.  I walked out.  As soon as I walked out,
4    they grabbed me.
5        Q.  Well, I thought you said they didn't
6    grab you until you got to the W.
7        A.  Yes, ma'am.  That's when I walked out.
8        Q.  Okay.
9        A.  When I walked out the back room, that's
10   when they grabbed me, as soon as I got to the W.
11       Q.  Okay.  How much -- approximately how
12   many steps were there between the threshold of
13   the back bedroom and the place where you put the
14   W in the living room?
15       A.  Like 10 to 15 steps.
16       Q.  10 to 15 steps.  And it wasn't until you
17   got to that 10th or 15th step that they first put
18   hands on you; right?
19       A.  Yes, ma'am.
20       Q.  Okay.  So is it your testimony that
21   there was -- that nothing happened while they
22   were handcuffing you, other than that they threw
23   you down on the coffee table?
24       A.  No, ma'am.  They was choking me up,
25   trying to bend my arms back.

1        Q.  Okay.  Where did the choking happen?
2    Were you on the ground or standing up at that
3    point?
4        A.  I'm on the ground.
5        Q.  Okay.  So the choking that you're
6    describing happened after you were thrown into
7    the coffee table?
8        A.  Yes, ma'am.
9        Q.  Okay.  What else happened while or
10   shortly after they were -- they tossed you into
11   the coffee table?
12       A.  They cuffed me.
13       Q.  Okay.  So they succeeded in getting
14   handcuffs on you while you were on the ground?
15       A.  Yes, ma'am.
16       Q.  Did you actually hit the coffee table?
17       A.  Yes, ma'am.
18       Q.  What part of your body made contact with
19   the coffee table?
20       A.  My head.
21       Q.  Did the glass in the coffee table break
22   when you made contact with?
23       A.  I don't think it broke at that instant.
24   I think in the midst of it, it broke.
25       Q.  But it broke at some point during that

Page 65

1    incident?
2         A.   Yes, ma'am.
3         Q.   Okay.  How long would you say it was
4    between the time the police officer put his hands
5    on you and the time that he handcuffed you?
6    Understanding that you're talking about having
7    been on the ground, hit the coffee table, et
8    cetera, during that time.
9         A.   I don't recall.
10        Q.   Can you approximate it at all?
11        A.   No, ma'am.
12        Q.   Was it longer or shorter than one
13   minute?
14        A.   Longer.
15        Q.   So for more than one minute, you were on
16   the ground with the police officers?
17        A.   Yes, ma'am.
18        Q.   Before they handcuffed you?
19        A.   Yes, ma'am.
20        Q.   More or less than five minutes before
21   they --
22        A.   Less.
23        Q.   Less?
24        A.   (Witness nodded head.)
25        Q.   Okay.  When you viewed the video footage

Page 66

1    from the police officer's cruiser cameras of the
2    New Year's Day event, could you see this
3    interaction where you were thrown into the coffee
4    table on that video anywhere?
5         A.   No, ma'am.
6         Q.   Do you have any video or photographs or
7    other evidence to support your claim that you
8    were grabbed and thrown into the coffee table?
9         A.   No, ma'am.
10        Q.   Did anyone else say anything at the time
11   to cause you to believe that he or she had seen a
12   police officer grab you and throw you into the
13   coffee table?
14        A.   Yes, ma'am.
15        Q.   Who?
16        A.   Dashon's friend.
17        Q.   Dashon's friend?
18        A.   Um-hmm.
19        Q.   And you don't know her name?
20        A.   No.  I don't know.
21        Q.   Have you talked to her at all since New
22   Year's Day of 2021?
23        A.   Yes, ma'am.
24        Q.   When did you talk to her last?
25        A.   It's been a minute.  I can't recall.  It

Page 67

1    was a while.
2         Q.   Was it closer to New Year's Day of 2021
3    or closer to today?
4         A.   It was closer to 2021.
5         Q.   Has anyone else subsequently told you
6    that they saw a police officer throw you into the
7    coffee table?
8         A.   Yes, ma'am.
9         Q.   Who?
10        A.   Yusef Davis.
11        Q.   And when did Yusef tell you that?
12        A.   Right before they took me in.
13        Q.   So on the day of the events --
14        A.   Um-hmm.
15        Q.   -- while you were still at the
16   apartment?
17        A.   Yes, ma'am.
18        Q.   Your lawsuit also alleges that one or
19   more police officers kneeled on your neck and
20   back after you were thrown into the coffee table.
21   How many police officers kneeled on your neck or
22   back?
23        A.   I had one on my neck and one on my back.
24        Q.   Are they the same two that you said were
25   involved in that incident?

Page 68

1         A.   Yes, ma'am.
2         Q.   Okay.  And you couldn't describe them
3    beyond they were both White males; right?
4         A.   Yes, ma'am.
5         Q.   Did any police officer speak to you
6    while you were involved in this -- I'm going to
7    call it a scuffle?
8         A.   No, ma'am.
9         Q.   No.  Did they issue any commands to you?
10        A.   No.  All they all -- only thing I heard
11   was stop resisting.
12        Q.   Okay.  Is this based on what you
13   independently recall of the events or what you
14   saw on video?
15        A.   Independent recall.
16        Q.   Did you say anything during that
17   scuffle?
18        A.   Yeah, I was saying something.
19        Q.   What were you saying?
20        A.   I don't recall.
21        Q.   How long did an officer kneel on your
22   neck?
23        A.   A few minutes.
24        Q.   For a few minutes?
25        A.   Yes, ma'am.

17 (Pages 65 to 68)

Page 69

1    Q.  How long did an officer kneel on your
2  back?
3    A.  For a few minutes.
4    Q.  Okay.  More or less than two minutes?
5    A.  Two minutes.
6    Q.  More or less than two minutes?
7    A.  Two minutes.
8    Q.  Okay.  So approximately two minutes?
9    A.  Yes, ma'am.
10   Q.  Okay.
11   A.  Right around that amount of time.
12   Q.  Okay.  As far as you know, did you see
13 anybody else kneel on your -- I'm sorry, strike
14 that.
15        As far as you know, did anyone else see
16 any police officers kneeling on you?
17   A.  Yes, ma'am.
18   Q.  Who?
19   A.  Everybody else that was in there besides
20 Ricco.
21   Q.  Okay.  Did any of them tell you they saw
22 that?
23   A.  Yes, ma'am.
24   Q.  Okay.  So everybody but Ricco?
25   A.  Yes, ma'am.

Page 70

1    Q.  And when you say Ricco, are you talking
2  about Ricardo?
3    A.  Yes, ma'am.
4    Q.  That's the same person?
5    A.  Yes, ma'am.
6    Q.  Do you know the name of the officer who
7  got the handcuffs on you?
8    A.  No, ma'am.
9    Q.  Was it one of those two that you talked
10 about being involved with the coffee table
11 incident?
12   A.  Yes, ma'am.
13   Q.  And your testimony is you didn't resist
14 the officer's efforts to handcuff you at all?
15   A.  No, ma'am.
16   Q.  You did not?
17   A.  No, ma'am.
18   Q.  Okay.  I'm going to ask it a different
19 way, because to me that's a little unclear with
20 double negatives.
21        Did you resist the officer's efforts to
22 handcuff you?
23   A.  No, ma'am.
24   Q.  Your lawsuit alleges that you were
25 forced outside and required to lie face down in

Page 71

1  the mud; okay?
2    A.  Yes, ma'am.
3    Q.  So, again, we're going to talk about
4  that in a minute, but first I need you to focus
5  on the time between when they got handcuffs on
6  you and the time that you were forced outside and
7  required to lie face down in the mud; okay?
8    A.  Yes, ma'am.
9    Q.  In that time frame, did anything of
10 significance to your lawsuit happen?
11   A.  Besides them putting their hands on me?
12   Q.  Yeah.  You said that -- I thought you
13 said that they put hands on you up until the time
14 they handcuffed you.
15   A.  Yes, ma'am.
16   Q.  Okay.  So between the time that they
17 handcuffed you and the time that you had to go
18 outside, did anything of significance to your
19 lawsuit happen?
20   A.  Well, yeah, I was still saying -- I was
21 yelling and one of the officers came over there
22 and tried to get me to shut up.
23   Q.  Okay.  And you're suing them for that?
24   A.  I don't know.  I don't -- I don't recall
25 like exactly what it is.

Page 72

1    Q.  Okay.
2    A.  I just --
3    Q.  But that in some way forms the basis for
4  your lawsuit?
5    A.  Yes, ma'am.
6    Q.  The fact that a police officer came over
7  and tried to get you to quiet down?
8    A.  Yes, ma'am.
9    Q.  Okay.  What did -- first of all, do you
10 know -- can you describe that officer?
11   A.  I think it was the Black officer.
12   Q.  The Black officer came over and tried to
13 get you --
14   A.  No, it was -- it was the blue shirt,
15 Murphy.
16   Q.  So Murphy came over and tried to get you
17 to quiet down?
18   A.  Yes.  I think -- I recall it was him.
19   Q.  Okay.  What did Murphy say to you to get
20 you to quiet down?
21   A.  Kept telling me to shut up and I was
22 yelling for my girlfriend.
23   Q.  Okay.  Did he say anything other than
24 shut up?
25   A.  No, ma'am.

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 73

1    Q.  Okay.
2    A.  Not that I recall.
3    Q.  Did he touch you in any way?
4    A.  Yes, ma'am.
5    Q.  How did he touch you?
6    A.  Like when I was on the ground, he
7  grabbed me like this, like he was pulling me up,
8  telling me to shut up.  And that's when they
9  started pulling me out to outside.
10   Q.  Okay.  So did Murphy approach you to get
11 you to quiet down close in time to the time that
12 they pulled you up and got you outside?
13   A.  Yes, ma'am.
14   Q.  Okay.  Other than pulling you up to
15 get -- pulling -- how did he pull you?  What part
16 of your body did he touch?
17   A.  My arms.
18   Q.  Okay.  So other than pulling on your
19 arms to get you to stand up, did he do anything
20 else to you?  Touch you in any other way?
21   A.  Not that I recall.
22   Q.  Okay.  Were you injured as a result of
23 him picking -- touching your arm to pull you up?
24   A.  Yes, ma'am.
25   Q.  Okay.  So are you saying that he did

Page 74

1  that in a rough manner?
2    A.  Yes, ma'am.
3    Q.  Okay.  Can you describe it somehow?
4    A.  It was like -- I'm cuffed, then he
5  grabbed like my -- cuff to my arm.
6    Q.  Your under -- under your arm?
7    A.  Yes, ma'am.
8    Q.  Like where somebody might put deodorant
9  or something?
10   A.  Yes, ma'am.
11   Q.  Okay.  The crook of your arm?
12   A.  And then pulled on me.
13   Q.  Okay.
14   A.  And I'm not a little guy so that's going
15 to create friction with the -- I heard it because
16 he created pain, because you pulling me by the
17 socket of my arm.
18   Q.  Okay.  So it caused some pain?
19   A.  Yes, ma'am.
20   Q.  Okay.  Beyond that, were you injured by
21 his pulling you up by the arm to take you
22 outside?
23   A.  I believe so.
24   Q.  You don't believe so?
25   A.  I believe so.

Page 75

1    Q.  You believe so.  Okay.
2    A.  Yes, ma'am.
3    Q.  In what other way were you injured by
4  that?
5    A.  My shoulder.
6    Q.  What about your shoulder?
7    A.  It got a torn, torn rotator -- rotator.
8    Q.  Okay.  So have you been to -- I'm going
9  to ask you about that in a minute.
10        Other than Officer Murphy pulling you up
11 by the arm to take you outside, did anything of
12 significance to your lawsuit happen between the
13 time that they got handcuffs on you and the time
14 that they took you outside?
15   A.  No, ma'am.
16   Q.  Okay.
17   A.  I don't recall.
18   Q.  So is it "no, ma'am," or is it "I don't
19 recall"?
20   A.  I don't recall.
21   Q.  Okay.
22   A.  I'm sorry.
23   Q.  Okay.  Back to the allegation that you
24 were taken outside and forced to lie in the mud;
25 okay?

Page 76

1    A.  Yes, ma'am.
2    Q.  How many officers were involved in
3  forcing you outside and --
4    A.  Two.
5    Q.  Two.  And one was Murphy?
6    A.  I don't recall.  I couldn't see.  I know
7  one of them was Black.
8    Q.  Okay.  So what I'm getting at is, you
9  said Murphy pulled you up right before they took
10 you outside?
11   A.  Yes, ma'am.
12   Q.  Was it two other officers that took you
13 outside or Murphy was one of them?
14   A.  It was the Black cop and Murphy.
15   Q.  Okay.  So Murphy and the Black cop took
16 you outside.  How did it get to be that you were
17 lying facedown in the mud?
18   A.  I was asking them what I was arrested
19 for.  They wouldn't tell me.  And I said -- and
20 that's when my -- I kept asking questions and I
21 told him that he gonna tell me what I was being
22 arrested for.  And that's when he got aggressive
23 with me and slammed me in the mud.  And then he
24 put me face down in the mud.
25   Q.  You said "he."  Which one?  Who?

19  (Pages 73 to 76)

Page 77

1     A.  The Black cop.
2     Q.  The Black cop did that?
3     A.  Um-hmm.
4     Q.  Okay.  So in forcing you to the ground,
5   did he touch some part of your body?
6     A.  Well, he already had my arms because I
7   was being cuffed and he was grabbing me up.
8     Q.  So he touched your arm?
9     A.  Um-hmm.
10    Q.  Did he touch any other part of your
11  body?
12    A.  When he slammed me?
13    Q.  Yeah.  Did he touch some other part of
14  your body to slam you to the ground?
15    A.  I don't recall.
16    Q.  So it could have been just your arm?
17    A.  No.  No, ma'am.
18    Q.  Okay.  So I asked you, did he touch any
19  other part of your body.  And you --
20    A.  I don't know exactly what part he
21  touched.  That's why --
22    Q.  Okay.  That wasn't my -- I didn't ask
23  you yet what part of your body did he touch.  I
24  asked you did he touch any other part of your
25  body in putting you to the ground.  Is that a --

Page 78

1   yes or no, did he touch any other part of your
2   body besides your arm?
3     A.  Yes, ma'am.
4     Q.  Okay.  What part of your body did he
5   touch besides your arm?
6     A.  I don't recall exactly what part.  But
7   he couldn't slam me just by my arms.
8     Q.  So you're assuming that he touched some
9   other part of your body?
10    A.  Yes, ma'am.
11    Q.  Okay.  And you don't recall whether or
12  not he touched some part of your body and you
13  don't recall what part of your body he may have
14  touched?
15      MR. DAVIS:  Objection.  Asked and
16  answered.
17    Q.  Is that true?
18    A.  Yes, ma'am.
19    Q.  Okay.  Was it just that Black officer
20  who was involved in forcing you to the ground?
21    A.  No, ma'am.
22    Q.  Who else was involved in that?
23    A.  I don't know his name.  It was another
24  officer.
25    Q.  Okay.  Was it --

Page 79

1     A.  I believe it was Murphy, but I'm not a
2   hundred percent sure.
3     Q.  Can you describe what the officer looked
4   like who also put you to the ground?
5     A.  He was White.  He had -- he was White.
6     Q.  Are you still trying to think of it?
7     A.  Yes, ma'am.
8     Q.  Okay.
9     A.  I can't -- it's blurry, but I know he
10  was a White officer and I believe it was Murphy.
11    Q.  Okay.  You think it was Murphy?
12    A.  Yes, ma'am.
13    Q.  But you don't know for sure?
14    A.  I don't know for sure.
15    Q.  Okay.
16    A.  I was being taken to the ground at that
17  point.  The only thing I seen was the ground and
18  mud and dirt.
19    Q.  Did either the Black officer or the
20  White officer who you think might be Murphy, did
21  either of them give you any commands or orders
22  before taking you to the ground?
23    A.  They just said, Come on.  They was
24  yanking me to come on, like get me out of that
25  house.  That's it.

Page 80

1     Q.  Okay.  Were you not wanting to go out of
2   the house?
3     A.  No, ma'am.
4     Q.  You didn't want to?
5     A.  No, ma'am.
6     Q.  Okay.  So when they were trying to lead
7   you out of the apartment, did you willingly go?
8     A.  I stopped and asked them what they were
9   arresting me for.
10    Q.  Okay.  Was it your understanding that
11  they were trying to take you to a cruiser and put
12  you in the back?
13    A.  Yes, ma'am.
14    Q.  Okay.  And at some point you stopped
15  while they were trying to do that?
16    A.  Before they took me out the house, I
17  stopped and asked them what I was being arrested
18  for.
19    Q.  Okay.
20    A.  And that's when the tussling started
21  again.
22    Q.  Where on -- where between where you've
23  got the W and --
24    A.  By the sliding doors.
25    Q.  That happened by the sliding doors?

1      A.  Yes, ma'am.
2      Q.  Okay.
3      A.  Right before we went outside.
4      Q.  Okay.  And they were trying to take you
5   outside, but you stopped; right?
6      A.  Yes, ma'am.
7      Q.  Okay.  At any point did you pull away
8   from an officer?
9      A.  No, ma'am.
10     Q.  Did you turn your body around?
11     A.  To talk to them.  To be face to face
12  with the Black one.
13     Q.  Okay.  So you did turn your body around?
14     A.  Yes, ma'am.
15     Q.  Okay.  What was the volume of your voice
16  when you were talking to the officer?
17     A.  I don't recall.
18     Q.  While you were lying in the mud, did any
19  officer physically punch or kick or strike you?
20     A.  Yes, ma'am.
21     Q.  How many times did that happen?
22     A.  Twice.
23     Q.  Twice.  Okay.  Do you know which officer
24  did that?
25     A.  No, ma'am.  I was face down in the mud.

1      Q.  Okay.  Are you saying it's either the
2   Black officer or the White officer, who you think
3   might have been Murphy --
4         MR. DAVIS:  Objection.
5      Q.  -- or somebody else?
6         MR. DAVIS:  Objection.  Calls for
7   speculation.  The witness has testified that he
8   could not see.  His face was in the mud.
9      Q.  You can answer the question.
10     A.  I couldn't tell.  I was face down in the
11  mud.
12     Q.  So you have no idea who that might have
13  been?
14     A.  No, ma'am.
15     Q.  Okay.  You said that somebody made
16  contact with you twice while you were on the
17  ground.  Can you describe what kind of contact
18  they made?
19        MR. DAVIS:  Objection.  Misstates
20  testimony.  He didn't say contact.
21     Q.  Well, I'm asking more specifically about
22  what happened while you were on the ground.
23     A.  I was kicked and then I was -- my head
24  -- forced my head down into the mud with his
25  knee, I think.

1      Q.  So are those the two things that you
2   were talking about?
3      A.  Yes, ma'am.
4      Q.  Okay.  Did anything else significant to
5   your lawsuit happen while you were lying in the
6   mud?
7      A.  Can you rephrase that for me?
8      Q.  Yeah.  So you indicated that there was
9   a -- there were two ways that the officer made
10  contact with you, which you just described.  Did
11  anything else happen while you were lying in the
12  mud that you're suing the officers for?
13     A.  Yeah.  He put my face in the mud.
14  Forced my face in the mud with his hands.
15     Q.  Okay.  So -- okay.  I thought that was
16  one of the two.
17     A.  One -- no, the one of the two was the
18  kicking and then the knee to the back of my neck.
19     Q.  Okay.  So while you're laying on the
20  ground, he put a knee to the back of your neck,
21  kicked you, and forced your face in the mud?
22     A.  Yes, ma'am.
23     Q.  Okay.  And again, you don't know who did
24  that?
25     A.  No, ma'am.

1      Q.  Okay.
2      A.  I couldn't see.
3      Q.  Say again?
4      A.  No, ma'am.  I couldn't see.
5      Q.  Okay.  Other than those things, did
6   anything else happen while you were lying in the
7   mud that forms the basis for your lawsuit?
8      A.  Don't recall.
9      Q.  Have you told me everything that you can
10  recall about what happened while you were lying
11  face down on the ground?
12     A.  Yes, ma'am.
13     Q.  Okay.  How long were you lying in the
14  mud?
15     A.  I don't recall exactly how long.
16     Q.  Can you estimate?
17     A.  No, ma'am.  Because I don't know exactly
18  how long it was.
19     Q.  Okay.  So I mean, did you have any sense
20  of time while you were laying in the mud?
21     A.  No, ma'am.
22     Q.  So you don't know if it was longer than
23  five minutes?
24     A.  No, ma'am.  It wasn't longer than five
25  minutes.

Page 85

1      Q.  It wasn't longer than five minutes?
2      A.  No.
3      Q.  Okay.  So was it longer than three
4  minutes?
5      A.  Yes, ma'am.
6      Q.  So you were on the ground for somewhere
7  between three and five minutes?
8      A.  Yes, ma'am.
9      Q.  Okay.  What happened after you were --
10  after you were no longer lying in the mud?  What
11  was the first thing that happened?
12      A.  They lift me up, took me to the cruiser.
13      Q.  Okay.  How many officers were involved
14  in lifting you up?
15      A.  I think it was two.  I really can't
16  tell.  I don't --
17      Q.  Okay.  Do you recall what any of these
18  officers looked like?
19      A.  One of them was Black and the other one
20  was White.
21      Q.  So you're describing two officers?
22      A.  Yeah.
23      Q.  Okay.  So was it only two officers then
24  that lifted you up and --
25      A.  I think so.

Page 86

1      Q.  Okay.  Was the White officer the same
2  one that you think is Murphy?
3      A.  I don't recall.  I don't think -- I
4  don't think it was the same one that lift me up.
5      Q.  So you think it was somebody other than
6  Murphy that lifted you up?
7      A.  Yes, ma'am.
8      Q.  Okay.  Did anything that you consider
9  improper happen in the course of lifting you up?
10      A.  The way that they lift me up.
11      Q.  Say that again?
12      A.  You said did anything improper happen
13  when they lift me up.  I said the way that they
14  lift me up.
15      Q.  Okay.  The way that they lifted you up.
16  Can you describe how they lifted you up?
17      A.  By my hands, by the cuffed part.
18      Q.  So by like your handcuffed wrists?
19      A.  Yes, ma'am.
20      Q.  Okay.  What do you think was improper
21  about that?
22      MR. DAVIS:  Objection.  Calls for an
23  expert opinion, but go ahead.
24      A.  The way that they did it.
25      Q.  Well, what was the way -- describe for

Page 87

1  me the way that they did it.
2      A.  They grabbed me by my wrists, next to
3  where the handcuffs at.  Instead of using my
4  shoulder or anything, they grabbed me by my
5  wrists and it messed up my wrists and put a scar
6  on my wrists from the cuffs.
7      Q.  Do you still have those scars?
8      A.  No, ma'am.  It was three years ago.
9      Q.  So after they lifted you up, did
10  somebody take you to a police cruiser?
11      A.  Yes, ma'am.
12      Q.  How many people took you to the police
13  cruiser?
14      A.  Just one.
15      Q.  Just one.  Can you describe that
16  officer?
17      A.  Black.
18      Q.  The Black officer did?
19      A.  Yes, ma'am.
20      Q.  Was it the same Black officer that
21  you've referred to throughout --
22      A.  Yes, ma'am.
23      Q.  -- your testimony today?  Okay.  Did the
24  Black officer do anything inappropriate, that you
25  consider inappropriate, in taking you to the

Page 88

1  police cruiser?
2      A.  I don't recall.
3      Q.  Well, I'm asking you these questions
4  today so that when we get to the trial of this
5  matter, I'm not surprised by anything that you
6  say happened.
7      A.  Yes, ma'am.
8      Q.  So do you or do you not --
9      MR. DAVIS:  For -- please don't lecture
10  my client.  If you have a question, ask the
11  question.
12      MS. LANGEN:  I'm not lecturing him, I'm
13  just telling him the point of the question.
14      MR. DAVIS:  He understands the point of
15  the questioning.
16      MS. LANGEN:  Okay.
17      MR. DAVIS:  I've prepped him for his
18  deposition so just ask the question so that we
19  can proceed, please.
20      MS. LANGEN:  As a preface to the
21  question, I need him to understand why I'm asking
22  the question.
23  BY MS. LANGEN:
24      Q.  So I don't want to be surprised by
25  anything at trial, so I need to know everything

Page 89

1  that you're basing your lawsuit on. One of those
2  things that I've asked you about is the time
3  between the time you were lifted up and the time
4  you were taken to the police car. So tell me
5  everything that you're basing your lawsuit on
6  that happened in that time frame.
7      MR. DAVIS: Objection, confusing.
8  Objection, ambiguous. Objection, calls for
9  speculation.
10     Q. You can answer the question.
11     A. Well, what I said, the way that they
12  lift me up, I felt it was improper.
13     Q. Right. Right. I'm talking about what
14  the Black officer did in leading you to the
15  police cruiser from the time that you got picked
16  up.
17     A. I don't recall. After that point, I
18  don't know what was being done. I don't
19  remember.
20     Q. Do you know who Officer Doug Ullrich is?
21     A. Yes, ma'am.
22     Q. What does Doug Ullrich look like?
23     A. Tall, skinny.
24     Q. What is his skin color?
25     A. White.

Page 90

1      Q. What do you remember about his hair?
2      A. I don't.
3      Q. How old do you think Officer Ullrich is?
4      A. I don't...
5      Q. Is there anything that you consider
6  distinctive about Officer Ullrich?
7      A. Not that -- not right off back, no,
8  ma'am.
9      Q. Do you contend that Officer Ullrich was
10  present during your interaction with Covington
11  police officers at the apartment on New Year's
12  Day of 2021?
13     A. I don't recall.
14     Q. You don't recall if he was there?
15     A. I -- I believe he was there, but I don't
16  recall what his -- what was his part in any of
17  the things.
18     Q. Okay. So do you realize that Officer
19  Ullrich is one of the officers that you've sued
20  in this lawsuit?
21     A. Um-hmm.
22     Q. And you have no recollection of what he
23  may have done or not done on New Year's Day of
24  2021; is that right?
25     A. Yes, ma'am.

Page 91

1      Q. Okay. Do you have a recollection of
2  seeing Officer Ullrich --
3      A. Yes, ma'am.
4      Q. -- in the apartment on New Year's Day of
5  2021?
6      A. Yes, ma'am.
7      Q. Okay. Where was Officer Ullrich when
8  you first saw him at the apartment that day?
9      A. By his cruiser, I think.
10     Q. So in the parking lot?
11     A. Yes, ma'am.
12     Q. Okay. Did you see him in the apartment
13  at all?
14     A. Not that I recall.
15     Q. Other than in the parking lot near his
16  cruiser, do you have a specific recollection of
17  seeing Officer Ullrich at all on New Year's Day
18  of 2021?
19     A. Not that I recall.
20     Q. You do not have a specific recollection
21  of --
22     A. No, ma'am.
23     MR. DAVIS: Objection. Let me object.
24  Object, compound. Object, confusing. Object,
25  misstates testimony.

Page 92

1      Q. Do you have a specific recollection of
2  seeing Officer Ullrich anywhere on New Year's Day
3  of 2021, other than in the cruiser -- or, sorry,
4  in the parking lot near his cruiser -- of the
5  apartment complex?
6      A. I don't recall. I'm sorry.
7      Q. You do not have a -- do you or do you
8  not have a specific recollection of that?
9      MR. DAVIS: Objection. Asked and
10  answered.
11     Q. You can answer the question.
12     A. I'm trying to think. Not right off
13  back. I know it was a bunch of cops, and I
14  believe he arrested Yusef.
15     Q. Did you see him arrest Yusef?
16     A. I believe so.
17     Q. Where was he when he arrested Yusef?
18     A. Yusef got arrested when I was in the --
19  face down in the mud.
20     Q. So you didn't see that; is that right?
21     A. I didn't.
22     Q. You did not?
23     A. No, ma'am.
24     Q. Okay. So either you do or you do not
25  have a specific recollection of seeing Officer

23 (Pages 89 to 92)

Page 93

```
 1   Ullrich.
 2        A.  I remember seeing him, but I don't...
 3        Q.  Okay.  Where did you see him?
 4        MR. DAVIS:  Objection.  Asked and
 5   answered.
 6        Q.  You can answer.
 7        MR. DAVIS:  My client has already
 8   answered your question.
 9        Q.  You can answer.
10        A.  I said I seen him by the cruiser.
11        Q.  Okay.  And that was in the parking lot
12   of the complex; right?
13        A.  Yes, ma'am.
14        Q.  Okay.  And do you have a specific
15   recollection of seeing him anywhere else other
16   than in the parking lot near his cruiser?
17        A.  That's the same question you just asked
18   me.
19        Q.  Do you know what a specific recollection
20   is?
21        MR. DAVIS:  Objection.  Objection, asked
22   and answered.  Objection, argumentative.
23        Q.  When I say specific recollection, I'm --
24   I mean, do you, as you sit here today, remember
25   seeing Officer Ullrich?  So with that in mind, do
```

Page 94

```
 1   you have a specific recollection of having seen
 2   Officer Ullrich in the apartment on New Year's
 3   Day of 2021?
 4        MR. DAVIS:  Objection.  Asked and
 5   answered.  My client has already --
 6        MS. LANGEN:  No, he keeps saying he
 7   doesn't know.  There's an answer to that
 8   question.  He either specifically remembers or he
 9   does not specifically remember.
10        MR. DAVIS:  He said he did not recall
11   that.
12        MS. LANGEN:  That's not answering.  It's
13   a yes or no question.
14        MR. DAVIS:  That's his answer.
15   BY MS. LANGEN:
16        Q.  Do you, as you sit here today, remember
17   seeing Officer Ullrich other than in the parking
18   lot of the apartment complex?
19        A.  I really don't recall.  It's -- it was a
20   bunch of cops.  I know Ullrich was there, but I
21   don't recall seeing exactly what he was doing and
22   stuff.
23        Q.  Okay.  When you looked at the video of
24   this New Year's Day 2021 event, did you see
25   Officer Ullrich anywhere on the video?
```

Page 95

```
 1        A.  No, ma'am.
 2        Q.  Okay.  What was Officer Ullrich doing
 3   when he was next to his cruiser in the parking
 4   lot?
 5        A.  I don't recall exactly what he was
 6   doing.  I was being shoved in the police car by
 7   that time.
 8        Q.  Who put you in the police car?
 9        A.  The Black cop.
10        Q.  The Black cop.  Okay.  In your
11   estimation, did the police -- did the Black
12   officer do anything that you consider improper in
13   putting you into the police cruiser?
14        A.  Not that I recall.
15        Q.  So either you consider something he did
16   improper or you don't consider something he did
17   improper.
18        Do you consider -- yes or no, did he do
19   something improper?
20        MR. DAVIS:  Objection, confusing.
21   Objection, ambiguous.  Objection, vague.
22        Q.  You can answer the question.
23        MR. DAVIS:  Objection, argumentative.
24        A.  I don't recall because I don't know
25   police policy on how they supposed to put people
```

Page 96

```
 1   in the car.
 2        MR. DAVIS:  And can we take a break at
 3   this time?
 4        MS. LANGEN:  Yeah.  Let's take a break.
 5        MR. DAVIS:  Thank you.
 6        (Brief recess.)
 7   BY MS. LANGEN:
 8        Q.  Mr. Wynn, when we left off we were
 9   talking about the manner in which the Black
10   officer put you into the police cruiser.
11        A.  Um-hmm.
12        Q.  Did he push you?
13        A.  Yes, ma'am.
14        Q.  With how much force?
15        A.  With a lot.  I actually bumped my head
16   on the top of the cruiser.  And my wrists, from
17   the cuffs, were swollen.  I actually had pictures
18   of it.
19        Q.  You do?
20        A.  I had.  I don't -- I don't know if I've
21   still got them.
22        Q.  If you still have them somewhere, can
23   you produce them to your attorney so he can
24   produce them to us?
25        A.  Yes, ma'am.
```

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 97

1   Q.  Thank you.  As far as the cuffs go, did
2  you tell anybody they were too tight or --
3   A.  Yes, ma'am.
4   Q.  Who did you tell?
5   A.  I told an officer.
6   Q.  Which officer?
7   A.  The Black officer.
8   Q.  Oh, the Black officer, okay.  And I
9  assume you did that at some point while he was
10 walking you from the location where you were in
11 the mud up to the cruiser; correct?
12  A.  Yes, ma'am.
13  Q.  Okay.  Did he kick you at all while he
14 was putting you into the cruiser?
15  A.  No, ma'am.  He didn't kick me.
16  Q.  Did he punch you?
17  A.  Not that -- no, ma'am.  Not that I
18 recall.  I know that he was shoving me hard in
19 the cruiser.
20  Q.  Okay.  Back to Officer Ullrich, do you
21 contend that Officer Ullrich did anything to
22 violate your rights in any way on New Year's Day
23 of 2021?
24  A.  Not that I recall.
25  Q.  Not that you recall, okay.  Do you know

Page 98

1  who officer Danny Elsbernd is?
2   A.  Yes, ma'am.  He was one of the officers
3  that was involved.
4   Q.  Okay.  What does Officer Elsbernd look
5  like?
6   A.  Kind of chubby, tall.
7   Q.  Tall and kind of chubby?
8   A.  Yes, ma'am.
9   Q.  How tall?
10  A.  Full beard.
11  Q.  I'm sorry.  How tall do you think he is?
12  A.  I don't -- probably 6'2", 6 foot.
13  Q.  What do you remember about his hair, if
14 anything?
15  A.  I don't.  I think he had a full beard.
16  Q.  Okay.  So facial hair.  A full beard;
17 correct?
18  A.  (Witness nodded head.)
19  Q.  Can you answer out loud?
20  A.  Yes, ma'am.
21  Q.  Thank you.  How old do you think Officer
22 Elsbernd is?
23  A.  Older.
24  Q.  Older than the average officer?
25  A.  Um-hmm.

Page 99

1   Q.  Was there anything distinctive that you
2  can remember about Officer Elsbernd other than
3  what you said was the full beard?
4   A.  No, ma'am.
5   Q.  Do you contend that Officer Elsbernd was
6  present during your interaction with Covington
7  police officers at the Promontory Drive apartment
8  on New Year's Day of 2021?
9   A.  I do not recall if he was like doing
10 anything, but I'm pretty sure he was there.
11  Q.  What makes you say you are pretty sure
12 he was there?
13  A.  Because I remember seeing him.
14  Q.  Where do you -- where -- okay.
15     Where were you when you first saw
16 Officer Elsbernd?
17  A.  Coming out of the back room, I think.
18  Q.  Coming out of the bedroom?
19  A.  Um-hmm.
20  Q.  Where was Officer Elsbernd when you --
21 or the person who you think is Officer Elsbernd
22 when you first saw him?
23  A.  Standing next to the other officers.
24  Q.  Standing next to which other officers?
25  A.  The Black cop and the other -- Murphy

Page 100

1  and the other cops.
2   Q.  Okay.  So if I remember correctly, you
3  said you thought there were three officers who
4  called you out of the back bedroom?  Was it three
5  or four?
6   A.  Four.
7   Q.  Okay.  So are you saying that Officer
8  Elsbernd was one of the four?
9   A.  I think so.
10  Q.  Okay.  Can you put an E on the sketch to
11 show me where you -- where approximately Officer
12 Elsbernd was when you first saw him?
13  A.  (Witness complied.)
14  Q.  Okay.  Did you see Officer Elsbernd in
15 any other place in the apartment that day?
16  A.  Not that I recall.
17  Q.  What was Officer Elsbernd doing when you
18 first saw him?
19  A.  Standing next to the other officers.
20  Q.  Just standing there?
21  A.  (Witness nodded head.)
22  Q.  Was he saying anything?
23  A.  Come out of the back room.
24  Q.  Was he doing anything?
25  A.  Not that I recall.

Barlow Reporting & Video Services, LLC
(859) 261-8440

1    Q.  Did he touch you in any way?
2    A.  Not that I recall.
3    Q.  Okay.  Did he speak directly to you
4  other than saying come out of the room?
5    A.  No.
6    Q.  Did he -- you put an E on the sketch, as
7  I asked you to, to signify where Officer Elsbernd
8  was when you first saw him; correct?
9    A.  Yes, ma'am.
10    Q.  Okay.  Did he basically stay in that
11  space the whole time that you saw him?
12    A.  Not that I recall.  Like I said, once I
13  came out from the back, it was pretty much a
14  tussle.  From there I couldn't recall where
15  exactly everybody was standing.  I'm too busy
16  with worrying about not getting killed in there.
17    Q.  Is it your contention that Officer
18  Elsbernd was in the apartment the whole time that
19  this was -- that these events were going on?
20    A.  Not that I recall.  I don't know what he
21  did, what --
22    Q.  So is it the case that you saw him where
23  you put the E on the sketch and then you didn't
24  see him again?
25    A.  Yes, ma'am.

1    Q.  Okay.  When you reviewed the videos of
2  the New Year's Day events, did you see Officer
3  Elsbernd on the videos at all?
4    A.  Not that I recall.  It's been a minute
5  since I've seen the videos.
6    Q.  Say that again.
7    A.  Not that I recall.  It's been a while
8  since I seen the videos.
9    Q.  Do you contend that Officer Elsbernd
10  personally did anything to violate your rights in
11  any way on New Year's Day of 2021?
12    A.  As far as the scuffle.  Other than that,
13  I don't recall.
14    Q.  Are you saying he was involved in the
15  scuffle?
16    A.  He could have been.
17    Q.  He could have been, but do you know for
18  sure if he was or was not?
19    A.  Not that I recall.
20    Q.  You just don't recall who was involved
21  in the scuffle; is that true?
22    A.  Yes, ma'am.
23    Q.  Okay.  So it could have been anybody;
24  right?
25    A.  Yes, ma'am.

1    Q.  Okay.  Do you know who Chief Robert
2  Nader is?
3    A.  No, ma'am.
4    Q.  Do you contend as part of this lawsuit
5  that Chief Nader was personally present during
6  your interaction with Covington police officers
7  on New Year's Day of 2021?
8    A.  I think that they had called him.
9    Q.  You think they called him?
10    A.  Um-hmm.
11    Q.  What makes you think they called him?
12    A.  Because I was asking them who -- why
13  they arrested me.  And I think he showed up.
14    Q.  You think Chief Nader showed up?
15    A.  Yes, ma'am.
16    Q.  Okay.  What -- you said you think Chief
17  Nader showed up.  What makes you think that?
18    A.  Because I was asking for the higher-ups.
19    Q.  Okay.  Do you understand that there's
20  multiple levels of supervision within the
21  Covington Police Department?
22    A.  No, ma'am.
23    Q.  You don't have any understanding of
24  that?
25    A.  No, ma'am.

1    Q.  Okay.  Did you hear anybody use the name
2  Chief Nader?
3    A.  No, ma'am.  I just know it was somebody
4  higher up that came.
5    Q.  Okay.  But you don't know who
6  specifically that was; right?
7    A.  No, ma'am.
8    Q.  You do not?
9    A.  No, ma'am.
10    Q.  Okay.  Did you see the person who showed
11  up?
12    A.  No, ma'am.
13    Q.  Do you know for a fact that somebody
14  higher up showed up?
15    A.  Not for a fact, because it could have
16  been anybody.
17    Q.  You just think that they might have
18  called -- you just think that somebody higher up
19  might have showed up because you asked for them
20  to do that?
21    A.  Yes, ma'am.
22    Q.  Okay.  You don't have any other reason
23  for thinking that somebody higher up showed up at
24  the scene?
25    A.  No, ma'am.  Not that I recall.

26 (Pages 101 to 104)

Page 105

1     Q.   When you reviewed the video of the New
2   Year's Day events, did you see Chief Nader on any
3   of those videos?
4     A.   Not that I recall.  I don't know how he
5   look.
6     Q.   You don't know what he looks like?
7     A.   No, ma'am.
8     Q.   Do you contend that Chief Nader
9   personally did anything to violate your rights in
10  any way on New Year's Day of 2021?
11    A.   Not that I recall.
12    Q.   Are you aware that the Covington Police
13  Department's response to your girlfriend's
14  apartment on New Year's Day of 2021 led to the
15  creation of numerous reports?
16    A.   No, ma'am.  Not that I recall.
17    Q.   Okay.  That's something that we have
18  produced in discovery.  You have not seen them?
19    A.   No, ma'am.
20    Q.   Can you point to any document from any
21  source to suggest that Officer Ullrich was
22  present at the apartment on New Year's Day of
23  2021?
24    A.   No, ma'am.
25    Q.   Can you point to any document from any

Page 106

1   source to suggest that Officer Elsbernd was
2   present on New Year's Day of 2021?
3     A.   No, ma'am.  Not that I recall.
4     Q.   Can you point to any document from any
5   source that would suggest Chief Nader was
6   personally present on New Year's Day of 2021?
7     A.   Not that I recall.
8     Q.   Following the events of New Year's Day
9   of 2021, you were charged with disorderly
10  conduct; is that correct?
11    A.   Yes, ma'am.
12    Q.   And you ultimately pleaded guilty to
13  that charge; is that correct?
14    A.   Yes, ma'am.
15    Q.   And you were taken to the Kenton County
16  Detention Center; is that correct?
17    A.   Yes, ma'am.
18    Q.   Were you able to bond out or make bail?
19    A.   Yes, ma'am.
20    Q.   Was that yes?
21    A.   Yes, ma'am.
22    Q.   How long were you in jail before you
23  were able to bail -- to post bail or bond?
24    A.   I don't recall exactly how long.
25    Q.   Was it a full 24 hours?

Page 107

1     A.   No, ma'am.
2     Q.   Was it eight or more hours?
3     A.   Yes, ma'am.
4     Q.   Did you eat a meal at the jail?
5     A.   No, ma'am.
6     Q.   Were you employed at the time of your
7   arrest?
8     A.   Yes, ma'am.
9     Q.   Where were you employed?
10    A.   Through the guy I was working with for
11  the home foundation.
12    Q.   David?
13    A.   Yes, ma'am.
14    Q.   And you don't remember his last name?
15    A.   No, ma'am.
16    Q.   Do you know how to get in touch with
17  him?
18    A.   No, ma'am.  I was -- I was hired through
19  a Facebook app.
20    Q.   Okay.  Were you paid with a check or
21  under the table or how?
22    A.   With a check.
23    Q.   Okay.  Did you pay taxes on whatever you
24  were paid?
25    A.   Yes, ma'am.

Page 108

1     Q.   Okay.  What tax year, 2021?
2     A.   Yes, ma'am.  No, 2020.
3     Q.   2020?
4     A.   Yes, ma'am.
5     Q.   So did you work at all in 2021 for
6   David?
7     A.   No, ma'am.  I was arrested 2021.
8     Q.   Okay.  So when was the last time that
9   you worked for David?
10    A.   Day before New Year's.
11    Q.   New Year's Eve or the day before that?
12    A.   The day before that.
13    Q.   So December 30th of 2020?
14    A.   Yes, ma'am.
15    Q.   Okay.  Do you have any documentation to
16  establish that you were working on that date?
17    A.   Check stubs.
18    Q.   Okay.  Can you locate those check stubs
19  and provide them to your attorney so he can
20  produce them to us?
21    A.   Try to.
22    Q.   You'll try to?  Is that what you're
23  saying?
24    A.   Yes, ma'am.
25    Q.   Okay.  Other than check stubs, do you

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 109

1  have any other documentation that you were
2  working for David on December 30th of 2020?
3      A.  No, ma'am.
4      Q.  Okay.  If you had been working for David
5  in 2021, was he performing any work on January
6  1st or January 2nd of 2021, if you know?
7      A.  I don't know.
8          MR. DAVIS:  Objection.  Calls for
9  speculation.
10     Q.  I'm sorry.  Did you say you don't know?
11     A.  No, ma'am.
12     Q.  What was your answer to the question?
13     A.  Can you ask the question again?
14     Q.  Yeah.  Do you know if David performed
15 any work for anybody on January 1st of 2021 or
16 January 2nd of 2021?
17     A.  Not that I recall.
18     Q.  So between the time you got out of jail
19 and January 16th of 2021, did you do any work for
20 David?
21     A.  No, ma'am.
22     Q.  Were you physically injured in any way
23 as a result of the events of New Year's Day of
24 2021?
25     A.  Yes, ma'am.

Page 110

1      Q.  Okay.  What part or parts of your body
2  were injured?
3      A.  My shoulder, my face, my wrists, and my
4  neck, and my back.
5      Q.  Okay.  We talked a little bit about your
6  shoulder before, but I want to make sure you tell
7  me everything that was wrong with your shoulder.
8  So tell me everything that was wrong with your
9  shoulder.
10     A.  Torn rotator cuff.
11     Q.  While you were at the Kenton County
12 Detention Center following your arrest, did you
13 get any medical attention for your shoulder?
14     A.  Yes, ma'am.
15     Q.  For your shoulder?
16     A.  Yes, ma'am.
17     Q.  Okay.  When did you get that medical
18 attention?
19     A.  When I was in Kenton County.
20     Q.  How soon after you arrived?
21     A.  They didn't do nothing to me until -- I
22 want to say they -- they didn't do nothing.  They
23 just came and checked me out, just left.
24     Q.  Was that specifically for your shoulder
25 or for something else?

Page 111

1      A.  For all the injuries I was complaining
2  on.
3      Q.  So when you were brought into the Kenton
4  County Detention Center, did somebody medical
5  come to look at you before they let you back into
6  a cell?
7      A.  Yes, ma'am.
8      Q.  Okay.  Did that person say anything to
9  you about what he or she observed?
10     A.  No, I don't recall exactly what she
11 said.
12     Q.  So it was a she?
13     A.  Yes, ma'am.
14     Q.  Do you remember her name?
15     A.  No, ma'am.
16     Q.  After you got out of jail, did you see a
17 doctor or nurse or any healthcare provider --
18     A.  I made a --
19     Q.  -- for treatment of your shoulder?
20     A.  I made an appointment, but I didn't get
21 to make it to the appointment.
22     Q.  Where did you make the appointment?
23     A.  UC.
24     Q.  UC.  Which location of UC?
25     A.  Cincinnati.

Page 112

1      Q.  Like the one in Clifton?  The main one
2  in Clifton --
3      A.  Yes, ma'am.
4      Q.  -- or some branch of it?
5      A.  The one in Clifton.
6      Q.  Okay.  What was your appointment for?
7      A.  17th.
8      Q.  Okay.  Do you remember which doctor you
9  had an appointment with at UC?
10     A.  I mean not the 17th, but the 18th.
11     Q.  Okay.  You had an appointment for the
12 18th.  Do you remember which doctor at UC that
13 you had an appointment with on that date?
14     A.  No, ma'am.
15     Q.  Was the doctor like a general
16 practitioner or an orthopedic guy or what?
17     A.  I just called to ask them who I would
18 speak to about my incidents.  And then that's
19 when they told me to call a certain branch --
20 well, they connected me to a certain part, a
21 physician.
22     Q.  Okay.  What specifically did you tell
23 the person that you called about the --
24     A.  About my wrists, my shoulders, my back
25 and my neck.

28  (Pages 109 to 112)

Page 113

1     Q.  So it was an appointment to address
2  generally those injuries --
3     A.  Yes, ma'am.
4     Q.  -- not just your shoulder; right?
5     A.  Yes, ma'am.
6     Q.  Did you end up seeing anybody at any
7  time for your shoulder?
8     A.  No, ma'am.  Just in Kenton County.
9     Q.  Just in Kenton County?
10     A.  Yes, ma'am.
11     Q.  How do you know you have a torn rotator
12  cuff?
13     A.  The doctor told me in Kenton County.
14     Q.  The person at Kenton County told you?
15     A.  Yes, ma'am.  The doctor.
16     Q.  Did the doctor do any MRIs or x-rays or
17  anything there?
18     A.  Yes, ma'am.
19     Q.  Okay.  Do you remember the name of the
20  doctor?
21     A.  No, ma'am.
22     Q.  I think you said your face was also
23  injured as a result of New Year's Day?
24     A.  Um-hmm.
25     Q.  How was your face injured?

Page 114

1     A.  Cuts from the glass.
2     Q.  Okay.  Where on your face were you cut?
3     A.  I don't recall exactly.  I -- I've got
4  pictures of it.
5     Q.  You have pictures of it?
6     A.  Yes, ma'am.
7     Q.  Can you provide them to your attorney?
8     A.  Yes, ma'am.
9     Q.  Thank you.  But you don't, as we sit
10  here today, remember where on your face you were
11  cut?
12     A.  No, ma'am.
13     Q.  Okay.  Did you have any scrapes or
14  bruises on your face?
15     A.  Yes, ma'am.
16     Q.  Were you bleeding?
17     A.  Yes, ma'am.  I had a cut on my face.
18     Q.  How many cuts?
19     A.  It was just like one, I think, right off
20  back.  It was like one.  I know it was one.
21     Q.  Okay.  And you think that was because of
22  the glass?
23     A.  Yes, ma'am.
24     Q.  Did your face require any medical
25  attention?

Page 115

1     A.  So as far as it being cut?
2     Q.  Yes.
3     A.  No, ma'am.
4     Q.  Okay.  You didn't get any stitches or
5  anything like that?
6     A.  No, ma'am.
7     Q.  And did you end up seeing anybody, any
8  doctor as a result of the injuries to your face?
9     A.  No, ma'am.
10     Q.  You didn't break any bones in your face,
11  did you?
12     A.  Hmm-um.
13     Q.  As far as you know?
14     A.  No, ma'am.
15     Q.  You said your wrists were also injured.
16  Describe how they were injured.
17     A.  They was swollen, bruises on them.
18     Q.  And I think you said before you might
19  have had pictures of those?
20     A.  Yes, ma'am.
21     Q.  And you are going to provide those to
22  your attorney; right?
23     A.  Yes, ma'am.
24     Q.  When you saw somebody at Kenton County
25  Detention Center -- first of all, how many times

Page 116

1  did you see somebody at Kenton County Detention
2  Center?
3     A.  A lot.
4     Q.  A lot?
5     A.  Yes, ma'am.
6     Q.  In that -- before you posted bond or
7  made bail?
8     A.  I'm sorry.  Before I posted bond?
9     Q.  Yes.
10     A.  No, ma'am.  I only seen them once before
11  I posted bond.  But I was back in there from --
12  the rest of the year.
13     Q.  Okay.  So your second stint, after the
14  January 16th incident is when you saw --
15     A.  Yes, ma'am.  The doctor.
16     Q.  -- somebody subsequently?
17     A.  Yes, ma'am.
18     Q.  Okay.  Have you ever had any -- since
19  New Year's Day of 2021, have you ever had any
20  x-rays on those wrists?
21     A.  Since the -- when?  I'm sorry.
22     Q.  Since New Year's Day of 2021.
23     A.  No, ma'am.
24     Q.  Have you, since New Year's Day of 2021,
25  had any MRIs on those wrists?

29  (Pages 113 to 116)

Page 117

1    A. No, ma'am.
2    Q. Did your wrists require any medical
3  attention?
4    A. No, ma'am. Not that I recall. I mean,
5  they was swollen, but I -- I refused to get
6  wrapped up because I didn't want to go to the
7  hole.
8    Q. You refused to get wrapped up when you
9  were at the detention center?
10    A. Yes, ma'am.
11    Q. Because why?
12    A. Because they will put you in isolation.
13    Q. Okay. And you didn't want to do that so
14  you didn't get wrapped up; right?
15    A. Yes, ma'am.
16    Q. Were you bleeding from your wrists?
17    A. No, ma'am.
18    Q. They were just bruised and swollen?
19    A. Yes, ma'am.
20    Q. Okay. You mentioned your neck. Can you
21  tell me what was injured about your neck on New
22  Year's Day of 2021?
23    A. Back of my neck.
24    Q. What was wrong with the back of your
25  neck?

Page 118

1    A. I -- I couldn't move my neck side to
2  side.
3    Q. Do you know if there were any bruises or
4  scrapes or bleeding on your neck?
5    A. Yes. I had bruises on my neck.
6    Q. How do you know you had bruises on your
7  neck?
8    A. People was telling me.
9    Q. Who told you?
10    A. The people I'd visit.
11    Q. And who were those people?
12    A. My baby momma -- well, my girlfriend, my
13  sister, my mom.
14    Q. Okay. Which sister?
15    A. Antonette.
16    Q. Antonette. Okay. Did you have any
17  medical attention for your neck?
18    A. Yes, ma'am. Well, I seen the doctor,
19  but it wasn't -- that's as far as it went.
20    Q. The doctor in the Kenton County
21  Detention Center?
22    A. Yes, ma'am.
23    Q. Okay. And was that immediately
24  following the New Year's Day events or was that
25  in your --

Page 119

1    A. After.
2    Q. -- latter stint?
3    A. After.
4    Q. Say it again?
5    A. After. It was after.
6    Q. Immediately after New Year's Day?
7    A. No. It was after that incident.
8    Q. So your stint in jail after January
9  16th?
10    A. Yes.
11    Q. Okay. Gotcha. And you mentioned your
12  back. So tell me what was wrong with your back.
13    A. Like I couldn't move. It was stiff and
14  it was pain down at the bottom of the back. And
15  then right here at the bottom of my neck where my
16  back begin, pain.
17    Q. Okay. You said your lower back?
18    A. Yes, ma'am.
19    Q. On the right or left side?
20    A. Right side.
21    Q. Okay. Did you have any bruises or
22  scrapes or cuts?
23    A. Not that I recall.
24    Q. Did you break any bones?
25    A. No, ma'am.

Page 120

1    Q. Did you have any x-rays?
2    A. No, ma'am.
3    Q. Did you have any MRI of your back?
4    A. No, ma'am.
5    Q. Did you have any MRI of your neck?
6    A. No, ma'am.
7    Q. Other than any treatment you may have
8  received during your second stint in the Kenton
9  County Detention Center after the January 16th
10  events, did you see a doctor for your neck or
11  your back?
12    A. Yes, ma'am.
13    Q. When did you see that?
14    A. I signed up on sick call and then the
15  doctor came. It was after the January 16th.
16    Q. After January 16th?
17    A. Um-hmm.
18    Q. Okay. But when you were in jail New
19  Year's Day, like immediately following the New
20  Year's Day arrest, did you see any doctors or
21  nurses for your neck or back at that point?
22    A. I seen the nurse, but then that was --
23  that's it. I didn't get to see the doctor
24  because the doctor didn't come until Wednesday.
25    Q. Okay. And was that, again, when the

Page 121

1 nurse came to see you when you were first brought
2 into the jail?
3    A.  Yes, ma'am.
4    Q.  Okay.  Did you spend any money on
5 medical care for your shoulder, face, wrists,
6 neck or back?
7    A.  No, ma'am.
8    Q.  Did you sustain any emotional injuries
9 as a result of the events of New Year's Day of
10 2021?
11    A.  Yes, ma'am.
12    Q.  Can you describe the emotional injuries
13 you claim to have sustained?
14    A.  Excuse me?
15    Q.  Can you describe the emotional injuries
16 that you claim to have sustained?
17    A.  Like emotional?
18    Q.  Yeah.
19    A.  Like I -- I pretty much got PS -- PTSD
20 and, you know, I'm scared of police officers now.
21 I -- every time I get interacted with them, I
22 think it's going to be the same thing, that I'm
23 going to get beat up, something, and -- pretty
24 much it.
25    Q.  Okay.

Page 122

1    A.  It's hard to explain it, make any sense.
2    Q.  That makes sense.  Have you sought any
3 treatment from a healthcare professional for
4 these emotional injuries?
5    A.  No, ma'am.
6    Q.  Have you incurred any out-of-pocket
7 costs in connection with your emotional injuries?
8    A.  No, ma'am.
9    Q.  Prior to January of 2021, had you ever
10 been treated for emotional injuries before?
11    A.  No, ma'am.
12    Q.  Any kind of mental health care?
13    A.  No, ma'am.
14    Q.  Who -- who was your doctor that you
15 would go to just for, I don't know, like an ear
16 infection or a cold or something before --
17    A.  I didn't have one.
18    Q.  -- before New Year's Day of 2021?
19    A.  I didn't have one.
20    Q.  You didn't have one?
21    A.  No, ma'am.
22    Q.  Okay.  Let's switch gears and talk about
23 January 16th of '21.
24    A.  Yes, ma'am.
25    Q.  2021.  Do you remember what day of the

Page 123

1 week that was?
2    A.  No, ma'am.
3    Q.  Okay.  I'm just going to represent to
4 you that when I was preparing for this
5 deposition, I looked at a calendar from 2021 and
6 January 16th was a Saturday; okay?
7    A.  (Witness nodded head.)
8    Q.  So your lawsuit alleges that you went
9 for a haircut at a barber shop on 12th Street and
10 Greenup in Covington at 10:30 p.m.  Would that
11 have been the day before January 16th?
12    A.  (Witness nodded head.)
13    Q.  Okay.  So January 15th; right?
14    A.  Yes, ma'am.
15    Q.  So that would have been Friday, January
16 15th, at 10:30 approximately --
17    A.  Yes, ma'am.
18    Q.  -- that you were in the barber shop;
19 right?
20    A.  Yes, ma'am.
21    Q.  Okay.  You've got to let me finish my
22 question --
23    A.  Okay.
24    Q.  -- before you start your answer; okay?
25    A.  Yes, ma'am.

Page 124

1    Q.  What is the name of the barber shop you
2 were visiting?
3    A.  I don't remember what was the name of
4 it.
5    Q.  Do you remember the name of the barber?
6    A.  No, ma'am.
7    Q.  Do you happen to remember the barber
8 shop's normal hours back in January of 2021?
9    A.  No, ma'am.  It was like a -- it was like
10 a cut party like.  There was a bunch of people
11 there that I knew and they was cutting
12 everybody's hair.
13    Q.  I'm not familiar with cut parties.  What
14 is that?
15    A.  It's where you -- when people come in,
16 not at -- like they go all day, music playing,
17 you know what I'm saying?
18    Q.  So are you saying that was outside of
19 the typical hours for the barber shop?
20    A.  Yes, ma'am.
21    Q.  Okay.  Do you know if that barber shop
22 is still there?
23    A.  No, ma'am.  It got shut down.
24    Q.  So according to your lawsuit, after the
25 haircut was finished at around 11:45, you and

## Page 125

```
1    some friends decided to go to a bar but the bar
2    was closed when you arrived.
3         Do you remember that?
4         A.  Yeah, but that's not -- the bar wasn't
5    closed.  It was at capacity.
6         Q.  Oh, it was at capacity, okay.  I'm
7    sorry, it said closed in the lawsuit.
8         So for whatever reason, you were denied
9    admittance to that bar?
10        A.  Yes, ma'am.
11        Q.  Okay.  What was the name of that bar?
12        A.  Twelfth Street.
13        Q.  Twelfth Street.  That's just the name of
14   it?
15        A.  Yes, ma'am.
16        Q.  Okay.  Is that still there?
17        A.  Yes, ma'am.
18        Q.  Your lawsuit alleges that you and your
19   friends decided to part ways and go home once you
20   found out you couldn't get into that bar.
21        Okay.  Do you remember that?
22        A.  Yes, ma'am.
23        Q.  Okay.  What address were you living at
24   on January 16th of 2021?
25        A.  Washington.
```

## Page 126

```
1         Q.  And is that where you were headed after
2    you found out that you couldn't get into the bar?
3         A.  Yes, ma'am.
4         Q.  The lawsuit says that you had been with
5    Yusef, Ricardo, Matthew, Michael, James, and
6    Cameron before you decided to part ways and go
7    home.
8         Do you remember them being there?
9         A.  Yes, ma'am.
10        Q.  And is Yusef, Yusef Davis who was also
11   present on January 1st?
12        A.  Yes, ma'am.
13        Q.  Where did Yusef live back in January of
14   2021?
15        A.  With me.
16        Q.  Say again?
17        A.  With me.
18        Q.  With you?
19        A.  Yes, ma'am.
20        Q.  On Washington Avenue?
21        A.  Yes, ma'am.
22        Q.  Okay.  Where does Yusef live now?
23        A.  I don't know.
24        Q.  How long had Yusef been living with you
25   prior to January 16th of 2021?
```

## Page 127

```
1         A.  Almost a half a year.  Like six months.
2         Q.  Six months or so, okay.  How do you know
3    Yusef?
4         A.  He's a Muslim brother of mine.
5         Q.  What do you mean by Muslim brother?
6         A.  He's a Muslim.
7         Q.  Okay.  He's just a person with the same
8    religion as you?
9         A.  Yes, ma'am.
10        Q.  Did you meet him -- I don't know what
11   they call the Muslim place of worship.  Temple?
12        A.  The mosque.
13        Q.  The mosque.  Thank you, I was missing
14   it.
15        Do you go to the same mosque?
16        A.  Yes, ma'am.
17        Q.  What mosque is that?
18        A.  On 13th in Covington.
19        Q.  13th Street in Covington?
20        A.  I mean Garrard, I'm sorry, in Covington.
21        Q.  Garrard Street?
22        A.  Yes, ma'am.
23        Q.  Are you still in touch with Yusef?
24        A.  No, ma'am.
25        Q.  When was the last time you spoke with
```

## Page 128

```
1    Yusef?
2         A.  I can't recall.  It's been a while.
3         Q.  Okay.  You don't know how to get in
4    touch with him now?
5         A.  No, ma'am.
6         Q.  And is Ricardo who was with you on
7    January 16th, the same Ricardo who was with you
8    on January 1st?
9         A.  It's his brother.
10        Q.  It's his brother?
11        A.  Yes, ma'am.
12        Q.  So what is Ricardo's last name?
13        A.  Hollis.
14        Q.  So there are -- are there two Ricardo
15   Hollises?
16        A.  No, ma'am.  There's Ricco and then
17   Ricardo.
18        Q.  Okay.  So Ricco was with you on January
19   1st and Ricardo was with you on the 16th?
20        A.  Yes, ma'am.
21        Q.  And they're brothers?
22        A.  Yes, ma'am.
23        Q.  Okay.  Where did Ricco live back in
24   January of 2021?
25        A.  I do not recall.
```

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 129

1    Q.   You don't know?
2    A.   No, ma'am.
3    Q.   Do you know what part of town he lived
4  in?
5    A.   Newport.
6    Q.   You don't know what street?
7    A.   No, ma'am.
8    Q.   Does Ricco still live in Newport as far
9  as you know?
10   A.   I don't recall.
11   Q.   Do you know how to get in touch with him
12 now?
13   A.   No, ma'am.
14   Q.   When was the last time you spoke with
15 Ricardo?
16   A.   Friday.
17   Q.   This past Friday?
18   A.   Yes, ma'am.
19   Q.   What did you talk about this past
20 Friday?
21   A.   Why he's in jail.
22   Q.   Oh, he's in jail?
23   A.   Yes, ma'am.
24   Q.   He's in this jail?
25   A.   Yes, ma'am.

Page 130

1    Q.   So did you see him in person, I'm
2  assuming?
3    A.   Yes, ma'am.
4    Q.   Do you know how long he's been in the
5  Campbell County Detention Center?
6    A.   Since Friday.
7    Q.   Just this Friday?
8    A.   (Witness nodded head.)
9    Q.   Do you know where he lived before he got
10 here?
11   A.   No, ma'am.
12   Q.   Before Friday, when was the last time
13 you had spoken with him?
14   A.   I don't recall.
15   Q.   Have you spoken with him about the
16 events of January 16th, after the fact?
17   A.   No, ma'am.
18   Q.   Okay.  Have you spoken with him at all
19 since January 16th of 2021?
20   A.   Yes, ma'am.
21   Q.   When?
22   A.   I don't recall exactly when.
23   Q.   Was it closer in time to January 16th of
24 2021 or closer in time to today?
25   A.   Closer to today.

Page 131

1    Q.   Okay.  So Matthew, who was with you on
2  January 16th of 2021, what was his last name?
3    A.   I don't recall.
4    Q.   Did you ever know his last name?
5    A.   No, ma'am.
6    Q.   Do you know where Matthew lived back in
7  January of 2021?
8    A.   No, ma'am.
9    Q.   Do you know where he lives today?
10   A.   No, ma'am.
11   Q.   Do you know how to get in touch with him
12 today?
13   A.   No, ma'am.
14   Q.   How did you know Matthew?
15   A.   He was a Muslim brother.
16   Q.   Did he go to the same mosque?
17   A.   Yes, ma'am.
18   Q.   Was he someone you hung out with
19 regularly?
20   A.   Yes, ma'am.
21   Q.   When was the last time you talked with
22 Matthew?
23   A.   I don't recall.  It's been a while.
24   Q.   All right.  Was it soon after the
25 January 16th event?

Page 132

1    A.   Um-hmm.  Yes, ma'am.
2    Q.   What is Michael's last name?
3    A.   I don't recall.
4    Q.   How did you know Michael?
5    A.   Muslim brother.
6    Q.   Same mosque?
7    A.   Yes, ma'am.
8    Q.   Do you know where Michael lived back in
9  January of 2021?
10   A.   No, ma'am.
11   Q.   Do you know where he lives now?
12   A.   No, ma'am.
13   Q.   Do you know how to get in touch with
14 him?
15   A.   No, ma'am.
16   Q.   Do you know when the last time you
17 talked with him was?
18   A.   No, ma'am.
19   Q.   Was it soon after January 16th of 2021?
20   A.   Yes, ma'am.
21   Q.   That's the last time you talked with
22 him?
23   A.   Yes, ma'am.
24   Q.   What is your friend James' last name?
25   A.   I don't recall.

33 (Pages 129 to 132)

Page 133

1    Q.  Did you ever know James' last name?
2    A.  No, ma'am.
3    Q.  Do you know where James lived in January
4  of 2021?
5    A.  No, ma'am.
6    Q.  Do you know where he lives now?
7    A.  Hmm-um.
8    Q.  Are you still in touch with James?
9    A.  No, ma'am.
10    Q.  When was the last time you spoke with
11  him?
12    A.  It's been a while.
13    Q.  Was it closer to January 16th of 2021?
14    A.  Yes, ma'am.
15    Q.  And that was the last time you spoke
16  with him?
17    A.  Yes, ma'am.
18    Q.  What is Cameron's last name?
19    A.  I don't recall.  I don't -- I don't
20  remember it.
21    Q.  Did you ever know it?
22    A.  Yes, ma'am.
23    Q.  Is Cameron male or female?
24    A.  Male.
25    Q.  Okay.  I've seen it as a girl's name,

Page 134

1  too, so I didn't know.
2    Do you know where Cameron lived back in
3  January of 2021?
4    A.  Newport.
5    Q.  Did he live with Ricardo?
6    A.  No, ma'am.
7    Q.  Where does Cameron live now?
8    A.  I don't know.
9    Q.  Have you lost touch with him?
10    A.  Yes, ma'am.
11    Q.  When was the last time you spoke with
12  Cameron?
13    A.  I don't know.  2021.
14    Q.  Besides Yusef and Ricardo, Matthew,
15  Michael, James, and Cameron, was anyone else with
16  you when you tried to go to that bar on the 16th?
17    A.  Yes, ma'am.
18    Q.  Who?
19    A.  I don't remember -- recall right off
20  back.  There was citations, they should have been
21  in the report.
22    Q.  So you believe that those people were --
23  are on the -- are listed on the uniform citation
24  connected to January 16th of 2021?
25    A.  Yes, ma'am.

Page 135

1    Q.  Have you seen that citation?
2    A.  Yes, ma'am.
3    Q.  So did you recognize their names on the
4  report?
5    A.  Yes, ma'am.
6    Q.  Did you know of anybody who was with you
7  on January 16th when you tried to go to that bar
8  that was not listed on the uniform citation?
9    A.  No, ma'am.
10    Q.  No?
11    A.  No, ma'am.
12    Q.  Okay.  Was someone named Kayla with you
13  when you tried to go to that bar?
14    A.  Yes, ma'am.
15    Q.  What's Kayla's last name?
16    A.  Hoffman.
17    Q.  Hoffman?
18    A.  Yes, ma'am.
19    Q.  H-O-F-F-M-A-N?
20    A.  Yes, ma'am.
21    Q.  Where did Kayla live back in January
22  2021?
23    A.  Covington.
24    Q.  Do you know where in Covington?
25    A.  Lee Street.

Page 136

1    Q.  Do you know the specific number?
2    A.  No, ma'am.
3    Q.  Do you know where Kayla lives now?
4    A.  No, ma'am.
5    Q.  How did you know Kayla?
6    A.  She was a friend of my girlfriend's.
7    Q.  A friend of Dashon's?
8    A.  Yes, ma'am.
9    Q.  Do you know if those two are still
10  friends?
11    A.  Yes, ma'am.
12    Q.  Okay.  Do you know how to get in touch
13  with Kayla Hoffman?
14    A.  No, ma'am.
15    Q.  Have you talked to Kayla Hoffman since
16  January 16th of 2021?
17    A.  Yes, ma'am.
18    Q.  When was the last time you talked with
19  her?
20    A.  It's been a while, 2021.
21    Q.  So closer to the events of January 16th,
22  2021?
23    A.  Yes, ma'am.
24    Q.  Was Kayla one of the friends of Dashon
25  that was present on New Year's Day of 2021?

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 137

1      A.  No, ma'am.
2      Q.  Okay.  Was your girlfriend also with
3    you, Dashon, when you tried to get into the bar?
4      A.  Yes, ma'am.
5      Q.  Does she still live at Promontory Drive
6    in Covington?
7      A.  No, ma'am.
8      Q.  Where does she live now?
9      A.  She moved.  She just moved.  I don't got
10   the address.
11     Q.  Somewhere still in Covington or
12   elsewhere?
13     A.  Yes, ma'am, still in Covington.
14     Q.  When did she move from there?
15     A.  Here recently.
16     Q.  Okay.  Is she still your girlfriend?
17     A.  Yes, ma'am.
18     Q.  Okay.  So when you said that you and
19   your friends all decided to leave and part ways
20   and go home, did you mean that your group split
21   up and left in different cars?
22     A.  Yes, ma'am.
23     Q.  Did anyone leave in the same car as you?
24     A.  Yes, ma'am.
25     Q.  Who left in the same car as you?

Page 138

1      A.  Kayla, Dashon, and Yusef.
2      Q.  Whose car were you in?
3      A.  My mom's car.
4      Q.  Your mom's car?
5      A.  Yes, ma'am.
6      Q.  And who was driving that car?
7      A.  Kayla.
8      Q.  Where were you sitting in the car?
9      A.  Behind Kayla.
10     Q.  So driver's side back?
11     A.  Yes, ma'am.
12     Q.  At some point was your car stopped by
13   the police?
14     A.  Yes, ma'am.
15     Q.  When your car was first stopped, how
16   many police officers were present?
17     A.  I don't recall.
18     Q.  When did you first notice that a police
19   cruiser was behind -- was trying to stop you?
20     A.  When the lights came on.
21     Q.  Was a siren used?
22     A.  I don't recall.
23     Q.  Did Kayla pull over immediately?
24     A.  Yes, ma'am.
25     Q.  Where did Kayla pull the car over to?

Page 139

1      A.  12th Street.
2      Q.  Okay.  Was there a nearby cross street?
3      A.  12th and Wheeler.
4      Q.  Can you spell that other name?
5      A.  W-H-E-E-L-E-R.
6      Q.  Wheeler, okay.  Gotcha.  Any landmarks
7    nearby there where she stopped?
8      A.  The bridge.
9      Q.  The bridge?
10     A.  (Witness nodded head.)
11     Q.  So it was close to the bridge.  Gotcha.
12        Once Kayla pulled over, did an officer
13   approach your car?
14     A.  Yes, ma'am.
15     Q.  Was it just one officer or were there
16   more?
17     A.  More.
18     Q.  So the officer that first approached
19   your car, what did that officer look like?
20     A.  It was Murphy.
21     Q.  It was Murphy.  Describe what that --
22   regardless of the name, describe what the officer
23   looked like.
24     A.  Short.  Short.  That's all I can
25   remember.

Page 140

1      Q.  White?
2      A.  White.
3      Q.  Anything else distinctive about that
4    officer that you can recall?
5      A.  No, ma'am.
6      Q.  How did you know it was Officer Murphy?
7      A.  His name tag.
8      Q.  Okay.  Was this something that you knew
9    at the time when he stopped you or was it
10   something you learned from watching video?
11     A.  Something I knew at the time when he
12   stopped me.
13     Q.  Okay.  What was the first thing that
14   Murphy said to somebody in the car when he first
15   approached?
16     A.  He asked them for their names.
17     Q.  Did he speak directly with Kayla before
18   he spoke with anybody else?
19     A.  No, ma'am.
20     Q.  So he just walked up and asked everybody
21   in the car for their names?
22     A.  Yes, ma'am.
23     Q.  No conversation prior to that?
24     A.  No, ma'am.
25     Q.  You said there were multiple officers on

35 (Pages 137 to 140)

Page 141

1    the scene.  Where were those officers when Murphy
2    was asking you -- everybody for their names?
3        A.  Surrounding the car.
4        Q.  Say again?
5        A.  They surrounded the car.
6        Q.  Around the car?
7        A.  (Witness nodded head.)
8        Q.  And can you describe that more
9    specifically, like where around the car?
10       A.  Just surrounded the car, they -- cops
11   surrounded car, they was then looking --
12       Q.  So how many officers were around the
13   car?
14       A.  I don't recall exactly how many.  It was
15   a lot there.
16       Q.  Okay.  And I'm still talking about when
17   that -- when Murphy came up and said the first
18   words to the people in your car.
19       A.  Yes, ma'am.
20       Q.  Okay.  Your recollection is multiple
21   officers surrounding the car at that time?
22       A.  Yes, ma'am.
23       Q.  Okay.  Were you wearing a seat belt at
24   that point?
25       A.  No, ma'am.

Page 142

1        Q.  Up to the point in time when Murphy
2    asked everybody for their names, had you said
3    anything to the officers?
4        A.  Before or?
5        Q.  Up to that point, so before.  Before
6    Murphy said I need your names, or whatever he
7    said -- however he said it, had you said anything
8    to him?
9        A.  No, ma'am.
10       Q.  Had you said anything to any of the
11   other officers on the scene?
12       A.  No, ma'am.
13       Q.  Can you describe the other officers who
14   were surrounding the car at that point?
15       A.  No, ma'am.
16       Q.  Can you say anything about what color --
17   like what race they were or --
18       A.  They was White.
19       Q.  They were all White?
20       A.  Yes, ma'am.
21       Q.  Okay.  Were they all male?
22       A.  Yes, ma'am.
23       Q.  And beyond that, you can't remember?
24       A.  No, ma'am.
25       Q.  Up to the point in time where Murphy

Page 143

1    asked for everybody's names, had anybody besides
2    you said anything to him?
3        A.  Yes.
4        Q.  Who?
5        A.  The driver.
6        Q.  Kayla.  What did Kayla say?
7        A.  I don't recall exactly what she said.
8        Q.  But the first thing that Murphy did was
9    ask everybody for their names.  Is that what you
10   said?
11       A.  Yes, ma'am.
12       Q.  So --
13       A.  That's what I recall.
14       Q.  Okay.  So did -- if Kayla spoke to him
15   before he said that, does that mean that she was
16   the first to speak?
17       A.  Yes, ma'am.
18       Q.  Okay.  So when the officer that you said
19   is Murphy, when he asked for everybody's name,
20   did you give him a name?
21       A.  Yes, ma'am.
22       Q.  What name did you give him?
23       A.  My brother's.
24       Q.  Ronnie?
25       A.  Yes.

Page 144

1        Q.  Ronnie Wynn.  Did you show him a
2    driver's license?
3        A.  No, ma'am.
4        Q.  I'm sorry?
5        A.  No, ma'am.
6        Q.  No.  In the process of giving the
7    officer a name, did you tell the officer you were
8    drunk right now?
9        A.  I don't recall.
10       Q.  Would you say video is the best evidence
11   of that?
12       A.  Yes, ma'am.
13       Q.  Do you recall being drunk at that point
14   in time?
15       A.  Not that I recall.
16       Q.  Prior to going to the cut party, had you
17   consumed any alcohol?
18       A.  No, ma'am.
19       Q.  Prior to -- and I'm going to say like 12
20   hours prior to the cut party, did you use any
21   drugs of any kind?
22       A.  No, ma'am.
23       Q.  What happened after you gave the officer
24   Ronnie's name?
25       A.  They pulled me out of the car.

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 145

1    Q.  They pulled you out of the car or they
2  asked you to step out of the car?
3    A.  They asked me to step out.
4    Q.  Okay.  They asked you to step out of the
5  car.  So did the officer tell you there was a
6  warrant out for you?
7    A.  Um-hmm.  Yes, ma'am.
8    Q.  And was that, again, Officer Murphy?
9    A.  Yes, ma'am.
10   Q.  And what specifically did he say?
11   A.  Step out of the car.
12   Q.  Okay.  And did he tell you why to step
13 out of the car?
14   A.  No.  Not that I recall.
15   Q.  He didn't reference the warrant?
16   A.  I believe so.
17   Q.  He did?
18   A.  I believe so.
19   Q.  Okay.  Did you initially refuse to step
20 out of the car by saying you ain't going to or
21 words to that effect?
22   A.  Not that I recall.
23     MR. DAVIS:  Objection.  Objection.
24 Calls for evidence not in testimony.
25   Q.  You can answer the question.

Page 146

1    A.  Not that I recall.
2    Q.  Do you think that video would be the
3  best evidence of that?
4    A.  Yes, ma'am.
5    Q.  Did the officer have to tell you a
6  second time to step out of the car?
7    A.  Not that I recall.
8    Q.  Do you think that video will be the best
9  evidence of that?
10   A.  (Witness nodded head.)
11   Q.  Did you eventually step out of the car?
12   A.  Yes, ma'am.
13   Q.  How many times did the officer have to
14 ask you to step out of the car before you finally
15 got out?
16   A.  I don't recall.
17   Q.  Say again?
18   A.  I don't recall him saying more than
19 once.
20   Q.  Okay.  Do you think the video would be
21 the best evidence of that?
22   A.  Yes, ma'am.
23   Q.  Okay.  When you stepped out of the car,
24 were you facing the officer?
25   A.  Yes, ma'am.

Page 147

1    Q.  Did you then begin telling the officer
2  that he had no right to order you out of the car?
3    A.  I don't recall.  I recall turning
4  around, putting my hands on the hood of the car.
5    Q.  Do you think the video would be the best
6  evidence as to whether you said that or not?
7    A.  Yes, ma'am.
8    Q.  Did the officer tell you to place your
9  hands on the car?
10   A.  Yes, ma'am.
11   Q.  Did you put your hands on the car
12 immediately?
13   A.  Yes, ma'am.
14   Q.  Did you argue with the officer at all?
15   A.  The officer tried to grab me, and I told
16 him he told me to put my hands on the car.  And
17 then that's when Elsbernd agree that I was
18 supposed to put my hands on top of the car.
19   Q.  You disagreed that what?
20   A.  I didn't say I disagreed.
21   Q.  Oh, I thought you did.
22   A.  That's when Officer Elsbernd agreed --
23 or whatever his name is, agreed that I put my
24 hands up on the car.
25   Q.  I don't understand that.  Can you

Page 148

1  explain that?
2    A.  Yes, ma'am.  So when they told me to
3  place my hands on the car, I placed my hands on
4  the hood of the car.  But Officer Murphy tried to
5  grab me in the midst of me putting my hands on
6  the car.  And that's when I told him, you told me
7  to put my hands on the car.  What are you doing?
8      And then the other officers agreed with
9  me that he did tell me to put my hands on the
10 car, so I put my hands on the top of the hood of
11 the car.
12   Q.  Who were the officers that you said
13 agreed with you about that?
14   A.  I don't remember his name, too, but I'm
15 pretty sure the video will tell exactly who his
16 name is.
17   Q.  Do you remember what he looked like?
18   A.  He had a full beard, a little gut, he
19 was chubby.
20   Q.  Okay.  So is it your testimony that you
21 did or you did not argue with the officer about
22 putting your hands on the car?
23   A.  I don't recall.  I know I put my hands
24 on the car.  I didn't argue with him.
25   Q.  You don't think you argued with him?

37 (Pages 145 to 148)

Page 149

1    A.  No, ma'am.
2    Q.  Okay.  Did the officer try to put
3  handcuffs on you?
4    A.  No, ma'am.
5    Q.  At any point did the officer try to put
6  handcuffs on you?
7    A.  Yes, ma'am.
8    Q.  Okay.  Did you resist the officer's
9  efforts in any way?
10    A.  No, ma'am.
11    Q.  Did you tense up your arms in an effort
12  to impede the officer's ability to put handcuffs
13  on you?
14    A.  No, ma'am.
15    Q.  Did you and the officer end up on the
16  ground?
17    A.  Yes, ma'am.
18    Q.  How did it happen that you and the
19  officer ended up on the ground?
20    A.  Because I told him -- he was trying to
21  take me down to the ground.  One was pulling me
22  in the one direction, the other one was pulling
23  me in the other direction.  So I told them both
24  just slam me forward, and I told -- so I went
25  down when they slammed me.

Page 150

1    Q.  Do you know who -- you said they, so I
2  take it there was more than one that did that; is
3  that right?
4    A.  Yes, ma'am.
5    Q.  Okay.  Do you recall what the -- what
6  any of them looked like?
7    A.  No, ma'am.  At that time it was a
8  scuffle, I'm not paying attention.
9    Q.  Did you happen to notice what their
10  nameplate said?
11    A.  No, ma'am.
12    Q.  So I think you alluded to a scuffle
13  while you were on the ground; right?
14    A.  What's alluded mean?
15    Q.  Sorry.  You mentioned it, I think.
16    A.  Yes, ma'am.
17    Q.  Okay.  What happened during the scuffle?
18    A.  I was getting punched.  I was getting
19  choked.  One had my legs.  One had my arm.  One
20  was on my back.
21    Q.  So how long did the scuffle last?
22    A.  I don't know.  The video would be the
23  best to tell that.
24    Q.  Okay.  So when they first started
25  putting handcuffs on you, were you near the

Page 151

1  driver's side rear of the car?
2    A.  I was in the backseat.
3    Q.  But you had gotten out; right?
4    A.  Yeah.
5    Q.  Okay.  So when you were standing there
6  as they put handcuffs on you, were you standing
7  at the driver's side rear of the car?
8    A.  I don't recall exactly where I was.
9    Q.  Okay.  Do you recall where you ended up
10  when the scuffle was over?
11    A.  Yes.
12    Q.  Where?
13    A.  Behind the car on the ground in the
14  middle of the street.
15    Q.  So do you recall whether that was the --
16  behind the car and to the passenger side of it?
17    A.  I'm sorry.  Can you repeat that again?
18    Q.  Yeah.  Do you recall whether, when the
19  scuffle was over, you were behind the car and to
20  the passenger side of it?
21    A.  I was behind the car.
22    Q.  Okay.  On the passenger side of it?
23    A.  Yes, ma'am.  No, ma'am.  Behind the car.
24    Q.  Okay.  But there's behind the car behind
25  the driver's side and there's behind the car

Page 152

1  behind the passenger side; right?
2    A.  I was by the trunk behind the car.  In
3  the back of the car.
4    Q.  Okay.  So in any event, you had moved
5  from where you were standing on the driver's side
6  rear, getting handcuffed, to --
7    A.  Getting slammed behind the car.
8    Q.  Behind the car; right?
9    A.  Getting slammed behind the car.  Yes,
10  ma'am.
11    Q.  While the scuffle happened, what were
12  the other people in your car doing?
13    A.  Recording.
14    Q.  Were they out of the car?
15    A.  I don't recall.  I was on the ground.
16    Q.  Okay.  So if they were out of the car,
17  you don't have any knowledge of that; right?
18    A.  The videos would tell.
19    Q.  But do you have any knowledge of that?
20    A.  I know Dashon got out of the car.
21    Q.  Okay.  So you know Dashon got out of the
22  car.  Do you know if Kayla got out of the car?
23    A.  (Witness shook head.)
24    Q.  You don't know?
25    A.  No, ma'am.  Not that I know of.

Page 153

1      Q.  Okay.  You said Dashon was out of the
2  car.  When did you become aware that she had been
3  out of the car?
4      A.  When I seen the videos.
5      Q.  Okay.  So not till after the fact;
6  right?
7      A.  Yes, ma'am.
8      Q.  So after you were placed in handcuffs,
9  like after the scuffle and you were in cuffs;
10  right?
11      A.  Yes, ma'am.
12      Q.  Did officers stand you back up and
13  position you near the rear passenger side of the
14  car?
15      A.  Yes, ma'am.
16      Q.  Okay.  Was an officer stationed near you
17  there?
18      A.  Yes, ma'am.
19      Q.  What did that officer look like?
20      A.  I don't recall exactly what he looked
21  like because my head was pointed down to the
22  ground.
23      Q.  The whole time?
24      A.  Yeah, because Murphy was lifting up on
25  my -- on my arms, trying to break my arm.

Page 154

1      Q.  And this was while you were standing at
2  the rear passenger side of the car?
3      A.  Yes, ma'am.  An officer had to tell him
4  to get off of me.
5      Q.  Okay.  How long were you standing --
6  just standing in that spot?
7      A.  I don't recall.
8      Q.  But in any event, you said there was a
9  police officer stationed next to you while you
10  were standing there; right?
11      A.  Yes, ma'am.
12      Q.  Okay.  Do you know the name of that
13  officer?
14      A.  Morris.
15      Q.  Morris.  How do you know that officer's
16  name?
17      A.  I mean, not Morris.  I'm sorry.  Martin.
18      Q.  Martin.  How do you know that officer's
19  name?
20      A.  Because I asked him.
21      Q.  Other than asking him his name, did you
22  have any conversation with him while you were
23  standing there at the rear passenger side of the
24  car?
25      A.  Yes, ma'am.

Page 155

1      Q.  What else did you all talk about?
2      A.  He told me that I didn't bust the police
3  officer's head.
4      Q.  He told you you did not?
5      A.  Yes, ma'am.
6      Q.  While you were reviewing video of the
7  January 16th, 2021 events, did you hear that
8  conversation captured on anybody's camera?
9      A.  No, ma'am.  I didn't get to see his body
10  cam.
11      Q.  Whose body cams did you look at?
12      A.  I can't recall exactly which names.
13      Q.  Okay.  But you remember you did not see
14  Martin's?
15      A.  Yes, ma'am.
16      Q.  Okay.  While you were standing near the
17  rear passenger side of the car, did you see one
18  of your friends being arrested on the driver's
19  side of the car?
20      A.  Yes, ma'am.
21      Q.  Okay.  Which of your friends did you see
22  being arrested?
23      A.  Ricardo.
24      Q.  Ricardo.  Did you see one of the females
25  being arrested?

Page 156

1      A.  Yes, ma'am.
2      Q.  Which one?
3      A.  Dashon.
4      Q.  So when the officers arrested Dashon,
5  who had been sitting in the backseat of the car
6  with you; right?
7      A.  (Witness nodded head.)
8      Q.  When the officers arrested her, did you
9  make a move towards the driver's side of the car?
10      A.  Yes, sir -- I mean, yes, ma'am.
11      Q.  When you did that, did the officer who
12  was stationed next to you put his hands on you?
13      A.  Yes, ma'am.
14      Q.  What part of your body did he touch?
15      A.  My chest.
16      Q.  Did you perceive that as an effort on
17  his part to keep you from leaving the rear
18  passenger side of the car?
19          MR. DAVIS:  Object.  Calls for
20  speculation.
21      Q.  I'm asking him what he perceived.
22          What did you perceive?
23      A.  I don't know.
24      Q.  You don't know how you perceived that?
25      A.  Yes, ma'am.  Not at the moment.

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 157

1    Q.   Okay.  Did you pull away from that
2    officer?
3    A.   No, ma'am.
4    Q.   Other than touching you in the manner
5    you just described, did the officer who was
6    stationed next to you when you were standing at
7    the rear passenger side of the car make any other
8    physical contact with you?
9    A.   One of them was -- well, my side -- arm
10   came out of my socket.  One of them pulled my arm
11   out of my socket.
12   Q.   When did that happen?
13   A.   When I was standing by the car.
14   Q.   At the rear passenger side of the car?
15   A.   Yes, ma'am.
16   Q.   When you were watching video of this
17   event, did you see that reflected on the video
18   anywhere?
19   A.   Yes, ma'am.
20   Q.   Whose video were you watching when you
21   saw that?
22   A.   I don't recall the names.  It's been a
23   while since I seen it.
24   Q.   Which officer did that?
25   A.   I don't recall.

Page 158

1    Q.   Was it Martin who was standing next to
2    you?
3    A.   Yes, ma'am.  No, no, it wasn't Martin.
4    Q.   It was not Martin?
5    A.   (Witness shook head.)
6    Q.   Can you describe what that officer
7    looked like who did that?
8    A.   No, ma'am.  Because my head was face
9    down.
10   Q.   So other than touching your chest when
11   you tried to pull away to get to the driver's
12   side of the car, did Martin make any physical
13   contact with you?
14   A.   I don't recall exactly what all -- what
15   all contact he made with me.  There was so much
16   going on at the time.
17   Q.   So do you think the video would best
18   reflect what Martin did or did not do?
19   A.   Yes, ma'am.
20   Q.   Did you make your way over to the
21   driver's side as Dashon was being arrested?
22   A.   No, ma'am.
23   Q.   So how did -- did you voice any
24   objections to her arrest?
25   A.   Yes, ma'am.

Page 159

1    Q.   What specifically did you say?
2    A.   I don't recall exactly what I said.
3    Q.   Can you describe the volume with which
4    you were speaking?
5    A.   High.
6    Q.   Like loud?
7    A.   Yes, ma'am.
8    Q.   Like excited?
9    A.   Hmm-um.
10   Q.   Worked up?
11   A.   Worked up, yeah.
12   Q.   What was your intention in moving from
13   the -- where you had been standing at the rear
14   passenger side of the car, over to the driver's
15   side when Dashon was being arrested?
16   A.   Telling them -- asking them why they was
17   arresting her.
18   Q.   Did you ask them that?
19   A.   Yes, ma'am.
20   Q.   Did you have any intention of
21   interfering with her arrest?
22   A.   No, ma'am.
23   Q.   What were you going to do when you got
24   out over to the driver's side if you had gotten
25   to her?

Page 160

1    A.   Nothing.
2    Q.   Nothing?
3    A.   (Witness nodded head.)
4    Q.   When you got to the driver's side of the
5    car where Dashon was being arrested, did officers
6    take you to the ground?
7    A.   Yes, ma'am.
8    Q.   How many officers were involved in doing
9    that?
10   A.   I don't recall.
11   Q.   Do you remember what any of them looked
12   like?
13   A.   No, ma'am.
14   Q.   Do you remember if any of them were
15   White --
16   A.   They all --
17   Q.   -- or Black?
18   A.   -- was White.
19   Q.   Any Black officers do that?
20   A.   No, ma'am.
21   Q.   Do you remember anything beyond the fact
22   that they were White?
23   A.   No, ma'am.
24   Q.   As those officers were trying to take
25   you to the ground, were you trying to stay on

40  (Pages 157 to 160)

Page 161

1   your feet?
2       A.  No, ma'am.
3       Q.  Were you twisting or turning your body?
4       A.  No, ma'am.
5       Q.  Were you raising your head up?
6       A.  No, ma'am.
7       Q.  Were you moving your legs?
8       A.  No, ma'am.
9       Q.  Were you moving in any fashion at all?
10      A.  No, ma'am.
11      Q.  In the process of getting you to the
12  ground, did any officer use a Taser or a weapon
13  of any sort on you?
14      A.  Not that I recall.
15      Q.  Were the officers ultimately successful
16  in getting you onto the ground at that point?
17      A.  Yes, ma'am.
18      Q.  After that, did one or more officers
19  stand you up and escort you to the police
20  cruiser?
21      A.  Yes, ma'am.
22      Q.  How long were you on the ground before
23  that happened?
24      A.  I don't recall.  Videos would best
25  describe it.

Page 162

1       Q.  But what's your recollection of it?
2       A.  I don't recall how long.
3       Q.  Do you think it was longer than three
4   minutes?
5       A.  I don't recall exactly.
6       Q.  How many officers were involved in
7   standing you up and escorting you to the police
8   cruiser?
9       A.  I don't recall exactly how many.
10      Q.  Do you know what any of those police
11  officers look like?
12      A.  White.
13      Q.  Anything besides that?
14      A.  No, ma'am.
15      Q.  Anything about their build, their
16  height?
17      A.  No, ma'am.
18      Q.  Their hair color or style?
19      A.  No, ma'am.
20      Q.  Did you see anything on their uniform
21  that might signify their rank?
22      A.  No, ma'am.
23      Q.  Did anything significant to your lawsuit
24  happen in the course of the officers standing you
25  up in order to move you to the police cruiser?

Page 163

1       A.  Yes, ma'am.
2       Q.  What?
3       A.  I was being hit on.
4       Q.  You were being hit on at what point in
5   time?
6       A.  When they was getting me from the ground
7   up to the car.
8       Q.  How were they hitting on you?
9       A.  With their fists.
10      Q.  With a closed fist?
11      A.  I don't know if it was closed or was
12  open.
13      Q.  Okay.  What part of their -- what part
14  of your body did they hit on?
15      A.  The back of my head.
16      Q.  The back of your head?
17      A.  Yes, ma'am.
18      Q.  Okay.  Did anything happen -- anything
19  significant to your lawsuit happen -- strike
20  that.
21          Did anything else significant happen, to
22  your lawsuit, when you were being picked up?
23      A.  The way they was picking me up.
24      Q.  How's that?
25      A.  Seemed unprofessional.

Page 164

1       Q.  It seemed unprofessional in what way?
2       A.  How they was handling me.
3       Q.  How were they handling you?
4       A.  Rough.
5       Q.  Rough in what way?
6       A.  Like were yanking on my hand -- arms
7   with the cuffs on me, throwing me up against the
8   car before they threw me in there.
9       Q.  Throwing you up against which car?
10      A.  The truck, the SUV, the cruiser.
11      Q.  So not Kayla's car, but the police -- or
12  not the car Kayla was driving, but the police
13  car?
14      A.  Police car, yes, ma'am.
15      Q.  Okay.  So I was just focused on when
16  they were standing you up.  So you said they were
17  hitting on you while they were standing you up;
18  right?
19      A.  Yes, ma'am.
20      Q.  Did anything else besides them hitting
21  on you happen in the course of them standing you
22  up?
23      A.  Not that I recall.
24      Q.  Okay.  So you've said that they pushed
25  you up against the police cruiser when they got

1    you there; right?
2        A.   Yes, ma'am.
3        Q.   Did anything happen between those two
4    events?
5        A.   Not that I recall.
6        Q.   Other than pushing you up against the
7    police cruiser, did anything else of significance
8    to your lawsuit happen when they were trying to
9    put you in the car?
10       A.   One of them was choking me when they was
11   trying to put me in the car.
12       Q.   Choking you how?
13       A.   Like that with his hand.
14       Q.   So he put -- you're signaling -- for the
15   record, you're signaling that he put --
16       A.   His hand on my throat.
17       Q.   His hand on your throat, okay.  Do you
18   know who that was?
19       A.   No, ma'am.
20       Q.   Do you remember what he looked like?
21       A.   White.
22       Q.   Anything else?
23       A.   No, ma'am.
24       Q.   Do you remember what kind of uniform he
25   was wearing?

1        A.   A regular uniform.
2        Q.   When you mean regular uniform, are you
3    talking about the navy blue button-down and navy
4    blue pants?
5        A.   Yes, ma'am.
6        Q.   Other than pushing you up against the
7    side of the cruiser and somebody choking you when
8    you were being put into the cruiser, did anything
9    else significant to your lawsuit happen while you
10   were being put in the cruiser?
11       A.   Not that I recall.
12       Q.   So when you were put in the cruiser, was
13   anybody else back there with you?
14       A.   Yes, ma'am.
15       Q.   Who?
16       A.   I don't recall exactly who it was.
17       Q.   You don't know the person's name?
18       A.   I don't -- it was a bunch of people
19   arrested with us.  I just don't remember who
20   exactly it was.
21       Q.   Was it any of the people that were in
22   your car with you?
23       A.   No, ma'am.
24       Q.   Was it any of the people who had gone to
25   the bar with you?

1        A.   Yes, ma'am.
2        Q.   So it was one of those guys?
3        A.   Yes, ma'am.
4        Q.   Okay.  How long did you sit in the back
5    of the cruiser before you left for the jail?
6        A.   We left immediately.
7        Q.   You didn't sit there for a few minutes?
8        A.   No, ma'am.
9        Q.   You immediately went off to the Kenton
10   County Detention Center?
11       A.   Yes, ma'am.  I think -- believe so.  I'm
12   not too sure.
13       Q.   Do you know which officer drove you to
14   the Kenton County Detention Center?
15       A.   Not -- not right off back, I don't.
16       Q.   Okay.  At any point in time from the
17   time you were placed in the back of the cruiser
18   until you left to go to the Kenton County
19   Detention Center, and I understand you said that
20   was pretty quickly thereafter, did any police
21   officer speak with you?
22       A.   Not that I recall, no, ma'am.
23       Q.   Okay.  How long did the drive to the
24   Kenton County Detention Center take?
25       A.   I don't recall.

1        Q.   Did you stop anywhere between the scene
2    of the arrest and the Kenton County Detention
3    Center?
4        A.   No, ma'am.
5        Q.   Whoever the officer was who drove you,
6    did that officer say anything to you while you
7    were in transit?
8        A.   Not that I recall.
9        Q.   Okay.  Did anything improper happen
10   that -- did anything in your estimation happen
11   that was inappropriate on your way from the scene
12   to the Kenton County Detention Center?
13       A.   Not that I recall.
14       Q.   Are you alleging in this lawsuit that
15   Officer Ullrich violated your rights in some way
16   on January 16th of 2021?
17       A.   Yes, ma'am.
18       Q.   What are you alleging Officer Ullrich
19   did that violated your rights on that date?
20       A.   Where do you want me to start at?  There
21   was numerous things that he did.
22       Q.   Okay.  First of all, where did you see
23   Officer Ullrich at the scene on January 16th of
24   2021?
25       A.   I don't know.  I can't recall exactly

Page 169

1  where I seen him at.
2      Q.  Okay.  So what do you believe Officer
3  Ullrich did on January 16th of 2021 that violated
4  your rights?
5      A.  I can't -- I don't recall exactly what
6  he did.  It was -- like I said, there was a bunch
7  of officers there.  Like the majority of the
8  police station was there.
9      Q.  Okay.  So you said that Officer Ullrich
10  did numerous things to you.  You said, where do
11  you want me to start, I think is what you said.
12      A.  Yeah.  I'm sorry.  It was a -- I thought
13  you was talking about Murphy.
14      Q.  No, I was talking about Officer Ullrich.
15      A.  Ullrich.
16      Q.  Okay.  So just to clear that up and make
17  sure we're both on the same page, are you
18  alleging that Officer Ullrich did anything to
19  violate your rights on January 16th of 2021?
20      A.  I believe so.
21      Q.  What?
22      A.  I can't recall exactly what.  There was
23  so many officers there.  I don't know if he was
24  the one that held -- hit me or not, but the
25  videos will show exactly what.

Page 170

1      Q.  Do you know when Officer Ullrich arrived
2  on the scene?
3      A.  No, ma'am.
4      Q.  Did you see him at any point on the
5  scene?
6      A.  Yes, ma'am.
7      Q.  When?
8      A.  When I was being arrested.  When they
9  was putting me in the cruiser.
10      Q.  So -- I'm sorry.  Can you say again at
11  what point did you see Officer Ullrich on the
12  scene?
13      A.  When I was getting put in the cruiser.
14      Q.  Okay.  Before that at all?
15      A.  No, ma'am.
16      Q.  Okay.  So when you were getting put in
17  the cruiser is when you saw him; right?
18      A.  Yes, ma'am.  I believe so.
19      Q.  Was he one of the officers that put you
20  in the cruiser?
21      A.  No, ma'am.
22      Q.  Did he talk to you while you were in the
23  cruiser?
24      A.  No, ma'am.
25      Q.  Did he do anything inappropriate to you

Page 171

1  while you were being put in the cruiser?
2      A.  Not that I recall.
3      Q.  Okay.  So I'm just talking about January
4  16th of 2021.  What facts do you rely on to
5  assert that Officer Ullrich did something to
6  violate your rights on that date?
7      A.  What facts?
8      Q.  That Officer Ullrich did, yes.
9      A.  Well, I know he was there because he
10  signed off and said that he took pictures and
11  stuff of me.  And I know he was talking to me
12  because he said something to me when I was at the
13  jail.
14      Q.  I thought you said he didn't talk to
15  you.
16      A.  You said in between.
17      Q.  Okay.  So at what point did he talk to
18  you?
19      A.  When I was in the jail going through the
20  sally port.
21      Q.  Okay.  At that point and no other point
22  did he talk to you; correct --
23      A.  No, ma'am.
24      Q.  -- on January 16th?
25      A.  Not that I recall.

Page 172

1      Q.  Not that you recall on January 16th;
2  right?
3      A.  Yes, ma'am.
4      Q.  Okay.  So the first time you saw Officer
5  Ullrich was when you were at the detention
6  center; is that correct?
7          MR. DAVIS:  Objection.  It misstates his
8  testimony.
9      A.  No, ma'am.
10      Q.  What did you say about the first time
11  you saw Officer Ullrich?
12      A.  When I was being put in a cruiser.
13      Q.  Oh, that's right.  Okay.  Other than
14  seeing Officer Ullrich when you were being put in
15  the cruiser and then seeing him at the Kenton
16  County Detention Center, did you see him at all
17  on the scene on January 16th?
18      A.  Not that I recall.
19      Q.  Okay.  What do you believe -- what, if
20  anything, do you believe Officer Ullrich did to
21  violate your rights on January 16th?
22      A.  I don't know if he was one of the ones
23  that was hitting on me or not, because I couldn't
24  see.
25      Q.  So you just don't know what Officer

Page 173

1    Ullrich might have done to --
2        A.  Yes, ma'am.  I believe the body cam
3    footage would be best.
4        Q.  Okay.  And if the body cam evidence
5    doesn't show Officer Ullrich doing anything to
6    you, do you have any claims against Officer
7    Ullrich, in your opinion?
8        MR. DAVIS:  Objection, calls for a legal
9    conclusion.  Objection, compound and also
10   confusing.
11       Q.  Answer.  You can answer.
12       A.  Not that I recall.
13       Q.  Okay.  You made mention of Officer
14   Murphy and you think he violated your rights.
15   What do you think he did to violate your rights?
16       A.  First of all by asking me my name.
17       Q.  You don't think that was appropriate?
18       A.  No, ma'am.
19       Q.  Why do you think that was not
20   appropriate?
21       A.  Because the law states that he's
22   supposed to ask the driver.  He was only supposed
23   to speak with the driver when it's a driving
24   matter.
25       Q.  You said the law states that.  What law

Page 174

1    are you relying on?
2        A.  Well, I had to -- we had to look up case
3    numbers and stuff like that, but as far -- if
4    it's a traffic stop, he only allowed to talk to
5    the driver.  You know what I'm saying?  Because
6    it's a traffic stop.  It was a traffic violation.
7    He said that he stopped the car because she
8    forgot to use her turn signals, so that's a
9    traffic stop.
10       Q.  But I thought you said when he got to
11   the car, you were not wearing your seat belt; is
12   that right?
13       A.  I did not say that.  You asked me was I
14   wearing my seat belt at the time.
15       Q.  And you said no; right?
16       A.  Yes, ma'am.
17       Q.  Okay.
18       A.  But it's not a seat belt law in Kentucky
19   for the backseat passenger.  It's only for the
20   passenger seat in Kentucky.  Not backseat.  I
21   didn't have to have a seat belt on.
22       Q.  Okay.  Can you -- do you know where that
23   is in the statutes?
24       A.  Yes, ma'am.
25       Q.  Where?

Page 175

1        A.  I can't -- I'd have to look it up.  I
2    can't tell you right now about that.
3        Q.  Okay.  So go on and tell me what else
4    Officer Murphy did that you believe violated your
5    rights.
6        A.  Well, he punched me.  He choked me.  He
7    slammed me.
8        Q.  When did all that take place?
9        A.  When I got out of the car.
10       Q.  The first time?  Like when you got out
11   of the car and he was trying to put handcuffs on
12   you?
13       A.  Yes.  When he first -- when he first
14   tried to put hand -- when I first got out of the
15   car, he told me to put my hands on the car.
16       Q.  Okay.
17       A.  I put my hands on the car.  Then he told
18   me to put my hands behind my back.  As I'm
19   pulling my hands behind my back, he punched me in
20   my back.
21       Q.  Where on your back?
22       A.  On my left-hand side.
23       Q.  Left side, okay.
24       A.  That's what started the whole scenario,
25   because I said, are you going to let him hit me?

Page 176

1    And once he punched me, that's when he started
2    scuffing me.  You've got one pulling me this way.
3    You've got one -- Murphy pulling me this way.
4    And I tell them on camera, you could hear it, me
5    say, you all both pulling me in different
6    directions, why don't you all both just slam me
7    forward?  And they both slammed me forward and
8    then that's when he proceeded to put me in the
9    headlock and proceeded to punching me in my face.
10       Q.  Okay.  I thought I heard a couple things
11   in there, so let me ask you more questions about
12   that.  I thought I heard you say first that
13   Officer Murphy punched you in the left side of
14   your lower back?
15       A.  Yes, ma'am.
16       Q.  Is that right?
17       A.  (Witness nodded head.)
18       Q.  And that was when he was trying to
19   handcuff you?
20       A.  Yes, ma'am.
21       Q.  And I thought I heard you say something
22   about a punch.  Is that a separate thing than
23   hitting you in the side of the back?
24       A.  Yes, ma'am.
25       Q.  So where did he punch you?

44  (Pages 173 to 176)

Page 177

1      A.  In my face.
2      Q.  Okay.  And when did he punch you in the
3  face?
4      A.  When he got me to the ground.
5      Q.  Okay.  So that happened when you were on
6  the ground?
7      A.  Yes, ma'am.
8      Q.  Okay.  Where -- what part of your face
9  did he punch you in?
10      A.  My face.  He just punched me in my face.
11      Q.  Left side?  Right side?  Under the
12  cheek?  On the forehead?  Under the chin?  Where?
13      A.  I can't recall exactly where.  The
14  pictures will -- body cam should show that.
15      Q.  Okay.  So what else did you say besides
16  being punched in the lower back and being punched
17  in the face?
18      A.  He was choking me.
19      Q.  Choking you.  Okay.  When did the choke
20  happen?
21      A.  When he got me down to the ground.
22      Q.  Okay.  What part of his -- what part of
23  his body did he use to choke you?
24      A.  His left arm.
25      Q.  His left arm.  Okay.  How long did he

Page 178

1  have his left arm on your neck?
2      A.  For a minute.
3      Q.  For a whole minute?
4      A.  No.  For over a little minute.
5      Q.  For over a minute?
6      A.  Yes, ma'am.
7      Q.  Okay.  I think you said there -- did
8  Officer Murphy do anything else in the course of
9  taking you to the ground to handcuff you besides
10  what you've mentioned?
11      A.  Not that I recall.
12      Q.  Okay.  I think you said there was
13  another officer involved in taking you to the
14  ground at that point; is that right?
15      A.  Yes, ma'am.
16      Q.  Okay.  Did that officer do anything that
17  you recall?
18      A.  Yes, ma'am.
19      Q.  What?
20      A.  Twisted my wrist.
21      Q.  Okay.  Which wrist?
22      A.  My right wrist.
23      Q.  Okay.  In what manner did he twist it?
24      A.  He was twisting it like, like something
25  like that, in a harsh way, telling me to give him

Page 179

1  my other arm.  Put my hands behind my back.  Put
2  my hands behind my back.
3      Q.  Okay.  Did he twist it in the direction
4  of pulling it behind your back or did he twist it
5  in the other direction?
6      A.  In the direction of pulling it behind my
7  back.
8      Q.  Did that officer do anything else that
9  you believe violated your rights?
10      A.  He had his knee in the back of my back.
11      Q.  In the back -- in your back?
12      A.  Yes, ma'am.
13      Q.  Which part of your back?
14      A.  Middle of it.
15      Q.  Okay.  So not the left or the right, but
16  central in your back?
17      A.  Yes, ma'am.
18      Q.  Lower or upper?
19      A.  Middle.
20      Q.  So right in the middle there?
21      A.  Yes, ma'am.
22      Q.  Okay.  Did anyone do anything else that
23  you believe violated your rights in that first
24  initial scuffle?
25      A.  It was a bunch of them.  I don't know

Page 180

1  exactly which one was doing what, but yes.  I was
2  being kicked.  My leg was being twisted.  My, my
3  wrist was being twisted.  I was being choked.  I
4  was being punched.
5      Q.  So is it your contention that there were
6  more than just those two officers you previously
7  described --
8      A.  I believe so.
9      Q.  -- doing this?  Do you know which
10  officers?
11      A.  No, ma'am.
12      Q.  Okay.  Do you know what the officers
13  looked like who did that?
14      A.  No, ma'am.
15      Q.  And you don't know which officer did
16  what; right?
17      A.  No, ma'am.  It --
18      Q.  You do know which officers did what?
19      A.  Well, no, ma'am, I don't know exactly
20  which ones.
21      Q.  Okay.  Anything else at any point on the
22  scene of January 16th that you have not yet
23  described that you think Officer Murphy did to
24  violate your rights?
25      A.  Not right off back, not that I recall.

45  (Pages 177 to 180)

Page 181

1      Q.  Okay.  Are you alleging in this lawsuit
2   that Officer Elsbernd violated your rights in
3   some way on January 16th of 2021?
4      A.  Yes, ma'am.
5      Q.  Okay.  What are you alleging Officer
6   Elsbernd did that violated your rights?
7      A.  He slammed me to the ground.  He twisted
8   my wrist.
9      Q.  At what point did he do that?
10     A.  When I got slammed to the ground.
11     Q.  Well, you got put on the ground twice;
12  right?
13     A.  The first time.
14     Q.  The first time.  Okay.  So when we were
15  talking about this just before, you said Murphy
16  and another officer.  Do you think Officer
17  Elsbernd was that officer?
18     A.  Yes, ma'am.
19     Q.  So when we were talking about what the
20  other officer, who was then unidentified, did, is
21  that what you're saying Officer Elsbernd did?
22     A.  Yes, ma'am.
23     Q.  Other than those things that you
24  described, did Officer Elsbernd do anything else
25  that you think violated your rights on January

Page 182

1   16th?
2      A.  Not that I recall.
3      Q.  Did Officer Elsbernd say anything to you
4   on January 16th?
5      A.  Not that I recall.
6      Q.  Are you alleging in this lawsuit that
7   Chief Nader violated your rights in any way on
8   January 16th?
9      A.  Not that I recall.
10     Q.  Do you know whether Chief Nader was
11  personally present on the scene on January 16th?
12     A.  Not that I could recall.  Not right off
13  back.
14     Q.  Other than Murphy, Elsbernd, and Ullrich
15  that we've already talked about, did any officers
16  do anything else that you think violated your
17  rights on September the -- or on January the
18  16th?
19     A.  Not that I can recall.
20     Q.  Okay.  Did you have any conversations
21  with any other officers besides Murphy, Elsbernd,
22  and Ullrich, and Martin -- you said Martin?
23     A.  Yes, ma'am.
24     Q.  Did you have any conversations with any
25  other officers while you were on the scene on

Page 183

1   January 16th?
2      A.  Not that I can recall.
3      Q.  Were you physically injured in any way
4   as a result of the events of January 16th?
5      A.  Yes, ma'am.
6      Q.  Okay.  What part or parts of your body
7   were injured?
8      A.  My face, my neck, my back, my wrist, my
9   shoulder.
10     Q.  Okay.  So in what way was your face
11  injured?
12     A.  I was being punched.
13     Q.  Okay.  That's the action that you're
14  alleging injured your face; right?
15     A.  Yes, ma'am.
16     Q.  But what were the injuries to your face?
17     A.  A bruise.
18     Q.  Okay.  Where?
19     A.  On my face, next to my eye.
20     Q.  Which eye?
21     A.  My left one -- I mean, my right one.
22  I'm sorry.
23     Q.  Your right eye.  Okay.  So it bruised
24  like on your cheek under your eye?
25     A.  Yes, ma'am.

Page 184

1      Q.  Okay.  Any other bruising on your face?
2      A.  Well, I had marks on my neck from being
3   choked.
4      Q.  Okay.  We're still talking about your
5   face though.
6      A.  No, ma'am.
7      Q.  So any other marks on your face?
8      A.  No, ma'am.
9      Q.  Okay.  Was your face bleeding in any
10  way?
11     A.  My lip.
12     Q.  Your lip was bleeding?
13     A.  Yes, ma'am.
14     Q.  Any other part of your face?
15     A.  No, ma'am.
16     Q.  Did you have any -- did anybody come
17  take pictures of your face?
18     A.  I believe Ullrich did.
19     Q.  You believe who did?
20     A.  Ullrich.
21     Q.  Ullrich, you think he did.
22        Okay.  Did you receive any medical
23  treatment for the injuries to your face?
24     A.  No, ma'am.  Just some ice.  An ice pack.
25     Q.  Who gave you the ice pack?

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 185

1      A.  Detention center.
2      Q.  Okay.
3      A.  Kenton County.
4      Q.  Okay.  So when you were brought to the
5   Kentucky -- I'm saying it.  I can't get my words
6   here.
7      A.  Kenton County.
8      Q.  When you were brought to the Kenton
9   County, thank you, Detention Center, did somebody
10  from medical staff come look at you?
11     A.  Yes, ma'am.
12     Q.  Who?
13     A.  I don't know her name.
14     Q.  You don't know his name?
15     A.  I don't know her name.
16     Q.  Oh, her name.  Okay.  Was, as far as you
17  know, she part of the medical staff there?
18     A.  Yes, ma'am.
19     Q.  Did you have a conversation with her?
20     A.  About what happened?
21     Q.  About anything.
22     A.  Not that I recall.
23     Q.  You did not have a conversation with her
24  that you recall?
25     A.  It was kind of confusing.  Like to have

Page 186

1   a conversation with her about my injuries or what
2   happened at the scene?
3      Q.  Did you have a conversation with her at
4   all?
5      A.  About my injuries, yes.
6      Q.  Okay.  What did you tell her about your
7   injuries?
8      A.  Well, I told her what happened to me.
9      Q.  Okay.  What did she say?
10     A.  My shoulder was dislocated.
11     Q.  The nurse said that?
12     A.  Yes, ma'am.
13     Q.  Okay.  Did she say anything else to you?
14     A.  She asked me did I want something for
15  the pain.  And she gave me a big ice pack around
16  my -- to put on my shoulder and an ice pack to
17  put on my face.
18     Q.  Okay.  What happened with your
19  dislocated shoulder?  How did that get --
20     A.  She popped it back in place.
21     Q.  She did that?
22     A.  Yes, ma'am.
23     Q.  At the Kenton County Detention Center?
24     A.  Yes, ma'am.
25     Q.  Okay.  After you were out of -- other

Page 187

1   than Kenton County Detention Center, did you have
2   any other treatment for your face?
3      A.  No, ma'am.
4      Q.  Did your injuries require any stitches
5   or anything like that?
6      A.  No, ma'am.
7      Q.  All right.  You mentioned that you had a
8   bruise on your neck?
9      A.  Yes, ma'am.
10     Q.  A mark on your neck of some kind?
11     A.  Yes, ma'am.
12     Q.  Is that how you would describe it, as a
13  bruise?
14     A.  Yes, ma'am.
15     Q.  Where approximately on your neck was
16  that?
17     A.  On my neck.
18     Q.  Like on the front of your neck?
19     A.  Yes, ma'am.
20     Q.  The sides?
21     A.  The front.
22     Q.  The front.  Were you cut or bleeding
23  around your neck at all?
24     A.  No, ma'am.
25     Q.  Did you receive any treatment for your

Page 188

1   neck?
2      A.  No, ma'am.
3      Q.  Did the nurse at the Kenton County
4   Detention Center say anything about your neck at
5   all?
6      A.  No, ma'am.
7      Q.  Did you tell her about your neck?
8      A.  Yes, ma'am.
9      Q.  Did she examine your neck?
10     A.  No, ma'am.
11     Q.  Was she primarily concerned with your
12  shoulder?
13     A.  Yes, ma'am.
14     Q.  What were the injuries to your back?
15     A.  My lower back, I couldn't move it.  It
16  was stiff.  It kind of felt like it was swollen.
17     Q.  Your lower back?  Is that what you're
18  saying?
19     A.  Yes, ma'am.
20     Q.  On your left or right?
21     A.  On my -- just my middle, like my spine.
22     Q.  Did you have any visible marks or
23  anything on your back?
24     A.  No, ma'am.
25     Q.  Did you get any treatment for your back?

47  (Pages 185 to 188)

Page 189

1      A.  No, ma'am.
2      Q.  Even outside of the Kenton County
3  Detention Center?
4      A.  Yes, ma'am.  No, ma'am.
5      Q.  So you did not get any treatment for
6  your back outside of the Kenton County Detention
7  Center?
8      A.  No, ma'am.
9      Q.  Okay.  So no treatment for your back?
10     A.  Yes, ma'am.
11     Q.  Okay.  So did you get any treatment for
12  your back in the Kenton County Detention Center?
13     A.  Ibuprofen.
14     Q.  Ibuprofen.  Okay.  Anything else?
15     A.  No, ma'am.
16     Q.  So in what way were your wrists injured
17  as a result of January 16th?
18     A.  They was swollen.  I had marks like cuff
19  lacerations around them.
20     Q.  So were they bleeding?
21     A.  One of them was.  This one was.
22     Q.  That's your left?
23     A.  Yes, ma'am.
24     Q.  Okay.
25     A.  I've got pictures of it.

Page 190

1      Q.  You have pictures of that?
2      A.  Yes, ma'am.
3      Q.  Can you give it to your attorney?
4      A.  Yes, ma'am.
5      Q.  Thank you.  What were the lacerations
6  from, the --
7      A.  Cuffs.
8      Q.  Were they too tight?
9      A.  Yes, ma'am.
10     Q.  Did you tell anybody they were too
11  tight?
12     A.  Yes, ma'am.
13     Q.  Who did you tell?
14     A.  The officer.
15     Q.  Which officer?
16     A.  I don't recall -- exactly recall which
17  officer it was.
18     Q.  Was it the officer who drove you to the
19  detention center or --
20     A.  Yes, ma'am.
21     Q.  -- somebody else?
22     A.  The one that drove me to the detention
23  center.
24     Q.  Did you get any treatment for your
25  wrists?

Page 191

1      A.  No, ma'am.  Just ice and Band-Aid.
2      Q.  Who gave you the Band-Aid?
3      A.  The nurse.
4      Q.  At the detention center?
5      A.  Yes, ma'am.
6      Q.  Outside of the detention center, did you
7  have any treatment for your wrist?
8      A.  No, ma'am.
9      Q.  Okay.  And then your shoulder, you
10  talked about it being dislocated.  You said the
11  nurse put it back in place?
12     A.  Yes, ma'am.
13     Q.  Other than that, did you have any
14  treatment for your shoulder?
15     A.  Yes, ma'am.
16     Q.  Where?
17     A.  Kenton County.
18     Q.  Okay.  When did you have treatment for
19  your shoulder at Kenton County?
20     A.  The doctor gave me some cream to rub on
21  it for the pain.  They was going to put me in a
22  thing, but I refused it because I didn't want to
23  go to the hole.
24     Q.  Okay.  So subsequent to when you were
25  first brought into the Kenton County Detention

Page 192

1  Center and the nurse looked at you, you had an
2  appointment with the doctor?
3      A.  Yes, ma'am.
4      Q.  A couple days later, or when was that?
5      A.  A couple days later.
6      Q.  And the doctor gave you cream?
7      A.  Yes, ma'am.
8      Q.  Offered you a sling?
9      A.  Yes, ma'am.
10     Q.  And you refused the sling; right?
11     A.  Yes, ma'am.
12     Q.  Did the doctor do anything else for you
13  for your shoulder?
14     A.  No, ma'am.  Just gave me ibuprofen and
15  some cream.
16     Q.  Okay.  Outside of the detention center,
17  did you have any treatment --
18     A.  No, ma'am.
19     Q.  -- for your shoulder?  Okay.  How long
20  were you in jail following January 16th of 2021?
21     A.  How long was I in jail?
22     Q.  Yes.
23     A.  From that incident?
24     Q.  Yes.
25     A.  To February 2nd.

48  (Pages 189 to 192)

Page 193

1    Q.  February 2nd.  And what happened on
2  January 2nd that got you out?
3    A.  I bonded out.
4      MR. DAVIS:  Object to form.
5    Q.  You bonded out?  Is that what you said?
6    A.  Yes, ma'am.
7      MR. DAVIS:  Sorry.  I tried to get in
8  there quick enough.  I just want to clear up the
9  record.  I think you said January 2nd.
10    Q.  Oh, February 2nd.  Sorry.
11    I think you said you had photos of your
12  wrists.  Do you have photos of any other part of
13  your body that was injured on January 16th?
14    A.  My face.
15    Q.  Okay.  You have those personally?
16    A.  Yes, ma'am.
17    Q.  Can you give those to your attorney as
18  well?
19    A.  Yes, ma'am.
20    Q.  Any pictures of any kind from January
21  16th, can you get those to your attorney?
22    A.  Yes, ma'am.
23    Q.  Thank you.  Did you sustain any
24  emotional injuries as a result of what happened
25  on January 16th?

Page 194

1    A.  Yes, ma'am.
2    Q.  Can you describe that for me?
3    A.  Like pretty much I got PA -- TSD.  I'm
4  scared of police officers, you know.  I -- I be
5  having nightmares at night sometimes.
6    Q.  Okay.  Did that not happen after your
7  other arrest that you were incarcerated for?
8    A.  Yes, ma'am.
9    Q.  It did or did not?
10      MR. DAVIS:  Objection.  Confusing when
11  you say "other arrest."
12    A.  Yeah.  What do you mean by --
13    Q.  So you said you were in jail -- oh,
14  let's go back to the beginning here.  Following
15  your conviction on December 17th of 2020 -- or
16  2010, sorry, you were in jail; right?
17    A.  Yes, ma'am.
18    Q.  And you presumably had been arrested on
19  some charges prior to that; correct?
20    A.  Yes, ma'am.
21    Q.  Did you not have the fear of police and
22  the nightmares and the other things you described
23  as a result of that arrest?
24    A.  No, ma'am.
25    Q.  You also said you had been in jail

Page 195

1  following a conviction of June 26th of 2015;
2  correct?
3    A.  Yes, ma'am.
4    Q.  And presumably you had been arrested
5  prior to that; right?
6    A.  Yes, ma'am.
7    Q.  And you're testifying that you did not
8  have any fear of police or --
9    A.  No, ma'am.
10    Q.  -- anything like that after that arrest?
11    A.  No, ma'am.
12    Q.  What were those arrests like?
13    A.  Easy.  Done right.  It was -- wasn't no
14  resisting, wasn't no fighting.  It was just a
15  clear-cut arrest.  Handcuffs, got back in the
16  cruiser, no complaints.
17    Q.  Which -- which police departments
18  arrested you on those occasions?
19    A.  Kenton County.
20    Q.  The Kenton County Sheriff's Department
21  arrested you?
22    A.  No, the Kenton County.
23    Q.  Police?
24    A.  Yes.
25    Q.  Okay.  Have you sought any treatment

Page 196

1  from a healthcare professional for your -- the
2  emotional injuries that you're describing --
3    A.  No.
4    Q.  -- that happened on January 16th?
5    A.  No, ma'am.
6    Q.  Have you incurred any out-of-pocket
7  costs in connection with those emotional
8  injuries?
9    A.  No.
10    Q.  Were you aware that a police officer
11  sustained an injury to his head on January 16th
12  of 2021?
13    A.  Yes, ma'am.
14    Q.  Do you have any idea how that happened?
15    A.  No, ma'am.
16    Q.  Do you know which officer it was?
17    A.  Yes, ma'am.
18    Q.  Who?
19    A.  Murphy.
20    Q.  Did you see Officer Murphy engaged with
21  anybody else at the scene on January 16th of
22  2021?
23    A.  Yes, ma'am.
24    Q.  Who?
25    A.  Ricardo.

49 (Pages 193 to 196)

Page 197

1    Q.  Ricardo.  So you believe it was Officer
2 Murphy that was involved in arresting Ricardo?
3    A.  Yes, ma'am.
4    Q.  Was there any force used in the course
5 of his arrest?
6    A.  Yes, ma'am.
7    Q.  Was he taken to the ground?
8    A.  Yes, ma'am.
9    Q.  So that's how you believe Murphy -- or
10 Murphy got his head injured?
11       MR. DAVIS:  Objection.
12    Q.  Is that how you believe -- is that how
13 you believe Officer Murphy got his head injured?
14    A.  I never said that.
15    Q.  I'm just asking you.  Yes or no?
16    A.  I don't recall how he got his injury.
17    Q.  You just don't know how he got his
18 injury?
19    A.  Yes, ma'am.
20    Q.  Okay.  Were you charged with theft of
21 identity, assault on a police officer, resisting
22 arrest, and being a persistent felony offender as
23 a result of the events of January 16th?
24    A.  Yes, ma'am.
25    Q.  As far as you know, are those charges

Page 198

1 still pending?
2    A.  Yes, ma'am.
3    Q.  You've encountered Ullrich and Elsbernd
4 outside of the events of New Year's Day of 2021
5 and January 16th of 2021, haven't you?
6    A.  I'm sorry.  Excuse me?
7    Q.  Have you encountered Officers Ullrich
8 and Elsbernd outside of the events of New Year's
9 Day of 2021 or January 16th of 2021?
10    A.  I believe so.
11    Q.  In fact, Officer Elsbernd responded to a
12 traffic stop on August 28th of 2020 involving
13 you, didn't he?
14       MR. DAVIS:  Objection, leading.
15 Objection, calls for evidence that hasn't been
16 entered into the record yet.
17    Q.  Okay.  You can answer the question.
18    A.  I don't recall.
19    Q.  You don't recall if Officer Elsbernd was
20 at the scene of a traffic stop on August 28th,
21 2020, involving you?
22    A.  Don't recall.
23    Q.  Do you recall being searched on that
24 occasion?
25    A.  I don't recall.

Page 199

1    Q.  Do you remember -- do you remember
2 Officer Ullrich being present on August the 28th
3 of 2020?
4    A.  I don't recall.
5    Q.  Do you remember filing this lawsuit,
6 filing the document that initiated this lawsuit?
7    A.  Yes, ma'am.
8    Q.  Do you remember there being allegations
9 about officers being involved in an August 28th,
10 2020 traffic stop?
11    A.  Yes, ma'am.
12    Q.  Do you remember which officers you
13 alleged were involved in that traffic stop?
14    A.  No, ma'am.
15    Q.  Okay.  Do you have -- whoever it was
16 that was involved in that August 28th, 2020
17 traffic stop, do you have issues with what they
18 did during that stop?
19    A.  No, ma'am.  Is it a --- is it part of
20 this?  Do I have to answer that?
21    Q.  It's -- it's, in my opinion,
22 discoverable, so yeah.
23       MR. DAVIS:  I mean, you guys moved to --
24       MS. LANGEN:  I know it's dismissed, I'm
25 going somewhere else with it.

Page 200

1       MR. DAVIS:  It's dismissed so I don't
2 know why you're entering it into the record.  If
3 you -- you've moved for that evidence not to be
4 included.  So if you're opening the door --
5       MS. LANGEN:  We haven't moved that
6 evidence -- we're not at trial yet.
7       MR. DAVIS:  Right.
8       MS. LANGEN:  We're just in discovery.
9       MR. DAVIS:  Right.
10       MS. LANGEN:  So whether I enter it at
11 trial is a different issue from whether I do it
12 here.
13       MR. DAVIS:  That's --
14       MS. LANGEN:  You can -- if you want it
15 excluded or if we want it excluded at trial, we
16 can both move motions in limine.
17       MR. DAVIS:  I think Jeff has already
18 asked the Court to exclude all testimony and all
19 evidence from that event that you're talking
20 about.  So if you're opening -- if you're opening
21 the door here again, then we're going to ask that
22 it be included in this civil case as well.
23 That's what you're doing.  He's already moved --
24 he's already moved the Court to have that
25 dismissed.

50  (Pages 197 to 200)

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 201

```
 1            MS. LANGEN:  All right.
 2   BY MS. LANGEN:
 3       Q.  Well, you have -- your federal criminal
 4   charges arise from the August 28th, 2020 arrest,
 5   don't they?  The ones that you're here for today?
 6       A.  (Witness nodded head.)
 7       Q.  Is that a yes?
 8       A.  Yes, ma'am.
 9       Q.  Okay.  And in your federal criminal
10   case, you filed a motion to suppress the items
11   that were found on you in the course of the
12   August 28th, 2020 traffic stop, didn't you?
13            MR. DAVIS:  I'm going to object to --
14   I'm going to object and ask you not to answer any
15   of those questions.  The judge has already
16   ordered that all of that evidence be dismissed.
17            MS. LANGEN:  I don't recall that so I'm
18   just going to certify it.  I'll look into it and
19   if I need to come back, I will.
20            MR. DAVIS:  Yeah.
21   BY MS. LANGEN:
22       Q.  And along those same lines, you were
23   present when Officer Ullrich testified at the
24   hearing on your motion to suppress the evidence
25   collected from August 28th, 2020, weren't you?
```

Page 202

```
 1            MR. DAVIS:  Object and don't answer.
 2       Q.  Certify it.
 3            And Officer Elsbernd testified in that
 4   same hearing, didn't he?
 5       A.  I don't feel comfortable answering that.
 6       Q.  Certify it.
 7            Are you aware that the magistrate
 8   recently recommended that the judge in your
 9   federal case deny your motion to suppress?
10            MR. DAVIS:  Objection, argumentative.
11   Objection, beyond the scope of this case.
12       Q.  Certify it.
13            So if the judge adopts the magistrate's
14   recommendation, the items that Officer Ullrich
15   found during a search of you on August 28th,
16   2020, are going to be allowed as evidence in the
17   trial of the federal charges.  Is that your
18   understanding of that motion?
19            MR. DAVIS:  Object, argumentative.  And
20   object under Rule FRE 403.  If you continue with
21   this line of questioning and harassing my
22   witness, I will end this deposition.
23       Q.  Certify it.  I've got one more.  I'm not
24   going to ask that.  Never mind.
25            Other than what we've talked today, has
```

Page 203

```
 1   Officer Murphy ever been involved in arresting
 2   you?
 3       A.  Not that I recall.
 4       Q.  Okay.  Has Officer Murphy ever stopped
 5   you without arresting you?
 6       A.  That's still the same thing.
 7       Q.  No.  I asked you if he'd ever arrested
 8   you.  I'm asking you now if he's ever stopped you
 9   but not arrested you?
10       A.  I don't feel comfortable answering that
11   question.
12       Q.  That's discoverable information.  It
13   goes to your motive for filing this lawsuit, so
14   you'll need to answer that question unless your
15   attorney tells you not to, and I don't think he
16   has grounds to.
17       A.  Yes.
18       Q.  So Officer Murphy has stopped you
19   without arresting you?
20       A.  No.
21       Q.  All right.  I'm totally confused.  I'm
22   going to ask it again.
23            Has Officer Murphy ever stopped you
24   without arresting you?
25       A.  No, ma'am.
```

Page 204

```
 1       Q.  Other than the arrests we've talked
 2   about today, has Officer Ullrich ever been
 3   involved in arresting you?
 4       A.  That's the same question.
 5       Q.  No, that was Officer Murphy I was asking
 6   about before.
 7       A.  Oh.
 8       Q.  This is Officer Ullrich.  So just to be
 9   clear, other than the arrests we've already
10   talked about today, has Officer Ullrich ever been
11   involved in arresting you?
12       A.  No, ma'am.
13       Q.  Has Officer Ullrich ever been -- ever
14   stopped you without arresting you?
15       A.  No, ma'am.
16       Q.  Other than the arrests we've already
17   talked about, has Officer Elsbernd ever been
18   involved in arresting you?
19       A.  Not that I recall.
20       Q.  Has Officer Elsbernd ever stopped you
21   without arresting you?
22       A.  Not that I recall.
23       Q.  Your lawsuit says the Covington Police
24   Department and its agents constantly harass you.
25   Are you referring to the three arrests that are
```

51 (Pages 201 to 204)

Page 205

1    described in your lawsuit as examples of how
2    you've been harassed by Covington Police
3    Department?
4        A.  No, ma'am.
5        Q.  What are you referring to?
6        A.  Numerous stops.
7        Q.  The what?
8        A.  Other stops.
9        Q.  So stops that do not involve the
10   officers who are defendants in this lawsuit?
11       A.  Including them, too.
12       Q.  Okay.  So those are the examples of
13   harassment.  Do you have any other examples of
14   how you've been harassed by Covington Police
15   Department?
16       A.  Pulled over for no reason.
17       Q.  When has that happened?
18       A.  I can't -- I don't know exact time, but
19   I know I was pulled over in 2018, 2019, 2020.
20       Q.  Okay.  Do you remember who stopped you
21   on those --
22       A.  No, ma'am.
23       Q.  -- incidents?  No?
24       A.  No, ma'am.  Records will show.
25       Q.  So when you say that Covington Police

Page 206

1    Department and its agents constantly harass you,
2    you're just -- that's what you're relying on is
3    the stops and -- including the stops involved in
4    this lawsuit; correct?
5        A.  Yes, ma'am.
6        Q.  And nothing else?
7        A.  Yes, ma'am.
8        Q.  Okay.  Your lawsuit also says that
9    you've been profiled by the Covington Police
10   Department and its agents.  Are you claiming that
11   the Covington Police Department and its officers
12   have arrested or stopped you because of your
13   race?
14       A.  Yes, ma'am.
15       Q.  Okay.  What facts or circumstances do
16   you rely on to support the conclusion that
17   Covington police officers have racially profiled
18   you?
19       A.  The charges that I'm in.  The charges
20   that I'm facing now and the ones that I beat.
21       Q.  But how do you relate your race to that?
22       MR. DAVIS:  Objection, calls for a legal
23   conclusion.  Objection, confusing.  He answered
24   the question.
25       Q.  You can answer.

Page 207

1        A.  Can you ask the question again?
2        Q.  I'll ask it a different way.
3            What makes you think that the arrests or
4    the stops of you were based on your race?
5        A.  Because -- when you see a Black guy
6    driving in a certain time of night in a
7    neighborhood, they pull you over for no reason.
8    I was pulled over, not just the incidents that I
9    was arrested for, I was pulled over for no
10   reason.  And a Black guy in a nice car, pulled
11   over.  And they instantly say they smell
12   marijuana, but don't smell nothing, don't find
13   nothing, and let you go after that, or find any
14   reason to figure out to lock you up.  I've been
15   pulled over numerous times by them, just because
16   a Black guy in a nice car in the neighborhood.
17       Q.  Well, do you know if that's happened to
18   any other Black guys?
19       A.  Yeah.
20       Q.  Who?
21       A.  I mean, what, do you want me to make a
22   list and tell you exactly who?
23       Q.  Yeah.
24       A.  There's a bunch of Black people that
25   have been pulled over.

Page 208

1        Q.  Do you know them?
2        A.  No, ma'am.
3        Q.  Okay.  Well, do you know the names of
4    any of them?
5        A.  No, ma'am.
6        Q.  So you can't list them?
7        A.  I can't list them.
8        Q.  Okay.
9        MR. DAVIS:  Objection, argumentative.
10       Q.  So --
11       MR. DAVIS:  And then objection, it
12   misstates the law.  That's not the law.
13       Q.  Do you know any White people who have
14   been pulled over or arrested for no apparent
15   reason?
16       A.  No, ma'am.
17       Q.  Your lawsuit alleges that the City of
18   Covington only requires that lawful procedures
19   relating to search and deescalation prior to use
20   of force be used when policed against White
21   citizens.  So are you implying that does not
22   apply when they are arresting their White
23   citizens?
24       MR. DAVIS:  Objection, calls for a legal
25   conclusion.

52 (Pages 205 to 208)

Page 209

```
 1          Q.  You can answer.
 2          A.  Can you ask it a different way?
 3          Q.  Yeah.  Your lawsuit alleges that the
 4    City of Covington only requires that lawful
 5    procedures are being used when they police their
 6    White citizens; okay?  That's -- that's what your
 7    lawsuit says.
 8          Are you alleging then that the city does
 9    not require lawful procedures to be used when
10    they are policing Black citizens?
11          MR. DAVIS:  Object.
12          A.  Absolutely.
13          Q.  Okay.  Tell me the facts that you rely
14    on in support of that allegation.
15          A.  If --
16          MR. DAVIS:  Objection, calls for a legal
17    conclusion.  Go ahead.
18          A.  If they pulled me over, it's automatic
19    they gonna say they smell marijuana and say that
20    there's a gun in the car or say -- they pull you
21    over, they just, how you doing, ma'am, you did
22    this wrong, license, registration.  And then you
23    all go about your all way.  If a black person
24    gets pulled over, they want to search their car.
25    They want to run their name through, see if they
```

Page 210

```
 1    got any warrants or anything like that, so
 2    scenario, pull you out of the car.  Like it's
 3    just a bunch of things.  We could go on and on
 4    and on.  But it's not a civil rights activist,
 5    so...
 6          Q.  So other than your own experiences that
 7    you've testified about, do you have any other
 8    facts or information to support that allegation?
 9          A.  No, ma'am.
10          Q.  Okay.  Do you have any knowledge
11    relating to the content of the written policies
12    that the city maintains concerning the use of
13    force?
14          A.  Can you ask that in a different way?
15          Q.  Have you ever looked at the policy and
16    procedure manual of the Covington Police
17    Department?
18          A.  No, ma'am.
19          Q.  Okay.  So then is it fair to say that
20    you don't have any knowledge about what those
21    policies say on the use of force?
22          A.  No, ma'am.
23          Q.  Okay.  It's not fair to say that or it
24    is fair to say that?
25          A.  I know it's not right for, for a Black
```

Page 211

```
 1    man to be choked and punched in the face.
 2          Q.  I didn't ask you about that.  I asked
 3    you if you know anything about the written
 4    content of the use of force policies of the city.
 5          A.  I know you didn't ask me, but that's
 6    what I'm answering.  I don't recall.  I don't --
 7    I never read the police force and this and that.
 8    I never read that, but at the end of the day, I
 9    know what I've been through and I know that
10    wasn't proper police force.  They don't tell them
11    to punch nobody.  They don't tell them to choke
12    nobody.  To sit on the back of somebody's back
13    and bend they wrist and do all this and stuff
14    like that.  They don't -- that police policy
15    don't include that.
16          Q.  And you've never read it?
17          A.  I, I -- no, I've never read it.  But I
18    just -- I just -- as a matter of fact, I have
19    read something about it, I just seen it with the
20    George Floyd, when they put it up on the board
21    for his trial.  They had it on his trial.  That
22    was excessive force.  That was excessive force
23    that was used on me as well.
24          Q.  Well, now, that happened in Minnesota;
25    right?
```

Page 212

```
 1          A.  Yeah.
 2          Q.  That's not the Covington Police
 3    Department, right, we're here in Kentucky?
 4          A.  So you're telling me Covington Police
 5    Department says that you can beat a person?
 6          Q.  No, I'm just asking you if you've ever
 7    read the use of force policies for the Covington
 8    Police Department.
 9          A.  No, ma'am.  I never read it but --
10          Q.  Okay.
11          A.  -- I know that wasn't proper force used.
12          Q.  So do you have any knowledge relevant to
13    the content of the city's written policies and
14    procedures about searches?
15          A.  No.
16          Q.  You've not read that; right?
17          A.  No, ma'am.
18          Q.  Are you aware of any facts or
19    circumstances to suggest that the city allows its
20    officers to use force or conduct searches in any
21    way other than as described in the written
22    policies and procedures that the city maintains?
23          A.  No, ma'am.
24          Q.  Do you have any knowledge relating to
25    the kind of training that Covington police
```

53 (Pages 209 to 212)

Page 213

1  officers receive?
2      A.  No, ma'am.
3      Q.  Do you know what applicable statutes
4  require police officers to receive in Kentucky --
5      A.  What's applicable?
6      Q.  Okay.  Do you know what the statutes
7  require police officers to receive in Kentucky
8  for training?
9      A.  No, ma'am.
10     Q.  Your lawsuit alleges that the city did
11 not adequately train, supervise or discipline its
12 officers.  Are you aware of any facts or
13 circumstances that support that allegation?
14     A.  Yes, ma'am.  The way I was handled.
15     Q.  Other than the way that you were
16 handled, do you have any knowledge to support --
17 or facts or information to support that
18 allegation?
19     A.  No, ma'am.
20     Q.  Okay.  So your allegations against the
21 city and its police -- its policies and practices
22 are strictly based on what you have experienced;
23 right?
24     A.  I mean, that's the only thing I can
25 speak upon is what I've been through.  Right.

Page 214

1      Q.  So you're saying, yes, that's?
2      A.  Yes.
3      Q.  That's all it's based on; right?
4      A.  Um-hmm.  Yes, ma'am.
5      Q.  Do you know how many hours of training a
6  typical Covington police officer has in a given
7  year?
8      A.  No, ma'am.
9      Q.  Do you know where Covington police
10 officers receive their training?
11     A.  No, ma'am.
12     Q.  Do you know what subject matter their
13 training covers?
14     A.  No, ma'am.
15     Q.  Is there a particular aspect of the
16 training program that you think is problematic?
17     A.  Yes, ma'am.
18     Q.  In what way do you think the training
19 program is problematic?
20     A.  On how they handle people.
21     Q.  But you said that the only knowledge you
22 have is what happened to you; right?
23         MR. DAVIS:  Objection.  Confusing.
24 Misstates his testimony.
25     A.  Is that what you said, that your only

Page 215

1  knowledge about the training program is based on
2  what you experienced?
3      A.  Yes.  I did say that.
4      Q.  Okay.  Is there a specific subject on
5  which you think Covington police officers need
6  more or better training?
7          MR. DAVIS:  Objection.  Calls for expert
8  testimony.
9      Q.  You can answer.
10     A.  I'm going to go with him.
11     Q.  Say again?
12     A.  I'm going to go with what he said.
13     Q.  Well, he didn't tell you not to answer.
14 He just said that -- he just entered an
15 objection.  That's different.
16     A.  I don't recall.
17     Q.  Do you know how Covington police
18 supervisors go about supervising other officers?
19     A.  No, I don't.
20     Q.  Do you know if there are periodic
21 evaluations of police officers in the Covington
22 Police Department?
23     A.  No, I don't.
24     Q.  Do you know if Covington police
25 supervisors review police officer reports?

Page 216

1      A.  No.
2      Q.  Do you know if Covington police
3  supervisors ever investigate patrol officers'
4  actions in certain circumstances?
5      A.  No, ma'am.
6      Q.  Do you know what circumstances might
7  trigger an investigation?
8      A.  No, ma'am.
9      Q.  Do you know how Covington police
10 supervisors go about disciplining patrol
11 officers?
12     A.  No, ma'am.
13     Q.  Do you know what circumstances warrant
14 disciplining a patrol officer?
15     A.  No, ma'am.
16     Q.  Do you know what types of discipline
17 Covington police supervisors impose on patrol
18 officers when the circumstances warrant
19 discipline?
20     A.  No, ma'am.
21     Q.  Are you aware of any facts or
22 circumstances in which a Covington police officer
23 was found to have violated policy, but did not
24 receive any discipline?
25     A.  Yes, ma'am.

54 (Pages 213 to 216)

Page 217

1    Q.   What?
2    A.   My incident.
3    Q.   So what do you know about that?
4    A.   That nothing was done.
5    Q.   So coming out of your incident, out of
6  the -- which one, the January 1st or the January
7  16th incident?
8    A.   Both.
9    Q.   Okay.  So let's take the January 1st
10 incident.  Are you aware of whether or not there
11 was an investigation of that event?
12   A.   No, ma'am.
13   Q.   Okay.  Are you aware of whether any
14 police officer was found to have been in
15 violation of any state policies or practices as a
16 result of that January 1st event?
17   A.   No, ma'am.
18   Q.   Are you aware if anybody -- any of the
19 police officers in the Covington Police
20 Department received any discipline as a result of
21 the January 1st event?
22   A.   No, ma'am.
23   Q.   January 16th event.  We're going to talk
24 about that one.  Do you know whether or not there
25 was an investigation following that one?

Page 218

1    A.   No, ma'am.
2    Q.   Do you know whether or not any police
3  officer was found to have been in violation of
4  any policy or practice of the Covington Police
5  Department in connection with the January 16th
6  events?
7    A.   Not that I know of.
8    Q.   Okay.  Do you know if any Covington
9  police officer was disciplined as a result of
10 what happened on January 16th of 2021?
11   A.   Not that I know of.
12   Q.   Your lawsuit states that the city
13 received a blistering assessment by the US
14 Department of Justice in October of 2016, which
15 found that substantive, unlawful use of force and
16 racism, slash, biased efforts were rampant in the
17 department, and that's a quote from your lawsuit.
18       Do you have a copy of that report?
19   A.   Yes, ma'am.
20   Q.   Okay.  Can you provide that to your
21 attorney, because I'm not familiar with it, so I
22 would like to request that from you, Jamir.
23       Have you ever read that report?
24   A.   Yes, ma'am.
25   Q.   Do you recall anything specific in that

Page 219

1  report?
2    A.   No, ma'am.
3    Q.   Your complaint asserts a claim of
4  negligent hiring, retention, supervision, and
5  discipline against the city.
6        Are you aware of that?
7    A.   Yes, ma'am.
8    Q.   With respect to Officer Murphy, what
9  facts or circumstances do you have to support a
10 conclusion that Officer Murphy was unfit for --
11 to work as a police officer before the city made
12 a decision to hire him?
13       MR. DAVIS:  Objection.  Calls for a
14 legal conclusion.
15   Q.   You can answer.
16   A.   I don't know.
17   Q.   Are you aware of any information that
18 came to light after the city hired Officer Murphy
19 that should have been -- that should have made
20 the city aware that Officer Murphy was not fit to
21 work as a police officer?
22   A.   Not that I know of.
23   Q.   What facts do you rely on to support
24 your assertion that the city failed to supervise
25 or discipline Officer Murphy?

Page 220

1    A.   None that I know of.
2    Q.   Are you aware of any incidents for which
3  you believe Officer Murphy should have been
4  disciplined but was not?
5    A.   Yes, ma'am.
6    Q.   What?
7    A.   Me.
8    Q.   So your January 1st or January 16th
9  incidents?
10   A.   Yes, ma'am.
11   Q.   Anything else?
12   A.   No, ma'am.
13   Q.   Okay.  With respect to Officer Ullrich.
14 What facts or circumstances do you have to
15 support a conclusion that Officer Ullrich was
16 unfit to work as a police officer before the city
17 hired him?
18   A.   I don't know.
19   Q.   Are you aware of any information that
20 came to light after the city hired Officer
21 Ullrich that should have made the city aware that
22 Officer Ullrich was not fit to serve as a police
23 officer?
24   A.   No, ma'am.
25   Q.   What facts do you rely on to support

55  (Pages 217 to 220)

Page 221

1    your assertion that the city failed to supervise
2    or discipline Officer Ullrich?
3        A.  My scenario.
4        Q.  Anything other than that?
5        A.  No, ma'am.
6        Q.  Are you aware of any incidents for which
7    you believe Officer Ullrich should have been
8    disciplined but was not?
9        A.  Yes, ma'am.
10       Q.  What?
11       A.  My incidents.
12       Q.  Anything other than that?
13       A.  Yes, ma'am.
14       Q.  What?
15       A.  The case versus Johnson where he strip
16   searched a guy.
17       Q.  Johnson?
18       A.  Yes, ma'am.
19       Q.  Okay.  Anything else?
20       A.  No, ma'am.
21       Q.  With respect to Officer Elsbernd -- or
22   let me strike that.
23           What do you know about Johnson?
24       A.  It's a case.
25       Q.  That's all you know?

Page 222

1        A.  Um-hmm.
2        Q.  Do you know what it involved?
3        A.  Ullrich going and pulling somebody's
4    pants down.
5        Q.  Do you know if the city had any
6    investigation of that incident?
7        A.  I don't know.  It was a case that's on
8    the law library.
9        Q.  Do you know if there was ever any
10   conclusion by the Covington Police Department
11   that Officer Ullrich did anything against policy
12   or procedure in connection with whatever that
13   was?
14       A.  Not that I know of.
15       Q.  Okay.  With respect to Officer Elsbernd,
16   what facts or circumstances do you have to
17   support the conclusion that Officer Elsbernd was
18   not fit to work as a police officer before the
19   city hired him?
20       A.  None.
21       Q.  Are you aware of any information that
22   came to light after the city hired Officer
23   Elsbernd that should have put the city on notice
24   that Officer Elsbernd was unfit to work as a
25   police officer?

Page 223

1        A.  Besides my scenario?
2        A.  Yes.
3        A.  I don't know.
4        Q.  Okay.  What facts do you rely on to
5    support your assertion that the city does not
6    discipline or supervise Officer Elsbernd?
7        A.  My scenario.
8        Q.  Anything else?
9        A.  No, ma'am.
10       Q.  Are you aware of any incidents for which
11   you believe Officer Elsbernd should have been
12   disciplined but was not?
13       A.  Besides my incidents, no, ma'am.
14       Q.  Your lawsuit alleges that Chief Nader
15   violated your constitutional rights by
16   participating in the act of covering up evidence
17   and not properly preserving phone text messages
18   and witness statements in an attempt to
19   criminally charge you with acts of domestic
20   violence.  That's a quote from your complaint
21   that initiated this lawsuit.
22           Were you charged with any acts of
23   domestic violence in connection with the events
24   of either January 1st of 2021 or January 16th of
25   '21?

Page 224

1        A.  They tried to say I was, but I wasn't.
2        Q.  What do you mean by that?
3        A.  They tried to -- my original charge was
4    supposed to be domestic violence, but it wasn't.
5    On January 1st.
6        Q.  Okay.  So you were not charged with that
7    ultimately?
8        A.  No, ma'am.
9        Q.  Okay.  What are you referring to when
10   you say Chief Nader tried to cover up evidence
11   and failed to properly preserve phone text
12   messages?
13       A.  The incidents with my case, he forgot --
14   he -- I'm sorry.  The incident with my case that
15   he covered up evidence that what they did as far
16   as like how they injured me and stuff like that.
17       Q.  How did he cover that up?
18       A.  He ain't do nothing about it.  I, I went
19   to the office and I -- and I told them I wanted
20   to file a complaint.  And he texted.  Next thing
21   you know, my lawyer is calling me, telling me
22   about the prosecutor just called him, telling him
23   that I just tried to file a complaint against the
24   police officer.
25       Q.  Okay.  So it's your testimony that you

Page 225

1    went to see Chief Nader at some point?
2        A.  Um-hmm.
3        Q.  When?
4        A.  When I was -- got released.
5        Q.  From the January 1st or the January
6    16th?
7        A.  From the January 16th.
8        Q.  So sometime after February 2nd?
9        A.  Yes, ma'am.
10       Q.  How soon after February 2nd did you do
11   that?
12       A.  February 3rd.
13       Q.  Okay.  So the next day after you got
14   out?
15       A.  Yes, ma'am.
16       Q.  Okay.  And where did you go to visit
17   Chief Nader?
18       A.  At the police station.
19       Q.  Okay.  Where is -- where is that
20   located?
21       A.  Covington, Kentucky.
22       Q.  Yeah.  Where?
23       A.  I don't know the streets.  I'm not from
24   Covington.
25       Q.  Okay.  How did you get there?

Page 226

1        A.  My momma drove me.
2        Q.  Okay.  Did you have to talk to anybody
3    else before you talked to Chief Nader?
4        A.  No, ma'am.
5        Q.  Did you talk directly to Chief Nader?
6        A.  I don't know exactly if that's who it
7    was, but I talked to somebody.
8        Q.  So you don't know if it was Chief Nader?
9        A.  Yes, ma'am.
10       Q.  You do not know?
11       A.  I don't know.
12       Q.  Okay.  So it could have been Chief
13   Nader, but it could have been anybody else?
14       A.  Yes, ma'am.
15       Q.  Is there -- when you first get
16   into that building, is there a little window
17   there where you talk to somebody and say what you
18   want to do?
19       A.  Yes.
20       Q.  Yes.
21       A.  Say who you want to talk to.
22       Q.  Okay.  So what did you tell that person?
23       A.  My momma told him that she wanted to
24   talk to the higher-ups.  And somebody to -- I
25   think it was the chief came out and was talking

Page 227

1    to us.
2        Q.  So were you standing there when your
3    mother said that?
4        A.  No, ma'am.
5        Q.  So were you present at all when your mom
6    was talking to this person behind the window?
7        A.  Not behind the window, but when the guy
8    came out from behind, yeah.
9        Q.  At what point in time did you come into
10   the building?
11       A.  I was in the building the whole time.
12       Q.  Okay.  So -- but it was your mom that
13   talked to the person behind the window that you
14   first told what you wanted?
15       A.  Yes.
16       Q.  And you just didn't speak during that
17   time; right?
18       A.  Yes.
19       Q.  Okay.  But you were there?
20       A.  Yes.
21       Q.  Okay.  So somebody came out to talk to
22   you; right?
23       A.  Yes.
24       Q.  Who?
25       A.  I don't know.

Page 228

1        Q.  What did they look like?
2        A.  White guy.  Bald, I think.
3        Q.  Okay.  Anything else that you can
4    remember about that person?
5        A.  No, ma'am.
6        Q.  And did you speak at this point or was
7    it still your mom?
8        A.  I spoke.
9        Q.  You spoke.  What did you say?
10       A.  I told them what happened.
11       Q.  Okay.  Told them what happened on
12   January 1st or told them what happened on January
13   16th?
14       A.  16th.
15       Q.  16th.  Okay.  And you told them you
16   wanted to file a complaint?
17       A.  (Witness nodded head.)
18       Q.  Okay.  What happened then?
19       A.  That's it.  I got a call from my lawyer
20   in the midst of it.  I walked out and then I
21   walked back in there and I told my momma not to
22   do it because the prosecutor was threatening me.
23       Q.  Okay.  So you were talking to whoever
24   the person was that came out and said you wanted
25   to file a complaint.  But while you were saying

57 (Pages 225 to 228)

Page 229

1    that, you got this phone call from your attorney?
2        A.   No.  Afterwards, I'm sorry.  We never
3    filed the complaint.
4        Q.   Oh, you never actually filed the
5    complaint.  Is that what you said?
6        A.   Yes.
7        Q.   Okay.  So you never did file that
8    complaint?
9        A.   No, ma'am.
10       Q.   So when you said Chief Nader was
11   covering up and failing to properly
12   preserve phone text messages, I think you
13   responded ultimately that you didn't really know
14   if it was Chief Nader who did that; right?
15           MR. DAVIS:  Objection.  Misstates
16   testimony.
17       Q.   What did you say on that point?
18       A.   On what point?
19       Q.   About whether -- about what facts or
20   evidence that you have to support a claim that
21   Chief Nader tried to cover up evidence and failed
22   to properly preserve phone text messages?
23       A.   I guess it was Chief Nader.  I asked who
24   it was.  I mean, if something happened and then
25   we go to the chief and then the chief not do

Page 230

1    nothing about it, then that's him covering it up.
2        Q.   Well, but I thought you said you never
3    filed a report.
4        A.   Well, we went to go talk to the chief.
5        Q.   Did you talk to the chief?
6        A.   Yes.
7        Q.   Are you talking about the person who
8    came out and talked to you after you spoke with
9    the lady at -- or whoever was at the window?
10       A.   Yes.
11       Q.   Okay.  But you don't know if that was
12   Chief Nader, do you?
13       A.   Yes.  It was the chief.
14       Q.   You're sure?
15       A.   Yes.
16       Q.   I thought -- I thought I heard you say
17   you didn't know who that was?
18           MR. DAVIS:  Objection.  Asked and
19   answered.
20       Q.   Is that right?
21           MR. DAVIS:  Objection.  Argumentative.
22       A.   It was the chief.
23           MR. DAVIS:  He just answered the
24   question.  He told you who he -- who he thought
25   it was.

Page 231

1            MS. LANGEN:  Well, I thought before he
2    said he didn't know who it was.
3    BY MS. LANGEN:
4        Q.   So do you know who it was or not?
5        A.   Yes.  It was the chief.
6        Q.   It was for sure the chief?
7        A.   Yes.
8        Q.   Can you describe what Chief Nader looks
9    like?
10       A.   White older guy.
11       Q.   White older guy?
12       A.   Yes.
13       Q.   Tall?  Short?
14       A.   Short.
15       Q.   Short, okay.  Do you remember anything
16   about his hair?
17       A.   No, ma'am.
18       Q.   What was he wearing?
19       A.   He was wearing a white shirt.
20       Q.   Okay.
21       A.   With a blue -- khaki pants.
22       Q.   So your allegation about --
23           MR. DAVIS:  And just -- I previously --
24           MS. LANGEN:  Oh, go ahead.  Let's take a
25   look so you can take your call.

Page 232

1            MR. DAVIS:  I have a call at 1:00.
2            (Brief recess.)
3    BY MS. LANGEN:
4        Q.   Your lawsuit makes mention of fabricated
5    police incident reports.  Do you remember making
6    that allegation?
7        A.   Yes, ma'am.
8        Q.   Okay.  Have you seen any of the police
9    reports that were written as a result of the
10   events of either January 1st or January 16th?
11       A.   Yes, ma'am.
12       Q.   Which ones have you seen?
13       A.   Both of them.
14       Q.   Both of them.  Okay.  Do you have any
15   reason to -- what do you think is fabricated on
16   those reports?  Start with the January 1st one.
17       A.   Well, first they said -- like on January
18   1st, they say I came out with my hands balled up,
19   you know, looking for a fight with police
20   officers but that's not true, what happened.
21   Then they didn't file an incident report -- a
22   physical force of use report, nor was pictures
23   tooken of the incident that happened.  So that's
24   why I said it's falsified and they falsified the
25   police report.

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 233

```
 1        Q.  Okay.  So the one that was done, you say
 2   that was false because it alleges that you
 3   engaged in some conduct that you didn't engage
 4   in?
 5        A.  Yes, ma'am.
 6        Q.  And then there's two things that were
 7   not reduced to writing, I guess --
 8        A.  Yes, ma'am.
 9        Q.  -- that you think should have been;
10   right?
11        A.  Yes, ma'am.
12        Q.  Okay.  And that's the basis for your
13   fabrication with respect to the January 1st
14   incident --
15        A.  Yes, ma'am.
16        Q.  -- is that right?
17        A.  For both.
18        Q.  Oh, that's for both of them?
19        A.  Yes, ma'am.
20        Q.  What did you see on the January 16th
21   report?
22        A.  In the January 16th report, they said I
23   refused to put my hands behind my back.
24        Q.  Okay.  Anything else about that?
25        A.  Yes, ma'am.  Then they said that I
```

Page 234

```
 1   struck the officer, which I never did.
 2        Q.  Okay.  Anything else about that report
 3   that you say they fabricated?
 4        A.  I was -- they said I was resisting
 5   arrest.
 6        Q.  Okay.  Anything else?
 7        A.  No, ma'am.
 8        MS. LANGEN:  Okay.  Let me go back over
 9   my notes real quick, but I think I'm done.  Yeah,
10   we're just going to say I'm done.  Your witness.
11        MR. DAVIS:  Thank you.
12             DIRECT EXAMINATION
13   BY MR. DAVIS:
14        Q.  On the January 1st, 2021 incident, did
15   officers tell you -- ever tell you why you were
16   being arrested?
17        A.  No, sir.
18        Q.  Do you believe that it's a policy of the
19   Covington Police Department that they should tell
20   you why you're being arrested?
21        A.  Yes, sir.
22        Q.  All right.  In the January 1st, 2021
23   incident, did officers ever file a use of force
24   report?
25        A.  No, sir.
```

Page 235

```
 1        Q.  Okay.  On January 1st, 2021, did they
 2   use force against you?
 3        A.  Yes, sir.
 4        Q.  All right.  Do you know if officers were
 5   ever disciplined for not filing a use of force
 6   report --
 7        A.  No, sir.
 8        Q.  -- on January 1st?  On the January 1st,
 9   2021 event, did officers ever observe you before
10   you came out of the back bedroom?
11        A.  No, sir.
12        MS. LANGEN:  Objection.  I don't know
13   how he would know what they observed.
14        Q.  Okay.  Could officers observe you before
15   you came out of that back bedroom?
16        A.  No, sir.
17        MS. LANGEN:  Objection.  I don't know
18   how he could know what they could observe.
19   That's speculative.
20        Q.  Go ahead.  You can answer.
21        A.  No, sir.
22        Q.  Okay.  When you were in the back
23   bedroom, was the door closed to the back bedroom?
24        A.  No, sir.
25        Q.  Okay.  Did -- while you were in the back
```

Page 236

```
 1   bedroom, did any officer ever come into the back
 2   bedroom?
 3        A.  No, sir.
 4        Q.  So prior to you entering the living room
 5   of the apartment on January 1st, 2021, did you
 6   have any interaction at all with police officers?
 7        A.  I'm sorry.  Can you ask that again?
 8        Q.  So prior to you entering into the living
 9   room on January 1st, 2021, did you have any
10   interactions with officers prior to that?
11        A.  No, sir.
12        Q.  Okay.  Is it true that the officers
13   charged you with disorderly conduct on January
14   1st, 2021?
15        A.  Yes, sir.
16        Q.  Is it true that officers never observed
17   you in the back bedroom, or is it true that
18   officers did not observe any of your conduct in
19   the back bedroom on January 1st, 2021?
20        MS. LANGEN:  Objection.
21        A.  No, sir.
22        MS. LANGEN:  I don't know how he could
23   know what the officers observed or didn't
24   observe.  That's how you asked it.
25        Q.  Well, you can go ahead and answer.
```

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 237

```
 1        A.  No, sir.
 2        Q.  Okay.  Is it -- do you believe that
 3   police officers are required to take photographs
 4   of you after a use of force?
 5        A.  Yes, sir.
 6        Q.  On January 1st, 2021, did police
 7   officers take any photos of you?
 8        A.  No, sir.
 9        Q.  Is it your understanding that Officer
10   Nader was the Chief of Police at the time of the
11   January 1st, 2021 incident?
12        A.  Yes, sir.
13        Q.  And then as the chief of police, do you
14   believe that it was his job to supervise the
15   officers that were on the scene of the January
16   1st, 2021 incident?
17        A.  Yes, sir.
18        Q.  Were you supposed to show up to work on
19   January 2nd, 2021?
20        A.  Yes, sir.
21        Q.  And who were you working with at the
22   time?
23        A.  David.
24        Q.  And were you able to show up to work on
25   January 2nd, 2021?
```

Page 238

```
 1        A.  Hmm-um.  No, sir.
 2        Q.  And why not?
 3        A.  Because I was incarcerated.
 4        Q.  Okay.  And were you terminated from your
 5   job after not showing up for work?
 6        A.  Yes, sir.
 7        Q.  Let's move to the January 16th, 2021
 8   incident.  On January 16th, 2021, were you ever
 9   cited for not wearing a seat belt?
10        A.  No, sir.
11        Q.  Were you ever -- was a ticket ever
12   written and handed to you for not wearing a seat
13   belt?
14        A.  No, sir.
15        Q.  And you -- did you review the police
16   report from January 16th, 2021?
17        A.  Yes, sir.
18        Q.  Was there any mention of you not wearing
19   a seat belt in that police report?
20        A.  No, sir.
21        Q.  Do you believe that officers -- strike
22   that.
23           Did the officers start questioning you
24   immediately on January 16th, 2021?
25        A.  Yes, sir.
```

Page 239

```
 1        Q.  Did you feel free to leave the scene?
 2        A.  No, sir.
 3        Q.  Why didn't you feel free to leave the
 4   scene?
 5        A.  Because the questioning and the way
 6   that -- how they surrounded me.  He was standing
 7   right -- I was in the passenger seat, he's
 8   standing right here by the door, so talking to me
 9   with the window down, questioning me.  So I
10   couldn't open up the door and leave.  I felt like
11   I was being seized.
12        Q.  Okay.  Were you multiple officers
13   surrounding you on January 16th, 2021?
14        A.  Yes, sir.
15        Q.  Okay.  Did officers ever -- on January
16   16th, 2021, did officers ever mention that there
17   was probable cause that you had committed a
18   crime?
19        A.  No, sir.
20        Q.  And to your knowledge, did Chief Nader
21   ever review any of the use of force reports from
22   January 16th, 2021, or January 1st, 2021?
23        A.  No, sir.  He couldn't possibly do that
24   if one of them was never written.
25           MR. DAVIS:  Okay.  I have no further
```

Page 240

```
 1   questions.
 2           MS. LANGEN:  Okay.  I think I might have
 3   a few recross.  Let me think here a second.
 4           RECROSS-EXAMINATION
 5   BY MS. LANGEN:
 6        Q.  On January 16th of 2021, you gave the
 7   police officer the name of Ronnie Wynn; is that
 8   right?
 9        A.  Yes, ma'am.  I think so.
10        Q.  Is that your name?
11        A.  No, ma'am.
12        Q.  Okay.  Did the police officer tell you
13   that there was a warrant out for Ronnie Wynn?
14        A.  As I recall, yes, ma'am.
15        Q.  Okay.  Was it shortly after the officer
16   told you about the warrant that he asked you to
17   step out of the car?
18        A.  Yes, ma'am.
19        Q.  Okay.  Did that lead you to believe that
20   the officer was arresting you because you had
21   given a false name or because you had a warrant?
22           MR. DAVIS:  Objection, calls for
23   speculation.  Objection, calls for a legal
24   conclusion.
25        Q.  Did that lead -- did that lead you to
```

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 241

1  believe that the officer was under the impression
2  that you were Ronnie Wynn and had a warrant out
3  and that's why you were being arrested?
4       A.  No, ma'am.
5       Q.  What did that lead you to believe?
6       A.  That I was being harassed.
7       Q.  Okay.  You said that you were supposed
8  to show up to work for David on February -- did
9  you say February 2nd or January 2nd?
10      A.  January 2nd.
11      Q.  January 2nd.  Okay.  How did you get
12  that assignment from David?
13      A.  Well, usually that's the schedule.  We
14  had a house to do.  I worked Sunday through
15  Friday.
16      Q.  Okay.  Do you have any communication
17  from David or any documentation or anything in
18  writing that establishes what your schedule was?
19      A.  No, ma'am.  Not right off back.  I mean,
20  I've got check stubs, that's it.
21      Q.  Okay.  But you don't have like any
22  Facebook post or -- I think that's how you said
23  you got in touch with David was through Facebook;
24  right?
25      A.  Yes, ma'am.

Page 242

1       Q.  Do you have any Facebook posts or
2  anything of that nature that would show that you
3  were supposed to come work on that day?
4       A.  No, ma'am.  My Facebook was seized on.
5       Q.  Okay.  Do you have any emails or letters
6  or anything like that from David?
7       A.  No, ma'am.  Only thing I've got is the
8  Facebook which it was seized by the marshals.
9       MS. LANGEN:  Okay.  I think those are
10  all the questions I have.  Thank you.  Thanks.
11
12          (Witness excused.)
13          (Deposition concluded at 1:54 p.m.)
14
15
16
17
18  _____   _____
19  ANTHONY MARIO WYNN                 DATE
20
21
22
23
24
25

Page 243

1                      )
   COMMONWEALTH OF KENTUCKY   )
2                      )
3
4       I, Lee Ann Goff, Notary Public in and for
5  the Commonwealth of Kentucky, do hereby certify:
6       That the witness named in the deposition,
7  prior to being examined, was by me duly sworn;
8       That said deposition was taken before me at
9  the time and place therein set forth and was taken
10  down by me in shorthand and thereafter transcribed
11  into typewriting under my direction and supervision;
12      That said deposition is a true record of
13  the testimony given by the witness and of all
14  objections made at the time of the examination.
15      I further certify that I am neither counsel
16  for nor related to any party to said action, nor in
17  any way interested in the outcome thereof.
18      IN WITNESS WHEREOF I have subscribed my
19  name and affixed my seal this 3rd day of November,
20  2023.
21
22          _____
23          Lee Ann Goff
24          Notary Public KYNP30963
25  My Commission Expires:  7/1/25

Barlow Reporting & Video Services, LLC
(859) 261-8440



DEFENDANT'S
EXHIBIT