UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON


ANTHONY MARIO WYNN,

                    Plaintiff,

V.

CITY OF COVINGTON, ET AL.,

                    Defendants



**DEPOSITION OF ROBERT NADER**
I

        I, BRANDY MOWERY, Court Reporter, and Notary

Public in and for the Commonwealth of Kentucky at Large,

appeared for the taking of the deposition of ROBERT NADER,

at Adams Law, located at 40 West Pike Street, Covington,

Kentucky, on November 13, 2023, commencing at the

approximate hour of 9:00 a.m.

                * * * * * * * * * *


                    BRANDY D. MOWERY, CR
                AN/DOR REPORTING AND TECHNOLOGIES
                    179 EAST MAXWELL STREET
                LEXINGTON, KENTUCKY  40507
                        859.254.3013

APPEARANCES


**COUNSEL FOR PLAINTIFF:**

Hon. Jamir Davis
J. Davis Law Firm, PLLC
Post Office Box 122123
Covington, Kentucky  41011

**COUNSEL FOR DEFENDANTS:**

Hon. Jeffrey C. Mando
Adams Law, PLLC
40 West Pike Street
Covington, Kentucky  41011

Also present:  Doug Ullrich

**INDEX**

**DEPONENT:  ROBERT NADER**

EXAMINATION BY:                                     PAGE
        Attorney Jamir Davis                     04

EXHIBITS:                                           PAGE

Exhibit No. 1                                        24
Exhibit No. 2                                       103


REPORTER'S CERTIFICATION                            105

2        ROBERT NADER, called as a witness, first being duly
sworn by the Court Reporter/Notary Public, testified as

3    follows, to wit:

4                    EXAMINATION

5    BY MR. DAVIS:

6    Q.   This deposition is beginning.  My name is

7    Jamir Davis.  I'm the attorney for Anthony Wynn, in Case

8    No. 2-21-CV-00137.

9        Before questions begin, I just wanted to lay out a

10   couple of rules for a deposition.  Have you been in a

11   deposition before?

12   A.   Yeah, a long time ago.

13   Q.   Okay.  And just for the sake of the court

14   reporter, can you make sure to answer my questions "yes" or

15   "no" verbally because she obviously can't pick up on the

16   shaking of a head or nodding or anything like that?

17   Q.   Also, if you -- you can take a break at any time.

18   I just ask that if you take a break, you finish answering

19   the question that I've put forth prior to taking that break.

20   A.   Okay.

21   Q.   Also, just for the sake of the court reporter,

22   please make sure to allow me to finish my full question

23   before responding.  That way, the record is clean.

24        So as I stated, my name is Jamir Davis, and I'm an

1    attorney for Anthony Wynn.  Can you please state your full

2    name for the record?

3         A.   Robert Nader, N-A-D-E-R.

4         Q.   Okay.  So during this deposition, I will ask you

5    questions which you may answer truthfully.  Unless your

6    attorney tells you not to answer, please answer all of the

7    questions.  Although the judge is not present, this is a

8    formal legal proceeding, just like any other legal

9    proceeding.  So you're under the same obligation to tell the

10   truth.  Okay?

11        A.   Yes.

12        Q.   Before we begin, I need to know, are you currently

13   under the influence of any drugs, alcohol or medication that

14   would impair your judgment?

15        A.   No.

16        Q.   Are you under the influence of anything that would

17   keep you from responding accurately to my questions?

18        A.   No.

19        Q.   Did you prepare for the deposition today?

20        A.   How do you prepare?

21        Q.   Did you meet with your attorney at all?

22        A.   Yes, I met with Mr. Mando last week.

23        Q.   Okay.  And I'm not going to ask about any of your

24   communications but in preparation, did you review any

1    documents of any sort?

2         A.   Yes.

3         Q.   Okay.  Do you remember which documents you

4    reviewed?

5         A.   Use of force and a CAD call.

6         Q.   Okay.  And when you say "use of force," which

7    use-of-force document did you review?

8         A.   January 16th, that incident.

9         Q.   Okay.  Did you review any body-worn camera

10   footage in preparation for today?

11        A.   On January 16th, no.

12        Q.   Okay.  Did you review any body-worn camera footage

13   from January 1st, 2021?

14        A.   Yes.

15        Q.   Okay.  And so today when I describe "Incident 1"

16   as January 1st, 2021, you will be aware of the incident that

17   I'm referring to, correct?

18        A.   Yes.

19        Q.   Okay.  Then if I say "Incident 2," being the

20   January 16the, 2021, incident, you will be aware of the

21   incident I'm referring to, correct?

22        A.   Yes.

23        Q.   Okay.  In Incident 1, on January 1, 2021, in your

24   review of that body-worn camera footage, was there use of

 1    force?

 2         A.    No.

 3         Q.    There was no use of force?

 4         A.    No.

 5         Q.    Okay.  On January 16th, are you aware if there was

 6    any use of force?

 7         A.    Yes.

 8         Q.    Okay.  Where were you born and raised?

 9         A.    Born in Cincinnati.  Raised in the City of

10    Covington.

11         Q.    Okay.  What high school did you attend?

12         A.    Holly Cross High School in Covington.

13         Q.    Did you attend -- what year did you graduate?

14    Excuse me?

15         A.    1993.

16         Q.    Okay.  Did you attend college?

17         A.    Yes, I did.

18         Q.    Where did you attend?

19         A.    I graduated at NKU.  Graduated with an associate's

20    in 1996 in law enforcement.  I was hired with the police

21    department in January '97.  Then, slowly but surely, I

22    finally got my bachelor's degree because of shift changes

23    and stuff like that in 2013 - I don't remember what month -

24    from Thomas Moore.  Then I went and sought my master's

1    degree from NKU and completed that in 2015.

2         Q.   Okay.  And what was your master's degree in?

3         A.   Executive leadership organizational change,

4    master's of science.

5         Q.   How old are you currently?

6         A.   48.

7         Q.   Are you married?

8         A.   Yes.

9         Q.   Do you have any children?

10        A.   Yes.

11        Q.   How many?

12        A.   Two daughters.

13        Q.   Okay.  Are you active on any social clubs or

14   organizations?

15        A.   No.  I play golf and I go to church --

16        Q.   Okay.

17        A.   -- Cathedral.

18        Q.   I'm sorry.  Where?

19        A.   Cathedral, off Madison.

20        Q.   Have you ever been arrested?

21        A.   No.

22        Q.   Have you ever been cited for any crime?

23        A.   Speeding.  A stop sign, too.

24        Q.   When was the speeding?

1      A.    When I was 16.

2      Q.    And how about the stop sign?

3      A.    I was in college.  Before I became a police

4   officer, on Warren Street.  And then the speeding was up in

5   Ohio.  It was, like, Christmas Eve.

6      Q.    Okay.  And then when did you start with the

7   Covington Police Department?

8      A.    January 1997.

9      Q.    And what was the first position that you held with

10  the Covington Police Department?

11     A.    Patrolman.

12     Q.    And how long were you in that position?

13     A.    I think I was in there seven years.  And I was

14  patrol during that time.  Then I went to community relations

15  for a couple years, detective.  And somewhere -- that's when

16  I got promoted to sergeant.  Then I went to -- or patrol,

17  narcotics.  Then I went up the ranks after that.

18     Q.    Okay.  In your time as a patrolman, were you ever

19  disciplined for any reason?

20     A.    I'm trying to think.  No.

21     Q.    Okay.  Were you ever given a written reprimand of

22  any kind?

23     A.    No.

24     Q.    Any verbal reprimands?

1    A.    Yes.

2    Q.    Okay.  Tell me about the verbal reprimands.

3    A.    Third car in a pursuit.  I got a verbal for that.

4  That was probably '98, '99.  But it was kind of overruled

5  because I was actually the second car in pursuit, but the

6  lieutenant thought I was the third car.  Another car showed

7  up.  I just took my lumps and moved on.

8    Q.    Okay.  Was that documented at all?

9    A.    Not that I know of.  It was a verbal.

10    Q.    Is that the only verbal you received as a

11  patrolman?

12    A.    That I recall.

13    Q.    So after a patrolman, what was your next position

14  with the Covington Police Department?

15    A.    Cops unit, which was community outreach.

16    Q.    And how long were you in that position?

17    A.    I believe it was about two years before I went to

18  become a detective.

19    Q.    Okay.  Do you remember the years?

20    A.    No, not right off the bat.  I'd have to do --

21  maybe 2003, to 2005.  I think I was promoted to sergeant in

22  2006.  I don't remember.

23    Q.    Were you ever disciplined in your role?

24    A.    No.

1      Q.   As in community outreach.

2      A.   No.

3      Q.   Did you receive any verbal reprimands?

4      A.   No.

5      Q.   So you were promoted in 2006 to sergeant; is that

6   correct?

7      A.   I think so.  I don't recall when, but it was

8   around that time.

9      Q.   And how long were you in the role of sergeant?

10     A.   Two or three years before I became a lieutenant.

11     Q.   Okay.  And what were your job duties at sergeant?

12     A.   Patrol sergeant.  And then detective sergeant.

13  And then I became narcotics sergeant.  Then back to

14  detective sergeant.

15     Q.   Okay.  So as a detective sergeant, what were your

16  general job duties?

17     A.   Sexual abuse of children and domestic abuse.  So I

18  would take the reports and assign it to the two detectives.

19  I also had the crime lab under me.

20     Q.   Okay.  And then as a -- you said patrol sergeant

21  also?

22     A.   Uh-huh.

23     Q.   What were your duties there?

24     A.   Third-shift patrol.

1      Q.   Okay.

2      A.   Then I moved to the second shift for, like, a

3   month or two.  That's when I went to the crime bureau.  I

4   didn't stay on second shift very long.  I was probably six

5   months on third, two months on second.  Then I moved.

6      Q.   Now, when you were promoted from the position in

7   community outreach to sergeant, was there some type of

8   testing -- any type of testing that was required of you?

9      A.   Well, I went from community relations to

10   detective.  Yes, there is a test.  You have to take a

11   written test.  Seniority points are added.  Then the verbal

12   test, an interview.

13      Q.   Okay.  So after sergeant, tell me a little bit

14   about what happened next.  What position were you in after

15   sergeant?

16      A.   I tested for lieutenant.  The same procedure.

17   Scored number one.  Then I was promoted and put back in

18   patrol.  I was a shift lieutenant.

19      Q.   Okay.  Shift lieutenant.  What were the job duties

20   as shift lieutenant?

21      A.   I was on second shift and moved to first shift.

22   You're the watch commander.  So I'm, like, the administrator

23   for that shift.  In other words, review paperwork,

24   scheduling, overtime, training.  All the stuff through

1    Richmond, you make sure is done.  And you supervise your

2    sergeants directly and also the officers, too.  Sometimes,

3    you may not have a sergeant working.

4        Q.   Okay.  And were you ever disciplined as a

5    lieutenant?

6        A.   No.

7        Q.   Were you ever given a verbal warning?

8        A.   No.

9        Q.   Okay.  Do you recall what year you were moved to

10   lieutenant from sergeant?

11       A.   I think it was -- I only did two years as

12   lieutenant.  It was 2009 to 2011, for two and a half years.

13   Because I was eligible to take the captain's test and scored

14   first on that.

15       Q.   So in 2011, you took the captain's test?

16       A.   I don't know what year it was but, yeah, in that

17   time frame.  You have to have two years in each rank before

18   you can move up.

19       Q.   Okay.  Then tell me about the job duties as

20   captain.

21       A.   I was first assigned as administrative captain.

22   So I had to get accreditation done through the state.  So I

23   had to rewrite all of the policies and stuff.  Under that

24   position, I was also in charge of equipment for the

1   department, building maintenance.  I had training, which I

2   had a sergeant under me.  I did not have a lieutenant.

3   Hiring.  This was all during that time.  And then after

4   that, Chief Russo left.  Chief Jones became chief.  And then

5   I was moved to patrol.  I did that for three years.

6        Q.   As a captain?

7        A.   As captain of patrol.

8        Q.   Okay.  You said you had to rewrite all of the

9   policies and procedures?

10       A.   Well, I shouldn't say "rewrite."  I had to make

11   them into -- from old Adobe and put them into Word.

12       Q.   Oh, okay.

13       A.   So it was more like -- I don't know how you -- use

14   the word "transcribe."

15       Q.   Transcribe?

16       A.   Like, just make them match, because you had to

17   submit it.  Everything became electronic that year.

18       Q.   Got you.  What year was that, you said?

19       A.   I think we got the accreditation in 2012.  So I

20   worked on it in 2011.

21       Q.   Okay.  So you became familiar with all of the

22   policies and procedures within --

23       A.   At that time.

24       Q.   -- the department?

1    A.   You have to know them all the way up through the

2    ranks.

3    Q.   Okay.

4    A.   That's part of the testing.

5    Q.   So when you are given these policies and

6    procedures, you have to study those prior to taking an exam?

7    A.   Correct.

8    Q.   Okay.  And in those policies and procedures, are

9    general orders a part of that?

10   A.   Yes.

11   Q.   Okay.  Do you know how many general orders there

12   are within the Covington Police Department?

13   A.   No.  It was a pretty big book.  So I would give

14   them out and keep them electronically.

15   Q.   Okay.  Do you recall if there's a general order in

16   the Covington Police Department about warrant requirements

17   and entering homes?

18   A.   I'm sure there is.  That's part of accreditation

19   anyway, yeah.

20   Q.   Okay.  Can you ask your attorney to provide that

21   to us, the general order on warrants and entering homes?

22              MR. MANDO:  We'll provide you -- I

23   thought we already provided you with the general orders

24   manual.

 1                        MR. DAVIS:  The only one that I seem to

 2      have in my file is the use of force.

 3                        MR. MANDO:  Okay.  So your request may

 4      have been specific for the use-of-force policy.  Do you want

 5      the policy -- the general order on entering into homes,

 6      warrant execution?  That's what you're asking for?

 7                        MR. DAVIS:  Yes, please.

 8                        BY MR. MANDO:  We'll certainly supply

 9      that to you.

10                        BY MR. DAVIS:  Thank you.

11          Q.   Is there a general order for the stop and search

12      of vehicles?

13          A.   I'm sorry.  It's been a few years, but I'm sure

14      there is, yes.

15          Q.   Okay.

16                        MR. DAVIS:  I would like that one as

17      well if I could have it.

18                        BY MR. MANDO:  For traffic stops?

19                        BY MR. DAVIS:  Traffic stops and if

20      there's a separate one for searching vehicles.

21                        MR. MANDO:  No problem.

22          Q.   So I think we're going back to captain, you

23      rewriting the policies.

24          A.   Not rewriting, turning them into something that

1    can be turned into KSP.  The only way a policy can be

2    changed is approval through the chief.

3         Q.   Okay.  So how long were you in the role of

4    captain?

5         A.   I think -- I know it was three years' patrol.

6    Probably four years, around that time.  '11 to '15.

7         Q.   Okay.  And during your time as captain, were you

8    ever disciplined or --

9         A.   No.

10        Q.   -- reprimanded?

11        A.   No.

12        Q.   Did you receive any verbal --

13        A.   No.

14        Q.   Okay.  And then at some point in time, were you

15   promoted to chief?

16        A.   Assistant chief.

17        Q.   Assistant chief next?

18        A.   Yeah.  It was June of 2015 or --  June or July.  I

19   can't remember which commissioning year it was.

20        Q.   What was the process to be promoted to assistant

21   chief?

22        A.   A test again.  And then a interview process

23   through members of the city hall.  I was in Japan at the

24   time.  So I had to do it through Facetime, or whatever I

1    did.

2         Q.    Okay.  How did you score on that test?

3         A.    I was selected out of two of us as well.

4         Q.    And then how long were you in the position of

5    assistant chief?

6         A.    From '15 to September '17.  That's when I became

7    chief.

8         Q.    Were you ever disciplined as assistant chief?

9         A.    No.

10        Q.    Were you ever given a verbal --

11        A.    No.

12        Q.    -- reprimand?  Okay.  And then in 2017, were you

13   promoted to chief?

14        A.    Yes.

15        Q.    And what was that process like?

16        A.    I submitted my resume to the city manager.  And

17   then did a short interview with the mayor.  They told me

18   they were selecting me.

19        Q.    Was there a test part required?

20        A.    No.

21        Q.    And how long were you the chief of the City of

22   Covington's Police Department?

23        A.    Five years.

24        Q.    And your time as chief with the City of Covington,

1       did you ever have any complaints filed against you?

2           A.   Against me?

3           Q.   Yes.

4           A.   No.

5           Q.   Okay.  How about as your time as assistant chief,

6       did you have any complaints filed against you?

7           A.   Not that I know of, no.

8           Q.   Okay.  How about as a lieutenant or sergeant?

9           A.   None.

10          Q.   Okay.  How about as an officer?

11          A.   None.  Not that I know of.

12          Q.   Okay.

13                    MR. MANDO:  Can we clarify?  I think he

14      may be perceiving complaints as citizen complaints about his

15      behavior.  When you're a service chief, it goes with the

16      territory that you may get named as a defendant in a

17      lawsuit.  I'm sure that he would have been named as a

18      defendant in a lawsuit --

19                    THE WITNESS:  Just like this one.

20                    BY MR. MANDO:  -- just like this one.

21                    BY MR. DAVIS:  Okay.

22                    THE WITNESS:  I think this is my only

23      one.

24                    MR. MANDO:  Warren.

```
 1                      THE WITNESS:  Oh, okay.

 2                      MR. MANDO:  I know there's at least one.

 3          A.   Sorry.

 4                      MR. MANDO:  I'm not trying -- I want to

 5     make sure we communicate and he's giving you full answers.

 6          A.   I'm thinking public complaint through the mayor or

 7     something.

 8          Q.   All right.  So now that that's been cleared up,

 9     has there been a civil complaint filed against you in your

10     capacity as a police officer at any time?

11          A.   This one.

12                      THE WITNESS:  You said that one.

13          A.   I can't recall.  Then I remember one when I was a

14     rookie.  There was a bunch of us that were involved in one

15     that was quickly dismissed.

16          Q.   Okay.

17          A.   Yeah, I was a rookie.  Yeah.

18          Q.   So in the complaint that was identified by your

19     attorney, is that the Warren case?  Are you familiar with

20     that case.

21          A.   Vaguely.  Is that from West Covington?

22                      MR. MANDO: Which one is that?

23                      MR. DAVIS:  Warren.

24                      MR. MANDO:  I don't remember that -- oh,
```

1    you're talking about Horn?

2                        MR. DAVIS:  Yeah.

3                        MR. MANDO:  I remember Horn, yes.

4        A.    I don't know my capacity where I was sued in that,

5    as captain or --

6                        MR. MANDO:  Chief.

7                        THE WITNESS:  Was it chief?

8                        MR. MANDO:  I'm pretty sure.

9                        THE WITNESS:  I don't think I was chief

10    then.

11                        MR. MANDO:  Spike was named, but I

12    thought you were in that one, too.

13                        THE WITNESS:  I did the deposition.

14                        MR. MANDO:  Yeah.  Just answer what you

15    recall the best you can.

16        A.    I can't recall actually being named in that, but I

17    know I was represented -- or I had to go do a deposition

18    over it.

19        Q.    Okay.  Do you remember any of the allegations in

20    that case?

21        A.    The allegations were use of force against the

22    officers.

23        Q.    Okay.  And do you remember which officers were

24    involved in that?

1        A.   I remember two: Captain Kelly, I believe, and now,

2   Sergeant Rogers.  They were officers, I believe, at the

3   time.  That's why I don't think I was the chief.

4        Q.   And you were referring to the Horn case?

5        A.   The Horn case, yes.

6        Q.   Okay.  Besides the Horn case, are there any other

7   civil complaints that have been filed against you in your

8   individual capacity or in your capacity as chief of police?

9        A.   Not that I recall, except the one when I was a

10  rookie.  I was called -- I think his name was Chavis.  The

11  only thing I remember about that is I spotted him on the

12  roof.  He did a burglary.  We arrested him.  And I guess

13  because I spotted them, you know, we caught them, I got

14  sued.  I don't know what I got sued for, for seeing them.

15       Q.   Okay.

16       A.   He stuck his head over the ridge of the roof line.

17       Q.   Okay.  So, currently, what is your job title?

18       A.   Chief of police, Fort Mitchel.

19       Q.   And how long have you been with the City of Fort

20  Mitchel?

21       A.   December 5th, they hired me as a lieutenant.

22  January 1st, they made me a chief, as of this year.

23       Q.   And what was your last year as chief of police at

24  the City as Covington?

1          A.    I retired September 1, 2022.

2          Q.    And when did you start with the City of Fort

3     Mitchel?

4          A.    December 5th, as a lieutenant.

5          Q.    2022?

6          A.    Yes.

7          Q.    Can you tell me, as a police chief, what are your

8     general duties and responsibilities?

9          A.    To guide and direct the police department, to

10    provide service to the public.

11         Q.    Okay.  Is the police chief responsible for

12    overseeing protocols and procedures of the police

13    department?

14         A.    Yes.

15         Q.    Okay.  Is the police chief responsible for the

16    discipline of officers?

17         A.    Yes.

18         Q.    Where are the police chief's job duties listed?

19         A.    Should be in the policies and procedures.  If not,

20    in the job description with HR.  We're merging two cities

21    right now.  So, in my brain, two different worlds.

22                    MR. DAVIS:  Also, I'd like to request

23    the policies and procedures where the job duties are listed

24    if that's with the city Covington.

1          MR. MANDO:  We'll either get you that or

2     we'll get you the job description.

3          MR. DAVIS:  Okay.

4     Q.   So, before, we were talking about the use-of-force

5     standards when it comes to the general officers.  And you're

6     familiar with those, correct?

7     A.   Not as familiar as I was before I left.  It's been

8     two years.  Yeah, yeah.

9     Q.   All right.  I'd like to start with this exhibit.

10    It's just the general orders.

11               (Exhibit No. 1 was marked for

12    identification purposes.)

13               MR. MANDO:  So Exhibit 1 is the general

14    order on use of force, as revised March 10, 2023.

15               MR. DAVIS:  Correct.

16               MR. MANDO:  Okay.

17               MR. DAVIS:  Any objection to that?

18               MR. MANDO:  No, no.

19    Q.   Are you familiar with this document?

20    A.   I'm familiar with it as it was before I retired --

21    Q.   Okay.

22    A.   -- as much as I can recall.  I don't know what's

23    been revised.

24    Q.   Right.  Okay.

1          MR. DAVIS:  I think that's where we may

2     have an issue, because I'm also calling him the person most

3     knowledgeable about current policies and procedures.  And so

4     if this is -- if the ones you provided me is 2023, he's not

5     going to know anything about it.

6          MR. MANDO:  Right.  I mean, when you

7     sent your request, Jamir, you asked for the use-of-force

8     policy.  We gave you, you know, what you asked for, to the

9     best of my recollection.

10          MR. DAVIS:  Right.

11          MR. MANDO:  It's clear that Chief Nader

12     would not have been involved in any revisions in March of

13     2023 because he retired in September of 2022.  I guess I

14     need some clarity.  Are you asking for the person most

15     knowledgeable about the use-of-force policy that was in

16     effect in January of 2021?  Or are you asking about someone

17     who is most knowledgeable about the use of force today?

18          MR. DAVIS:  I mean, in January of 2021?

19     Because that's what the timeline of this case.

20          MR. MANDO:  Right.  He would be the

21     person we would designate as the person most knowledgeable

22     about the general orders use of policy that was in effect in

23     January of 2021 --

24          MR. DAVIS:  Okay.

1          MR. MANDO:  -- because he was chief at

2     the time.

3          MR. DAVIS:  Okay.  I guess I don't have

4     that policy --

5          MR. MANDO:  We can --

6          MR. DAVIS:  -- from January.

7          MR. MANDO:  We can go back and see if we

8     can find that.  We should be able to track that, right?

9          MR. DAVIS:  Yeah.  Those changes are

10    tracked

11          THE WITNESS:  Yeah, they are all

12    tracked.

13          MR. MANDO:  They are all tracked.  So we

14    should be able to get you that.  And he might be able to

15    tell you, just on specific questions, whether he thinks it's

16    changed or not, given what you have in front of you.

17          MR. DAVIS:  Okay.

18     Q.  So, generally, is this what use of force general

19    orders would look like at the City of Covington Police

20    Department?

21     A.  Yes.

22     Q.  Yes.  And do you know if this general order from,

23    what you can see, has changed much since your time?

24     A.  I'd have to go all the way through it, but it's

1    still General Order 1.3, which has always been our use of

2    force.

3         Q.   Okay.  If you can, look at Page 21.  It's also

4    listed as COV00072.

5         A.   Yes.

6         Q.   I'm looking at 1.3.15, "Use of Force Report

7    Review."  Do you see that?

8         A.   Yes.

9         Q.   If you can, just look over that before I ask a

10   couple questions on it.

11                      (Witness reviews document.)

12        Q.   Does this use-of-force report look similar to the

13   one that was in effect in 2021?

14        A.   It does look -- yes.

15        Q.   Okay. Based on this general order in 1.3.15, is it

16   required that a use-of-force report is written any time

17   there is use of force by an officer?

18        A.   Yes.

19        Q.   Okay.  And then when we talk about the incident

20   again, we go back to the January 1st, 2021, incident.  Was

21   there any use of force during that time?

22        A.   Not that I know of.

23        Q.   And you reviewed the body-worn camera --

24        A.   No.

Page 28

1      Q.   -- footage?

2      A.   When I went to go see -- I don't know what the

3   case was until the lawsuit -- when I was named in the

4   lawsuit for January 1st.  So I looked at the body cam.  I

5   didn't even really look at it.  I asked Assistant

6   Chief Wietholter a couple weeks ago.  I don't know what this

7   January 1 thing is.  Came down.  I just didn't know what it

8   was.  It turned out to be a disorderly conduct.  So I would

9   have never been notified on that.

10      Q.   Okay.

11      A.   So he pulled up the film real quick, but I didn't

12   really look at it.  I said, "I don't know anything about

13   that case."

14      Q.   Okay.  So you have never actually seen the

15   body-worn camera footage from the January 1st 2021 incident?

16      A.   I did not watch it with careful view.  He just

17   pulled it up on his screen because I had no idea about that

18   incident at all until the lawsuit.

19      Q.   Okay.  So what would be the process -- if there

20   was use of force on any incident, during your time with the

21   City of Covington, what was the process to notify the chief

22   of police of the use of force?

23      A.   Well, first, you would call a supervisor on the

24   scene.  That's practice.  And they would come and do the --

1    talking to the suspect or handling of the witnesses.  Then

2    they would also have to write a report, of course, which the

3    supervisor has to sign off on.  They would put on what they

4    call a "watch report," which is a shift that tells all the

5    biggest incidents that are occurring through the day.  So

6    not all incidents, because we could have 237 to 260

7    incidents within 24 hours.  So it's the highlights for

8    everybody to follow up on.  So if we caught a suspect that

9    was in a burglary, if we caught another rape case, so they

10   know that report is coming that way.  Use of force, the same

11   way if somebody is injured or anything.  So the way I get

12   notified is through that and/or the paperwork coming to me

13   through the use-of-force chain, up the chain.

14       Q.   Okay.  What are the levels of force based on the

15   general orders?

16       A.   I'd have to find what it says in here.  It usually

17   doesn't change because it follows KRS.  "Progressive Use of

18   Force" is under -- on Page 3328, under D.  It shows the

19   progression of force, starting with "Officer presence,"

20   ending with the "deadly force."

21       Q.   In looking at Page 3, under D, it says,

22   "Empty-handed control techniques."  Can you explain what

23   that is?

24       A.   It's the same as -- it's part of the handcuffing

1    techniques, escort techniques.  Like, "officer presence" can

2    be seen as force, or verbal commands, telling you put your

3    hands behind your back, it can be escorting somebody.  In

4    other words, if the person -- a lot of people don't like to

5    be in handcuffs.  That's just the way it is.  If they do

6    that, you kind of might hold them against the wall.  Or if

7    they are dragging their feet, they will try to pull you

8    down, you help them down to the ground.  So it's basically

9    to protect that person and yourself so it doesn't get more

10   escalated.  It's called "escort techniques," just walking

11   somebody to a car.  What else is there?  Then it can go up

12   to, like, empty hand strikes, too --

13       Q.   Okay.

14       A.   -- which means no baton.

15       Q.   So if someone doesn't want to be handcuffed and an

16   officer physically has to put that person's hands behind

17   their back, would that be considered use of force?

18       A.   No.

19       Q.   It's not?

20       A.   No.

21       Q.   Okay.

22       A.   I'd say about 99 percent of people I arrest, even

23   when they were working with you, not working against you,

24   they still resist to put their arms behind their back.

1    That's just common.  I think it's a fight-or-flight kind of

2    thing.  I've never had anybody say, here, you know.  You're

3    always -- and it's a normal thing to tense up.

4         Q.   Okay.  How about forcing someone to the ground, is

5    that use of force?

6         A.   If you do a leg sweep or do something that you're

7    actually causing a strike to take them down to the ground.

8    But if they are taking you down to the ground or you're

9    trying to control them -- in other words, they are starting

10   to kick and stuff like that, you can take a person down to

11   the ground -- not slam them, take them down to the ground

12   for control.  It usually gives them time to re-gather their

13   thoughts and they are -- less likely you might have to use a

14   higher level of force when they are neutralized for

15   everybody's safety.

16        Q.   Okay.  How about -- so when you're saying that

17   physically restraining someone is not -- or physically

18   putting someone's hands behind their back is not use of

19   force?

20        A.   It's not -- you don't have to do a use of force on

21   that.

22        Q.   You don't have to do a report?

23        A.   Like, your presence is a use of force.  So us just

24   stopping you -- I'd have to do a use-of-force report every

1    day.

2         Q.   What is the standard of use-of-force report?

3         A.   Strikes and/or grappling moves.  In other words,

4    the arm bar takedown or any of our various tools on our

5    belt.

6         Q.   Got ya.  So if someone is already in handcuffs and

7    they have to be taken down again for resisting or -- excuse

8    me.  If someone is already in handcuffs and they have to be

9    taken to the ground, would that be a use of force?

10        A.   It matters how you take them down to the ground.

11        Q.   Okay.  Can you explain that?

12        A.   Yeah.  I have to knee you, strike you to force you

13   to the ground, or a strike of any sort.  But if I'm

14   handcuffing you, and you're trying to trip and pull me down

15   with you, we can also escort you down to the ground.  It's

16   not use of force.  Your behavior is leading to our reaction.

17        Q.   Got ya.  Got ya.  Okay.  If you'd look at Page 4

18   of 28 --

19        A.   Uh-huh, yes.

20        Q.   -- do you see where it says, "Medical evaluation

21   and care"?

22        A.   Yes.

23        Q.   Are you familiar with this section?

24        A.   Yes.

1      Q.   Okay.  So based on your understanding, what does

2   this section require?

3      A.   If somebody is injured, you call them -- through a

4   use of force, you call medical staff.

5      Q.   Okay.

6      A.   And it's usually with OC and Taser deployment,

7   too.

8      Q.   But it's not required for Taser deployment; is

9   that correct?

10     A.   If required.

11     Q.   Yeah.

12     A.   I mean, it's a safer way to be sometimes.  In

13   other words, a Taser probe goes into a sensitive area.

14     Q.   So No. 1, it says, "Employee shall evaluate the

15   subject for injuries as soon as practical following any use

16   of force, action or apprehension or arrest;" is that

17   correct?

18     A.   That's correct.

19     Q.   On January 1, 2021, was Anthony Wynn apprehended?

20     A.   I know that, yes.  Arrested for disorderly

21   conduct.

22     Q.   Was he arrested?

23     A.   Yes.

24     Q.   Okay.  Do you know if -- from you watching the

1    body-worn camera, did Anthony Wynn complain of any injuries?

2         A.   Like I said, I just glimpsed over it.  He was

3    actively arguing with the police.  I don't remember the

4    scene because I was never there.  So I didn't review it

5    because I didn't review it while I was the chief because I

6    never knew about it.

7         Q.   Okay.  Do you know if Anthony Wynn received any

8    medical aid --

9         A.   I don't know anything about that.

10        Q.   -- on January 1st, 2021?

11        A.   I don't know anything about that.

12        Q.   Based on your knowledge and experience, though, if

13   Anthony would have claimed that he was injured after their

14   arrest, should medical attention have been offered to him?

15        A.   It could be called.  Or we would have the jail

16   staff look at him.  We have a jail nurse.

17        Q.   But is that what the policy says?

18        A.   No.

19        Q.   What does the policy say?

20        A.   "Employee shall evaluate."  So it's up to the

21   employees to search him "for injuries as soon as practical

22   following any use-of-force action or apprehension or arrest

23   where injuries occurred as a result of that apprehension."

24        Q.   Does it also -- can you read No. 3?  Do you see

1    that one?

2         A.   "Employee shall request an ambulance or other

3    appropriate medical aid for all subjects who complain of

4    injury, are unconscious or show signs of an injury."

5         Q.   So if Anthony Wynn would have complained of

6    injury, it was the police officer's on the scene job to make

7    sure that he had appropriate medical care?

8         A.   Yeah.  I mean, if they determined that he was

9    injured, yes, they would call an ambulance for him.

10        Q.   Is that what the policy requires, if the officer

11   determines they are injured?  Or does the policy require

12   that the subject complains of injury?

13        A.   Well, per 1, "Employee shall evaluate the subject

14   for injuries as soon as practical."

15        Q.   "Shall evaluate."  I'm talking about No. 3.

16        A.   I understand that, but people lie all the time

17   when we're arresting them.  It's just what they do.  It's

18   constant.  Oh, I've got a bad shoulder.  Oh, you did this.

19   Oh, you did that.  Then it says that we have to go to the

20   hospital and spend another hour.  And it upsets the medical

21   staff because they know the person is lying.  So if we did

22   something that we think we injured somebody, yes, of course,

23   we're going to call.  During our actions, we're going to

24   call medical staff or take them to the hospital.

1    Q.    And that's your policy?

2    A.    Please?

3    Q.    That's your policy, as the chief of police?

4    A.    Yeah, we're going to call.

5    Q.    And that was your policy when you were the chief

6    of police?

7    A.    Yes.

8    Q.    Okay.  But that wasn't the general order policy,

9    correct?

10    A.    You're confusing me now.  Because I just said

11    "Employees shall evaluate the subject for injuries."

12    Q.    I'm not talking about No. 1.  I'm talking about

13    No. 3.  No. 3 says, "Employee shall request an ambulance or

14    other appropriate medical aid for all subjects who complain

15    of injury."

16    A.    Yeah.  We're not going to -- we didn't just do it

17    because you said that.

18    Q.    Okay.  So that was your policy when you were the

19    chief of police?

20    A.    That was past practice, and it's written right

21    there.  We evaluate the subject first.  That's No. 1.  Then

22    you go to No. 3.  It's sequential.

23    Q.    Okay.  Let's take your line of thought.  Are your

24    officers at all trained as medical -- in the medical field?

1      A.   No.

2      Q.   Okay.  So can your officer properly diagnose

3  anyone of a medical injury?

4      A.   No.

5      Q.   Okay.  Just so I'm clear, while you were chief of

6  police, you personally told your officers not to call --

7      A.   No, I do not --

8             MR. MANDO:  Let him finish the question.

9  It's important you let him finish the question before you

10  begin.  You may know where he's going.  Let him finish.

11  It's better for the record.

12             Go ahead, Jamir.  Start the question again,

13  please.

14      Q.   For the record, during your time as chief of

15  police, did you ever tell your officers or anyone that

16  worked under you that they did not have to call for medical

17  aid if someone complained of an injury?

18      A.   No.

19      Q.   Did you ever personally not call for medical aid

20  if a subject complained of an injury?

21      A.   No.

22      Q.   So if a subject complained of an injury and wasn't

23  provided medical treatment or medical aid, who would be held

24  responsible for that?

1    A.   Usually, what happens is, usually, on body cams,

2    the person will complain about pain -- complain about pain.

3    Then you say, as the officers, do you want to go to the

4    hospital?  Because the chances of you getting denied at the

5    jail are pretty high, because they ask a big bunch of

6    questions when you get there about health or suicide.  So if

7    you ask that question and they don't want to go to the

8    hospital, you go to the jail.  Then they might bring it up

9    at the jail.  Then you're turning around and going to the

10   hospital with the arrestee.

11   Q.   Okay.  Based on your knowledge of the general

12   orders, what is the requirement for Covington Police

13   Department to enter into a home?

14   A.   Exigent circumstances to -- we got a call there,

15   and we hear violence inside or anything like that.  It's

16   mostly exigent circumstances or, of course, if we're invited

17   in or somebody let us in.

18   Q.   Okay.  So in the January 1st, 2021, incident, were

19   there any -- to your knowledge, did your officers enter into

20   a home?

21   A.   To my knowledge.  I knew nothing about it while I

22   was the chief at Covington.  But I saw a video, and they

23   were inside the home.

24   Q.   Okay.

1      A.    I didn't pay attention to the beginning of the

2    video or after.  It was more what was my involvement in this

3    kind of a question.

4      Q.    Okay.  And so, to your knowledge, the officers

5    were in the home, though, correct?

6      A.    From what I could tell from the body cam, correct.

7      Q.    And to your knowledge, did officers have a warrant

8    to enter that home?

9      A.    I don't believe so.  I don't know.

10     Q.    Okay.

11     A.    I think they were there for a trouble call.

12     Q.    If there's a warrant requested from a judge, would

13   you be knowledgeable about that as the chief of police?

14     A.    Yes.

15     Q.    Okay.  So, to your knowledge, there was no warrant

16   requested prior to January 1st, 2021, for that?

17     A.    Not that I know of.

18     Q.    Okay.

19     A.    Again, this is a normal daily -- 238 calls a day,

20   trouble call, where somebody got arrested for DC.

21     Q.    Okay.  And what were the procedure and policies

22   surrounding exigent circumstances at that time?  How did an

23   officer make that determination?

24     A.    I don't know.  I don't know anything about that

1    call.

2         Q.   Okay.  No.  I'm just talking about, generally, the

3    policies and procedures of Covington police --

4         A.   Oh, common sense.  If you knock on the door and

5    somebody is screaming for help, that's exigent

6    circumstances.

7         Q.   Okay.

8         A.   If you hear people fighting inside and nobody is

9    answering the door, or a neighbor is calling and there's,

10   you know, domestic issue and goes quiet when you get there,

11   you know, we have to make sure everybody is safe inside.  So

12   it's always about safety of the public.

13        Q.   And that was a policy and procedure that was --

14        A.   I think it's --

15        Q.   -- in the general order?

16        A.   -- I think it's a law, too.  I don't know what

17   policies.  It's part of the law.

18        Q.   Okay.  And who trained police officers on that

19   law?

20        A.   Originally, DOCJT for the academy in Richmond,

21   Kentucky.

22        Q.   And so were there, like, written materials that

23   taught officers that law or not?

24        A.   Oh, it would have to be.  It's an academy.  I

1    don't know exactly what they are.  It's the Kentucky Law

2    Enforcement Council that oversees that.

3        Q.   As chief of police, were you ever in possession of

4    the Kentucky Law Enforcement Council policies or procedures

5    that were provided to your officers?

6        A.   The training?

7        Q.   Yes.

8        A.   I mean, I don't have it.  We see what their grades

9    are when they successfully complete the academy.  Then we

10   all have to go back to what they call "in-service training"

11   for 40 hours a week -- or, I'm sorry, a year, plus other

12   things we have to train on.  It's all state mandated by law

13   and stuff like that.

14       Q.   Okay.

15                  MR. DAVIS:  I'm going to request a copy

16   of that, too, just on the record, the Kentucky Law

17   Enforcement training on warrant requirements and exigent

18   circumstances.

19                  MR. MANDO:  Well, we wouldn't be the

20   custodian of a KLAC document.  If you're asking for the

21   training -- each officer has a training transcript that

22   reflects the training that they have received from their

23   inception as a police officers and on an annual basis.  It's

24   like your normal college transcript or something.  It shows

1    all of the courses they've taken.  We can produce that for

2    you for the officers that are named as defendants, but we

3    wouldn't necessarily have the KLAC policies, per se.

4                    MR. DAVIS:  Okay.  No.  That's fair.

5    But I guess my question is:  The police department generally

6    just doesn't have those policies?  They don't keep those

7    policies on hand?

8                    MR. MANDO:  You can ask the chief about

9    what the policy is on development of policies.  They may use

10   any number of different sources to develop a policy they

11   get.  There may be a supreme court case.  It may be

12   something from the city solicitor's office.  It may be a

13   Kentucky Law Enforcement Council recommendation.  It could

14   be a model policy circulated by Kentucky League of Cities.

15   It could be something from CALEA, Commission on

16   Accreditation of Law Enforcement Agencies, or it could be

17   something from the Kentucky Association of Chiefs of Police.

18   Any number of different sources could be utilized in

19   development of policy.  Chief will be able to speak to how

20   they develop those.

21                    MR. DAVIS:  Okay.

22       Q.   So, yeah, let me ask about that.  So it seems like

23   -- are there a lot of different policies and procedures out

24   there that kind of broadly dictate how officers should act

1    and respond in certain situations?

2         A.   No.  They are pretty all similar statewide --

3         Q.   Okay.

4         A.   -- because we're all accredited -- or almost all

5    of us.  I don't know if we all are.

6         Q.   Got ya?

7         A.   But it's the Kentucky Association Chiefs of

8    Police.  Then he stated the model policies from Kentucky

9    League of Cities.  Then we were also, when I was in

10   Covington CALEA, which is the whole -- international

11   designation, so a step above that.

12        Q.   Got ya.

13        A.   What you did is they actually came in, outside

14   experts, and check your policies.  And then they would ask

15   for proofs that you were following such policies.  It was a

16   pretty intensive affair.

17        Q.   Right.

18        A.   It's not like it's easy.  So it's not just me

19   writing a policy.

20        Q.   Got you.  But based off of all those policies,

21   does the department then draft its own use of -- I mean,

22   general orders?

23        A.   They are pretty much copies -- exactly what it

24   would say -- but, you know, you would change it -- some

1    departments don't have a crime lab.  So we would leave, you

2    know, that kind of stuff out.  But it's the best policies.

3    So that's the whole point in going through accreditation is

4    you're not -- your policies are the best.  That's your goal.

5    And your goal is to stay with those policies.

6          Q.   Got it.

7          A.   Then they give you the updates.

8          Q.   Got it.  Okay.  So if there was a policy that --

9    the general orders for the City of Covington, in regards to

10   the warrant requirement in exigent circumstances, it would

11   reflect these overarching broader policies, correct?

12         A.   They could, but those are also laws.  So when it

13   comes to laws, policies are guidelines.  And then when you

14   look at a policy, you say, okay, was the law followed?  So

15   it's two different things from a chief.  So, sometimes, not

16   all policies are followed directly -- exactly what was said

17   because all humans are different and all situations are

18   different.  So then you look at is the law followed.

19         Q.   Got you.

20         A.   That's the biggest thing.

21         Q.   And, generally, if there is some -- if there's the

22   idea that there's some domestic dispute between individuals,

23   what is the general avenue to try to resolve that once an

24   officer is on the scene?

1       A.   If we have proper manpower, we separate both of

2   them and get their side of the story --

3       Q.   Okay.

4       A.   -- if possible.  Sometimes, you don't get that

5   chance --

6       Q.   Okay.

7       A.   -- because they are too -- actively arguing or

8   fighting.

9       Q.   Okay.  And so you would ask both individuals

10   independently if there was any issue?

11       A.   To see if there was a crime.

12       Q.   A crime committed.  Okay.  Got it.  On the January

13   1st, 2021, do you know if there was any domestic violence

14   procedures implemented?

15       A.   Again, I didn't even know about it.  So, a couple

16   weeks ago -- and I wasn't chief.  So I just found out it was

17   a disorderly conduct.  That's all I know.  I was never

18   notified about that call.  I never got a complaint about it.

19   That's why I never knew about it.

20       Q.   Who would have been responsible for overseeing all

21   of the officers on the January 1st, 2021, incident?

22       A.   The shift supervisors.

23       Q.   Okay.  Do you remember who the shift supervisor

24   would have been?

1        A.   No.  But I did -- through the call notes, I know

2    Lieutenant West showed up.

3        Q.   Lieutenant West?

4        A.   Yeah.  I guess he asked for a supervisor, from

5    what I understand.  But, again, I didn't know anything about

6    it until a couple weeks ago.

7        Q.   So if there was use of force on the January -- you

8    said you didn't review it.  But if there were use of force

9    on the January 1st, 2021, incident, would -- Lieutenant West

10   should have known about it, correct?

11       A.   Yeah.  The officers would have told him he used

12   force.

13       Q.   And then what would have been the process from

14   there?  Who should Lieutenant West have contacted as a

15   result of that?

16       A.   Nobody.  He would have made sure they had the

17   reports done.  It would have went up the chain of command.

18       Q.   Then Lieutenant -- who would have drafted the

19   reports?

20       A.   The officers.

21       Q.   The officers.  Okay.  And then who would the

22   reports have gone to after they were drafted?

23       A.   To him --

24       Q.   Okay.

1    A.   -- as the investigating supervisor first on the

2    scene.

3    Q.   Then to who after that?

4    A.   To their watch commanders.  So their lieutenants

5    for their -- sergeants or lieutenants for their review.

6    Because what they do is they look for patterns.

7    Q.   Okay.

8    A.   If there's, like, an early warning system

9    besides -- you know, you see if there's an issue, similar

10   kind of thing.  So it's like a check and balance.  And that

11   they are familiar with it.  Then they watch the video and

12   make sure everything followed procedures.  Then it goes to

13   the captain.  The captain reads it, watches the video, signs

14   off he watched the video, everything was followed.  Then it

15   goes, I believe -- it switched -- so I'm vaguely -- in

16   between, it goes to the training officer to make sure that

17   the policies were followed and good use of tools.  Then it

18   goes to the assistant chief.  Then it goes to my office.

19   Q.   Okay.

20   A.   Everybody reviews it all the way down.

21   Q.   Got it.  And to your knowledge, you never reviewed

22   any use-of-force report as it relates to the January 1st,

23   2021 incident?

24   A.   None.

1              MR. MANDO:  There were no reports

2    prepared, no use of force prepared for January 1, 2021,

3    incident.

4              MR. DAVIS:  Okay.

5              MR. DAVIS:  Can we take a ten-minute

6    recess?

7              MR. MANDO:  Sure.

8              (WHEREUPON, a break was taken in the

9    proceedings.)

10       BY MR. DAVIS:

11       Q.   So we're back on the record.  So before we left,

12   we were kind of talking about general orders.  I want to

13   turn your attention one more time to the general order that

14   I provided you.

15       A.   Yes.

16       Q.   If we can look at Page 20 of 28.  To your

17   knowledge, does the general order look similar to the

18   general order that would have been in place in January of

19   2021?

20       A.   It looks the same.

21       Q.   Great.  Under A, do you see that?

22       A.   Yes.

23       Q.   A states, "Whenever an employee must physically

24   compel another person to submit to his or her authority,

1   regardless of the means employed, the employee shall."  Do

2   you see that?

3        A.   Yes.

4        Q.   And then under that, it says, "No. 1:  Notify the

5   on-duty shift supervisor and complete a signed use-of-force

6   report."  Do you see that?

7        A.   Yes.

8        Q.   Okay.  To your knowledge, did Anthony Wynn have to

9   be compelled to submit to authority on the night of

10  January 1st, 2021?

11       A.   He was handcuffed, so yes.

12       Q.   Okay.  And then you see under C --

13       A.   Yes.

14       Q.   -- where it says, "This report requirement applies

15  to all incidents occurring on or off duty when an officer

16  acting under the color of law uses or is alleged to have

17  used."  And then you do see where it says "5"?

18       A.   Yes.

19       Q.   "Use of force which causes any visible or apparent

20  physical injury or which results in the subject saying that

21  he was injured."

22       A.   Yes.

23       Q.   Okay.  So based on this report, if a subject says

24  that he was injured, there should have been a use-of-force

1   report written; is that correct?

2       A.   If he was saying he was -- he or she was injured

3   by the actions of the officer and the officer did do actions

4   against that person, that is correct, yes.

5       Q.   Okay.  Under 6, do you see where it says, "An

6   officer uses any other type of a lethal" -- or, excuse me,

7   "Any other type of less lethal object to strike a blow to a

8   subject or uses physical force to force a subject to the

9   ground."

10      A.   Yes.

11      Q.   All right.  So in that instance also, a

12  use-of-force report would be required, correct --

13      A.   Yes.

14      Q.   -- based on the policy?

15      A.   Uh-huh, yes.

16      Q.   Okay.  What would you describe as a routine

17  handcuffing --

18      A.   Routine --

19      Q.   -- based on your knowledge and experience?

20      A.   Usually, holding one arm and asking them to keep

21  the other arm back, cuffing, and then cuffing the other one.

22  Usually, we like two officers doing that, but you can't

23  always, so the other officer can control that other arm so

24  there is no momentarily turnaround, swinging at the officer.

1    It's just kind of guiding them back there.  Plus, it lets

2    you check for fit.  Sometimes, people need extra handcuffs

3    because of their width or if they are really big wristed or

4    anything like that, because we do lock them afterwards.

5        Q.   And, in your experience, have you been involved in

6    a situation where there was a pretty standard or routine

7    handcuffing?

8        A.   Yes.

9        Q.   Okay.  And in that instance, did you have to force

10   anyone to the ground?

11       A.   During a standard?

12       Q.   During a routine handcuffing.

13       A.   To my own experience?

14       Q.   Yes.

15       A.   There's times when you're handcuffing, and they

16   are kind of pushing away.  So you hold them against -- they

17   are not - what do you want to call it - aggressively

18   resisting you, but they are just pushing you off, or they

19   are -- when you're cuffing them, they are starting to go

20   down to the ground and do dead body weight.  So you just let

21   them go down to the ground.

22       Q.   And that's a routine handcuffing?

23       A.   Uh-huh.

24       Q.   Okay.  All right.  So a routine handcuffing, would

1    that include, you know, physically holding someone down on

2    the ground while you were trying to handcuff them?

3         A.   It can.  I mean, if you are -- if they are kind of

4    resisting, and you're just trying to get the other cuff

5    over, you -- I mean, it can be that, yes.  But if you're

6    doing blows or strikes or, you know, really twisting the arm

7    up, that's use of force.

8         Q.   Okay.  How about other physical restraints such

9    as, like, elbows to hold an individual down on the ground,

10   is that use of force, or is that a routine?

11        A.   If you're using your body weight to cuff them, no,

12   that's not a use of force.  If you are elbowing and

13   striking, yes, that's a use of force.

14        Q.   Okay.  In school, you attended -- what is it?

15        A.   The academy.

16        Q.   The academy, yeah.  Is that how they define "use

17   of force," the way that you've just defined it?

18        A.   I'm pretty sure.  It's just past practice.  I

19   don't know any other way to think about it.

20        Q.   Okay.

21        A.   We did different handcuffing.  That was back in --

22   '97 styles from when you have a person on the ground, on how

23   you handcuff them to standing up.  Because on a traffic

24   stop, you might get them on the ground.  They may force you

1      to the ground because they do a dead-body-weight kind of

2      thing because they don't want go to jail.

3          Q.   Uh-huh.  In the academy, did they teach you

4      techniques that did not involve weapons but just your

5      physical hands and feet, techniques to arrest someone?

6          A.   To strike them or just arrest them?

7          Q.   To arrest them.

8          A.   Yeah.  They would have you have your shoulder --

9      it's all different now.  It's changed 100 times, but you'd

10     have your hands outward.  Sometimes, you can't do that.  But

11     to use your body weight to make sure their shoulder don't

12     move.  You put your leg between their legs so they can't

13     flee on you, those kinds of things.  But they change off and

14     on, whatever new style is out there, but they are almost all

15     similar.  It's to prevent escape and prevent the person from

16     turning violently to you or something, striking you or

17     striking away from you, which you would have to use force.

18         Q.   Right.  How about the use of, like, pressure

19     points or anything of that nature, were you taught that?

20         A.   Yes.

21         Q.   Okay.  And how about the use of, like, arm bars

22     or --

23         A.   Yes.

24         Q.   -- other --

1      A.    Yes.

2      Q.    Were you taught that?

3      A.    Yes.

4      Q.    Okay.  Were those considered use of force?

5      A.    Yes.

6      Q.    Okay.  Based on the use-of-force general order, do

7    you know if photographs were required to be taken if force

8    was used?

9      A.    Of injuries, yes.

10     Q.    Of injuries, or photographs, in general, taken?

11     A.    Injuries is what we're trying to look for, like

12   taster probes where we struck the person or where they were

13   injured.  It's kind of like -- it's a pass-on from before

14   body cam.

15     Q.    Okay.

16     A.    Because a body cam usually covers everything, but

17   it's still --

18     Q.    That was your policy --

19     A.    Yeah.

20     Q.    -- while you were there --

21     A.    Yes.

22     Q.    -- to take photos of only injuries?

23     A.    Now, we take them with the body cam.

24     Q.    Okay.  Do you see -- can look back at the general

Page 55

1    order, Page 20?

2         A.   Sure.

3         Q.   Do you see where it states "E"?

4         A.   Yes.

5         Q.   Can you read that section for me?

6         A.   "Also shall photograph any involved person, also

7    suspect or witness, for their protection."

8         Q.   All right.  So based on this, any involved person

9    in a use of force should be photographed; is that correct?

10        A.   Yes.

11        Q.   Okay.  Does this look similar to the policy that

12   was in place when you were chief?

13        A.   Yes.

14        Q.   Okay.  But you weren't requiring your police

15   officers to do this; is that correct?  Only if injuries?

16        A.   If there's a use of force, you always took photos.

17   But you were trying to zoom in on the injury itself, too.

18   So if the officer is injured, you'd take a front/back photo,

19   but you would also get specifically to the injured area or

20   where the probe struck or where you had to use your baton.

21        Q.   Okay.  And then if you look at F, "The

22   notification to the supervisor and the use-of-force report

23   shall be completed as soon as practical after the incident

24   occurs."  Was that the policy when you were --

1        A.   Yes.

2        Q.   -- the chief?  Okay.  And how did you generally

3   ensure that all of these policies were being followed?

4        A.   Through the rank and file.

5        Q.   Okay.  What do you mean by that?

6        A.   That's why we always had supervisors out,

7   sergeants out.  Then lieutenants above them.  Captains above

8   them.  Assistant chiefs above them.  Then myself.  It's 135

9   employees.  114, 116 being police officers.

10       Q.   So how would we know -- just generally, when you

11  were the chief of police, if an officer was involved in use

12  of force and didn't report it directly to their supervisor,

13  how would that -- what would happen in those circumstances?

14       A.   Well, usually, if there's use of force or --

15  there's going to be other officers there.  So they know the

16  procedure is to call a supervisor there.  Usually, you can

17  tell by the radio and type of call.  Everything is on body

18  cams.  The supervisors have to spot-check body cams through

19  their evaluation process.  So that's a backup plan on that.

20  Or if the person came in and complained and said this

21  happened, then we would look into it from there.  So there's

22  a lot of different avenues to make sure that it's done.  I

23  never had a complaint that we didn't follow up on.  Such as

24  this one, I -- again, I didn't know about it because there

1    was no complaint, no anything.

2          Q.   Okay.  So you just said that if an -- if an

3    officer called the supervisor, that's typically because

4    there was use of force, correct?

5          A.   Correct --

6          Q.   Okay.

7          A.   -- because they are supposed to investigate.

8          Q.   Do you know if a supervisor was called to the

9    January 1st, 2021, incident?

10         A.   Again, I just found out two weeks ago, looking at

11   the call with Assistant Chief Wietholter.  I was making sure

12   I wasn't there because I couldn't recall it at all.  We

13   found out I never knew about it because it was just a

14   disorderly conduct arrest.  There was no complaint on it, so

15   I wouldn't know.  So through that call log, we found out

16   Lieutenant West was summoned.  And we believe -- I think he

17   said it was because he asked for a supervisor.  I don't

18   recall.  Because, again...

19         Q.   Okay.  So one more question about the general

20   order.  Then we're going to watch a little bit of video.

21   Okay?  So, to your knowledge, did the use-of-force report

22   general order, when you were chief, require that when

23   someone is physically compelled to authority, that a

24   use-of-force report be written?

1          MR. MANDO:  Objection.  Asked and

2   answered.

3          But you can answer again.

4     A.   I'm confused.  You're compelled every time you're

5   handcuffed.  We do not do a use of force every time we

6   handcuff you.

7     Q.   No, no.  I'm asking about the general order.

8     A.   Yeah.  The general order says any time you're

9   physically compelled.  Handcuffing is physical -- compelling

10  you.  So we don't use a use of force for that.  Again, it's

11  the strikes and blows and everything else and tools.  Oh,

12  okay.  That part says this report may be a requirement.

13  "Does not apply to routine handcuffing, escort techniques

14  where no weapons, force or injury occurred, and incidental

15  contact in the course of affecting an arrest."  It's Part D

16  on Page 20, so...

17    Q.   Okay.  I think we're confusing one another in my

18  question.  My question was:  Does the City of -- did the

19  City of Covington Police Department general orders require

20  for a use-of-force report to be completed when an officer

21  had physically compelled someone to submit to their

22  authority?

23    A.   Yes --

24    Q.   Okay.

1        A.    -- if you're using force.

2        Q.    Okay.  Great.  All right.  The first video that

3    we're going to watch is identified as COV000103.  And this

4    was submitted to me, Jamir Davis, by the City of Covington.

5    We're going to start at 26:16.  26 is the minute.  16 is the

6    second.

7                        MR. MANDO:  Is this January 1?

8                        MR. DAVIS:  The January 1 incident.

9                        MR. MANDO:  All right.  Thank you.  Do

10   you know who is -- is this Durairaj's?  Is this Krueger's?

11   Do you know who --

12                       MR. DAVIS:  Griswald.

13                       MR. MANDO:  Griswald's?

14                       MR. DAVIS:  YES.

15                       MR. MANDO:  Okay.

16       Q.    Have you seen the video that I'm referring to

17   before?

18       A.    Not Griswald's.

19       Q.    Okay.

20                       (WHEREUPON, a video recording was

21   played)

22       Q.    Okay.  At point -- it says "23:59."  Do you see

23   that?

24       A.    Uh-huh.

1    Q.   Do you see the arm that is on Anthony Wynn?

2    A.   I see it's around his armpit, yeah.

3    Q.   Is that a technique that's taught --

4    A.   Escort technique, uh-huh.

5    Q.   That's an escort technique?

6    A.   Or handcuffing, yeah.  Just controlling his arm

7    from flaring up.  It looks like the other officer is trying

8    to handcuff him.

9    Q.   He was already handcuffed at this point.

10   A.   Well, you went straight to it.  You skipped the

11   whole beginning of it, so I don't know...

12   Q.   So you are saying that this is an escort

13   technique?

14   A.   Yeah.  He's just holding him.

15   Q.   Do you see a wall here?

16   A.   Yeah.

17   Q.   And that's what you considered an escort

18   technique?

19   A.   Yeah, a handcuffing technique.

20   Q.   That's what you taught your officers, as a chief

21   of police or Covington Police Department?

22   A.   I never taught anybody anything.  The academy

23   teaches common practices.  They are not striking him.  They

24   are not pushing him -- like, hammering his head against it.

Page 61

1    They are just holding him.  Because it sounds like he was

2    being pretty combative, but you stopped it.

3         Q.   Oh, we're going to keep watching.

4         A.   Okay.

5         Q.   Don't worry.

6         A.   I never saw the beginning, so I  don't know what

7    led up to that part.

8         Q.   Yeah.  Okay.  But is your understanding, as the

9    chief of police for the Covington Police Department, that

10   this is just an escort technique?

11        A.   Right now, yeah.

12        Q.   Okay.

13                      (WHEREUPON, a video recording is

14   played.)

15        Q.   So do you see the knee in Anthony Wynn's back?

16        A.   Uh-huh.

17        Q.   Are you saying that that is an escort technique as

18   well?

19        A.   No.  But I don't know what they are doing at that

20   point or what led to that.

21        Q.   Okay.  Would this be considered use of force?

22        A.   It could be depending on what happened why it went

23   to that point, yes.

24        Q.   Okay.  And we're talking at 24:36.  Would you

1   consider this, at this point, a routine arrest?

2       A.   I don't know what led to it.  So if he started

3   kicking or trying to fight the officers and went down to the

4   ground, was turning his body -- I just don't know.  I mean,

5   I don't have enough facts.  This is just a clip of a video

6   to make a determination.

7       Q.   But you consider this a routine arrest?

8       A.   No.  It looks like he's a really highly agitated

9   person.  It's not routine.

10      Q.   It's not routine?

11      A.   No.

12      Q.   Anything that's not routine is considered use of

13  force according to this policy, correct?

14      A.   No.

15                    MR. MANDO:  Objection.

16  Mischaracterization.

17          Go ahead.

18      A.   No.

19      Q.   No?

20      A.   No.

21      Q.   Okay.  So according to the policy, what is it?

22      A.   I don't know.  You're showing me a clip of a film

23  and asking me to make a decision without letting me see all

24  of the videos.

1        Q.   I'm asking --

2        A.   I don't know if he ended up on the ground and

3    started trying to kick the officers, so they are controlling

4    him.  I don't know anything.  You're just showing me a clip

5    of a film.

6        Q.   I'm talking about the knee in his back.

7        A.   I'm not going to make a determination without all

8    of the facts.  That was my job as a chief is look for all of

9    the facts.  That is just not showing me anything at this

10   point.

11       Q.   Okay.  Let's back up because I think we're getting

12   a little confused.

13       A.   Yeah.

14       Q.   Is the knee in the back of Anthony Wynn considered

15   use of force or not?

16       A.   No.

17       Q.   It's not?

18       A.   No.

19       Q.   What is it considered?

20       A.   A control technique right now, because I don't

21   know what's going on.  I don't know why he's on the ground.

22   Now, if they took him to the ground forcefully, tripped him,

23   took him to the ground, landed on top of him because he's

24   kicking, yes, it's use of force.  There's no doubt.

1      Q.   Okay.  What is the knee technique, in your

2  understanding, supposed to do?

3      A.   I don't see it as a knee technique.  I see them

4  holding him down.  Yeah, a knee is part of your body.  They

5  are using their body to keep him down, probably to calm him

6  down.  So there's no striking with the knee that I see from

7  this one-second clip.

8      Q.   Okay.  And that is -- and that's how you, as the

9  chief of police, read and implemented this policy in your

10  time with the Covington Police Department?

11     A.   Correct.  Because I can't make a decision on a one

12  second of a film, nor will I.

13                     (WHEREUPON, a video recording is

14  played.)

15                     MR. DAVIS:  I'm going to go to another

16  video.  I think we lost everything on this one.

17     Q.   Was it a policy of your office to tell people what

18  they were being arrested for?

19     A.   Yeah, we would tell them --

20     Q.   Okay.

21     A.   -- when the time is right.  I mean, if you just

22  murdered somebody, we're going to handcuff you first, detain

23  you first.  Or if you're highly agitated, yeah.  But,

24  usually, we say, "Put your hands behind your back.  You're

1    under arrest."  Then they usually ask what for, why we're

2    arresting them.  But the matter is timing and everything

3    like that.  What's the officer's safety -- yeah, we --

4    that's every attempt.

5         Q.   Okay.  So that was a policy in 2021?

6         A.   I don't know if it was a policy, but it's common

7    practice.

8         Q.   That's common practice?

9         A.   I don't know if there's a policy when you tell

10   somebody they are under arrest.

11        Q.   Do you know if Anthony Wynn, on January 1st, 2021,

12   was ever told why he was under arrest?

13        A.   I have no idea.

14        Q.   All right.  The next video we're going to watch is

15   going to be COV000105.  We're going to start at the

16   30-minute mark and go to 33.

17                     MR. MANDO:  Is this still January 1, for

18        the record?

19                     MR. DAVIS:  January 1.  I don't know how

20        to pronounce this.  It's D-U-R-A --

21                     MR. MANDO:  Durairaj.

22                     MR. DAVIS:  D-U-R-A-I-R-A-J.

23                     MR. MANDO:  What minute mark did you

24        say?

```
 1                      BY MR. DAVIS: 30-minute mark.

 2                      (WHEREUPON, a video recording is

 3     played.)

 4                      MR. DAVIS:  Let's back up a little bit

 5     here.

 6                      (WHEREUPON, a video recording is

 7     played.)

 8         Q.   So did you see -- I know it's kind of hard to see

 9     on the body camera.  But at about 23:45, there was some type

10     of -- what would you describe that as, the interaction

11     between the officers and Mr. Wynn?

12         A.   What part?  I'm sorry.  I didn't look at the time.

13     When they were talking with the female, or before they

14     started walking?  It looks like he was trying to get away.

15         Q.   He was trying -- it looked like he was trying to

16     get away?

17         A.   Yeah.  He was pulling away from the officers.

18         Q.   Okay.

19                      (WHEREUPON, a video recording is

20     played.)

21         Q.   Did you hear him ask, "Explain it to me now"?

22         A.   Yeah.  He's screaming at them.  He's totally

23     agitated.

24         Q.   He's agitated.  At any point in what we played,
```

1    did you hear the officers tell him why he was being

2    arrested?

3         A.   No.  I don't know if he was told before, but I

4    didn't hear anything there, no.

5         Q.   Okay.

6         A.   I think he's in handcuffs now and already under

7    arrest.

8         Q.   Correct, yeah.

9         A.   Okay.

10                       (WHEREUPON, a video recording was

11   played.)

12        Q.   So, here, we're at 23:38.

13        A.   Uh-huh.

14        Q.   And there seems to be -- what would you describe

15   this as, as a police officer -- as a chief, at this point?

16        A.   A highly agitated person who is under arrest.  And

17   they are just trying to get him to jail.  The officer did

18   great de-escalations in saying it's just menacing,

19   disorderly conduct.  Let's go.  It's just a basic arrest at

20   this point.

21        Q.   Basic arrest.  Okay.

22                       (WHEREUPON, a video recording was

23   played.)

24        Q.   Did you see the officer there?

1       A.   I saw him look like -- he started running away,

2   and they are all trying to grab his arms.

3       Q.   You saw somebody running in that?

4       A.   Watch.  You'll see him.  He's pulling away as they

5   go out the door.

6                         (WHEREUPON, a video recording was

7   played.)

8       Q.   Okay.  Do you see the arms there by the officer --

9       A.   Yeah.

10       Q.   -- that we just stopped at?  What would you call

11   that with the arms extended like that?

12       A.   Holding him.  It looks like he was trying to get

13   away.  I don't have all of the video.  They were trying to

14   keep him calm walking out, and something happened outside

15   the door where he was still agitated.  You're right. It

16   looked like his arms were out.  Maybe they were just trying

17   to hold him.  I don't know what he was doing.  I don't know

18   if this was a second floor, not to plead ignorance.  But I

19   don't need somebody to jump off a staircase either.  I can't

20   tell if this is upstairs or downstairs.

21       Q.   It's the first floor.

22       A.   Okay.  I'm sorry.

23       Q.   And so would you -- you just said it looked like

24   Mr. Wynn was trying to run away, correct?

1        A.   Or pull away.  I can't tell.  I can't say that

2    because I can't see.

3        Q.   Right, right.

4        A.   Because they are trying to walk him out calmly.

5    All of a sudden, you see his body take off.

6        Q.   Got you.  Then we see officers' arms extended,

7    right?

8        A.   Right.

9        Q.   Would you, as chief of police, describe this as a

10   routine arrest at this point?

11       A.   Not routine, but probably a good 40 percent.

12   Everybody is agitated when we arrest them, especially with

13   DCAIs.  You know, you are dealing with people that are

14   intoxicated.  So they are fighting -- you're pulling them

15   from in the bars to anywhere else.

16       Q.   Right.

17       A.   I wouldn't say it's out of the ordinary --

18       Q.   Right.

19       A.   -- but it's not a good thing.  We don't want --

20   because then we -- you know, it might become a fight to an

21   officer injured or that person injured, all kinds of things.

22       Q.   Right.  But things are escalating, correct?

23       A.   Yeah.  And they are trying to keep it down, yeah.

24                      (WHEREUPON, a video recording was

1    played.)

2          Q.   I'm going to stop there.  This is at about 24:30.

3    What did you just see there?

4          A.   Hardly anything.

5          Q.   Yeah.  What did you hear?

6          A.   He fell, came back up.  Him even getting madder

7    and starting to fight with them, it sounded like.

8          Q.   Yeah.  It sounded like there was some tussling,

9    right?

10         A.   Yeah.  He was fighting with them.  He's screaming

11   and yelling at them.

12         Q.   Yeah.  Okay.  So based on your observation of this

13   and your knowledge, would this be considered a routine

14   arrest?

15         A.   No, no.  It's starting to escalate.  But the

16   charges are still routine, yes.

17         Q.   But it's starting -- the physicality of it --

18         A.   Yeah.

19         Q.   -- it's starting to escalate, correct?

20         A.   Right, from the audio.  I can't see.

21         Q.   Right, yeah.

22                        (WHEREUPON, a video recording is

23   played.)

24         Q.   Okay.  We're going to stop it there at 25:06.  Did

1    you see the Anthony Wynn was on the ground?

2        A.   That one second that just showed, yes.

3        Q.   Yeah.

4        A.   And he said, "Call my Mama."

5        Q.   Yeah.

6        A.   That's what I saw.

7        Q.   Okay.  Great.  So just for the record, there was a

8    point in time where he was standing up --

9        A.   Okay.

10       Q.   -- handcuffed, is that correct, earlier in --

11       A.   Inside the house, yes.

12       Q.   Yes.

13       A.   Yes.

14       Q.   Okay.  And then what we saw was -- from your

15   observation, it looked like he tried to -- what did you say,

16   flee?

17       A.   I don't know if he was trying to run.  He was just

18   taking off for a minute, yeah.

19       Q.   Correct.  Then we saw officers' hands extended,

20   correct?

21       A.   Correct, yeah.

22       Q.   Then, again, we see -- well, not again.  Then we

23   see Anthony Wynn already in handcuffs on the ground,

24   correct?

1    A.    Correct.

2    Q.    Okay.  So by your definition, is this at all

3  routine -- a routine arrest?

4    A.    No.  This is a resisting arrest, big time.

5    Q.    Is it?

6    A.    I mean, I don't know if he got charged with it,

7  but it's solely resisting arrest.

8    Q.    Resisting arrest.  And from your -- what you can

9  see, does it look like police are using force to keep -- to

10  restrain him?

11    A.    Yeah.  They are getting to the point of still

12  using escort techniques.  I didn't see them do blows or OC

13  or Taser.  But they are just reacting to his actions at that

14  point.

15    Q.    Okay.  And based on your knowledge and skill and

16  ability as a chief, do you think that this will require a

17  use-of-force report?

18    A.    From the glimpses you gave me here?

19    Q.    Yes.

20    A.    I can't determine, but this could have been one --

21  I mean, it's not required by law that -- they could have

22  done the use of force on just a CYA.  There's no law

23  requiring that you do a use of force.  It's just, you know,

24  a policy.  I mean, again, I think he was charged with

1   menacing DC.  I'm surprised they didn't do a resisting

2   arrest at this point.

3       Q.   Right.  No.  I'm -- yeah.  I understand that.  I'm

4   talking about policy-wise.

5       A.   Yeah.

6       Q.   Yeah.  Based on your knowledge and skills and

7   understanding, as the police chief, at this time, would this

8   have required, based on general order -- and I think we've

9   gone over it -- General Order 1.314.  Should a use-of-force

10  report be written based on what you observed?

11      A.   From the glimpses you gave me, a use of force

12  could have been done, yes, but it doesn't change the outcome

13  of the arrest.

14      Q.   Okay.  I'm going to get just a little bit more of

15  this.

16                      (WHEREUPON, a video recording is

17  played.)

18      Q.   All right.  I think that's the end of that one.  I

19  have one more video.  It's going to be COV000106, Officer

20  Ashley, 20 -- and we're going to start at 21:36.  This is

21  related to the January 1, 2021, incident.

22                      MR. MANDO:  Which officer again?  I'm

23  sorry.

24                      MR. DAVIS:  Ashley.

1              THE WITNESS:  Ashley.

2              MR. DAVIS:  Ashley.

3              THE WITNESS:  Aaron Ashley.

4              MR. MANDO:  Yeah, I know.

5              (WHEREUPON, a video recording is

6    played.)

7         Q.   All right.  Based on what we just saw, stopping --

8    going from 23:24 to 23:48, you see -- what did you see?

9         A.   Him coming out the door.  I don't know what he was

10   doing.  And I just saw him circling around, and everybody

11   was saying, "Stop, stop, stop."

12        Q.   Did you see officers doing anything?

13        A.   It looked like they were trying to grab his arms

14   (indicating).

15        Q.   Okay.  And would that be a restraint technique,

16   grabbing arms?

17        A.   Just holding somebody?  That's just basically an

18   escort technique.

19        Q.   That's an escort technique as well?

20        A.   They're just holding somebody and making sure they

21   don't take off from you.

22              (WHEREUPON, a video recording is

23   played.)

24        Q.   All right.  Then did you see that hand that was

1     here --

2          A.   Uh-huh.

3          Q.   -- under his arm?

4          A.   Uh-huh.

5          Q.   What is that considered?

6          A.   That's starting handcuffing technique.  I don't

7     see any pressure -- he's standing straight up.  You can go

8     like this, and it lifts the arm up and holds pressure.  It's

9     still controlling techniques because he's acting the fool.

10         Q.   Okay.  And that's a control technique?

11         A.   Uh-huh.

12         Q.   Okay.

13         A.   But I didn't see him lift his elbow.  So you lift

14    the elbow, which lifts the arms back (indicating).

15         Q.   Right.  And so you're saying that a control -- is

16    a control technique different than escorting?

17         A.   It's the same thing.  You're throwing all

18    different words.  They are just trying to control him to get

19    him to the car.

20         Q.   Okay.  No, I'm not trying to throw words.  I'm

21    asking a question.

22         A.   But they are all the same thing.  They are just

23    taking a person that he handcuffed to the car, and he's

24    resisting them getting to the car.  So they are trying to

1    make sure he doesn't hurt himself or others to get him to

2    the car.

3         Q.   Okay.  Yeah.  I understand what your observation

4    of that is.  I'm specifically asking about the technique.

5         A.   Okay.

6         Q.   So...

7                    (WHEREUPON, a video recording is

8    played.)

9         Q.   Okay.  Now what did you just observe there?

10        A.   Him turning around like he's in a fighting stance

11   with the officers.  And then a whole bunch of circling.  And

12   then him on the ground.  But I don't know how he got there.

13   I'm sure they escorted him down.

14        Q.   You said a "fighting stance."  A fighting stance

15   like he had his fists out?

16        A.   No.  You can kick the heck out of somebody, facing

17   them, which is just as dangerous.  He turned his body around

18   to get a blade at him.  That's menacing.  Right there, he

19   was looking to fight.  I mean, I don't know what else to

20   tell you.

21        Q.   Did you see him kick anyone?

22        A.   No, but he was ready to.  You can headbutt, spit,

23   bite somebody's face off.  So he was looking to fight at

24   that point.

1     Q.   Oh, okay.  That's your observation --

2     A.   Yes --

3     Q.   -- that he was looking to fight?

4     A.   -- through my experience.

5     Q.   Okay.  Did you hear him complaining about his

6  wrist hurting?

7     A.   Yes.

8     Q.   And according to the general orders, if someone

9  complains about an injury, what was the protocol back then?

10    A.   Saying your wrist hurts?  Yeah.  If you're

11 injured, we will call you medical staff or take you to the

12 hospital.

13    Q.   Okay.  If someone complains of an injury, what was

14 the protocol?

15    A.   All the way to get to the car -- because,

16 obviously -- did he state his wrist was injured?

17    Q.   Yeah.

18    A.   He stated his wrist hurts.

19    Q.   Okay.  So you're saying there's a difference

20 between saying your wrist hurts and your wrist is injured?

21    A.   In handcuffs, yeah.  People say that quite often.

22    Q.   All right.  And now based on what you saw again,

23 this is all routine, according to your -- the way that you

24 implemented police policies?

1       A.   I don't understand your question.

2       Q.   The way that you implemented police policies in

3   2021, this is considered a routine escort techniques being

4   used on Anthony Wynn?

5       A.   They were trying to get him to the car, yes.  He

6   was amping it up way high, so...

7       Q.   Yeah.

8       A.   Okay.  Yeah.  It was getting to the point, I'm

9   surprised that OC is not getting deployed or any other kind

10   of -- you know, like you said, the use of forces because

11   he's escalating it by the use of force himself.  I don't

12   know what it goes on to.  Maybe it gets worse or it gets

13   better.  I don't know.

14       Q.   So Anthony is escalating as far as the use of

15   force continuing --

16       A.   Yes, in his actions.

17       Q.   But you're saying officers aren't using any use of

18   force?

19       A.   I don't know if they tripped him.  I can't tell

20   from the video.  If they did and took him down, yes, that

21   would be use of force because they forced him to the ground.

22       Q.   Okay.

23       A.   I don't know if he went down to the ground.  I

24   can't tell from this.  All I know from the part of the

1     apartment so far is he kept on pulling away from the

2     officers, and they just kept on trying to control him.  They

3     get him to the car without any blows, strikes, batons,

4     weapons or anything else.  They kept on saying, "Let's just

5     go to the car" over and over and over.

6          Q.   Okay.  Let's watch it one more time.

7                         (WHEREUPON, a video recording is

8     played.)

9          Q.   I heard when the officers said "pull him down."

10    Did you hear that?

11         A.   I did want to correct one part.  He said, "Look

12    how they've got my wrist."  He never says his wrist is

13    injured there.

14         Q.   That's not what I was asking.

15         A.   But I just wanted to go back on that earlier part.

16         Q.   Yeah.  Did you see where the officer said, "Pull

17    him down"?

18         A.   Yeah.

19         Q.   Yeah.

20         A.   I heard it.

21         Q.   Huh?

22         A.   I heard it.

23         Q.   So then Anthony -- after that, Anthony Wynn is on

24    the ground, correct?

1      A.   So they might have took him down to the ground,

2  correct.

3      Q.   That's at 24:27, correct?

4      A.   Correct.

5      Q.   And there was no use-of-force report written on

6  this, to your knowledge, correct?

7      A.   No.  I didn't even know about it, again, until a

8  couple weeks ago.

9      Q.   All right.

10                    MR. DAVIS:  We'll take a break.

11                    (WHEREUPON, a break was taken in the

12  proceedings.)

13

14                    MR. DAVIS:

15      Q.   So do you know if Anthony Wynn suffered a rotator

16  cuff injury as a result of the January 1, 2021, incident?

17      A.   Not until the lawsuit.

18      Q.   Not until the lawsuit was filed?

19      A.   Uh-huh.

20      Q.   Okay.  Were any officers disciplined as a result

21  of the January 1st, 2021, event?

22      A.   No.

23      Q.   So let's move to the January 16th, 2021, incident.

24      A.   Okay.

1      Q.   And as far as you know, this incident also

2   involved my client, Anthony Wynn, correct?

3      A.   Yes, sir.

4      Q.   Okay.  So did you review any of the body cam

5   footage from that incident?

6      A.   Recently, no.  I remember the incident itself, but

7   I don't remember everything that was on the body cam.

8      Q.   Okay.  What do you generally remember about the

9   incident?

10      A.   Well, the incident -- I saw it on the watch

11   report, but it was the next day and overnight that I had

12   commissioners and various members of the eastside public

13   call me because somebody was passing around a video of the

14   incident amongst the eastside and getting people fired up,

15   as one commissioner put it.  So I had to come into work to

16   review what body cam I had.

17      Q.   And from your recollection, what did you -- what

18   did you view?

19      A.   Well, first, Facebook clips.  And why people were

20   most upset was, at some part in the fight, Murphy put him in

21   a headlock when they were on the ground fighting.  That was

22   right after the George Floyd movement and the protest and

23   stuff.  So it was really, really a hot topic at that point.

24   That's what I was getting most of the complaints about.  So

1    I reviewed the video.  And from the video, I could tell it

2    was a street brawl where my officer was basically losing.

3    Got slammed in the head.  Couldn't tell -- I can't remember

4    from what.  But he did get a slight concussion and was off

5    for three days.  So the -- but, anyway, either way, I

6    decided because of the heat and just what's going on in the

7    public at the time and trying to be transparent -- because

8    that was the thing -- the lack of trust in policing

9    nationwide, I decided to make an internal affairs

10   investigation.  And I put him on admin leave with pay until

11   the investigation was completed.

12        Q.   Okay.  And who was that officer?

13        A.   Officer John Murphy.

14        Q.   When you say he was in a brawl -- is that what you

15   described it as?  I want to get your --

16        A.   I mean, it was -- I mean, there was a crowd

17   building.  There was nobody helping.  And Murphy and

18   Mr. Wynn were both on the ground.  I can't remember exactly.

19   But it did seem to me, just watching the video that day,

20   that Murphy was getting overpowered.  So I just remember

21   seeing his head and hearing deep breathing like he was out

22   for a second.  I do remember that part, but I haven't

23   watched that video since probably January, February.  So I

24   can't tell you everything.  I just did the IA.  And I took

1    all the video and brought it to Rob Sanders, the

2    Commonwealth attorney, to determine if he thought there

3    would be any charges on Murphy.  And I brought in

4    Mayor Meyer and Commissioner Washington for them to watch

5    the video to show them, you know, what actually happened,

6    that it was actually a big fight.

7        Q.   Okay.  You said there was a fight, specifically,

8    to your recollection, between Murphy and Anthony Wynn?

9        A.   Yeah.  The only thing I can really recall about it

10   is he was a passenger in the car.  He gave his brother's

11   name.  He went to arrest him.  And sort of like -- I was not

12   familiar with that video outside there.  The same with

13   that -- Mr. Wynn started fighting with the police, trying to

14   get him off.  Very similar -- agitation and stuff.  And I

15   don't remember the steps next.  I haven't watched the video

16   in over two years.  I'm sorry.  But I thought it was

17   important enough to be transparent with the public and

18   stuff.  That's why I did the IA right away.

19       Q.   All right.

20       A.   And they did the investigation.  Like I said, went

21   through the external partners, Rob Sanders' office, and

22   showed it to the mayor and commissioner.

23       Q.   All right.  What was the result of the IA

24   investigation with Rob Sanders and the commissioner and the

1    mayor?

2         A.   Officer Murphy was exonerated.

3         Q.   Okay.

4         A.   I'm sorry if I didn't use the correct term.  I

5    haven't seen -- there's certain terms they put, but it means

6    he was cleared.

7         Q.   Okay.  Was there an IA, like, report that you sent

8    to the mayor or the commissioner?

9         A.   No.  It came to me after it was done by the

10   internal affairs board.

11        Q.   Oh.

12        A.   Then I reviewed it.  Then I sat down -- I don't

13   remember exactly when I sat down with them -- the mayor and

14   Commissioner Washington.  But because of the outcry during

15   this time and the feeling on it, I was very comfortable

16   showing the video and showing why things happened the way

17   they did and let them see that.  I can't recall showing the

18   IA to them or if I didn't.  I don't believe I did.  I don't

19   think they asked for it.  They just knew I did one.

20        Q.   Okay.  Where are the IA reports kept?

21        A.   They are locked up - I can't even get them - at

22   the Covington Police Department.

23        Q.   So they are in the possession of the Covington

24   Police Department?

1          A.    Uh-huh.

2                     MR. DAVIS:  I would like to request

3      that.  I don't believe I've seen the IA report.

4          Q.    Okay.  All right.  So there was a report that came

5      from -- just so I'm clear, there's a report that came back

6      to you from --

7          A.    Uh-huh.

8          Q.    -- internal affairs --

9                     MR. MANDO:  Let him finish.

10         Q.    -- internal affairs?  Yeah.  There's a report that

11     came back to you from internal affairs.  Was there a report

12     that you had to write or a request that you had to write to

13     internal affairs?

14         A.    Yes.  I would have written a memo.

15         Q.    A memo.  Okay.

16                     MR. DAVIS:  I would also like to request

17     a copy of that memo.

18                     MR. MANDO:  Got it.

19         Q.    So let me talk a little bit about the general

20     orders regarding the stop of a vehicle.  We don't have those

21     in front of us.

22         A.    Yes, sir.

23         Q.    But just your general recollection or

24     understanding of those.  When it comes to a traffic stop,

1    what was the general procedure that occurred when it comes

2    to a traffic stop?

3        A.   I mean, we just -- we call in to dispatch our

4    location, the tag number, turn on our lights.  If it seems

5    like they don't -- they are not going to stop or see us,

6    maybe use our siren for a second.  Of course, use your siren

7    all the way through if it's a pursuit.

8        Q.   Got it.  And what is the standard applied to a

9    police stop?

10       A.   I don't...

11       Q.   Well, let me -- that's a difficult question to

12   answer.  What is the standard applied to determine if you

13   can make a police stop?

14       A.   A violation.

15       Q.   Violation of...

16       A.   Law.

17       Q.   Of law.  Okay.  So you have to know that the law

18   has been violated?  Is that the standard?

19       A.   That's correct.

20       Q.   Okay.  And what is the standard used to determine

21   if a passenger in a vehicle should be ID'd or not?

22       A.   I don't know if there is a standard.  The officer

23   can request ID from everybody in the car.

24       Q.   Okay.  They can request ID from everyone in the

1   car.  That's your understanding?

2        A.   That's correct.

3        Q.   That's your understanding what the general orders

4   would say for a traffic stop in 2021?

5        A.   I'm not sure -- that's just a law.  I'm not sure

6   what the general orders would say.

7        Q.   Okay.  What do you know about standard of probable

8   cause?

9        A.   By law?

10       Q.   Yes.

11       A.   You have more than a hunch that they committed a

12  crime.

13       Q.   Okay.  And how about reasonable suspicious?

14       A.   It's a hunch.

15       Q.   Okay.  So in 2021, the Covington Police Department

16  was free to ID anyone that was in a vehicle; is that

17  correct?

18       A.   They were free to request it.

19       Q.   Request the ID from anyone that was in the

20  vehicle --

21       A.   Yes.

22       Q.   -- regardless if there was reasonable suspicion of

23  a crime being committed?

24       A.   Yes.

1    Q.   And regardless if there was probable cause that a

2    crime had been committed?

3    A.   Yes.

4    Q.   Okay.  So do you know how frequently your officers

5    would ask passengers for their ID?

6    A.   No.

7    Q.   Okay.  Is that something that, as the chief of

8    police, you encouraged?

9    A.   No.  It's just the law.

10   Q.   And so was it your understanding that your

11   officers would implement that policy all of the time or some

12   of the time?  How was that policy implemented?

13   A.   It's not a policy.  It's the law.  I would imagine

14   they have their discretion.  If they saw something or had a

15   reason for it or a reason, they just did it.  I mean,

16   usually, discovered people with warrants and other things.

17   It's pretty common.

18   Q.   Okay.  And is it your understanding that the

19   individual who would have their ID requested had to provide

20   that ID?

21   A.   They could refuse.

22   Q.   Okay.  And what would happen if they refused?

23   A.   Nothing.

24   Q.   Okay.  Based on your understanding, at what point

1    was an individual placed under arrest?

2         A.   What individual?  I'm sorry.

3         Q.   Just, in general, what was your policy and

4    procedure on when someone was considered under arrest?

5         A.   When they were getting handcuffed and told they

6    were under arrest.

7         Q.   Okay.  And to your understanding that was the --

8    that's the law as well?

9         A.   I don't think there's a law.  When you say,

10   "You're under arrest," you're under arrest, but I can't

11   answer that.

12        Q.   Based on your knowledge, if someone is being

13   questioned and not free to leave, are they under arrest?

14        A.   They are detained.

15        Q.   And that's kind of -- is that the policy or the

16   term that was used when you were the chief of police, that

17   if someone was questioned and unfree to leave, they were

18   being detained?

19        A.   Correct.  That's been through my whole career.

20        Q.   And based on your understanding of the January

21   16th, 2021, incident, was there any point where Mr. Wynn was

22   being questioned and not free to leave?

23        A.   I can't recall from the video.  I thought he

24   didn't have a seat belt on.  I can't recall exactly what it

1   was.  All I remember is he gave his brother's name, and his

2   brother had a warrant.

3        Q.   Oh, okay.

4        A.   I think it was his brother.  Sorry.  I don't know

5   who it was.

6        Q.   So based on your recollection of the January 1st,

7   2021, incident, was there a point where Mr. Wynn was being

8   questioned and not free to leave?

9        A.   I never watched the whole video, so I have no

10  idea.  I wasn't there.  I didn't see it.

11       Q.   Is there any time that -- when you -- from your

12  understanding in the way that the Covington Police

13  Department operated, was there any time where someone was

14  placed in handcuffs but wasn't under arrest?

15       A.   Yes.

16       Q.   Okay.  And explain that to me.

17       A.   All kinds of crimes.  If we think the person is a

18  flight risk or anything else, yes, or they are going to

19  fight us, agitation, yes, we could detain them in handcuffs

20  for our safety and theirs.

21       Q.   And how long can that detainment last?

22       A.   It's short.  It's relative to what you're doing.

23       Q.   When you say "short," what is that?

24       A.   It's not extended.

1    Q.   Okay.  Is there an amount of time.

2    A.   It's probably a question more for a judge, but, I

3    mean, it's just common sense.  You're not going to detain

4    somebody forever.  But if you're doing a show-up of a

5    robbery suspect or anything else, the detain could be longer

6    while you bring the witness to the spot where the robbery

7    suspect would be.

8    Q.   Do you know how long Anthony Wynn was in handcuffs

9    on January 21st, 2021, before he was told that he was under

10   arrest?

11   A.   Again, I have no idea.  I didn't know anything

12   about it until two weeks ago.

13   Q.   We're going to watch a little film.  Actually, I

14   had two more videos from the January 1 incident.  So I want

15   to watch those with you.  Then we'll jump to the --

16   A.   Okay.

17   Q.   So this is going to be body-worn camera.  And it's

18   COV000100.  And it's going to start at 42.

19                   MR. MANDO:  Which officer is this?

20                   MR. DAVIS:  Excuse me.  I don't know.  I

21   still can't pronounce this.  The D-U-R --

22                   THE WITNESS:  Durairaj.

23                   MR. MANDO:  Durairaj?

24                   MR. DAVIS:  Durairaj, yes.

1          MR. MANDO:  We already looked at that.

2     It was -- Video 105 was Durairaj.

3          MR. DAVIS:  Yeah.  There was another

4     one.

5          MR. MANDO:  Is there a second?

6          MR. DAVIS:  Yeah, there was a second

7     one.

8          (WHEREUPON, a video recording is

9     played.)

10

11          MR. DAVIS:

12     Q.   All right.  So this is actually COV000105 we're

13     starting at.

14          MR. MANDO:  What number did you say,

15     105?

16          MR. DAVIS:  Yes.

17          MR. MANDO:  All right.

18          (WHEREUPON, a video recording is

19     played.)

20     Q.   All right.  What did you just observe there?

21     A.   The officers trying to force entry.

22     Q.   Okay.  Is that standard policy to do that?

23     A.   I don't know what kind of call they were on.  I

24     have no idea.

1        Q.   Okay.  I thought -- did you say you listened to

2    the call for this --

3        A.   No.

4        Q.   -- in preparation?

5        A.   No, I did not.

6        Q.   Okay.

7        A.   I said I watched a little bit of video.  I was

8    trying to figure out how I was involved.  I wasn't even

9    there.  So -- then the order said it was disorderly conduct.

10   So you wouldn't have known because it is a minor -- that is

11   a routine arrest in Covington.

12       Q.   Okay.  Disorderly conduct?

13       A.   Yeah.

14       Q.   So if this is a disorderly conduct call, would the

15   officers have the right to kick down the door?

16       A.   For disorderly conduct?

17       Q.   Yeah.

18       A.   I don't know what kind of call that is.  I don't

19   know what they were called there for.  I have no idea.

20       Q.   Okay.

21       A.   Do you know?  I mean, I don't -- I mean, I'm being

22   serious.  I don't know what --

23       Q.   Okay.

24       A.   -- the dispatch notes said or how they were

1    dispatched.

2                        MR. MANDO:  Can we clarify that --

3    "disorderly conduct," you mean what he was charged with?

4                        THE WITNESS:  What he was charged with.

5    I don't know what kind of call it was.

6                        MR. MANDO:  All right.

7         Q.   And, to your knowledge, unless there was an

8    exigent circumstance, correct, that they would need a

9    warrant to go into this property?

10        A.   Some kind of emergency, correct.

11        Q.   Correct.  From this video, can you tell if there

12   was some type of emergency?

13        A.   I cannot tell anything from this video.

14        Q.   Okay.  And that's in your professional opinion, as

15   a chief?

16        A.   Right.

17        Q.   All right.  Okay.  I'm going to stop it again at,

18   it looks like, 55:24.  We just watched the officers try to

19   kick down the door again; is that correct?

20        A.   That's correct.

21        Q.   And, to your knowledge, can you hear anything that

22   would make you think there was any type of exigent

23   circumstance on the video?

24        A.   I don't know what type of call it is, so I can't

1    answer that.  Sometimes, silence can be the worst if it's

2    domestic or something -- or somebody held against their

3    will.

4        Q.   Okay.  But based on your knowledge, you don't know

5    if that was the case here?

6        A.   I don't know what type of call it was.

7        Q.   All right.  If this was a noise disturbance call,

8    would the officers attempting to kick down the door be a

9    correct action to take?

10       A.   If nobody was answering the door and the noise was

11   all the way up, Supreme Court ruled that we could go in and

12   turn off the noise because it will never end, but you would

13   think -- I don't hear any noise at this time.

14       Q.   At this time, is there noise that's up on the

15   video?

16       A.   Not that I can hear.

17       Q.   So that Supreme Court case wouldn't apply, would

18   it?

19       A.   No.

20       Q.   Okay.

21                       (WHEREUPON, a video recording is

22   played.)

23       Q.   Okay.  We're at 55:44 of the same video.  What did

24   you just observe on the video?

1      A.   Him walk up to an open screen door and start

2    pushing it open.

3      Q.   Okay.  And at this point, did you hear anything

4    that was a noise disturbance of any kind?

5      A.   Again, I don't know what kind of call -- you're

6    asking me to answer questions about something I know nothing

7    about.

8      Q.   No.  I'm asking you to state what you observed on

9    the video.  I'm not asking -- I'm saying, based on what you

10   saw, was there any noise disturbance --

11     A.   Not there.

12     Q.   -- going on at the time that he entered into

13   this --

14     A.   No.

15     Q.   -- sliding glass door?

16     A.   No.

17     Q.   Okay.

18     A.   No.

19     Q.   Okay.  Now what did you just observe?

20     A.   Him walking into the apartment.  Nobody is in

21   there.

22     Q.   Okay.  And do you hear any noise disturbance at

23   this time?

24     A.   No.

1    Q.   Okay.  Did you see what he did to the left of the

2    screen here?

3    A.   No.  I missed that.

4    Q.   Okay.

5              (WHEREUPON, a video recording is

6    played.)

7    Q.   Let's stop it right here.  So what did you observe

8    here?

9    A.   The officer is yelling, "I know you're in here.

10   You went in here."  So I don't know if it's a loud music

11   call anymore.  I'm thinking somebody fled in there or ran

12   from them, like, those questions.  And now they are

13   detaining everybody, again, for -- why they were there, I

14   don't know.  So I don't know why they are detaining them.

15   Q.   Okay.  So, in your opinion, it's proper to detain

16   these individuals if this was -- if this was a loud music

17   call?

18   A.   If this was just a loud music call, no.  But,

19   again, they yelled, "we know you're in here.  You ran in

20   here."  So I don't know what kind of call it is.  So...

21   Q.   Just based off of what you observed.

22   A.   No, I would not just for loud music.  But,

23   usually, people aren't hiding in the back room.

24   Q.   Okay.  So based on what you just saw, based on

1    COV000105, at approximately 58:45, Mr. Wynn was placed in

2    handcuffs; is that correct?

3         A.   Yes.  He was detained.

4         Q.   Yeah, detained, placed in handcuffs.  Okay.  Now,

5    previously, we watched this same video.  And I'm going to

6    try to get there.  Give me one second.  So we fast-forward

7    this all the way to where we previously watched.  It's about

8    24 minutes later.  And Mr. Wynn was still in handcuffs,

9    correct?

10        A.   Correct.

11        Q.   And it was almost 24 minutes at this point.  Do

12   you remember officers telling him why he was arrested?

13        A.   Yes.

14        Q.   Okay.  And are you saying that that's standard

15   policing with the City of Covington?

16        A.   It's policing.  I don't know -- they detained him.

17   It's 24 minutes later, he's going to jail.

18        Q.   Okay.  And at the point that Mr. Wynn came out of

19   -- based on this body camera, of what you viewed, the point

20   that Mr. Wynn came out of the back room, did you see any

21   disorderly conduct from him?

22        A.   That's up to a judge to decide.  I don't know what

23   his court case is, but that's up for a judge.  Maybe they

24   saw something prior or afterwards.  I don't know.

Page 99

1          Q.    Okay.  But your officers charged him with

2     disorderly conduct?

3          A.    Then they go to court, and the judge decides if

4     they were right or not and if there was probable cause.

5          Q.    Okay.  So you're saying that from the time -- in

6     your professional opinion, from the time that he left the

7     room to the time that he was detained, that he committed

8     some acts that --

9          A.    I have no idea.  I haven't watched the film in the

10     entirety.  I guess by their opinion, he did.  Again, it goes

11     to the court, and the judge decides, yay or nay.

12          Q.    Okay.

13          A.    Or jury, I should say.

14          Q.    All right.  Let's go back to this January 16th

15     incident.  While I'm pulling this up, have you ever had to

16     give a verbal reprimand to John Murphy?

17          A.    Not that I can recall.  A verbal, like, from me?

18          Q.    Uh-huh.

19          A.    Not that I recall, but I'd have to look at my

20     list.  I did issue discipline.  So I just don't know who I

21     gave discipline to.  I don't want to speak out of turn.

22          Q.    There's an official list that you would give a

23     verbal reprimand to?

24          A.    The only one I do is an official written.

1       Q.    Okay.

2       A.    So you can get an official written for too many

3    accidents that are your fault.  You can get all the way up

4    to termination, not just that.  But that's the things -- or

5    missing court too many times or anything like that.  So for

6    me to recall everybody I disciplined in five years, plus two

7    years as assistant chief - and I did it for the chief.  I

8    helped him write them - in seven years, I don't know.

9       Q.    Okay.

10      A.    Nothing stands out right away.

11      Q.    That you have -- okay.  Let me ask a specific

12   question, though.  Do you document when someone is given a

13   verbal reprimand?

14      A.    Yes.

15      Q.    Just a verbal?

16      A.    Not a verbal.  I don't do verbals.  There is no

17   verbal from the chief.  It's written, on up.  I do official

18   discipline.

19      Q.    Got you.  So who documents if there's a verbal?

20      A.    It's called a counseling, because it's not -- it's

21   usually documented in your evaluation.  That's the whole

22   purpose.  And you could say, hey, you were late too many

23   times to work.  It's usually minor things that are regular

24   employee issues.  I mean, anything that's more major that

1    comes up in a complaint, I'm going to handle it because I'm

2    the only one that can give official discipline.

3        Q.   Got it.  So, to your knowledge, has John Murphy

4    ever had a counseling verbal?

5        A.   A counseling verbal, I don't know.

6        Q.   You don't know?

7        A.   Yeah.

8        Q.   But there's somewhere where that should be stored

9    if it were?

10       A.   They will tell them.  Then it's written in their

11   evaluation, annual that they received a verbal for this.

12   They are supposed to keep that because we call them

13   mentoring.  It's not a -- the other word you said, verbal --

14   because the whole thing is -- the big fight is how do you

15   make an employee better.

16       Q.   Right, right, right.  Okay.

17       A.   Where it's not something they did that's against

18   rules or a violation, you know.

19       Q.   Okay.  To your knowledge -- so to your knowledge,

20   you don't know if there was a verbal for John Murphy?  You

21   don't know, correct?

22       A.   I did not look that up, no.

23       Q.   All right.  And then, to your knowledge, is there

24   a written reprimand for John Murphy?

1          A.   I think I gave him a written reprimand.  I just

2     don't recall.

3                         MR. MANDO:  For anything or for the

4     January 16th --

5                         MR. DAVIS:  For anything.

6                         MR. MANDO:  Okay.

7          A.   Yeah, I'm -- I'm pretty sure, yeah, there is one

8     off-duty incident.

9                         MR. DAVIS:  I think we requested that.

10    So if we can get a copy of that, that would be great.

11                        MR. MANDO:  Didn't we produce the

12    personnel files?

13                        THE WITNESS:  No.  That's the only one I

14    can think of.

15                        MR. MANDO:  All right.  I know we

16    provided whatever you asked for.  I just can't recall,

17    Jamir, whether the personnel files were included or not --

18                        MR. DAVIS:  Right.

19                        MR. MANDO:  -- in your discovery

20    request.

21                        MR. DAVIS:  Yeah.  I think I sent this

22    letter here.

23          I would like to enter this one into evidence -- I

24    mean, to the exhibits list.

1          MR. MANDO:  And we responded to this

2     letter, did we not?

3          MR. DAVIS:  Yes.  But we were

4     specifically asking for, I believe, the records for any

5     officers who were involved in that incident.  And the

6     response was there were no records, I believe.

7          MR. MANDO:  Okay.

8          (Exhibit No. 2 was marked for

9     identification purposes.)

10          MR. MANDO:  I'll just have to pull my

11     response.  I know we responded to this.  This is a

12     September 21 letter from Jamir to me, and I know we

13     responded.  I just don't recall -- I'll have to pull that

14     up.

15     Q.   Okay.  I'm going to ask the same series of

16     questions for Doug Ullrich.  Was he ever given a verbal

17     counseling, to your knowledge?

18     A.   Yeah.  He was given some reprimands from the

19     chief's office.

20     Q.   And how about -- was he given a written?

21     A.   Yes.

22     Q.   Okay.

23          MR. DAVIS:  I'd also like to request

24     those, for the record.

1            MR. MANDO:  Okay.

2            MR. JAMIR:  Can I go off the record.

3            (WHEREUPON, a break was taken in the

4    proceedings.)

5            MR. MANDO:  A discovery dispute has

6    arisen over document production issues.  We have had

7    off-the-record conversations about what was requested, what

8    was produced, and have a disagreement about that process.

9    As a result, the depositions -- to resolve the dispute, the

10   depositions are going to be adjourned in progress -- today's

11   deposition of Mr. Nader is going to be adjourned in

12   progress.  The depositions of Officers Elsbernd, Ullrich and

13   Murphy that are scheduled for this afternoon and tomorrow

14   are going to be postponed.  All of those depositions to be

15   rescheduled pending production of redacted personnel files

16   for the respective officers, Elsbernd, Murphy and Ullrich.

17           MR. DAVIS:  And the continued deposition

18   of Nader.

19           MR. MANDO:  Yes.  I'm sorry.

20           (The deposition of Robert Nader was

21   adjourned at the approximate hour of 12:39 a.m.)

22

23

24

1                        REPORTER'S CERTIFICATE

2     STATE OF KENTUCKY )
                                ) SS.
3     COUNTY OF KENTON  )

4          I, Brandy D. Mowery, CR and Notary Public in and for
      the Commonwealth of Kentucky at Large, do hereby certify
5     that the facts as stated by me in the caption hereto are
      true, to the best of my knowledge and belief and as provided
6     to me in the Notice of Deposition; that all parties appeared
      before me; that the deponent hereinbefore named was placed
7     under oath by me; that the foregoing proceedings were taken
      by me in stenotype and were reduced to transcript format by
8     computer-aided transcription; and that the foregoing
      transcript is a true and accurate record of the proceedings.

9
           I further certify that I am not employed by, related
10    to, nor of counsel for any of the parties herein, nor
      otherwise interested in the outcome of this action.

11
           No party to the action nor counsel for said parties
12    requested that the foregoing deposition transcript be read
      and signed by the deponent.

13
           IN WITNESS WHEREOF, I have affixed my signature and
14    seal this 20th day of December, 2023.

15                        AN/DOR REPORTING & VIDEO TECHNOLOGIES,
      INC.
16

17

      _____
18    Brandy D. Mowery, CR
      Notary Public for the State of Kentucky at Large
19

20
                          My Commission Expires:  April 28, 2026
21          Kentucky Notary Public ID No. KYNP49700

22

23

24

**'** 

'**11** [1] - 17:6
'**15** [2] - 17:6, 18:6
'**17** [1] - 18:6
'**97** [2] - 7:21, 52:22
'**98** [1] - 10:4
'**99** [1] - 10:4

**0**

**04** [1] - 3:3

**1**

**1** [22] - 3:5, 6:15, 6:23, 23:1, 24:11, 24:13, 28:7, 33:14, 33:19, 35:13, 36:12, 36:21, 48:2, 49:4, 59:7, 59:8, 65:17, 65:19, 73:21, 80:16, 91:14
**1.3** [1] - 27:1
**1.3.15** [2] - 27:6, 27:15
**1.314** [1] - 73:9
**10** [1] - 24:14
**100** [1] - 53:9
**103** [1] - 3:6
**105** [3] - 3:7, 92:2, 92:15
**114** [1] - 56:9
**116** [1] - 56:9
**122123** [1] - 2:4
**12:39** [1] - 104:21
**13** [1] - 1:16
**135** [1] - 56:8
**16** [2] - 9:1, 59:5
**16th** [7] - 6:8, 6:11, 7:5, 80:23, 89:21, 99:14, 102:4
**16the** [1] - 6:20
**179** [1] - 1:21
**1993** [1] - 7:15
**1996** [1] - 7:20
**1997** [1] - 9:8
**1st** [18] - 6:13, 6:16, 22:22, 27:20, 28:4, 28:15, 34:10, 38:18, 39:16, 45:13, 45:21, 46:9, 47:22, 49:10, 57:9, 65:11, 80:21, 90:6

**2**

**2** [3] - 3:6, 6:19, 103:8
**2-21-CV-00137** [1] -

4:8
**20** [4] - 48:16, 55:1, 58:16, 73:20
**2003** [1] - 10:21
**2005** [1] - 10:21
**2006** [2] - 10:22, 11:5
**2009** [1] - 13:12
**2011** [3] - 13:12, 13:15, 14:20
**2012** [1] - 14:19
**2013** [1] - 7:23
**2015** [2] - 8:1, 17:18
**2017** [1] - 18:12
**2021** [34] - 6:13, 6:16, 6:20, 6:23, 25:16, 25:18, 25:23, 27:13, 27:20, 28:15, 33:19, 34:10, 38:18, 39:16, 45:13, 45:21, 46:9, 47:23, 48:2, 48:19, 49:10, 57:9, 65:5, 65:11, 73:21, 78:3, 80:16, 80:21, 80:23, 87:4, 87:15, 89:21, 90:7, 91:9
**2022** [3] - 23:1, 23:5, 25:13
**2023** [5] - 1:16, 24:14, 25:4, 25:13, 105:14
**2026** [1] - 105:20
**20th** [1] - 105:14
**21** [2] - 27:3, 103:12
**21:36** [1] - 73:20
**21st** [1] - 91:9
**237** [1] - 29:6
**238** [1] - 39:19
**23:24** [1] - 74:8
**23:38** [1] - 67:12
**23:45** [1] - 66:9
**23:48** [1] - 74:8
**23:59** [1] - 59:22
**24** [5] - 3:5, 29:7, 98:8, 98:11, 98:17
**24:27** [1] - 80:3
**24:30** [1] - 70:2
**24:36** [1] - 61:24
**25:06** [1] - 70:24
**26** [1] - 59:5
**260** [1] - 29:6
**26:16** [1] - 59:5
**28** [3] - 32:18, 48:16, 105:20

**3**

**3** [6] - 29:21, 34:24, 35:15, 36:13, 36:22
**30-minute** [2] - 65:16, 66:1

**33** [1] - 65:16
**3328** [1] - 29:18

**4**

**4** [1] - 32:17
**40** [4] - 1:15, 2:8, 41:11, 69:11
**40507** [1] - 1:21
**41011** [2] - 2:5, 2:8
**42** [1] - 91:18
**48** [1] - 8:6

**5**

**5** [1] - 49:17
**55:24** [1] - 94:18
**55:44** [1] - 95:23
**58:45** [1] - 98:1
**5th** [2] - 22:21, 23:4

**6**

**6** [1] - 50:5

**8**

**859.254.3013** [1] - 1:22

**9**

**99** [1] - 30:22
**9:00** [1] - 1:17

**A**

**a.m** [1] - 1:17, 104:21
**Aaron** [1] - 74:3
**ability** [1] - 72:16
**able** [4] - 26:8, 26:14, 42:19
**abuse** [2] - 11:17
**academy** [7] - 40:20, 40:24, 41:9, 52:15, 52:16, 53:3, 60:22
**accidents** [1] - 100:3
**according** [4] - 62:13, 62:21, 77:8, 77:23
**accreditation** [4] - 13:22, 14:19, 15:18, 44:3
**Accreditation** [1] - 42:16
**accredited** [1] - 43:4
**accurate** [1] - 105:8

**accurately** [1] - 5:17
**act** [1] - 42:24
**acting** [2] - 49:16, 75:9
**action** [5] - 33:16, 34:22, 95:9, 105:10, 105:11
**actions** [5] - 35:23, 50:3, 72:13, 78:16
**active** [1] - 8:13
**actively** [2] - 34:3, 45:7
**acts** [1] - 99:8
**Adams** [2] - 1:15, 2:7
**added** [1] - 12:11
**adjourned** [3] - 104:10, 104:11, 104:21
**admin** [1] - 82:10
**administrative** [1] - 13:21
**administrator** [1] - 12:22
**Adobe** [1] - 14:11
**affair** [1] - 43:16
**affairs** [6] - 82:9, 84:10, 85:8, 85:10, 85:11, 85:13
**affecting** [1] - 58:15
**affixed** [1] - 105:13
**afternoon** [1] - 104:13
**afterwards** [2] - 51:4, 98:24
**again..** [1] - 57:18
**Agencies** [1] - 42:16
**aggressively** [1] - 51:17
**agitated** [7] - 62:8, 64:23, 66:23, 66:24, 67:16, 68:15, 69:12
**agitation** [2] - 83:14, 90:19
**ago** [7] - 4:12, 28:6, 45:16, 46:6, 57:10, 80:8, 91:12
**ahead** [2] - 37:12, 62:17
**aid** [6] - 34:8, 35:3, 36:14, 37:17, 37:19, 37:23
**aided** [1] - 105:8
**AL** [1] - 1:6
**alcohol** [1] - 5:13
**all right** [25] - 20:8, 24:9, 50:11, 51:24, 55:8, 59:2, 59:9, 65:14, 73:18, 74:7, 74:24, 77:22, 80:9, 83:19, 83:23, 85:4, 92:12, 92:17, 92:20,

94:6, 94:17, 95:7, 99:14, 101:23, 102:15
**allegations** [2] - 21:19, 21:21
**alleged** [1] - 49:16
**allow** [1] - 4:22
**almost** [3] - 43:4, 53:14, 98:11
**ambulance** [3] - 35:2, 35:9, 36:13
**amount** [1] - 91:1
**amping** [1] - 78:6
**AN/DOR** [2] - 1:20, 105:15
**AND** [1] - 1:20
**annual** [2] - 41:23, 101:11
**answer** [10] - 4:14, 5:5, 5:6, 21:14, 58:3, 86:12, 89:11, 95:1, 96:6
**answered** [1] - 58:2
**answering** [3] - 4:18, 40:9, 95:10
**answers** [1] - 20:5
**Anthony** [22] - 4:7, 5:1, 33:19, 34:1, 34:7, 34:13, 35:5, 49:8, 60:1, 61:15, 63:14, 65:11, 71:1, 71:23, 78:4, 78:14, 79:23, 80:15, 81:2, 83:8, 91:8
**ANTHONY** [1] - 1:3
**anyway** [2] - 15:19, 82:5
**apartment** [2] - 79:1, 96:20
**apparent** [1] - 49:19
**APPEARANCES** [1] - 2:1
**appeared** [2] - 1:14, 105:6
**applied** [2] - 86:8, 86:12
**applies** [1] - 49:14
**apply** [2] - 58:13, 95:17
**apprehended** [1] - 33:19
**apprehension** [3] - 33:16, 34:22, 34:23
**appropriate** [3] - 35:3, 35:7, 36:14
**approval** [1] - 17:2
**approximate** [2] - 1:17, 104:21
**April** [1] - 105:20
**area** [2] - 33:13, 55:19

**arguing** [2] - 34:3, 45:7
**arisen** [1] - 104:6
**arm** [10] - 32:4, 50:20, 50:21, 50:23, 52:6, 53:21, 60:1, 60:6, 75:3, 75:8
**armpit** [1] - 60:2
**arms** [9] - 30:24, 68:2, 68:8, 68:11, 68:16, 69:6, 74:13, 74:16, 75:14
**arrest** [37] - 30:22, 33:16, 34:14, 34:22, 53:5, 53:6, 53:7, 57:14, 58:15, 62:1, 62:7, 65:1, 65:10, 65:12, 67:7, 67:16, 67:19, 67:21, 69:10, 69:12, 70:14, 72:3, 72:4, 72:7, 72:8, 73:2, 73:13, 83:11, 89:1, 89:4, 89:6, 89:10, 89:13, 90:14, 91:10, 93:11
**arrested** [8] - 8:20, 22:12, 33:20, 33:22, 39:20, 64:18, 67:2, 98:12
**arrestee** [1] - 38:10
**arresting** [2] - 35:17, 65:2
**Ashley** [4] - 73:20, 73:24, 74:2, 74:3
**ashley** [1] - 74:1
**assign** [1] - 11:18
**assigned** [1] - 13:21
**assistant** [9] - 17:16, 17:17, 17:20, 18:5, 18:8, 19:5, 47:18, 56:8, 100:7
**Assistant** [2] - 28:5, 57:11
**associate's** [1] - 7:19
**Association** [2] - 42:17, 43:7
**AT** [1] - 1:2
**attempt** [1] - 65:4
**attempting** [1] - 95:8
**attend** [4] - 7:11, 7:13, 7:16, 7:18
**attended** [1] - 52:14
**attention** [3] - 34:14, 39:1, 48:13
**attorney** [8] - 3:3, 4:7, 5:1, 5:6, 5:21, 15:20, 20:19, 83:2
**audio** [1] - 70:20
**authority** [4] - 48:24, 49:9, 57:23, 58:22

**avenue** [1] - 44:23
**avenues** [1] - 56:22
**aware** [3] - 6:16, 6:20, 7:5

**B**

**bachelor's** [1] - 7:22
**backup** [1] - 56:19
**bad** [1] - 35:18
**balance** [1] - 47:10
**bar** [1] - 32:4
**bars** [2] - 53:21, 69:15
**based** [28] - 27:15, 29:14, 33:1, 34:12, 38:11, 43:20, 49:23, 50:14, 50:19, 54:6, 55:8, 70:12, 72:15, 73:6, 73:8, 73:10, 74:7, 77:22, 88:24, 89:12, 89:20, 90:6, 95:4, 96:9, 97:21, 97:24, 98:19
**basic** [2] - 67:19, 67:21
**basis** [1] - 41:23
**bat** [1] - 10:20
**baton** [2] - 30:14, 55:20
**batons** [1] - 79:3
**became** [7] - 9:3, 11:10, 11:13, 14:4, 14:17, 14:21, 18:6
**become** [2] - 10:18, 69:20
**begin** [3] - 4:9, 5:12, 37:10
**beginning** [4] - 4:6, 39:1, 60:11, 61:6
**behavior** [2] - 19:15, 32:16
**behind** [5] - 30:3, 30:16, 30:24, 31:18, 64:24
**belief** [1] - 105:5
**belt** [2] - 32:5, 89:24
**best** [5] - 21:15, 25:9, 44:2, 44:4, 105:5
**better** [3] - 37:11, 78:13, 101:15
**between** [6] - 44:22, 47:16, 53:12, 66:11, 77:20, 83:8
**big** [5] - 13:13, 38:5, 51:3, 72:4, 83:6, 101:14
**biggest** [2] - 29:5, 44:20
**bit** [6] - 12:13, 57:20,

66:4, 73:14, 85:19, 93:7
**bite** [1] - 76:23
**blade** [1] - 76:18
**blow** [1] - 50:7
**blows** [4] - 52:6, 58:11, 72:12, 79:3
**board** [1] - 84:10
**body** [29] - 6:9, 6:12, 6:24, 27:23, 28:4, 28:15, 34:1, 38:1, 39:6, 51:20, 52:11, 53:1, 53:11, 54:14, 54:16, 54:23, 56:17, 56:18, 62:4, 64:4, 64:5, 66:9, 69:5, 76:17, 81:4, 81:7, 81:16, 91:17, 98:19
**body-worn** [7] - 6:9, 6:12, 6:24, 27:23, 28:15, 34:1, 91:17
**book** [1] - 15:13
**born** [2] - 7:8, 7:9
**Box** [1] - 2:4
**brain** [1] - 23:21
**Brandy** [2] - 105:4, 105:18
**BRANDY** [2] - 1:12, 1:20
**brawl** [2] - 82:2, 82:14
**break** [7] - 4:17, 4:18, 4:19, 48:8, 80:10, 80:11, 104:3
**breathing** [1] - 82:21
**bring** [2] - 38:8, 91:6
**broader** [1] - 44:11
**broadly** [1] - 42:24
**brother** [2] - 90:2, 90:4
**brother's** [2] - 83:10, 90:1
**brought** [2] - 83:1, 83:3
**building** [2] - 14:1, 82:17
**bunch** [3] - 20:14, 38:5, 76:11
**bureau** [1] - 12:3
**burglary** [2] - 22:12, 29:9
**BY** [10] - 3:3, 4:5, 16:8, 16:10, 16:18, 16:19, 19:20, 19:21, 48:10, 66:1

**C**

**CAD** [1] - 6:5
**CALEA** [2] - 42:15,

43:10
**calm** [2] - 64:5, 68:14
**calmly** [1] - 69:4
**cam** [8] - 28:4, 39:6, 54:14, 54:16, 54:23, 81:4, 81:7, 81:16
**camera** [9] - 6:9, 6:12, 6:24, 27:23, 28:15, 34:1, 66:9, 91:17, 98:19
**cams** [3] - 38:1, 56:18
**cannot** [1] - 94:13
**capacity** [2] - 20:10, 21:4, 22:8
**captain** [10] - 13:20, 13:21, 14:6, 14:7, 16:22, 17:4, 17:7, 21:5, 47:13
**Captain** [1] - 22:1
**captain's** [2] - 13:13, 13:15
**captains** [1] - 56:7
**caption** [1] - 105:5
**car** [16] - 10:3, 10:5, 10:6, 30:11, 75:19, 75:23, 75:24, 76:2, 77:15, 78:5, 79:3, 79:5, 83:10, 86:23, 87:1
**care** [2] - 32:21, 35:7
**career** [1] - 89:19
**careful** [1] - 28:16
**case** [14] - 20:19, 20:20, 21:20, 22:4, 22:5, 22:6, 25:19, 28:3, 28:13, 29:9, 42:11, 95:5, 95:17, 98:23
**Case** [1] - 4:7
**Cathedral** [2] - 8:17, 8:19
**caught** [3] - 22:13, 29:8, 29:9
**causes** [1] - 49:19
**causing** [1] - 31:7
**certain** [2] - 43:1, 84:5
**certainly** [1] - 16:8
**CERTIFICATE** [1] - 105:1
**CERTIFICATION** [1] - 3:7
**certify** [2] - 105:4, 105:9
**chain** [3] - 29:13, 46:17
**chance** [1] - 45:5
**chances** [1] - 38:4
**change** [5] - 8:3, 29:17, 43:24, 53:13, 73:12

**changed** [4] - 17:2, 26:16, 26:23, 53:9
**changes** [2] - 7:22, 26:9
**charge** [1] - 13:24
**charged** [5] - 72:6, 72:24, 94:3, 94:4, 99:1
**charges** [2] - 70:16, 83:3
**Chavis** [1] - 22:10
**check** [4] - 43:14, 47:10, 51:2, 56:8, 57:11
**Chief** [4] - 14:4, 25:11, 28:6, 57:11
**chief** [60] - 14:4, 17:2, 17:15, 17:16, 17:17, 17:21, 18:5, 18:7, 18:8, 18:13, 18:21, 18:24, 19:5, 19:15, 21:6, 21:7, 21:9, 22:3, 22:8, 22:18, 22:22, 22:23, 23:7, 23:11, 23:15, 26:1, 28:21, 34:5, 36:3, 36:5, 36:19, 37:5, 37:14, 38:22, 39:13, 41:3, 42:8, 42:19, 44:15, 45:16, 47:18, 55:12, 56:2, 56:11, 57:22, 60:20, 61:9, 63:8, 64:9, 67:15, 69:9, 72:16, 73:7, 88:7, 89:16, 94:15, 100:7, 100:17
**chief's** [2] - 23:18, 103:19
**chiefs** [1] - 56:8
**Chiefs** [2] - 42:17, 43:7
**children** [2] - 8:9, 11:17
**Christmas** [1] - 9:5
**church** [1] - 8:15
**Cincinnati** [1] - 7:9
**circling** [2] - 74:10, 76:11
**circulated** [1] - 42:14
**circumstance** [2] - 94:8, 94:23
**circumstances** [7] - 38:14, 38:16, 39:22, 40:6, 41:18, 44:10, 56:13
**cited** [1] - 8:22
**Cities** [2] - 42:14, 43:9
**cities** [1] - 23:20
**citizen** [1] - 19:14
**CITY** [1] - 1:6
**City** [13] - 7:9, 18:21,

18:24, 22:19, 22:24, 23:2, 26:19, 28:21, 44:9, 58:18, 58:19, 59:4, 98:15
**city** [4] - 17:23, 18:16, 23:24, 42:12
**civil** [2] - 20:9, 22:7
**claimed** [1] - 34:13
**clarify** [2] - 19:13, 94:2
**clarity** [1] - 25:14
**clean** [1] - 4:23
**clear** [3] - 25:11, 37:5, 85:5
**cleared** [2] - 20:8, 84:6
**client** [1] - 81:2
**clip** [4] - 62:5, 62:22, 63:4, 64:7
**clips** [1] - 81:19
**clubs** [1] - 8:13
**college** [3] - 7:16, 9:3, 41:24
**color** [1] - 49:16
**combative** [1] - 61:2
**comfortable** [1] - 84:15
**coming** [3] - 29:10, 29:12, 74:9
**command** [1] - 46:17
**commander** [1] - 12:22
**commanders** [1] - 47:4
**commands** [1] - 30:2
**commencing** [1] - 1:16
**Commission** [2] - 42:15, 105:20
**Commissioner** [2] - 83:4, 84:14
**commissioner** [4] - 81:15, 83:22, 83:24, 84:8
**commissioners** [1] - 81:12
**commissioning** [1] - 17:19
**committed** [5] - 45:12, 87:11, 87:23, 88:2, 99:7
**common** [7] - 31:1, 40:4, 60:23, 65:6, 65:8, 88:17, 91:3
**Commonwealth** [3] - 1:13, 83:2, 105:4
**communicate** [1] - 20:5
**communications** [1] - 5:24
**community** [5] - 9:14,

10:15, 11:1, 12:7, 12:9
**compel** [1] - 48:24
**compelled** [5] - 49:9, 57:23, 58:4, 58:9, 58:21
**compelling** [1] - 58:9
**complain** [5] - 34:1, 35:3, 36:14, 38:2
**complained** [5] - 35:5, 37:17, 37:20, 37:22, 56:20
**complaining** [1] - 77:5
**complains** [3] - 35:12, 77:9, 77:13
**complaint** [8] - 20:6, 20:9, 20:18, 45:18, 56:23, 57:1, 57:14, 101:1
**complaints** [6] - 19:1, 19:6, 19:14, 22:7, 81:24
**complete** [2] - 41:9, 49:5
**completed** [4] - 8:1, 55:23, 58:20, 82:11
**computer** [1] - 105:8
**computer-aided** [1] - 105:8
**concussion** [1] - 82:4
**conduct** [12] - 28:8, 33:21, 45:17, 57:14, 67:19, 93:9, 93:12, 93:14, 93:16, 94:3, 98:21, 99:2
**confused** [2] - 58:4, 63:12
**confusing** [2] - 36:10, 58:17
**consider** [2] - 62:1, 62:7
**considered** [11] - 30:17, 54:4, 60:17, 61:21, 62:12, 63:14, 63:19, 70:13, 75:5, 78:3, 89:4
**constant** [1] - 35:18
**contact** [1] - 58:15
**contacted** [1] - 46:14
**continued** [1] - 104:17
**continuing** [1] - 78:15
**control** [10] - 29:22, 31:9, 31:12, 50:23, 63:20, 75:10, 75:15, 75:16, 75:18, 79:2
**controlling** [3] - 60:6, 63:3, 75:9
**conversations** [1] - 104:7
**copies** [1] - 43:23

**cops** [1] - 10:15
**copy** [3] - 41:15, 85:17, 102:10
**correct** [55] - 6:17, 6:21, 11:6, 15:7, 24:6, 24:15, 33:9, 33:17, 33:18, 36:9, 39:5, 39:6, 44:11, 46:10, 50:1, 50:4, 50:12, 55:9, 55:15, 57:4, 57:5, 62:13, 64:11, 67:8, 68:24, 69:22, 70:19, 71:10, 71:19, 71:20, 71:21, 71:24, 72:1, 79:11, 79:24, 80:2, 80:3, 80:4, 80:6, 81:2, 84:4, 86:19, 87:2, 87:17, 89:19, 94:8, 94:10, 94:11, 94:19, 94:20, 95:9, 98:2, 98:9, 98:10, 101:21
**Council** [3] - 41:2, 41:4, 42:13
**COUNSEL** [2] - 2:2, 2:6
**counsel** [2] - 105:10, 105:11
**counseling** [4] - 100:20, 101:4, 101:5, 103:17
**COUNTY** [1] - 105:3
**couple** [7] - 4:10, 9:15, 27:10, 28:6, 45:15, 46:6, 80:8
**course** [5] - 29:2, 35:22, 38:16, 58:15, 86:6
**courses** [1] - 42:1
**COURT** [1] - 1:1
**court** [7] - 4:13, 4:21, 42:11, 98:23, 99:3, 99:11, 100:5
**Court** [4] - 1:12, 4:2, 95:11, 95:17
**COV000100** [1] - 91:18
**COV000103** [1] - 59:3
**COV000105** [3] - 65:15, 92:12, 98:1
**COV000106** [1] - 73:19
**COV00072** [1] - 27:4
**covers** [1] - 54:16
**COVINGTON** [2] - 1:2, 1:6
**Covington** [32] - 1:15, 2:5, 2:8, 7:10, 7:12, 9:7, 9:10, 10:14, 15:12, 15:16, 18:24,

20:21, 22:24, 23:24, 26:19, 28:21, 38:12, 38:22, 40:3, 43:10, 44:9, 58:19, 59:4, 60:21, 61:9, 64:10, 84:22, 84:23, 87:15, 90:12, 93:11, 98:15
**Covington's** [1] - 18:22
**CR** [3] - 1:20, 105:4, 105:18
**crime** [9] - 8:22, 11:19, 12:3, 44:1, 45:11, 45:12, 87:12, 87:23, 88:2
**crimes** [1] - 90:17
**Cross** [1] - 7:12
**crowd** [1] - 82:16
**cuff** [3] - 52:4, 52:11, 80:16
**cuffing** [3] - 50:21, 51:19
**current** [1] - 25:3
**custodian** [1] - 41:20
**CYA** [1] - 72:22

**D**

**D-U-R-A-I-R-A-J** [1] - 65:22
**daily** [1] - 39:19
**dangerous** [1] - 76:17
**daughters** [1] - 8:12
**Davis** [5] - 2:3, 3:3, 4:7, 4:24, 59:4
**davis** [1] - 2:4
**DAVIS** [54] - 4:5, 16:1, 16:7, 16:10, 16:16, 16:19, 19:21, 20:23, 21:2, 23:22, 24:3, 24:15, 24:17, 25:1, 25:10, 25:18, 25:24, 26:3, 26:6, 26:9, 26:17, 41:15, 42:4, 42:21, 48:4, 48:5, 48:10, 59:8, 59:12, 59:14, 64:15, 65:19, 65:22, 66:1, 66:4, 73:24, 74:2, 80:10, 80:14, 85:2, 85:16, 91:20, 91:24, 92:3, 92:6, 92:11, 92:16, 102:5, 102:9, 102:18, 102:21, 103:3, 103:23, 104:17
**days** [1] - 82:5
**DC** [2] - 39:20, 73:1
**DCAIs** [1] - 69:13

**de** [1] - 67:18
**de-escalations** [1] - 67:18
**dead** [2] - 51:20, 53:1
**dead-body-weight** [1] - 53:1
**deadly** [1] - 29:20
**dealing** [1] - 69:13
**December** [3] - 22:21, 23:4, 105:14
**decide** [1] - 98:22
**decided** [2] - 82:6, 82:9
**decides** [2] - 99:3, 99:11
**decision** [2] - 62:23, 64:11
**deep** [1] - 82:21
**defendant** [2] - 19:16, 19:18
**defendants** [1] - 42:2
**Defendants** [1] - 1:7
**DEFENDANTS** [1] - 2:6
**define** [1] - 52:16
**defined** [1] - 52:17
**definition** [1] - 72:2
**degree** [3] - 7:22, 8:1, 8:2
**denied** [1] - 38:4
**department** [7] - 7:21, 14:1, 14:24, 23:9, 23:13, 42:5, 43:21
**Department** [16] - 9:7, 9:10, 10:14, 15:12, 15:16, 18:22, 26:20, 38:13, 58:19, 60:21, 61:9, 64:10, 84:22, 84:24, 87:15, 90:13
**departments** [1] - 44:1
**deployed** [1] - 78:9
**deployment** [2] - 33:6, 33:8
**deponent** [3] - 3:2, 105:6, 105:12
**DEPOSITION** [1] - 1:10
**Deposition** [1] - 105:6
**deposition** [12] - 1:14, 4:6, 4:10, 4:11, 5:4, 5:19, 21:13, 21:17, 104:11, 104:17, 104:20, 105:12
**depositions** [4] - 104:9, 104:10, 104:12, 104:14
**describe** [5] - 6:15, 50:16, 66:10, 67:14, 69:9
**described** [1] - 82:15

description [2] - 23:20, 24:2
designate [1] - 25:21
designation [1] - 43:11
detain [5] - 64:22, 90:19, 91:3, 91:5, 97:15
detained [6] - 89:14, 89:18, 98:3, 98:4, 98:16, 99:7
detaining [2] - 97:13, 97:14
detainment [1] - 90:21
detective [6] - 9:15, 10:18, 11:12, 11:14, 11:15, 12:10
detectives [1] - 11:18
determination [3] - 39:23, 62:6, 63:7
determine [4] - 72:20, 83:2, 86:12, 86:20
determined [4] - 35:11
determines [1] - 35:11
develop [2] - 42:10, 42:20
development [2] - 42:9, 42:19
diagnose [1] - 37:2
dictate [1] - 42:24
difference [1] - 77:19
different [12] - 23:21, 42:10, 42:18, 42:23, 44:15, 44:17, 44:18, 52:21, 53:9, 56:22, 75:16, 75:18
difficult [1] - 86:11
direct [1] - 83:4
directly [3] - 13:2, 44:16, 56:12
disagreement [1] - 104:8
discipline [3] - 23:16, 99:20, 99:21, 100:18, 101:2
disciplined [7] - 9:19, 10:23, 13:4, 17:8, 18:8, 80:20, 100:6
discovered [1] - 88:16
discovery [2] - 102:19, 104:5
discretion [1] - 88:14
dismissed [1] - 20:15
disorderly [12] - 28:8, 33:20, 45:17, 57:14, 67:19, 93:9, 93:12, 93:14, 93:16, 94:3, 98:21, 99:2
dispatch [2] - 86:3, 93:24

dispatched [1] - 94:1
dispute [3] - 44:22, 104:5, 104:9
DISTRICT [2] - 1:1, 1:1
disturbance [4] - 95:7, 96:4, 96:10, 96:22
DOCJT [1] - 40:20
document [6] - 6:7, 24:19, 27:11, 41:20, 100:12, 104:6
documented [2] - 10:8, 100:21
documents [3] - 6:1, 6:3, 100:19
domestic [5] - 11:17, 40:10, 44:22, 45:13, 95:2
don't.. [1] - 86:10
done [7] - 13:1, 13:22, 46:17, 56:22, 72:22, 73:4, 97:24
door [11] - 40:4, 40:9, 68:5, 68:15, 74:9, 93:15, 94:19, 95:8, 95:10, 96:1, 96:15
doubt [1] - 63:24
Doug [2] - 2:9, 103:16
down [32] - 28:7, 30:8, 31:7, 31:8, 31:10, 31:11, 32:7, 32:10, 32:14, 32:15, 47:20, 51:20, 51:21, 52:1, 52:9, 62:3, 64:4, 64:5, 64:6, 69:23, 76:13, 78:20, 78:23, 79:9, 79:17, 80:1, 84:12, 84:13, 93:15, 94:19, 95:8
downstairs [1] - 68:20
draft [1] - 43:21
drafted [2] - 46:18, 46:22
dragging [1] - 30:7
drugs [1] - 5:13
duly [1] - 4:1
DUR [1] - 91:21
DURA [1] - 65:20
Durairaj [5] - 65:21, 91:22, 91:23, 91:24, 92:2
Durairaj's [1] - 59:10
during [11] - 5:4, 9:14, 14:3, 17:7, 27:21, 28:20, 35:23, 37:14, 51:11, 51:12, 84:14
duties [8] - 11:11, 11:16, 11:23, 12:19, 13:19, 23:8, 23:18, 23:23
duty [3] - 49:5, 49:15,

102:8

E

early [1] - 47:8
EAST [1] - 1:21
EASTERN [1] - 1:1
eastside [2] - 81:12, 81:14
easy [1] - 43:18
effect [3] - 25:16, 25:22, 27:13
either [3] - 24:1, 68:19, 82:5
elbow [2] - 75:13, 75:14
elbowing [1] - 52:12
elbows [1] - 52:9
electronic [1] - 14:17
electronically [1] - 15:14
eligible [1] - 13:13
Elsbernd [2] - 104:12, 104:16
emergency [2] - 94:10, 94:12
employed [2] - 49:1, 105:9
employee [6] - 34:20, 35:2, 48:23, 49:1, 100:24, 101:15
Employee [2] - 33:14, 35:13, 36:13
employees [2] - 34:21, 56:9
Employees [1] - 36:11
Empty [1] - 29:22
empty [1] - 30:12
Empty-handed [1] - 29:22
encouraged [1] - 88:8
end [2] - 73:18, 95:12
ended [1] - 63:2
ending [1] - 29:20
Enforcement [5] - 41:2, 41:4, 41:17, 42:13, 42:16
enforcement [1] - 7:20
ensure [1] - 56:3
enter [4] - 38:13, 38:19, 39:8, 102:23
entered [1] - 96:12
entering [3] - 15:17, 15:21, 16:5
entirety [1] - 99:10
entry [1] - 92:21
equipment [1] - 13:24
escalate [2] - 70:15, 70:19

escalated [1] - 30:10
escalating [3] - 69:22, 78:11, 78:14
escalations [1] - 67:18
escape [1] - 53:15
escort [14] - 30:1, 30:10, 32:15, 58:13, 60:4, 60:5, 60:12, 60:17, 61:10, 61:17, 72:12, 74:18, 74:19, 78:3
escorted [1] - 76:13
escorting [2] - 30:3, 75:16
especially [1] - 69:12
ET [1] - 1:6
evaluate [6] - 33:14, 34:20, 35:13, 35:15, 36:11, 36:21
evaluation [4] - 32:20, 56:19, 100:21, 101:11
Eve [1] - 9:5
event [1] - 80:21
evidence [1] - 102:23
exactly [6] - 41:1, 43:23, 44:16, 82:18, 84:13, 89:24
exam [1] - 15:6
EXAMINATION [2] - 3:3, 4:4
except [2] - 22:9
excuse [4] - 7:14, 32:7, 50:6, 91:20
execution [1] - 16:6
executive [1] - 8:3
Exhibit [4] - 3:5, 24:11, 24:13, 103:8
exhibit [2] - 3:6, 24:9
exhibits [1] - 102:24
EXHIBITS [1] - 3:4
exigent [8] - 38:14, 38:16, 39:22, 40:5, 41:17, 44:10, 94:8, 94:22
exonerated [1] - 84:2
experience [5] - 34:12, 50:19, 51:5, 51:13, 77:4
experts [1] - 43:14
Expires [1] - 105:20
explain [3] - 29:22, 32:11, 90:16
Explain [1] - 66:21
extended [4] - 68:11, 69:6, 71:19, 90:24
external [1] - 83:21
extra [1] - 51:2

F

face [1] - 76:23
Facebook [1] - 81:19
Facetime [1] - 17:24
facing [1] - 76:16
facts [4] - 62:5, 63:8, 63:9, 105:5
fair [1] - 42:4
familiar [9] - 14:21, 20:19, 24:6, 24:7, 24:19, 24:20, 32:23, 47:11, 83:12
far [3] - 78:14, 79:1, 81:1
fast [1] - 98:6
fast-forward [1] - 98:6
fault [1] - 100:3
February [1] - 82:23
feet [2] - 30:7, 53:5
fell [1] - 70:6
female [1] - 66:13
few [1] - 16:13
field [1] - 36:24
fight [12] - 31:1, 62:3, 69:20, 70:7, 76:19, 76:23, 77:3, 81:20, 83:6, 83:7, 90:19, 101:14
fight-or-flight [1] - 31:1
fighting [9] - 40:8, 45:8, 69:14, 70:10, 76:10, 76:14, 81:21, 83:13
figure [1] - 93:8
file [1] - 16:2, 56:4
filed [5] - 19:1, 19:6, 20:9, 22:7, 80:18
files [3] - 102:12, 102:17, 104:15
film [6] - 28:11, 62:22, 63:5, 64:12, 91:13, 99:9
finally [1] - 7:22
finish [6] - 4:18, 4:22, 37:8, 37:9, 37:10, 85:9
fired [1] - 81:14
Firm [1] - 2:4
first [13] - 4:1, 9:9, 12:21, 13:14, 13:21, 28:23, 36:21, 47:1, 59:2, 64:22, 64:23, 68:21, 81:19
fists [1] - 76:15
fit [1] - 51:2
five [2] - 18:23, 100:6
flaring [1] - 60:7

**fled** [1] - 97:11
**flee** [2] - 53:13, 71:16
**flight** [2] - 31:1, 90:18
**floor** [2] - 68:18, 68:21
**Floyd** [1] - 81:22
**follow** [2] - 29:8, 56:23
**followed** [7] - 44:14, 44:16, 44:18, 47:12, 47:14, 47:17, 56:3
**following** [3] - 33:15, 34:22, 43:15
**follows** [2] - 4:3, 29:17
**fool** [1] - 75:9
**footage** [6] - 6:10, 6:12, 6:24, 28:1, 28:15, 81:5
**FOR** [2] - 2:2, 2:6
**force** [93] - 6:5, 6:6, 6:7, 7:1, 7:3, 7:6, 16:2, 16:4, 21:21, 24:4, 24:14, 25:7, 25:15, 25:17, 26:18, 27:2, 27:12, 27:16, 27:17, 27:21, 28:20, 28:22, 29:10, 29:13, 29:14, 29:19, 29:20, 30:2, 30:17, 31:5, 31:14, 31:19, 31:20, 31:23, 31:24, 32:2, 32:9, 32:12, 32:16, 33:4, 33:16, 34:22, 46:7, 46:8, 46:12, 47:22, 48:2, 49:5, 49:19, 49:24, 50:8, 50:12, 51:9, 52:7, 52:10, 52:12, 52:13, 52:17, 52:24, 53:17, 54:4, 54:6, 54:7, 55:9, 55:16, 55:22, 56:12, 56:14, 57:4, 57:21, 57:24, 58:5, 58:10, 58:14, 58:20, 59:1, 61:21, 62:13, 63:15, 63:24, 72:9, 72:17, 72:22, 72:23, 73:9, 73:11, 78:11, 78:15, 78:18, 78:21, 80:5, 92:21
**Force** [2] - 27:6, 29:18
**forced** [1] - 78:21
**forcefully** [1] - 63:22
**forces** [1] - 78:10
**forcing** [1] - 31:4
**foregoing** [3] - 105:7, 105:8, 105:12
**forever** [1] - 91:4
**formal** [1] - 5:8
**format** [1] - 105:7
**Fort** [3] - 22:18, 22:19, 23:2

**forth** [1] - 4:19
**forward** [1] - 98:6
**four** [1] - 17:6
**frame** [1] - 13:17
**free** [5] - 87:16, 87:18, 89:13, 89:22, 90:8
**frequently** [1] - 88:4
**front** [2] - 26:16, 85:21
**front/back** [1] - 55:18
**full** [3] - 4:22, 5:1, 20:5

## G

**gather** [1] - 31:12
**general** [43] - 11:16, 15:9, 15:11, 15:15, 15:21, 15:23, 16:5, 16:11, 23:8, 24:5, 24:10, 24:13, 25:22, 26:18, 26:22, 27:15, 29:15, 36:8, 38:11, 40:15, 43:22, 44:9, 44:23, 48:12, 48:13, 48:17, 48:18, 54:6, 54:10, 54:24, 57:19, 57:22, 58:7, 58:8, 58:19, 73:8, 77:8, 85:19, 85:23, 86:1, 87:3, 87:6, 89:3
**General** [2] - 27:1, 73:9
**generally** [7] - 26:18, 40:2, 42:5, 44:21, 56:2, 56:10, 81:8
**George** [1] - 81:22
**given** [9] - 9:21, 13:7, 15:5, 18:10, 26:16, 100:12, 103:16, 103:18, 103:20
**glass** [1] - 96:15
**glimpsed** [1] - 34:2
**glimpses** [2] - 72:18, 73:11
**goal** [2] - 44:4, 44:5
**golf** [1] - 8:15
**grab** [2] - 68:2, 74:13
**grabbing** [1] - 74:16
**grades** [1] - 41:8
**graduate** [1] - 7:13
**graduated** [2] - 7:19
**grappling** [1] - 32:3
**great** [5] - 48:21, 59:2, 67:18, 71:7, 102:10
**griswald** [1] - 59:12
**Griswald's** [2] - 59:13, 59:18
**ground** [33] - 30:8, 31:4, 31:7, 31:8, 31:11, 32:9, 32:10,

32:13, 32:15, 50:9, 51:10, 51:20, 51:21, 52:2, 52:9, 52:22, 52:24, 53:1, 62:4, 63:2, 63:21, 63:22, 63:23, 71:1, 71:23, 76:12, 78:21, 78:23, 79:24, 80:1, 81:21, 82:18
**guess** [6] - 22:12, 25:13, 26:3, 42:5, 46:4, 99:10
**guide** [1] - 23:9
**guidelines** [1] - 44:13
**guiding** [1] - 51:1

## H

**half** [1] - 13:12
**hall** [1] - 17:23
**hammering** [1] - 60:24
**hand** [3] - 30:12, 42:7, 74:24
**handcuff** [5] - 52:2, 52:23, 58:6, 60:8, 64:22
**handcuffed** [7] - 30:15, 49:11, 58:5, 60:9, 71:10, 75:23, 89:5
**handcuffing** [14] - 29:24, 32:14, 50:17, 51:7, 51:12, 51:15, 51:22, 51:24, 52:21, 58:9, 58:13, 60:6, 60:19, 75:6
**handcuffs** [13] - 30:5, 32:6, 32:8, 51:2, 67:6, 71:23, 77:21, 90:14, 90:19, 91:8, 98:2, 98:4, 98:8
**handed** [1] - 29:22
**handle** [1] - 101:1
**handling** [1] - 29:1
**hands** [7] - 30:3, 30:16, 31:18, 53:5, 53:10, 64:24, 71:19
**hard** [1] - 66:8
**hardly** [1] - 70:4
**head** [5] - 4:16, 22:16, 60:24, 82:3, 82:21
**headbutt** [1] - 76:22
**headlock** [1] - 81:21
**health** [1] - 38:6
**hear** [13] - 38:15, 40:8, 66:21, 67:1, 67:4, 70:5, 77:5, 79:10, 94:21, 95:13, 95:16, 96:3, 96:22

**heard** [3] - 79:9, 79:20, 79:22
**hearing** [1] - 82:21
**heat** [1] - 82:6
**heck** [1] - 76:16
**held** [3] - 9:9, 37:23, 95:2
**help** [2] - 30:8, 40:5
**helped** [1] - 100:8
**helping** [1] - 82:17
**hereby** [1] - 105:4
**herein** [1] - 105:10
**hereinbefore** [1] - 105:6
**hereto** [1] - 105:5
**hiding** [1] - 97:23
**high** [3] - 7:11, 38:5, 78:6
**High** [1] - 7:12
**higher** [1] - 31:14
**highlights** [1] - 29:7
**highly** [3] - 62:8, 64:23, 67:16
**himself** [2] - 76:1, 78:11
**hired** [2] - 7:20, 22:21
**hiring** [1] - 14:3
**hold** [4] - 30:6, 51:16, 52:9, 68:17
**holding** [8] - 50:20, 52:1, 60:14, 61:1, 64:4, 68:12, 74:17, 74:20
**holds** [1] - 75:8
**Holly** [1] - 7:12
**home** [5] - 38:13, 38:20, 38:23, 39:5, 39:8
**homes** [3] - 15:17, 15:21, 16:5
**Hon** [2] - 2:3, 2:7
**Horn** [5] - 21:1, 21:3, 22:4, 22:5, 22:6
**hospital** [6] - 35:20, 35:24, 38:4, 38:8, 38:10, 77:12
**hot** [1] - 81:23
**hour** [3] - 1:17, 35:20, 104:21
**hours** [2] - 29:7, 41:11
**house** [1] - 71:11
**HR** [1] - 23:20
**humans** [1] - 44:17
**hunch** [2] - 87:11, 87:14
**hurt** [1] - 76:1
**hurting** [1] - 77:6
**hurts** [3] - 77:10, 77:18, 77:20

## I

**IA** [7] - 82:24, 83:18, 83:23, 84:7, 84:18, 84:20, 85:3
**ID** [8] - 86:23, 86:24, 87:16, 87:19, 88:5, 88:19, 88:20, 105:21
**ID'd** [1] - 86:21
**idea** [8] - 28:17, 44:22, 65:13, 90:10, 91:11, 92:24, 93:19, 99:9
**identification** [2] - 24:12, 103:9
**identified** [2] - 20:18, 59:3
**ignorance** [1] - 68:18
**imagine** [1] - 88:13
**impair** [1] - 5:14
**implement** [1] - 88:11
**implemented** [5] - 45:14, 64:9, 77:24, 78:2, 88:12
**important** [2] - 37:9, 83:17
**IN** [1] - 105:13
**in-service** [1] - 41:10
**INC** [1] - 105:15
**inception** [1] - 41:23
**incident** [2] - 6:8, 6:16, 6:20, 6:21, 27:19, 27:20, 28:15, 28:18, 28:20, 38:18, 45:21, 46:9, 47:23, 48:3, 55:23, 57:9, 59:8, 73:21, 80:16, 80:23, 81:1, 81:5, 81:6, 81:9, 81:10, 81:14, 89:21, 90:7, 91:14, 99:15, 102:8, 103:5
**Incident** [3] - 6:15, 6:19, 6:23
**incidental** [1] - 58:14
**incidents** [4] - 29:5, 29:6, 29:7, 49:15
**include** [1] - 52:1
**included** [1] - 102:17
**independently** [1] - 45:10
**INDEX** [1] - 3:1
**indicating** [2] - 74:14, 75:14
**individual** [5] - 22:8, 52:9, 88:19, 89:1, 89:2
**individuals** [3] - 44:22, 45:9, 97:16
**influence** [2] - 5:13,

5:16
**injured** [18] - 29:11, 33:3, 34:13, 35:9, 35:11, 35:22, 49:21, 49:24, 50:2, 54:13, 55:18, 55:19, 69:21, 77:11, 77:16, 77:20, 79:13
**injuries** [11] - 33:15, 34:1, 34:21, 34:23, 35:14, 36:11, 54:9, 54:10, 54:11, 54:22, 55:15
**injury** [15] - 35:4, 35:6, 35:12, 36:15, 37:3, 37:17, 37:20, 37:22, 49:20, 55:17, 58:14, 77:9, 77:13, 80:16
**inside** [5] - 38:15, 38:23, 40:8, 40:11, 71:11
**instance** [2] - 50:11, 51:9
**intensive** [1] - 43:16
**interaction** [1] - 66:10
**interested** [1] - 105:10
**internal** [6] - 82:9, 84:10, 85:8, 85:10, 85:11, 85:13
**international** [1] - 43:10
**interview** [3] - 12:12, 17:22, 18:17
**intoxicated** [1] - 69:14
**investigate** [1] - 57:7
**investigating** [1] - 47:1
**investigation** [4] - 82:10, 82:11, 83:20, 83:24
**invited** [1] - 38:16
**involve** [1] - 53:4
**involved** [10] - 20:14, 21:24, 25:12, 51:5, 55:6, 55:8, 56:11, 81:2, 93:8, 103:5
**involvement** [1] - 39:2
**issue** [5] - 25:2, 40:10, 45:10, 47:9, 99:20
**issues** [2] - 100:24, 104:6
**itself** [2] - 55:17, 81:6

## J

**jail** [8] - 34:15, 34:16, 38:5, 38:8, 38:9, 53:2, 67:17, 98:17
**Jamir** [9] - 2:3, 3:3,

4:7, 4:24, 25:7, 37:12, 59:4, 102:17, 103:12
**JAMIR** [1] - 104:2
**January** [47] - 6:8, 6:11, 6:13, 6:16, 6:20, 6:23, 7:5, 7:21, 9:8, 22:22, 25:16, 25:18, 25:23, 26:6, 27:20, 28:4, 28:7, 28:15, 33:19, 34:10, 38:18, 39:16, 45:12, 45:21, 46:7, 46:9, 47:22, 48:2, 48:18, 49:10, 57:9, 59:7, 59:8, 65:11, 65:17, 65:19, 73:21, 80:16, 80:21, 80:23, 82:23, 89:20, 90:6, 91:9, 91:14, 99:14, 102:4
**Japan** [1] - 17:23
**Jeffrey** [1] - 2:7
**job** [11] - 11:11, 11:16, 12:19, 13:19, 22:17, 23:18, 23:20, 23:23, 24:2, 35:6, 63:8
**John** [5] - 82:13, 99:16, 101:3, 101:20, 101:24
**Jones** [1] - 14:4
**judge** [5] - 5:7, 39:12, 91:2, 98:22, 98:23, 99:3, 99:11
**judgment** [1] - 5:14
**July** [1] - 17:18
**jump** [2] - 68:19, 91:15
**June** [2] - 17:18
**jury** [1] - 99:13

## K

**keep** [10] - 5:17, 15:14, 42:6, 50:20, 61:3, 64:5, 68:14, 69:23, 72:9, 101:12
**Kelly** [1] - 22:1
**KENTON** [1] - 105:3
**KENTUCKY** [3] - 1:1, 1:21, 105:2
**Kentucky** [16] - 1:13, 1:16, 2:5, 2:8, 40:21, 41:1, 41:4, 41:16, 42:13, 42:14, 42:17, 43:7, 43:8, 105:4, 105:18, 105:21
**kept** [4] - 79:1, 79:2, 79:4, 84:20
**kick** [7] - 31:10, 63:3,

76:16, 76:21, 93:15, 94:19, 95:8
**kicking** [2] - 62:3, 63:24
**kind** [24] - 9:22, 10:4, 30:6, 31:1, 39:3, 42:24, 44:2, 47:10, 48:12, 51:1, 51:16, 52:3, 53:1, 54:13, 66:8, 78:9, 89:15, 92:23, 93:18, 94:5, 94:10, 96:4, 96:5, 97:20
**kinds** [3] - 53:13, 69:21, 90:17
**KLAC** [2] - 41:20, 42:3
**knee** [8] - 32:12, 61:15, 63:6, 63:14, 64:1, 64:3, 64:4, 64:6
**knock** [1] - 40:4
**know..** [1] - 60:11
**knowledge** [26] - 34:12, 38:11, 38:19, 38:21, 39:4, 39:7, 39:15, 47:21, 48:17, 49:8, 50:19, 57:21, 70:13, 72:15, 73:6, 80:6, 89:12, 94:7, 94:21, 95:4, 101:3, 101:19, 101:23, 103:17, 105:5
**knowledgeable** [5] - 25:3, 25:15, 25:17, 25:21, 39:13
**known** [2] - 46:10, 93:10
**KRS** [1] - 29:17
**Krueger's** [1] - 59:10
**KSP** [1] - 17:1
**KYNP49700** [1] - 105:21

## L

**lab** [2] - 11:19, 44:1
**lack** [1] - 82:8
**landed** [1] - 63:23
**Large** [2] - 1:13, 105:4, 105:18
**last** [3] - 5:22, 22:23, 90:21
**late** [1] - 100:22
**law** [20] - 7:20, 40:16, 40:17, 40:19, 40:23, 41:12, 44:14, 44:18, 49:16, 72:21, 72:22, 86:16, 86:17, 87:5, 87:9, 88:9, 88:13,

89:8, 89:9
**Law** [8] - 1:15, 2:4, 2:7, 41:1, 41:4, 41:16, 42:13, 42:16
**laws** [2] - 44:12, 44:13
**lawsuit** [7] - 19:17, 19:18, 28:3, 28:4, 28:18, 80:17, 80:18
**lay** [1] - 4:9
**leadership** [1] - 8:3
**leading** [1] - 32:16
**League** [2] - 42:14, 43:9
**least** [1] - 20:2
**leave** [6] - 44:1, 82:10, 89:13, 89:17, 89:22, 90:8
**led** [3] - 61:7, 61:20, 62:2
**left** [5] - 14:4, 24:7, 48:11, 97:1, 99:6
**leg** [2] - 31:6, 53:12
**legal** [2] - 5:8
**legs** [1] - 53:12
**less** [2] - 31:13, 50:7
**lethal** [2] - 50:6, 50:7
**letter** [3] - 102:22, 103:2, 103:12
**letting** [1] - 62:23
**level** [1] - 31:14
**levels** [1] - 29:14
**LEXINGTON** [1] - 1:21
**lie** [1] - 35:16
**lieutenant** [14] - 10:6, 11:10, 12:16, 12:18, 12:19, 12:20, 13:5, 13:10, 13:12, 14:2, 19:8, 22:21, 23:4, 46:3
**Lieutenant** [5] - 46:2, 46:9, 46:14, 46:18, 57:16
**lieutenants** [3] - 47:4, 47:5, 56:7
**lift** [2] - 75:13
**lifts** [2] - 75:8, 75:14
**lights** [1] - 86:4
**likely** [1] - 31:13
**line** [2] - 22:16, 36:23
**list** [3] - 99:20, 99:22, 102:24
**listed** [3] - 23:18, 23:23, 27:4
**listened** [1] - 93:1
**located** [1] - 1:15
**location** [1] - 86:4
**lock** [1] - 51:4
**locked** [1] - 84:21
**log** [1] - 57:15
**Look** [1] - 79:11

**look** [25] - 26:19, 27:3, 27:9, 27:12, 27:14, 28:5, 28:12, 32:17, 34:16, 44:14, 44:18, 47:6, 48:16, 48:17, 54:11, 54:24, 55:11, 55:21, 56:21, 63:8, 66:12, 68:1, 72:9, 99:19, 101:22
**looked** [7] - 28:4, 66:15, 68:16, 68:23, 71:15, 74:13, 92:1
**looking** [6] - 27:6, 29:21, 57:10, 76:19, 76:23, 77:3
**looks** [6] - 48:20, 60:7, 62:8, 66:14, 68:12, 94:18
**losing** [1] - 82:2
**lost** [4] - 97:10, 97:16, 97:18, 97:22
**loud** [4] - 97:10, 97:16, 97:18, 97:22
**lumps** [1] - 16:7
**lying** [1] - 35:21

## M

**madder** [1] - 70:6
**Madison** [1] - 8:19
**maintenance** [1] - 14:1
**major** [1] - 100:24
**Mama** [1] - 71:4
**manager** [1] - 18:16
**mandated** [1] - 41:12
**MANDO** [65] - 15:22, 16:3, 16:8, 16:18, 16:21, 19:13, 19:20, 19:24, 20:2, 20:4, 20:22, 20:24, 21:3, 21:6, 21:8, 21:11, 21:14, 24:1, 24:13, 24:16, 24:18, 25:6, 25:11, 25:20, 26:1, 26:5, 26:7, 26:13, 37:8, 41:19, 42:8, 48:1, 48:7, 58:1, 59:7, 59:9, 59:13, 59:15, 62:15, 65:17, 65:21, 65:23, 73:22, 74:4, 85:9, 85:18, 91:19, 91:23, 92:1, 92:5, 92:14, 92:17, 94:2, 94:6, 102:3, 102:6, 102:11, 102:15, 102:19, 103:1, 103:7, 103:10, 104:1, 104:5, 104:19

**mando** [1] - 5:22
**Mando** - 2:7
**manpower** [1] - 45:1
**manual** [1] - 15:24
**March** [2] - 24:14, 25:12
**MARIO** [1] - 1:3
**mark** [3] - 65:16, 65:23, 66:1
**marked** [2] - 24:11, 103:8
**married** [1] - 8:7
**master's** [3] - 7:24, 8:2, 8:4
**match** [1] - 14:16
**materials** [1] - 40:22
**matter** [1] - 65:2
**matters** [1] - 32:10
**MAXWELL** [1] - 1:21
**Mayor** [1] - 83:4
**mayor** [6] - 18:17, 20:6, 83:22, 84:1, 84:8, 84:13
**mean** [25] - 25:6, 25:18, 33:12, 35:8, 41:8, 43:21, 52:3, 52:5, 56:5, 62:4, 64:21, 72:6, 72:21, 72:24, 76:19, 82:16, 86:3, 88:15, 91:3, 93:21, 94:3, 100:24, 102:24
**means** [3] - 30:14, 49:1, 84:5
**Medical** [1] - 32:20
**medical** [16] - 33:4, 34:8, 34:14, 35:3, 35:7, 35:20, 35:24, 36:14, 36:24, 37:3, 37:16, 37:19, 37:23, 77:11
**medication** [1] - 5:13
**meet** [1] - 5:21
**members** [2] - 17:23, 81:12
**memo** [3] - 85:14, 85:15, 85:17
**menacing** [3] - 67:18, 73:1, 76:18
**mentoring** [1] - 101:13
**merging** [1] - 23:20
**met** [1] - 5:22
**Meyer** [1] - 83:4
**might** [7] - 26:14, 30:6, 31:13, 38:8, 52:24, 69:20, 80:1
**minor** [2] - 93:10, 100:23
**minute** [4] - 48:5,

59:5, 65:23, 71:18
**minutes** [3] - 98:8, 98:11, 98:17
**mischaracterization** [1] - 62:16
**missed** [1] - 97:3
**missing** [1] - 100:5
**Mitchel** [3] - 22:18, 22:20, 23:3
**model** [2] - 42:14, 43:8
**momentarily** [1] - 50:24
**month** [2] - 7:23, 12:3
**months** [2] - 12:5
**Moore** [1] - 7:24
**most** [6] - 25:2, 25:14, 25:17, 25:21, 81:20, 81:24
**mostly** [1] - 38:16
**move** [3] - 13:18, 53:12, 80:23
**moved** [6] - 10:7, 12:2, 12:5, 12:21, 13:9, 14:5
**movement** [1] - 81:22
**moves** [1] - 32:3
**mowery** [1] - 105:18
**MOWERY** [2] - 1:12, 1:20
**Mowery** [1] - 105:4
**MR** [120] - 4:5, 15:22, 16:1, 16:3, 16:7, 16:8, 16:10, 16:16, 16:18, 16:19, 16:21, 19:13, 19:20, 19:21, 19:24, 20:2, 20:4, 20:22, 20:23, 20:24, 21:2, 21:3, 21:6, 21:8, 21:11, 21:14, 23:22, 24:1, 24:3, 24:13, 24:15, 24:16, 24:17, 24:18, 25:1, 25:6, 25:10, 25:11, 25:18, 25:20, 25:24, 26:1, 26:3, 26:5, 26:6, 26:7, 26:9, 26:13, 26:17, 37:8, 41:15, 41:19, 42:4, 42:8, 42:21, 48:1, 48:4, 48:5, 48:7, 48:10, 58:1, 59:7, 59:8, 59:9, 59:12, 59:13, 59:14, 59:15, 62:15, 64:15, 65:17, 65:19, 65:21, 65:22, 65:23, 66:1, 66:4, 73:22, 73:24, 74:2, 74:4, 80:10, 80:14, 85:2, 85:9, 85:16,

85:18, 91:19, 91:20, 91:23, 91:24, 92:1, 92:3, 92:5, 92:6, 92:11, 92:14, 92:16, 92:17, 94:2, 94:6, 102:3, 102:5, 102:6, 102:9, 102:11, 102:15, 102:18, 102:19, 102:21, 103:1, 103:3, 103:7, 103:10, 103:23, 104:1, 104:2, 104:5, 104:17, 104:19
**murdered** [1] - 64:22
**Murphy** [13] - 81:20, 82:13, 82:17, 82:20, 83:3, 83:8, 84:2, 99:16, 101:3, 101:20, 101:24, 104:13, 104:16
**music** [4] - 97:10, 97:16, 97:18, 97:22
**must** [1] - 48:23

**N**

**N-A-D-E-R** [1] - 5:3
**NADER** [4] - 1:10, 1:14, 3:2, 4:1
**Nader** [5] - 5:3, 25:11, 104:11, 104:18, 104:20
**name** [6] - 4:6, 4:24, 5:2, 22:10, 83:11, 90:1
**named** [7] - 19:16, 19:17, 21:11, 21:16, 28:3, 42:2, 105:6
**narcotics** [2] - 9:17, 11:13
**nationwide** [1] - 82:9
**nature** [1] - 53:19
**nay** [1] - 99:11
**necessarily** [1] - 42:3
**need** [5] - 5:12, 25:14, 51:2, 68:19, 94:8
**neighbor** [1] - 40:9
**neutralized** [1] - 31:14
**never** [16] - 28:9, 28:14, 31:2, 34:4, 34:6, 45:17, 45:18, 45:19, 47:21, 56:23, 57:13, 60:22, 61:6, 79:12, 90:9, 95:12
**new** [1] - 53:14
**next** [6] - 10:13, 12:14, 17:17, 65:14, 81:11, 83:15
**night** [1] - 49:9

**NKU** [2] - 7:19, 8:1
**nobody** [5] - 40:8, 46:16, 82:17, 95:10, 96:20
**noise** [8] - 95:7, 95:10, 95:12, 95:13, 95:14, 96:4, 96:10, 96:22
**none** [3] - 19:9, 19:11, 47:24
**normal** [3] - 31:3, 39:19, 41:24
**Notary** [4] - 1:12, 105:4, 105:18, 105:21
**notes** [2] - 46:1, 93:24
**nothing** [4] - 38:21, 88:23, 96:6, 100:10
**Notice** [1] - 105:6
**notification** [1] - 55:22
**notified** [3] - 28:9, 29:12, 45:18
**notify** [2] - 28:21, 49:4
**November** [1] - 1:16
**number** [5] - 12:17, 42:10, 42:18, 86:4, 92:14
**nurse** [1] - 34:16

**O**

**oath** [1] - 105:7
**object** [1] - 50:7
**objection** [3] - 24:17, 58:1, 62:15
**obligation** [1] - 5:9
**observation** [4] - 70:12, 71:15, 76:3, 77:1
**observe** [5] - 76:9, 92:20, 95:24, 96:19, 97:7
**observed** [3] - 73:10, 96:8, 97:21
**obviously** [2] - 4:15, 77:16
**OC** [3] - 33:6, 72:12, 78:9
**occurred** [2] - 34:23, 58:14, 86:1
**occurring** [2] - 29:5, 49:15
**occurs** [1] - 55:24
**OF** [5] - 1:1, 1:6, 1:10, 105:2, 105:3
**of...** [1] - 86:15
**off-duty** [1] - 102:8
**off-the-record** [1] - 104:7
**offered** [1] - 34:14

**office** [5] - 42:12, 47:18, 64:17, 83:21, 103:19
**Office** [1] - 2:4
**officer** [37] - 9:4, 19:10, 20:10, 27:17, 30:1, 30:16, 35:10, 37:2, 39:23, 41:21, 44:24, 47:16, 49:15, 50:3, 50:6, 50:23, 50:24, 55:18, 56:11, 57:3, 58:20, 60:7, 67:15, 67:17, 67:24, 68:8, 69:21, 73:22, 79:16, 82:2, 82:12, 82:13, 84:2, 86:22, 91:19, 97:9
**Officer** [2] - 29:19, 73:19
**officer's** [2] - 35:6, 65:3
**Officers** [1] - 104:12
**officers** [49] - 13:2, 21:22, 21:23, 22:2, 23:16, 24:5, 36:24, 37:6, 37:15, 38:3, 38:19, 39:4, 39:7, 40:18, 40:23, 41:5, 41:23, 42:2, 42:24, 45:21, 46:11, 46:20, 46:21, 50:22, 55:15, 56:9, 56:15, 60:20, 62:3, 63:3, 66:11, 66:17, 67:1, 74:12, 76:11, 78:17, 79:2, 79:9, 80:20, 88:4, 88:11, 92:21, 93:15, 94:18, 95:8, 98:12, 99:1, 103:5, 104:16
**officers'** [2] - 69:6, 71:19
**official** [5] - 99:22, 99:24, 100:2, 100:17, 101:2
**often** [1] - 77:21
**Ohio** [1] - 9:5
**old** [2] - 8:5, 14:11
**on-duty** [1] - 49:5
**once** [1] - 44:23
**one** [42] - 12:17, 16:1, 16:16, 16:20, 19:19, 19:20, 19:23, 20:2, 20:11, 20:12, 20:13, 20:14, 20:22, 21:12, 22:9, 27:13, 35:1, 48:13, 50:20, 50:21, 56:24, 57:19, 58:17, 64:7, 64:11, 64:16, 71:2, 72:20, 73:18, 73:19, 79:6, 79:11,

81:15, 84:19, 92:4, 92:7, 98:6, 99:24, 101:2, 102:7, 102:13, 102:23
**one-second** [1] - 64:7
**ones** [1] - 25:4
**open** [2] - 96:1, 96:2
**operated** [1] - 90:13
**opinion** [4] - 94:14, 97:15, 99:6, 99:10
**order** [20] - 15:15, 15:21, 16:5, 16:11, 24:14, 26:22, 27:15, 36:8, 40:15, 48:13, 48:17, 48:18, 54:6, 55:1, 57:20, 57:22, 58:7, 58:8, 73:8, 93:9
**Order** [2] - 27:1, 73:9
**orders** [16] - 15:9, 15:11, 15:23, 24:10, 25:22, 26:19, 29:15, 38:12, 43:22, 44:9, 48:12, 58:19, 77:8, 85:20, 87:3, 87:6
**ordinary** [1] - 69:17
**organizational** [1] - 8:3
**organizations** [1] - 8:14
**originally** [1] - 40:20
**otherwise** [1] - 105:10
**outcome** [2] - 73:12, 105:10
**outcry** [1] - 84:14
**outreach** [3] - 10:15, 11:1, 12:7
**outside** [3] - 43:13, 68:14, 83:12
**outward** [1] - 53:10
**overarching** [1] - 44:11
**overnight** [1] - 81:11
**overpowered** [1] - 82:20
**overruled** [1] - 10:4
**overseeing** [2] - 23:12, 45:20
**oversees** [1] - 41:2
**overtime** [1] - 12:24
**own** [2] - 43:21, 51:13

**P**

**PAGE** [2] - 3:3, 3:4
**Page** [7] - 27:3, 29:18, 29:21, 32:17, 48:16, 55:1, 58:16
**pain** [2] - 38:2

**paperwork** [2] - 12:23, 29:12
**Part** [1] - 58:15
**part** [15] - 15:4, 15:9, 15:18, 18:19, 29:24, 40:17, 58:12, 61:7, 64:4, 66:12, 78:24, 79:11, 79:15, 81:20, 82:22
**parties** [3] - 105:6, 105:10, 105:11
**partners** [1] - 83:21
**party** [1] - 105:11
**pass** [1] - 54:13
**pass-on** [1] - 54:13
**passenger** [2] - 83:10, 86:21
**passengers** [1] - 88:5
**passing** [1] - 81:13
**past** [2] - 36:20, 52:18
**patrol** [9] - 9:14, 9:16, 11:12, 11:20, 11:24, 12:18, 14:5, 14:7, 17:5
**patrolman** [4] - 9:11, 9:18, 10:11, 10:13
**patterns** [1] - 47:6
**pay** [2] - 39:1, 82:10
**pending** [1] - 104:15
**people** [12] - 30:4, 30:22, 35:16, 40:8, 51:2, 64:17, 69:13, 77:21, 81:14, 81:19, 88:16, 97:23
**per** [2] - 35:13, 42:3
**perceiving** [1] - 19:14
**percent** [2] - 30:22, 69:11
**person** [22] - 25:2, 25:14, 25:21, 30:4, 30:9, 31:10, 35:21, 38:2, 48:24, 50:4, 52:22, 53:15, 54:12, 55:6, 55:8, 56:20, 62:9, 67:16, 69:21, 75:23, 90:17
**person's** [1] - 30:16
**personally** [2] - 37:6, 37:19
**personnel** [3] - 102:12, 102:17, 104:15
**photo** [1] - 55:18
**photograph** [1] - 55:6
**photographed** [1] - 55:9
**photographs** [2] - 54:7, 54:10
**photos** [2] - 54:22, 55:16

**physical** [5] - 49:20, 50:8, 52:8, 53:5, 58:9
**physicality** [1] - 70:17
**physically** [8] - 30:16, 31:17, 48:23, 52:1, 57:23, 58:9, 58:21
**pick** [1] - 4:15
**Pike** [2] - 1:15, 2:8
**place** [2] - 48:18, 55:12
**placed** [5] - 89:1, 90:14, 98:1, 98:4, 105:6
**plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 2:2
**plan** [1] - 56:19
**play** [1] - 8:15
**played** [21] - 59:21, 61:14, 64:14, 66:3, 66:7, 66:20, 66:24, 67:11, 67:23, 68:7, 70:1, 70:23, 73:17, 74:6, 74:23, 76:8, 79:8, 92:9, 92:19, 95:22, 97:6
**plead** [1] - 68:18
**PLLC** [2] - 2:4, 2:7
**plus** [3] - 41:11, 51:1, 100:6
**point** [26] - 17:14, 44:3, 59:22, 60:9, 61:20, 61:23, 62:1, 63:10, 66:24, 67:15, 67:20, 69:10, 71:8, 72:11, 72:14, 73:2, 76:24, 78:8, 81:23, 88:24, 89:21, 90:7, 96:3, 98:11, 98:18, 98:19
**points** [2] - 12:11, 53:19
**Police** [18] - 9:7, 9:10, 10:14, 15:12, 15:16, 18:22, 26:19, 38:12, 42:17, 43:8, 58:19, 60:21, 61:9, 64:10, 84:22, 84:24, 87:15, 90:12
**police** [43] - 7:20, 9:3, 20:10, 22:8, 22:18, 22:23, 23:7, 23:9, 23:11, 23:12, 23:15, 23:18, 28:22, 34:3, 35:6, 36:3, 36:6, 36:19, 37:6, 37:15, 39:13, 40:3, 40:18, 41:3, 41:23, 42:5, 55:14, 56:9, 56:11, 60:21, 61:9, 64:9,

67:15, 69:9, 72:9, 73:7, 77:24, 78:2, 83:13, 86:9, 86:13, 88:8, 89:16
**policies** [32] - 13:23, 14:9, 14:22, 15:5, 15:8, 16:23, 23:19, 23:23, 25:3, 39:21, 40:3, 40:17, 41:4, 42:3, 42:6, 42:7, 42:9, 42:23, 43:8, 43:14, 43:15, 43:20, 44:2, 44:4, 44:5, 44:11, 44:13, 44:16, 47:17, 56:3, 77:24, 78:2
**policing** [3] - 82:8, 98:15, 98:16
**policy** [43] - 16:4, 16:5, 17:1, 25:8, 25:15, 25:22, 26:4, 34:17, 34:19, 35:10, 35:11, 36:1, 36:3, 36:5, 36:8, 36:18, 40:13, 42:9, 42:10, 42:14, 42:19, 43:19, 44:8, 44:14, 50:14, 54:18, 55:11, 55:24, 62:13, 62:21, 64:9, 64:17, 65:5, 65:6, 65:9, 72:24, 73:4, 88:11, 88:12, 88:13, 89:3, 89:15, 92:22
**policy-wise** [1] - 73:4
**position** [8] - 9:9, 9:12, 10:13, 10:16, 12:6, 12:14, 13:24, 18:4
**possession** [2] - 41:3, 84:23
**possible** [1] - 45:4
**Post** [1] - 2:4
**postponed** [1] - 104:14
**practical** [4] - 33:15, 34:21, 35:14, 55:23
**practice** [5] - 28:24, 36:20, 52:18, 65:7, 65:8
**practices** [1] - 60:23
**preparation** [3] - 5:24, 6:10, 93:4
**prepare** [2] - 5:19, 5:20
**prepared** [1] - 48:2
**presence** [3] - 29:19, 30:1, 31:23
**present** [2] - 2:9, 5:7
**pressure** [3] - 53:18, 75:7, 75:8

**pretty** [11] - 15:13, 21:8, 38:5, 43:2, 43:16, 43:23, 51:6, 52:18, 61:2, 88:17, 102:7
**prevent** [2] - 53:15
**previously** [2] - 98:5, 98:7
**probable** [3] - 87:7, 88:1, 99:4
**probe** [2] - 33:13, 55:20
**probes** [1] - 54:12
**problem** [1] - 16:21
**procedure** [6] - 12:16, 39:21, 40:13, 56:16, 86:1, 89:4
**procedures** [13] - 14:9, 14:22, 15:6, 15:8, 23:12, 23:19, 23:23, 25:3, 40:3, 41:4, 42:23, 45:14, 47:12
**proceeding** [2] - 5:8, 5:9
**proceedings** [5] - 48:9, 80:12, 104:4, 105:7, 105:8
**process** [8] - 17:20, 17:22, 18:15, 28:19, 28:21, 46:13, 56:19, 104:8
**produce** [2] - 42:1, 102:11
**produced** [1] - 104:8
**production** [2] - 104:6, 104:15
**professional** [2] - 94:14, 99:6
**progress** [2] - 104:10, 104:12
**progression** [1] - 29:19
**progressive** [1] - 29:17
**promoted** [8] - 9:16, 10:21, 11:5, 12:6, 12:17, 17:15, 17:20, 18:13
**pronounce** [2] - 65:20, 91:21
**proofs** [1] - 43:15
**proper** [2] - 45:1, 97:15
**properly** [1] - 37:2
**property** [1] - 94:9
**protect** [1] - 30:9
**protection** [1] - 55:7
**protest** [1] - 81:22
**protocol** [2] - 77:9,

**77**:14

**protocols** [1] - 23:12

**provide** [4] - 15:20, 15:22, 23:10, 88:19

**provided** [7] - 15:23, 25:4, 37:23, 41:5, 48:14, 102:16, 105:5

**Public** [5] - 1:13, 4:2, 105:4, 105:18, 105:21

**public** [6] - 20:6, 23:10, 40:12, 81:12, 82:7, 83:17

**Pull** [1] - 79:16

**pull** [6] - 30:7, 32:14, 69:1, 79:9, 103:10, 103:13

**pulled** [2] - 28:11, 28:17

**pulling** [5] - 66:17, 68:4, 69:14, 79:1, 99:15

**purpose** [1] - 100:22

**purposes** [2] - 24:12, 103:9

**pursuit** [3] - 10:3, 10:5, 86:7

**pushing** [4] - 51:16, 51:18, 60:24, 96:2

**Put** [1] - 64:24

**put** [12] - 4:19, 12:17, 14:11, 29:3, 30:2, 30:16, 30:24, 53:12, 81:15, 81:20, 82:10, 84:5

**putting** [1] - 31:18

---

**Q**

**questioned** [4] - 89:13, 89:17, 89:22, 90:8

**questions** [11] - 4:9, 4:14, 5:5, 5:7, 5:17, 26:15, 27:10, 38:6, 96:6, 97:12, 103:16

**quick** [1] - 28:11

**quickly** [1] - 20:15

**quiet** [1] - 40:10

**quite** [1] - 77:21

---

**R**

**radio** [1] - 56:17

**raised** [2] - 7:8, 7:9

**ran** [2] - 97:11, 97:19

**rank** [2] - 13:17, 56:4

**ranks** [2] - 9:17, 15:2

**rape** [1] - 29:9

**re** [1] - 31:12

**re-gather** [1] - 31:12

**reacting** [1] - 72:13

**reaction** [1] - 32:16

**read** [4] - 34:24, 55:5, 64:9, 105:12

**reads** [1] - 47:13

**ready** [1] - 76:22

**real** [1] - 28:11

**really** [8] - 28:5, 28:12, 51:3, 52:6, 62:8, 81:23, 83:9

**reason** [3] - 9:19, 88:15

**reasonable** [2] - 87:13, 87:22

**receive** [2] - 11:3, 17:12

**received** [4] - 10:10, 34:7, 41:22, 101:11

**recently** [1] - 81:6

**recess** [1] - 48:6

**recollection** [5] - 25:9, 81:17, 83:8, 85:23, 90:6

**recommendation** [1] - 42:13

**record** [12] - 4:23, 5:2, 37:11, 37:14, 41:16, 48:11, 65:18, 71:7, 103:24, 104:2, 104:7, 105:8

**recording** [20] - 59:20, 61:13, 64:13, 66:2, 66:6, 66:19, 67:10, 67:22, 68:6, 69:24, 70:22, 73:16, 74:5, 74:22, 76:7, 79:7, 92:8, 92:18, 95:21, 97:5

**records** [2] - 103:4, 103:6

**redacted** [1] - 104:15

**reduced** [1] - 105:7

**referring** [4] - 6:17, 6:21, 22:4, 59:16

**reflect** [1] - 44:11

**reflects** [1] - 41:22

**refuse** [1] - 88:21

**refused** [1] - 88:22

**regarding** [1] - 85:20

**regardless** [3] - 49:1, 87:22, 88:1

**regards** [1] - 44:9

**regular** [1] - 100:23

**related** [2] - 73:21, 105:9

**relates** [1] - 47:22

**relations** [2] - 9:14, 12:9

**relative** [1] - 90:22

**remember** [25] - 6:3, 7:23, 10:19, 10:22, 17:19, 20:13, 20:24, 21:3, 21:19, 21:23, 22:1, 22:11, 34:3, 45:23, 81:6, 81:7, 81:8, 82:3, 82:18, 82:20, 82:22, 83:15, 84:13, 90:1, 98:12

**Report** [1] - 27:6

**report** [30] - 27:12, 27:16, 29:2, 29:4, 29:10, 31:22, 31:24, 32:2, 47:22, 49:6, 49:14, 49:23, 50:1, 50:12, 55:22, 56:12, 57:21, 57:24, 58:12, 58:20, 72:17, 73:10, 80:5, 81:11, 84:7, 85:3, 85:4, 85:5, 85:10, 85:11

**reporter** [2] - 4:14, 4:21

**Reporter** [1] - 1:12

**REPORTER'S** [2] - 3:7, 105:1

**Reporter/Notary** [1] - 4:2

**REPORTING** [2] - 1:20, 105:15

**reports** [6] - 11:18, 46:17, 46:19, 46:22, 48:1, 84:20

**represented** [1] - 21:17

**reprimand** [7] - 9:21, 18:12, 99:16, 99:23, 100:13, 101:24, 102:1

**reprimanded** [1] - 17:10

**reprimands** [4] - 9:24, 10:2, 11:3, 103:18

**request** [15] - 16:3, 23:22, 25:7, 35:2, 36:13, 41:15, 85:2, 85:12, 85:16, 86:23, 86:24, 87:18, 87:19, 102:20, 103:23

**requested** [6] - 39:12, 39:16, 88:19, 102:9, 104:7, 105:12

**require** [5] - 33:2, 35:11, 57:22, 58:19, 72:16

**required** [9] - 12:8, 18:19, 27:16, 33:8, 33:10, 50:12, 54:7, 72:21, 73:8

**requirement** [4] - 38:12, 44:10, 49:14, 58:12

**requirements** [2] - 15:16, 41:17

**requires** [1] - 35:10

**requiring** [2] - 55:14, 72:23

**rescheduled** [1] - 104:15

**resist** [1] - 30:24

**resisting** [8] - 32:7, 51:18, 52:4, 72:4, 72:7, 72:8, 73:1, 75:24

**resolve** [2] - 44:23, 104:9

**respective** [1] - 104:16

**respond** [1] - 43:1

**responded** [2] - 103:1, 103:11, 103:13

**responding** [2] - 4:23, 5:17

**response** [2] - 103:6, 103:11

**responsibilities** [1] - 23:8

**responsible** [4] - 23:11, 23:15, 37:24, 45:20

**restrain** [1] - 72:10

**restraining** [1] - 31:17

**restraint** [1] - 74:15

**restraints** [1] - 52:8

**result** [6] - 34:23, 46:15, 80:16, 80:20, 83:23, 104:9

**results** [1] - 49:20

**resume** [1] - 18:16

**retired** [3] - 23:1, 24:20, 25:13

**Review** [1] - 27:7

**review** [12] - 5:24, 6:7, 6:9, 6:12, 6:24, 12:23, 34:4, 34:5, 46:8, 47:5, 81:4, 81:16

**reviewed** [5] - 6:4, 27:23, 47:21, 82:1, 84:12

**reviews** [2] - 27:11, 47:20

**revised** [2] - 24:14, 24:23

**revisions** [1] - 25:12

**rewrite** [3] - 13:23, 14:8, 14:10

**rewriting** [2] - 16:23, 16:24

**Richmond** [2] - 13:1, 40:20

**ridge** [1] - 22:16

**risk** [1] - 90:18

**Rob** [3] - 83:1, 83:21, 83:24

**robbery** [2] - 91:5, 91:6

**ROBERT** [4] - 1:10, 1:14, 3:2, 4:1

**Robert** [2] - 5:3, 104:20

**Rogers** [1] - 22:2

**role** [3] - 10:23, 11:9, 17:3

**roof** [2] - 22:12, 22:16

**rookie** [3] - 20:14, 20:17, 22:10

**room** [3] - 97:23, 98:20, 99:7

**rotator** [1] - 80:15

**routine** [22] - 50:16, 50:18, 51:6, 51:12, 51:22, 51:24, 52:10, 58:13, 62:1, 62:7, 62:9, 62:10, 62:12, 69:10, 69:11, 70:13, 70:16, 72:3, 77:23, 78:3, 93:11

**ruled** [1] - 95:11

**rules** [2] - 4:10, 101:18

**run** [2] - 68:24, 71:17

**running** [2] - 68:1, 68:3

**Russo** [1] - 14:4

---

**S**

**safe** [1] - 40:11

**safer** [1] - 33:12

**safety** [4] - 31:15, 40:12, 65:3, 90:20

**sake** [2] - 4:13, 4:21

**Sanders** [2] - 83:1, 83:24

**Sanders'** [1] - 83:21

**sat** [2] - 84:12, 84:13

**saw** [15] - 38:22, 61:6, 68:1, 68:3, 71:6, 71:14, 71:19, 74:7, 74:10, 77:22, 81:10, 88:14, 96:10, 97:24, 98:24

**scene** [5] - 28:24, 34:4, 35:6, 44:24, 47:2

**scheduled** [1] - 104:13

**scheduling** [1] - 12:24
**school** [2] - 7:11, 52:14
**School** [1] - 7:12
**science** [1] - 8:4
**score** [1] - 18:2
**scored** [2] - 12:17, 13:13
**screaming** [3] - 40:5, 66:22, 70:10
**screen** [3] - 28:17, 96:1, 97:2
**se** [1] - 42:3
**seal** [1] - 105:14
**search** [2] - 16:11, 34:21
**searching** [1] - 16:20
**seat** [1] - 89:24
**second** [15] - 10:5, 12:2, 12:4, 12:5, 12:21, 59:6, 64:7, 64:12, 68:18, 71:2, 82:22, 86:6, 92:5, 92:6, 98:6
**section** [3] - 32:23, 33:2, 55:5
**see** [54] - 26:7, 26:23, 27:7, 28:2, 32:20, 34:24, 41:8, 45:11, 47:9, 48:21, 49:2, 49:6, 49:12, 49:17, 50:5, 54:24, 55:3, 59:22, 60:1, 60:2, 60:15, 61:15, 62:23, 64:3, 64:6, 66:8, 67:24, 68:4, 68:8, 69:2, 69:5, 69:6, 70:3, 70:20, 71:1, 71:22, 71:23, 72:9, 72:12, 74:8, 74:12, 74:24, 75:7, 75:13, 76:21, 79:16, 84:17, 86:5, 90:10, 97:1, 98:20
**seeing** [2] - 22:14, 82:21
**seem** [2] - 16:1, 82:19
**selected** [1] - 18:3
**selecting** [1] - 18:18
**seniority** [1] - 12:11
**sense** [2] - 40:4, 91:3
**sensitive** [1] - 33:13
**sent** [3] - 25:7, 84:7, 102:21
**separate** [2] - 16:20, 45:1
**September** [4] - 18:6, 23:1, 25:13, 103:12
**sequential** [1] - 36:22
**Sergeant** [1] - 22:2

**sergeant** [18] - 9:16, 10:21, 11:5, 11:9, 11:11, 11:12, 11:13, 11:14, 11:15, 11:20, 12:7, 12:13, 12:15, 13:3, 13:10, 14:2, 19:8
**sergeants** [3] - 13:2, 47:5, 56:7
**series** [1] - 103:15
**serious** [1] - 93:22
**service** [2] - 19:15, 23:10, 41:10
**seven** [2] - 9:13, 100:8
**sexual** [1] - 11:17
**shaking** [1] - 4:16
**shall** [10] - 33:14, 34:20, 35:2, 35:13, 35:15, 36:11, 36:13, 49:1, 55:6, 55:23
**shift** [14] - 7:22, 11:24, 12:2, 12:4, 12:18, 12:19, 12:20, 12:21, 12:23, 29:4, 45:22, 45:23, 49:5
**short** [3] - 18:17, 90:22, 90:23
**shoulder** [2] - 35:18, 53:8, 53:11
**show** [3] - 35:4, 83:5, 91:4
**show-up** [1] - 91:4
**showed** [4] - 10:6, 46:2, 71:2, 83:22
**showing** [6] - 62:22, 63:4, 63:9, 84:16, 84:17
**shows** [2] - 29:18, 41:24
**side** [1] - 45:2
**sign** [3] - 8:23, 9:2, 29:3
**signature** [1] - 105:13
**signed** [2] - 49:5, 105:12
**signs** [2] - 35:4, 47:13
**silence** [1] - 95:1
**similar** [7] - 27:12, 43:2, 47:9, 48:17, 53:15, 55:11, 83:14
**siren** [2] - 86:6
**situation** [1] - 51:6
**situations** [2] - 43:1, 44:17
**six** [1] - 12:4
**skill** [1] - 72:15
**skills** [1] - 73:6
**skipped** [1] - 60:10
**slam** [1] - 31:11
**slammed** [1] - 82:3

**sliding** [1] - 96:15
**slight** [1] - 82:4
**slowly** [1] - 7:21
**so..** [4] - 58:16, 76:6, 78:6, 97:20
**social** [1] - 8:13
**solely** [1] - 72:7
**solicitor's** [1] - 42:12
**someone** [18] - 25:16, 30:15, 31:4, 31:17, 32:6, 32:8, 37:17, 52:1, 53:5, 57:23, 58:21, 77:8, 77:13, 89:4, 89:12, 89:17, 90:13, 100:12
**sometimes** [7] - 13:2, 33:12, 44:15, 45:4, 51:2, 53:10, 95:1
**somewhere** [2] - 9:15, 101:8
**soon** [4] - 33:15, 34:21, 35:14, 55:23
**sorry** [12] - 8:18, 16:13, 20:3, 41:11, 66:12, 68:22, 73:23, 83:16, 84:4, 89:2, 90:4, 104:19
**sort** [3] - 6:1, 32:13, 83:11
**sought** [1] - 7:24
**sounded** [2] - 70:7, 70:8
**sounds** [1] - 61:1
**sources** [2] - 42:10, 42:18
**specific** [3] - 16:4, 26:15, 100:11
**specifically** [4] - 55:19, 76:4, 83:7, 103:4
**speeding** [3] - 8:23, 8:24, 9:4
**spend** [1] - 35:20
**spike** [1] - 21:11
**spit** [1] - 76:22
**spot** [2] - 56:18, 91:6
**spot-check** [1] - 56:18
**spotted** [2] - 22:11, 22:13
**SS** [1] - 105:2
**staff** [5] - 33:4, 34:16, 35:21, 35:24, 77:11
**staircase** [1] - 68:19
**stance** [2] - 76:10, 76:14
**standard** [11] - 32:2, 51:6, 51:11, 86:8, 86:12, 86:18, 86:20, 86:22, 87:7, 92:22, 98:14

**standards** [1] - 24:5
**standing** [3] - 52:23, 71:8, 75:7
**stands** [1] - 100:10
**start** [9] - 9:6, 23:2, 24:9, 37:12, 59:5, 65:15, 73:20, 91:18, 96:1
**started** [5] - 62:2, 63:3, 66:14, 68:1, 83:13
**starting** [9] - 29:19, 31:9, 51:19, 70:7, 70:15, 70:17, 70:19, 75:6, 92:13
**state** [5] - 5:1, 13:22, 41:12, 77:16, 96:8
**STATE** [1] - 105:2
**State** [1] - 105:18
**states** [2] - 48:23, 55:3
**STATES** [1] - 1:1
**statewide** [1] - 43:2
**stay** [2] - 12:4, 44:5
**stenotype** [1] - 105:7
**step** [1] - 43:11
**steps** [1] - 83:15
**still** [10] - 27:1, 30:24, 54:17, 65:17, 68:15, 70:16, 72:11, 75:9, 91:21, 98:8
**stop** [17] - 8:23, 9:2, 16:11, 52:24, 70:2, 70:24, 74:11, 85:20, 85:24, 86:2, 86:5, 86:9, 86:13, 87:4, 94:17, 97:7
**Stop** [1] - 74:11
**stopped** [2] - 61:2, 68:10
**stopping** [2] - 31:24, 74:7
**stops** [2] - 16:18, 16:19
**stored** [1] - 101:8
**story** [1] - 45:2
**straight** [2] - 60:10, 75:7
**street** [1] - 82:2
**Street** [3] - 1:15, 2:8, 9:4
**STREET** [1] - 1:21
**strike** [5] - 31:7, 32:12, 32:13, 50:7, 53:6
**strikes** [5] - 30:12, 32:3, 52:6, 58:11, 79:3
**striking** [5] - 52:13, 53:16, 53:17, 60:23, 64:6

**struck** [2] - 54:12, 55:20
**stuck** [1] - 22:16
**study** [1] - 15:6
**stuff** [9] - 7:23, 12:24, 13:23, 31:10, 41:13, 44:2, 81:23, 83:14, 83:18
**style** [1] - 53:14
**styles** [1] - 52:22
**subject** [11] - 33:15, 35:12, 35:13, 36:11, 36:21, 37:20, 37:22, 49:20, 49:23, 50:8
**subjects** [2] - 35:3, 36:14
**submit** [4] - 14:17, 48:24, 49:9, 58:21
**submitted** [2] - 18:16, 59:4
**successfully** [1] - 41:9
**sudden** [1] - 69:5
**sued** [2] - 21:4, 22:14
**suffered** [1] - 80:15
**suicide** [1] - 38:6
**summoned** [1] - 57:16
**supervise** [1] - 13:1
**supervisor** [12] - 28:23, 29:3, 45:23, 46:4, 47:1, 49:5, 55:22, 56:12, 56:16, 57:3, 57:8, 57:17
**supervisors** [3] - 45:22, 56:6, 56:18
**supply** [1] - 16:8
**supposed** [3] - 57:7, 64:2, 101:12
**Supreme** [2] - 95:11, 95:17
**supreme** [1] - 42:11
**surely** [1] - 7:21
**surprised** [2] - 73:1, 78:9
**surrounding** [1] - 39:22
**suspect** [5] - 29:1, 29:8, 55:7, 91:5, 91:7
**suspicion** [1] - 87:22
**suspicious** [1] - 87:13
**sweep** [1] - 31:6
**swinging** [1] - 50:24
**switched** [1] - 47:15
**sworn** [1] - 4:2
**system** [1] - 47:8

**T**

**tag** [1] - 86:4

**takedown** [1] - 32:4
**Taser** [4] - 33:6, 33:8, 33:13, 72:13
**taster** [1] - 54:12
**taught** [6] - 40:23, 53:19, 54:2, 60:3, 60:20, 60:22
**teach** [1] - 53:3
**teaches** [1] - 60:23
**technique** [18] - 60:3, 60:4, 60:5, 60:13, 60:18, 60:19, 61:10, 61:17, 63:20, 64:1, 64:3, 74:15, 74:18, 74:19, 75:6, 75:10, 75:16, 76:4
**techniques** [10] - 29:22, 30:1, 30:10, 53:4, 53:5, 58:13, 72:12, 75:9, 78:3
**TECHNOLOGIES** [2] - 1:20, 105:15
**ten** [1] - 48:5
**ten-minute** [1] - 48:5
**tense** [1] - 31:3
**term** [2] - 84:4, 89:16
**termination** [1] - 100:4
**terms** [1] - 84:5
**territory** [1] - 19:16
**test** [8] - 12:10, 12:11, 12:12, 13:13, 13:15, 17:22, 18:2, 18:19
**tested** [1] - 12:16
**testified** [1] - 4:2
**testing** [3] - 12:8, 15:4
**THE** [13] - 19:19, 19:22, 20:1, 20:12, 21:7, 21:9, 21:13, 26:11, 74:1, 74:3, 91:22, 94:4, 102:13
**theirs** [1] - 90:20
**they've** [2] - 42:1, 79:12
**thinking** [2] - 20:6, 97:11
**thinks** [1] - 26:15
**third** [4] - 10:3, 10:6, 11:24, 12:5
**third-shift** [1] - 11:24
**Thomas** [1] - 7:24
**thoughts** [1] - 31:13
**three** [4] - 11:10, 14:5, 17:5, 82:5
**throw** [1] - 75:20
**throwing** [1] - 75:17
**timeline** [1] - 25:19
**timing** [1] - 65:2
**title** [1] - 22:17
**today** [4] - 5:19, 6:10,

6:15, 25:17
**today's** [1] - 104:10
**tomorrow** [1] - 104:13
**took** [8] - 10:7, 13:15, 55:16, 63:22, 63:23, 78:20, 80:1, 82:24
**tools** [3] - 32:4, 47:17, 58:11
**top** [1] - 63:23
**topic** [1] - 81:23
**totally** [1] - 66:22
**track** [1] - 26:8
**tracked** [2] - 26:10, 26:12, 26:13
**traffic** [6] - 16:18, 16:19, 52:23, 85:24, 86:2, 87:4
**train** [1] - 41:12
**trained** [2] - 36:24, 40:18
**training** [9] - 12:24, 14:1, 41:6, 41:10, 41:17, 41:21, 41:22, 47:16
**transcribe** [2] - 14:14, 14:15
**transcript** [5] - 41:21, 41:24, 105:7, 105:8, 105:12
**transcription** [1] - 105:8
**transparent** [2] - 82:7, 83:17
**treatment** [1] - 37:23
**tried** [1] - 71:15
**trip** [1] - 32:14
**tripped** [2] - 63:22, 78:19
**trouble** [2] - 39:11, 39:20
**true** [2] - 105:5, 105:8
**trust** [1] - 82:8
**truth** [1] - 5:10
**truthfully** [1] - 5:5
**try** [4] - 30:7, 44:23, 94:18, 98:6
**trying** [33] - 9:20, 20:4, 31:9, 32:14, 52:2, 52:4, 54:11, 55:17, 60:7, 62:3, 63:3, 66:14, 66:15, 67:17, 68:2, 68:12, 68:13, 68:16, 68:24, 69:4, 69:23, 71:17, 74:13, 75:18, 75:20, 75:24, 78:5, 79:2, 82:7, 83:13, 92:21, 93:8
**turn** [4] - 48:13, 86:4, 95:12, 99:21
**turnaround** [1] - 50:24

**turned** [3] - 17:1, 28:8, 76:17
**turning** [5] - 16:24, 38:9, 53:16, 62:4, 76:10
**tussling** [1] - 70:8
**twisting** [1] - 52:6
**two** [21] - 8:12, 10:17, 11:10, 11:18, 12:3, 12:5, 13:11, 13:12, 13:17, 18:3, 22:1, 23:20, 23:21, 24:8, 44:15, 50:22, 57:10, 83:16, 91:12, 91:14, 100:6
**type** [10] - 12:7, 12:8, 50:6, 50:7, 56:17, 66:9, 94:12, 94:22, 94:24, 95:6
**typically** [1] - 57:3

**U**

**Ullrich** [4] - 2:9, 103:16, 104:12, 104:16
**unconscious** [1] - 35:4
**under** [30] - 5:9, 5:13, 5:16, 11:19, 13:23, 14:2, 29:18, 29:21, 37:16, 48:21, 49:4, 49:12, 49:16, 50:5, 65:1, 65:10, 65:12, 67:6, 67:16, 75:3, 89:1, 89:4, 89:6, 89:10, 89:13, 90:14, 91:9, 105:7
**unfree** [1] - 89:17
**unit** [1] - 10:15
**UNITED** [1] - 1:1
**unless** [2] - 5:5, 94:7
**up** [44] - 4:15, 9:4, 9:17, 10:7, 13:18, 15:1, 20:8, 28:11, 28:17, 29:8, 29:13, 30:11, 31:3, 34:20, 38:8, 46:2, 46:17, 52:7, 52:23, 56:23, 60:7, 61:7, 63:2, 63:11, 66:4, 70:6, 71:8, 75:7, 75:8, 78:6, 81:14, 84:21, 91:4, 95:11, 95:14, 96:1, 98:22, 98:23, 99:15, 100:3, 100:17, 101:1, 101:22, 103:14
**updates** [1] - 44:7

**upset** [1] - 81:20
**upsets** [1] - 35:20
**upstairs** [1] - 68:20
**use-of-force** [23] - 6:7, 16:4, 24:4, 25:7, 25:15, 27:12, 27:16, 29:13, 31:24, 32:2, 34:22, 47:22, 49:5, 49:24, 50:12, 54:6, 55:22, 57:21, 57:24, 58:20, 72:17, 73:9, 80:5
**uses** [3] - 49:16, 50:6, 50:8
**utilized** [1] - 42:18

**V**

**vaguely** [2] - 20:21, 47:15
**various** [2] - 32:4, 81:12
**vehicle** [4] - 85:20, 86:21, 87:16, 87:20
**vehicles** [2] - 16:12, 16:20
**verbal** [25] - 9:24, 10:2, 10:3, 10:9, 10:10, 11:3, 12:11, 13:7, 17:12, 18:10, 30:2, 99:16, 99:17, 99:23, 100:13, 100:15, 100:16, 100:17, 100:19, 101:4, 101:5, 101:11, 101:13, 101:20, 103:16
**verbally** [1] - 4:15
**verbals** [1] - 100:16
**Video** [1] - 92:2
**video** [50] - 38:22, 39:2, 47:11, 47:13, 47:14, 57:20, 59:2, 59:16, 59:20, 61:13, 62:5, 64:13, 64:16, 65:14, 66:2, 66:6, 66:19, 67:10, 67:22, 68:6, 68:13, 69:24, 70:22, 73:16, 73:19, 74:5, 74:22, 76:7, 78:20, 79:7, 81:13, 82:1, 82:19, 82:23, 83:1, 83:5, 83:12, 83:15, 84:16, 89:23, 90:9, 92:8, 92:18, 93:7, 94:11, 94:13, 94:23, 95:15, 95:21, 95:23, 95:24, 96:9, 97:5, 98:5
**VIDEO** [1] - 105:15

**videos** [2] - 62:24, 91:14
**view** [2] - 28:16, 81:18
**viewed** [1] - 98:19
**violated** [1] - 86:18
**violation** [3] - 86:14, 86:15, 101:18
**violence** [2] - 38:15, 45:13
**violently** [1] - 53:16
**visible** [1] - 49:19

**W**

**walk** [2] - 69:4, 96:1
**walking** [4] - 30:10, 66:14, 68:14, 96:20
**wall** [2] - 30:6, 60:15
**warning** [2] - 13:7, 47:8
**warrant** [9] - 15:16, 16:6, 39:7, 39:12, 39:15, 41:17, 44:10, 90:2, 94:9
**warrants** [2] - 15:21, 88:16
**Warren** [4] - 9:4, 19:24, 20:19, 20:23
**Washington** [2] - 83:4, 84:14
**watch** [14] - 12:22, 28:16, 29:4, 47:4, 47:11, 57:20, 59:3, 65:14, 68:4, 79:6, 81:10, 83:4, 91:13, 91:15
**watched** [9] - 47:14, 82:23, 83:15, 90:9, 93:7, 94:18, 98:5, 98:7, 99:9
**watches** [1] - 47:13
**watching** [3] - 33:24, 61:3, 82:19
**weapons** [3] - 53:4, 58:14, 79:4
**week** [2] - 5:22, 41:11
**weeks** [6] - 28:6, 45:16, 46:6, 57:10, 80:8, 91:12
**weight** [4] - 51:20, 52:11, 53:1, 53:11
**West** [8] - 1:15, 2:8, 20:21, 46:2, 46:3, 46:9, 46:14, 57:16
**WHEREOF** [1] - 105:13
**WHEREUPON** [23] - 48:8, 59:20, 61:13, 64:13, 66:2, 66:6,

66:19, 67:10, 67:22, 68:6, 69:24, 70:22, 73:16, 74:5, 74:22, 76:7, 79:7, 80:11, 92:8, 92:18, 95:21, 97:5, 104:3

**whole** [8] - 43:10, 44:3, 60:11, 76:11, 89:19, 90:9, 100:21, 101:14

**width** [1] - 51:3

**Wietholter** [2] - 28:6, 57:11

**wise** [1] - 73:4

**wit** [1] - 4:3

**Witness** [1] - 27:11

**witness** [3] - 4:1, 55:7, 91:6

**WITNESS** [14] - 19:19, 19:22, 20:1, 20:12, 21:7, 21:9, 21:13, 26:11, 74:1, 74:3, 91:22, 94:4, 102:13, 105:13

**witnesses** [1] - 29:1

**Word** [1] - 14:11

**word** [2] - 14:14, 101:13

**words** [7] - 12:23, 30:4, 31:9, 32:3, 33:13, 75:18, 75:20

**worlds** [1] - 23:21

**worn** [7] - 6:9, 6:12, 6:24, 27:23, 28:15, 34:1, 91:17

**worry** [1] - 61:5

**worse** [1] - 78:12

**worst** [1] - 95:1

**wrist** [8] - 77:6, 77:10, 77:16, 77:18, 77:20, 79:12

**wristed** [1] - 51:3

**write** [4] - 29:2, 85:12, 100:8

**writing** [1] - 43:19

**written** [17] - 9:21, 12:11, 27:16, 36:20, 40:22, 50:1, 57:24, 73:10, 80:5, 85:14, 99:24, 100:2, 100:17, 101:10, 101:24, 102:1, 103:20

**WYNN** [1] - 1:3

**Wynn** [28] - 4:7, 5:1, 33:19, 34:1, 34:7, 35:5, 49:8, 60:1, 63:14, 65:11, 66:11, 68:24, 71:1, 71:23, 78:4, 79:23, 80:15,

81:2, 82:18, 83:8, 83:13, 89:21, 90:7, 91:8, 98:1, 98:8, 98:18, 98:20

**Wynn's** [1] - 61:15

## Y

**year** [9] - 7:13, 13:9, 13:16, 14:17, 14:18, 17:19, 22:22, 22:23, 41:11

**years** [17] - 9:13, 9:15, 10:17, 10:19, 11:10, 13:11, 13:12, 13:17, 14:5, 16:13, 17:6, 18:23, 24:8, 83:16, 100:6, 100:7, 100:8

**years'** [1] - 17:5

**yelled** [1] - 97:19

**yelling** [2] - 70:11, 97:9

**YES** [1] - 59:14

**yourself** [1] - 30:9

## Z

**zoom** [1] - 55:17

EXHIBIT

*The City of Covington Police Department*
*General Orders*

| G.O. 1.3 | | |
|---|---|---|
| **Issued:** 2/6/1992 | **USE OF FORCE**<br>Standards<br>(CALEA 4.1.1, 4.1.2, 4.1.3, 4.1.4, 4.1.5, 4.2.1, 4.2.2, 4.2.3,<br>4.2.4, 11.3.3, 41.2.4, 81.2.4, 83.2.6)<br>(KACP 1.3, 1.4, 1.7, 1.9, 1.10, 1.12, 10.2a) | **Revised:** 3/10/2023 |

**General Order 1.3 – USE OF FORCE**

**This order consists of the following sections:**

| | |
|---|---|
| 1.3.1 | Use of Force Generally |
| 1.3.2 | Use of Deadly Force |
| 1.3.3 | Use of Deadly Force to Apprehend a Fleeing Felon or a Person Suspected of Being a Felon |
| 1.3.4 | Employee Training in Policies Required |
| 1.3.5 | Restrictions on the Use of Firearms |
| 1.3.6 | Less Lethal Shotguns |
| 1.3.7 | PepperBall Systems |
| 1.3.8 | TASER 7/CEW |
| 1.3.9 | OC Spray |
| 1.3.10 | Impact Weapons |
| 1.3.11 | Extended Range Impact Weapons (FN 303 Projectile Launcher) |
| 1.3.12 | Weapons of Opportunity |
| 1.3.13 | Reporting and Investigating Firearms Discharges |
| 1.3.14 | Use of Force Report |
| 1.3.15 | Use of Force Report Review |
| 1.3.16 | Chief's Review of Reports |
| 1.3.17 | Critical Incidents |
| 1.3.18 | Critical Incident Investigations |
| 1.3.19 | Removal from Duty and Administrative Review of Incidents Involving Serious Physical Injury or Death |
| 1.3.20 | Use of Deadly Force upon Animals |

**Form Links**

1.3.1    **Use of Force Generally (CALEA 1.2.2, 4.1.1, 4.1.2, 4.1.4, 4.1.5, 26.1.1) (KACP 1.3a, e)**

A. It is the policy of the Covington Police Department that Officers shall exhaust all other reasonable means of achieving a lawful police objective,  including the application of de-escalation techniques, before resorting to the use of force. The legitimate use of

COV000052

force, including deadly and non-deadly measures, is limited to only the amount reasonable and necessary under the circumstances to achieve a lawful police objective.

B. KRS 503.090, Use of physical force in law enforcement states in part:

    1. The use of physical force by a defendant upon another person is justifiable when the defendant, acting under official authority, is making or assisting in making an arrest, and he:

        a. Believes that such force is necessary to effect the arrest:

        b. Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested: and

        c. Believes the arrest to be lawful.

    2. The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when:

        a. The defendant, in effecting the arrest, is authorized to act as a peace Officer; and

        b. the arrest is for a felony involving the use or threatened use of physical force likely to cause death or serious physical injury; and

        c. The defendant believes that the person to be arrested is likely to endanger human life unless apprehended without delay.

C. Definitions - The following definitions are for the purpose of this General Order only.

    1. **"Application of de-escalation techniques"** means the concept or proportionality, crisis recognition, effective communication, using distance and cover to create time, contact and cover responsibilities, tactical repositioning, and "slowing down" situations that do not pose an immediate threat. Additionally, acknowledgement of circumstances involving persons in crisis should be denoted, as well as utilizing safety equipment, calling for back-up units and supervisory response to specific call types, such as a Crisis Intervention Event.

    2. **"Active aggression"** means active, hostile resistance by an individual culminating in a threatened or actual attack upon the employee.

    3. **"Active resistance"** means an individual is offering active physical resistance in the form of pushing an Officer; pulling away from an Officer; grappling with an Officer; or generally offering physical resistance that is not an attack upon the Officer.

    4. **"Deadly physical force"** means force which is used with the purpose of causing death or serious physical injury or which the Officer knows to create a substantial risk of causing death or serious physical injury. (KRS 503.010)

    5. **"Less-lethal defensive weapon"** means any defensive weapon or object that when used properly as a defensive impact instrument will not create a substantial risk of causing death or serious physical injury and includes the Less lethal shotgun round (flexible baton), TASER, PepperBall system, baton, flashlight, or other non-lethal objects (i.e., portable radio, rock, stick, etc.) that an Officer uses to assist in defending himself from attack. All non-lethal defensive weapons will be used in accordance with current established training standards.

COV000053

6. **"Passive resistance"** means an individual does not respond to the commands of the Officer; refuses to move; becomes dead weight; issues verbal offense but offers no active physical threat to the Officer.

7. **"Physical force"** means force used upon or directed toward the body of another person and includes confinement. (KRS 503.010)

8. **"Reasonable belief"** means when facts or circumstances the Officer knows are such as to cause an ordinary and prudent Officer to act or think in a similar way under similar circumstances. The elements of reasonable belief include the Officer's own experience and training.

9. **"Serious physical injury"** means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ.

10. **"Officer"** applies to a sworn member of this Agency with arrest powers

11. **"Employee"** means any category of person working for this Agency that may have to use force or weapon in the performance of their duties.

D. Progressive Use of Force - When the use of force is reasonable and necessary Officers shall, to the extent reasonable, utilize an escalating scale of options and shall not use a more forceful option unless lesser verbal or physical force would be or has been ineffective or inappropriate. The scale of options, from the least forceful to the most forceful, is established as:

1. Officer presence
2. Verbal persuasion or commands
3. Empty handed control techniques.
4. Less-lethal Oleoresin capsicum (OC) Spray, PepperBall, or Conducted Energy Weapons (CEW or TASER).
5. Empty handed striking techniques or instrument assisted holding techniques.
6. Less-lethal defensive weapon strikes.
7. OC, 2-chlorobenzalmalononitrile (also called o-chlorobenzylidene malononitrile or CS) grenades or other special less-lethal offensive weapons including flexible baton rounds (bean bags). (Generally used by SWAT or other specially trained individuals only).
8. Deadly Force

E. It is not the intent of this policy to require Officers to try each option before escalating to the next level. Good judgment and the circumstances of each situation will dictate what level the Officer chooses as appropriate to the threat confronted.

1. It is not intended that any suspect or arrestee should ever be allowed to be the first to exercise force, thus gaining an advantage in a physical confrontation.

2. Factors that should be considered when employing physical force include but are not limited to:
   a. Officer vs. subject: age, sex, size, skill level, number of subjects, etc.
   b. Special circumstances: closeness of a weapon, injury sustained or exhaustion, being on the ground, distance from the subject, level of intoxication, special knowledge, availability of other options, etc.

F. Nothing in this order should be interpreted to mean that an Officer is required to

COV000084

engage in prolonged hand-to-hand combat with all the risks involved before resorting to the appropriate use of force that will more quickly, humanely, and safely bring the arrested under physical control.

G. Precipitation of Use of Force Prohibited – Employees should recognize that their approach to confrontations may influence whether force becomes necessary and the extent to which force must be used. Employees must not precipitate a use of force by placing themselves or others in jeopardy through actions that are inconsistent with the Agency's defensive tactics and tactical training without a substantial justification for variation from recommended practice.

H. When judging the reasonableness of a particular use of force it must be judged from the perspective of a reasonable Officer on the scene and in light of the facts and circumstances confronting that Officer at the time force is used.

I. When utilizing force, Officers shall use only Agency-approved equipment which the Officers are trained and qualified to use, except in emergency situations when an Officer may use any resource at his/her disposal.

J. Force used on the injured, sick or ill – There may be times, e.g. accident scene, where force may have to be used on someone injured. The force used must be limited to only the amount reasonable and necessary under the circumstances to achieve a lawful police objective. Factors to consider include, but not limited to, the threat presented, injuries, mobility of suspect, capabilities of the suspect, etc. Per the 6th Circuit factors to consider are:
   1. Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to him or others?
   2. Was some degree of force reasonably necessary to improve the immediate threat?
   3. Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

K. Medical evaluation and care
   1. Employees shall evaluate the subject for injuries as soon as practical following any use of force action or apprehension or arrest where injuries occurred as a result of that apprehension.
   2. Employees will render first aid to the level of their training, if required. First aid shall include treatment for the exposure to the OC or the administration of the CEW.
   3. Employees shall request an ambulance or other appropriate medical aid for all subjects who complain of injury, are unconscious, or show signs of an injury.
   4. Employees shall maintain close observation of the subject while the subject is in their custody. All subjects who are placed into restraints following a use of force will be monitored for positional asphyxia.
   5. Subjects will be transported to the nearest medical facility for treatment under the following circumstances:
      a. Upon their request and/or due to a complaint of an injury or signs of injury.
      b. The application of bean bag rounds.
      c. More than three (3) applications of the CEW on one subject during an

COV000055

incident.

    d. Intentional or unintentional application of force to any area of the body that may be deemed as deadly force, i.e. unintentional baton strike to the head

L. This policy is for use within this Agency only and does not enlarge an employee's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidential sense, with respect to third party claims. Violations of such directives, if proven, can only form the basis of a complaint by this Agency, and then only in a non-judicial administrative setting.  Violations of law will form the basis for civil and criminal sanctions in a recognized judicial setting.

M. Duty to Intervene/Duty to Report

    1. When an employee has a reasonable opportunity to do so, they shall intercede when they know, or have reason to know that another employee is about to use or is using unreasonable force.

    2. Employees shall promptly report any unreasonable use of force and the efforts made to intercede, to a Supervisor.  G.O. 26.2.7 Duties of all Employees states "All employees are required to immediately notify their Supervisor of: 1.Violations of orders, policies or procedures."


### 1.3.2    Use of Deadly Force (CALEA 1.3.2, 41.2.4, 81.2.4f) (KACP 1.3b)

A. The use of deadly force to protect human life is justified when the Officer reasonably believes that the action is necessary to protect himself or another person from imminent death or serious physical injury. KRS 503.090, Use of physical force in law enforcement, section 2 states: the use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when:

    1. The defendant, in effecting the arrest, is authorized to act as a peace Officer; and

    2. the arrest is for a felony involving the use or threatened use of physical force likely to cause death or serious physical injury; and

    3. The defendant believes that the person to be arrested is likely to endanger human life unless apprehended without delay.

B. Officers should use deadly force only as a last resort and exhaust all other reasonable means before resorting to the use of deadly force. This should not be interpreted so as to endanger the lives of police Officers or third parties or subject them to serious physical injury. In this regard reference should be made to Section 1.3.1 (D) (E) of this General Order.

C. When possible and practical Officers shall issue a verbal warning to a suspect before using deadly force. In this warning, Officers will identify themselves as police Officers and instruct the suspect to stop whatever action the suspect is doing that has caused the Officer to consider the use of deadly force.

D. Officers may utilize deadly force on animals in the following circumstances:

    1.  To prevent substantial harm to the Officer or other individuals.

    2.  When the animal is so sick or badly injured that humanity requires its relief from further suffering.

COV000036

3. When possible the local game or animal warden should be notified to determine if the animal can be saved or should be destroyed in a safer manner.
4. In the event an Officer determines that a sick or injured animal needs to be destroyed, the Supervisor on duty shall be notified and give approval. Supervisors should, unless deemed unreasonable, respond to the scene prior giving authorization.
5. If deadly force is used on an animal to prevent harm to the Officer or other individuals, e.g. vicious dog, a use of force report is required. When force is used to relieve the suffering of an injured animal, a KYOPS E-Call Response is to be completed.

E. Choke Holds/Vascular Neck Restrictions:

1. The use of any technique restricting the intake of oxygen and temporary blood flow to the brain for incapacitation (vascular neck restriction) for the purpose of gaining control of a subject is prohibited, unless deadly force would be considered reasonable.
2. Choke holds or any other use of force that relies on the restriction of oxygen intake has the potential to result in serious injury or death. Such applications can result in physical airway injuries that prevent successful medical interventions. This prohibition also relates to restricting airflow in an effort to recover ingested evidence.

**1.3.3    Use of Deadly Force to Apprehend a Fleeing Felon or a Person Suspected of Being a Felon (CALEA 4.1.2) (KACP 1.3c)**

A. The use of deadly force to prevent the escape of all felons or felony suspects, whatever the circumstances, is constitutionally unreasonable.
B. If an Officer has probable cause to believe that a suspect's actions demonstrate their capability to cause serious physical harm to either the Officer themselves, or to others, and that the threat of such harm is imminent, deadly force may be used.

**1.3.4    Employee Training in Policies Required (CALEA 4.3.2, 4.3.4) (KACP 1.3e)**

All employees issued weapons shall be issued a copy of this General Order and receive classroom instruction on its contents prior to being authorized to carry a weapon. A copy of the training record and the signed policy receipt shall be placed into the employee's training file.

**1.3.5    Restrictions on the Use of Firearms (CALEA 4.1.2, 4.1.3) (KACP 1.3d)**

A. Shoot to stop - Officers will fire their weapons not to kill but rather to stop an assailant from completing an act that would likely inflict serious injury or death to

either the Officer personally or another as described in this General Order. The use of a firearm against another is generally recognized as an act that employs deadly force. As such, Officers are only authorized to employ such force as a last resort and should only so in the most extreme of circumstances when lower levels of intervention have either failed or would be unreasonable.

B. Shooting at or from moving vehicles - Officers should not fire at or from a moving vehicle except in the most critical of circumstances.

    1. Shooting at a moving vehicle presents a substantial danger of incapacitating the driver thereby creating the risk that the unguided vehicle may seriously injure or kill a disinterested party or create substantial property damage for disinterested parties. Unless the Officer or another individual is in imminent danger of death or serious physical injury shooting at a moving vehicle should be avoided.

    2. Shooting from a moving vehicle has a very detrimental effect on the Officer's accuracy with his weapon and creates a substantial danger for other individuals and property in the vicinity. Unless the Officer or other individual is in imminent danger of death or serious physical injury shooting from a moving vehicle should be avoided.

C. The safety of innocent bystanders is of paramount importance. When Officers are about to discharge their firearms, they will be cognizant of their field of fire and will not unnecessarily create a substantial risk of harm to innocent persons.

D. Warning shots - Officers may not discharge their firearm for the purpose of a warning shot. Any benefits that could be derived by a warning shot are overshadowed by the inherent danger of firing an un-aimed, potentially deadly shot.

E. While under the influence of alcohol or drugs, Officers may not use or carry any firearm.

F. Except for maintenance, Officers shall not draw or exhibit their firearm unless circumstances create a reasonable belief that it may be necessary to use the weapon in conformance with this General Order.

G. Officers shall be held strictly accountable for the deployment of all long barreled weapons. Officers shall handle long barreled weapons as inconspicuously as possible given the totality of the circumstances.

H. Situations calling for the deployment of patrol rifles may include, but not limited to:

    1. Potentials for mass violence (i.e. active aggressor).

    2. Perimeter containment in barricaded suspect situations with a known weapon potential.

I. In any review of an Officer's decision to use deadly force, only those facts known to the Officer involved may be considered in justifying the Officer's action(s). Those facts, no matter how compelling, that were unknown to the Officer involved cannot be weighed in any review regarding an Officer's decision to use deadly force.

**1.3.6  Less Lethal shotgun (CALEA 4.1.4, 4.1.5, 4.1.6) (KACP 1.8, 1.11c)**

A. The less lethal shotgun will be available as part of the Patrol/SWAT defensive arsenal and may be used only by trained Officers.

COV000058

B. A Less lethal shotgun round is a standard 2 3/4 inch, 12-gauge shotgun shell with a transparent hull for easy identification.

    1. Less Lethal shotguns will be available in the SWAT room and the patrol office. The Less lethal shotguns in the patrol office will be assigned out to patrol officers during roll call. Patrol less lethal shotguns shall only be loaded with the fin stabilized rubber rocket round. NO REGULAR SHOTGUN AMMUNITION SHOULD EVER BE PUT INTO THESE ASSIGNED WEAPONS.

    2. Less Lethal shotguns shall be marked by an orange stock and forend.

    3. Procedures:

        a. When using a less lethal shotgun rounds, aim at the large muscle mass areas of the body. Avoid areas around the head, neck, and groin unless circumstances justify an elevation to this level of force.

        b. Take any individual struck with a less lethal round to the hospital for medical evaluation.

        c. While multiple less lethal rounds may be expended as necessary, no more than two less lethal shotguns should be simultaneously deployed on an individual.

        d. The effective range of the fin stabilized rubber rocket round is 15 – 35 feet. Patrol officers shall not engage targets outside of this range.

        e. SWAT officers utilizing a less lethal shotgun shall follow the manufacturer's recommendations for deployment.

    6. After using a less lethal shotgun round and an individual is under control, immediately notify onlookers (if the situation permits) that a less lethal shotgun, not a regular shotgun, was used. Inform the onlookers that the less lethal shotgun is a less lethal alternative designed to apprehend individuals without causing serious injury.

    7. As with all uses of force, the required reports should be completed and the incident investigated by an on duty Supervisor in accordance with General Orders 1.3.13.

## 1.3.7  PepperBall (CALEA 4.1.4, 4.1.5, 4.1.6) (KACP 1.8, 1.11c)

A. The Agency authorizes sworn Officers who are trained and certified in the use of PepperBall to use such force. PepperBall may be used in the following type circumstances:

    1. When a suspect exhibits violent or potentially violent behavior that threatens the safety of others and attempts to subdue the subject by conventional means of persuasion, escort control, self-defense techniques, and/or pain compliance measures have not been or reasonably appear unlikely to be effective, or

    2. When it is unsafe for an Officer to approach a suspect within contact range, or

    3. When higher use of force options may be justified but an opportunity exists for the use of PepperBall before these other options are employed, or

COV000059

    4. To defend oneself or another from an aggressive and/or attacking animal, or

    5. To disperse an unruly crowd threatening unlawful property damage or physical force, or

    6. To incapacitate a suspect who, after ample verbal warning, refuses to comply with a lawful order and who takes an aggressive posture or makes aggressive movements towards the Officers.

B. Procedures:

    1. Supervisors may issue the PepperBall systems to trained and certified Officers at the beginning of each shift and in such a fashion as to ensure continuous availability and widest coverage on the street.

    2. Officers who are issued the system are responsible for inspecting it at the beginning of their shift. Any damage or deficiencies must be reported immediately. If a condition exists that renders the system inoperable or unsafe to operate, it will be taken out of service until repaired or replaced.

    3. Supervisors and Officers issued the system are responsible to ensure it is only used within the guidelines published here. At no time will the system be used for horseplay or other recreational activities. The firing of paint balls is expressly prohibited as it voids the warranty on the launcher. Such unauthorized use will result in administrative or other disciplinary action.

    4. Although classified as a less-than-lethal device, the potential exists for PepperBall projectiles to inflict injury when they strike the face, eyes, neck, or groin. Therefore, Officers deploying the PepperBall system shall avoid intentionally striking those parts of the body unless a life-threatening situation exists.

    5. After employing the system, Officers shall render appropriate medical attention. Photographs shall be taken of any visible marks or injury caused by the projectiles.

    6. The presence of a second Officer armed with a standard handgun, patrol rifle, or shotgun is vitally important for Officer Safety in case lethal force is encountered.

    7. As with all uses of force, the required reports including use of force report must be completed and the incident investigated by an on-duty Supervisor in accordance with General Order 1.3.13.

### 1.3.8  TASER 7/CEW (CALEA 4.1.4, 4.1.5, 4.1.6) (KACP 1.8, 1.11c)

A. TASER 7 - The Agency authorizes employees who are trained and certified in the use of the TASER 7 conductive energy weapon (CEW) to use such force as may be reasonably and necessarily required.

    1. The CEW is a less-lethal, hand-held, conductive energy weapon that can be used in two modes:

        a. Probe Mode – Utilizing compressed nitrogen gas to propel two darts on wires from a cartridge a maximum of 25 feet, depending on the cartridge.  Officers are assigned two different cartridges.  One "close-quarter" cartridge designed for a greater probe spread at short

*Page 9 of 28*

distance, and one "stand-off" cartridge with a tighter probe spread designed to reach greater distance to target.  The "close-quarter" cartridge shall occupy Bay 1 of the CEW.  The CEW sends an electric signal to the probes via the small wires. It can disrupt the subject's body's ability to communication messages from the brain to the muscles.  Depending on many factors, the signal usually causes motor-skill dysfunction.

    b. Drive Stun – Acting as a touch-stun system when the CEW is brought into immediate or close proximity contact with the subject's body or clothing. Drive stun only creates discomfort due to the narrow spread of the CEW probes.

2. CEW – The electronic control device utilized by the Covington Police Department shall be the TASER 7 manufactured by Axon Enterprise, Inc.

3. Authorized civilian positions within the Agency, such as Park Rangers and Cadets, are issued the TASER Pulse+ manufactured by Axon Enterprise, Inc.

4. Cartridge – Refers to a cartridge manufactured by Axon Enterprise, Inc. specifically for use with the TASER 7 and TASER Pulse+.

B. Procedures:

1. The CEW may be used in the following manner:

    a. CEW Displayed: The CEW is withdrawn from the holster and is made visible to the subject whenever possible

    b. CEW Laser Painted: The CEW laser is activated and pointed in the direction of the subject.

    c. CEW Warning Arc:  The CEW Arc button is depressed causing an audible and visual warning of electric pulse from the CEW.

    d. CEW Deployed: The CEW probes contact the subject's body or clothing. An alternative method is to use the touch stun or "drive stun."

2. CEW training and certification

    a. All Officers/civilians must first successfully complete the Agency's CEW familiarization training program prior to being issued the CEW. This familiarization program shall consist of written and practical training.

    b. Only trained and qualified employees may carry and/or use a CEW.

    c. Employees shall recertify annually.

    d. All Agency CEW certification and recertification programs will be presented by a TASER International, Inc. certified TASER instructor.

    e. Employees shall not be required to submit themselves to the electrical disruption of the device as part of certification or recertification; however, voluntary exposure is encouraged.

    f. Employees issued a CEW shall be required to carry the CEW in a cross-draw position opposite their firearm. The CEW shall be carried on their person during any uniformed duty assignment. Bureau Commanders may exclude certain Officers from this requirement as duty conditions dictate. Civilians shall also carry the CEW in a cross-draw fashion.

    g. CEW training and certification records shall be maintained by the Covington Police Training Unit Supervisor.

COV000061

    h. The Training Supervisor shall maintain accurate accountability of CEW serial numbers assigned to each Officer.

3. CEW Modifications
    a. No changes, alterations, modifications, or substitutions shall be made to the CEW.
    b. Repairs are to be made only by TASER International, Inc.
    c. No accessories or alterations are authorized.

4. CEW Inspections
    a. Employees shall visually inspect the CEW and cartridges for wear and damage at the beginning of each shift. Employees shall immediately notify his/her Supervisor of any damage, failures, or noticeable wear.
    b. Function Test
        1) As part of Roll Call inspections, Officers shall perform a function test following these steps:
            a. Cradle TASER in off hand
            b. Press and release both arc switches simultaneously
            c. Arm the TASER
            d. Tap an arc switch *(**DO NOT PULL TRIGGER**)*
            e. Place TASER in safe mode after completion of 5 second cycle
        2) If the TASER malfunctions, either during the testing phase or during actual use, it is to be turned over to the Training Supervisor for examination, and if necessary, sent for repair.

**Central Information Display (CID) BASICS**



        3) Damaged cartridges will be given to a Patrol Supervisor for replacement.
    c. The TASER 7 data logs are transferred via the battery and docking station. Officers are required to dock current battery every 30 days and/or after deployment.

5. Deployment of the CEW for Civilian Employees
    a. Any deployment of a CEW must be consistent with local, state, and federal laws.  Civilians' decisions to deploy CEWs are dependent upon the reasonably believed actions of subjects encountered, threats facing

COV000062

the employee, and the totality of the circumstances surrounding the incident.
b. Aim according to manufacturer's recommendation and training. The head, face, neck, and genitals should not be intentionally targeted unless an elevated level of force can be justified.
c. When deploying the CEW, civilians should
1) Remove the CEW from the holster and verify the TASER cartridge is loaded.
2) If the subject approaches within 15 feet and you have reason to fear for your safety then you may deploy the CEW.
3) If the subject continues to approach in a threatening manner, place the safety switch to the armed or "on" position.
4) Aim according to manufacturer's recommendation and training while giving loud repetitive verbal commands to "get back" and you are deploying a TASER.
5) Pull the trigger three times to ensure a full 30 second cycle, set the CEW down, and seek safety.
6) Call for backup giving your exact location and a description of the subject.
7) Notify a Supervisor and complete a Use of Force Report and an incident report. Send the incident report to Taser.com for a replacement TASER Pulse+.
6. Deployment of the CEW for Officers
a. The CEW is <u>not a substitute for deadly force</u> and should not be used in those situations. In deadly force situations, Officers' decisions to deploy the CEW should be backed up with the immediate availability of lethal force.
b. Any deployment of a CEW must be consistent with Covington Police policy and procedures and local, state, and federal laws. Officers' decisions to deploy CEWs are dependent upon the reasonably believed actions of the subject(s) or threats facing the Officers and the totality of the circumstances surrounding the incident. In the case of the subject(s) fleeing on foot, the need to take the subject(s) into custody should outweigh the risk of injury to the subject(s) (ex. subject(s) fleeing on foot that is wanted for or has committed a serious felony).
c. When safe and feasible, Officers deploying a CEW should attempt notification of the suspect and other Officers. The deploying Officer should also give the subject a verbal warning that a TASER is going to be deployed prior to deployment. This announcement should be made only if it would not further endanger any Officers, other persons, or the subject.
d. Aim according to manufacturer's recommendation and training. The head, face, neck, and genitals should not be intentionally targeted unless an elevated level of force can be justified.
e. Once the subject has been restrained and/or controlled, the CEW is to be turned off. Officers shall monitor the subject's condition after CEW

COV000063

deployment and request medical assistance as necessary.
   f. If the subject of a CEW application continues fighting, resisting, threatening, or continues to resist Officers' actions and commands, Officers may reapply a discharge of the CEW.  Officers shall allow the subject to comply between each application.  Officers should ordinarily limit a subject's exposure to three applications unless there are extenuating circumstances. Officers should; however, avoid continuous applications of 60 seconds or longer. After applying the CEW, Officers should continuously monitor a subject's condition for signs of severe physical distress.
   g. In an attempt to minimize the number of CEW discharges needed to cause subject compliance, an Officer should give loud, repetitive voice commands ordering the subject to comply.
7. Employees should avoid using the CEW under the following circumstances:
   a. Pregnant females and those individuals under the age of 10 or over the age of 70 unless justifiable.
   b. Individuals who are situated on elevated surfaces.
   c. Swimming pools or other bodies of water that may pose a risk of drowning.
   d. In the known presence of known flammable liquids/fumes or in explosive environments.
   e. Subject is operating a moving vehicle or machinery.
   f.  On individuals who are handcuffed or secured unless there is an imminent threat of injury to the Officer or another individual.
   g. On individuals who have had mace/OC used on them by another agency.
   h. Against fleeing persons when the deployment would likely lead to significant injury resulting from an uncontrolled fall to the ground – i.e. concrete/asphalt surfaces, stairs, while on fences, etc.
   i. As a means of defeating "passive resistance."  CEWs should not be used on a subject who is passively resisting ("It is unreasonable to tase a non-resisting suspect." Hagans v. Franklin County Sheriff's Office, 695 F.3d 505, 509, 6th Cir. 2012)
8. Prohibited CEW use
   a. Intentional deployment to the head, neck, face, groin, or genitals absent extenuating circumstances necessitating an increased level of force.
   b. Excessive test arcing or playing with the CEW.
   c. Horseplay of any type.
   d. To wake a person under the influence of drugs or other intoxicants.
   e. Used as a prod.
   f. Any other use that may be considered illegal or in violation of Covington Police policy or local, state, or federal laws.
9. Medical treatment/probe removal
   a. Employees shall request the appropriate medical personnel to respond if the subject or the Officer is injured during the incident and/or if the subject complains of injury.

*Page 13 of 28*

COV000064

b. Employees shall request EMS assistance in situations where the subject displays any of the following unusual reactions:
   1) Complains of chest pains.
   2) Through observation or complaint, subject experiences shortness of breath.
   3) Subject is, or was, unconscious as a result of the use of the CEW.
   4) Subject is manifestly under the influence of drugs.
   5) Subject displays a continued state of agitation after the application of the CEW.
   6) Subject falls while being "tased" and is injured as a result of the fall, unless the injury is a minor scrape or cut.
   7) Evidence of self-inflicted injuries.
   8) Where the subject displays symptoms of excited delirium (refer to G.O. 43.3)
   9) Subject received more than three applications of CEW.
c. Officers may remove CEW probes in non-sensitive areas using the provided cartridge clip. Officers or other trained personnel will provide first aid following the removal of the probes by applying alcohol wipes and Band-Aids to the probe sites as needed. Officers should inspect the probes after removal to ensure the entire probe and probe barb has been removed. In the event the probe or probe barb is broken off in the subject's skin, the appropriate medical attention shall be provided.
d. Only emergency room or hospital staff shall remove probes located in sensitive areas such as the face, neck, groin, genitals, and female breasts or probes that have become imbedded in bone.
e. The used cartridges and probes are considered a biohazard. Officers shall place the used cartridges and probes in biohazard receptacles and dispose of them following established biohazard procedures.

10. Reporting procedures
a. As with all uses of force, the required reports including the Use of Force Report must be completed and the incident investigated by an on-duty Supervisor in accordance with General Order 1.3.13.
b. In the event of a CEW deployment the shift Supervisor shall download the data from the CEW and shall forward this data along with the Employee's completed Use of force Report by the end of the shift in which the CEW was deployed.
c. Photographs shall be taken of the subject and the area where the TASER is deployed. If an Officer or subject is injured during the use of force incident, photographs of all injuries shall be taken.

11. Acknowledgment – Each employee certified for CEW use shall acknowledge by execution of their signature that the employee has read and understands the CEW policy.

## 1.3.9   Chemical Agents/Oleoresin Capsicum (OC) Spray (CALEA 4.1.4, 4.1.5, 4.1.6)

COV000065

**(KACP 1.8, 1.11c)**

A. Officers are permitted to carry and use only chemical agents approved by and purchased by the Agency.

B. The use of chemical agents should be consistent with Agency training.

C. The use of a chemical agent is authorized in circumstances when the officer reasonably believes that a degree of force is necessary to overcome actual, or anticipated, resistance by the suspect.

D. The Covington Police Department authorized chemical agent is OC spray for uniformed Officers.  SWAT Officers may have additional chemical agents for use during SWAT team operations.

    1. OC spray may be used:

        a. On actively aggressive persons who are combative and present a physical danger to themselves, the officer or any other person.

        b. When an Officer makes known his intent to arrest and the person being encountered overtly demonstrates the intent to resist, therefore making physical force, i.e. OC Spray, necessary.

        c. On prisoners who attempt to escape, cause serious physical injury to them or attempt to damage the property of others.

        d. In defense of any person

    2. Chemical Spray shall not be deployed as a compliance technique for a person who is passively or verbally non-compliant.  Active resistance/active aggression shall be required.

    3. Chemical Spray shall never be used as a punitive measure.

    4. Officers should never spray from a pressurized can directly into a subject's eyes from a close distance due to the potential for eye injury as a result of the pressurized stream.  Officers should never spray directly into a subject's eyes from closer than three feet or the distance recommended by the manufacturer of the spray (whichever is shorter) unless deadly force would be justified.

    5. Officers shall consider alternatives to chemical spray when attempting to control a subject in a crowded-enclosed area due to the innocent over-spray that may cause the onset of panic.

    6. Officers shall consider alternatives to chemical spray when the event is inside a building, particularly where the building has a closed-ventilation system due to the potential impact on innocent persons who may have to be evacuated (temporarily) from the locations.

    7. Once a person is restrained or under control, the use of OC Spray is no longer justified and or permitted, unless prisoner is attempting to escape, cause serious physical injury, or attempting to damage the property of others

    8. A person who has been sprayed with OC Spray will be allowed to flush the affected area with water as soon as practical after the incident; and when appropriate will be informed by the officer involved that medical attention is available.

E. Chemical Munitions:

    1. The use of chemical munitions is generally reserved for incidents of crowd

control/civil disturbance, controlling violent persons, SWAT Team operations and situations wherein the incident Commander deems their use appropriate and necessary to safely resolve an incident.

2. Chemical munitions will be deployed only on the order of the Commanding Officer on scene and only by those personnel qualified in the use of the weapons system utilized.

3. The use of pyrotechnic munitions is reserved for exterior deployment. Only non-burning chemical munitions are authorized for interior deployments unless exigent circumstances exist.

4. Upon incident resolution the incident Commander will determine the level of scene decontamination in accordance with published guidelines for the munitions deployed and will ensure that decontamination is completed before the scene is released.

5. Use of Force Report will be completed by the incident Commander, or their designee, detailing the expenditure of munitions, injuries sustained by involved persons, property damage incurred, and the typical required report information.

6. The Chief of Police will be notified as soon as practical on deployment of Chemical munitions for crowd control/ civil disturbance.

F. Sound/Flash Diversionary Devices:

1. The use of Sound/Flash Diversionary Devices is generally reserved for the SWAT Team for controlling violent persons, and situations wherein the SWAT Team Commander deems their use appropriate and necessary to safely resolve an incident.

2. Sound/Flash Diversionary Devices will be deployed only on the order of the SWAT Commander or their designee on scene and only by those personnel qualified in the use of the weapons system utilized.

G. Officers shall request the appropriate medical personnel to respond or transport the subject to the hospital if the subject or the Officer is injured during the incident and/or if the subject complains of injury.

H. As with all use of force, the required reports should be completed and the incident investigated by an on duty Supervisor in accordance with General Orders 1.3.13.

## 1.3.10    Impact Weapons (CALEA 4.1.4, 4.1.5, 4.1.6) (KACP 1.8, 1.11c)

A. Impact weapons (batons) are authorized as a means of:
   - Physical restraint or control.
   - Defense of any person,

   And, the Officer believes the use of these weapons would be reasonable to bring the event under control. Examples would be where other options have been utilized and failed or where based on the Officer's perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

B. Because of the potential for death or serious injury, Officers shall avoid intentional strikes to the head, neck, throat or clavicle with an impact weapon of any sort, unless deadly force is justified

COVID00067

C. Officers shall request the appropriate medical personnel to respond or transport the subject to the hospital if the subject or the Officer is injured during the incident and/or if the subject complains of injury.
D. As with all use of force, the required reports should be completed and the incident investigated by an on duty Supervisor in accordance with General Orders 1.3.13.

**1.3.11   Extended Range Impact Weapons (FN 303 Projectile Launcher) (CALEA 4.1.4, 4.1.5, 4.1.6) (KACP 1.8, 1.11c)**

A. Extended Range Impact Weapons (FN 303) are weapons and their use is considered nonlethal force. The FN 303 is intended to be used in compliance with the non-lethal portion of this policy, as an option to de-escalate potentially violent confrontations.
B. The FN303 is a compressed air launcher, less-lethal impact/chemical irritant delivery systems that is powered by compressed air. The launcher can deliver a variety of less-lethal projectiles including kinetic impact, PAVA pepper powder and non-toxic marking rounds.
C. The FN303 will be available as part of the SWAT defensive arsenal and may be used only by trained Officers.
D. FN303s will be available on the SWAT truck
E. The FN 303 will only be used with approval of the ranking SWAT Officer on scene or an Officer of higher rank.
F. Officers should keep in mind that while the use of the FN 303 is a non-lethal force, the potential for great bodily harm or death exists if the person's head or neck is struck at any range, or if the person is struck in the torso or mid-section at range of less than 12 feet.  Officers will observe the range limitations of the weapon as instructed during training. Only impact rounds approved by the Agency for use in the FN 303 will be allowed to be placed in the weapon's magazines or expelled from the weapon.
G. Deployment of FN 303
  1. The FN303 may be used for area saturation against subject(s) who, at a minimum, demonstrate active resistance.
  2. The FN303 may be used as a kinetic impact delivery system on subject(s) who, at a minimum, demonstrate assaultive resistance.
  3.  When deploying the FN 303, shot placement is crucial to prevention of serious injury.  Therefore:
    a. Based upon the distance between the Officer and subject, FN 303 projectiles primarily are targeted at the thigh region.
    b. Although classified as a less-lethal device, the potential exists for less-lethal projectiles to inflict potential lethal injury when they strike the face, eyes, neck, spine, and groin.  Officers deploying less-lethal launchers must avoid intentionally striking those areas.
    c. Officers may use the FN303 on subjects between 10 to 225 feet away as a kinetic impact device.

COVID0068

    d. If deploying the FN 303 in close encounter situations (10 - 20 feet) between the Officer and subject, the recommended primary target area is the subject's thighs. If engaging subjects greater than 20 feet away, Officers may target the lower torso, or upper and lower extremities (i.e., arms and legs).

    e. The FN303 shall not be deployed if the Officer is less than 10 feet from the subject, unless the use of deadly force is reasonable and necessary.

    f. The intentional targeting of areas where there is a substantial risk of serious physical injury or death is considered a use of deadly force. Officers shall not intentionally target the head, neck, spine, or groin of the intended subject, unless the use of deadly force is reasonable.

    g. Operators should fire two rounds and then re-evaluate the threat. Then, if needed, fire additional rounds.

    h. When deploying the FN 303, give loud verbal commands before deployment if practical.

    i. Exposure to FN303 projectiles (either kinetic impact or PAVA) during training is not permitted

H. Projectiles

    1. The FN 303 uses various projectiles based upon operational requirements. Projectiles must remain in the projectile transport storage tube until they are loaded into the magazine. The projectile is a fin-stabilized design containing bismuth granules with the selected payload. All materials in the FN 303 projectiles are non-toxic and environmentally safe.

    2. Never allow rounds to be stored in a cold environment. Optimum room temperature guidelines must be adhered to.

    3. The following FN 303 projectiles are authorized for use

        a. Training rounds

        b. Marking rounds

        c. Permanent marking round

        d. Oleoresin capsicum rounds (liquid)

I. Officers should not use a FN303, and should consider other force options, on subjects who are small children, elderly, pregnant, or operating a conveyance.

J. Take any individual struck with a FN303 projectile to the hospital for medical evaluation.

K. As with all use of force, the required reports should be completed and the incident investigated by an on duty Supervisor in accordance with General Order 1.3.13.

## 1.3.12   Weapons of Opportunity (CALEA 4.1.4, 4.1.5, 4.1.6) (KACP 1.11C)

A. Weapons of opportunity may constitute whatever is available at the time for the Officer to prevent harm to self or others

B. Weapons of opportunity may be used when:
   1. The nature of the weapon chosen and the method of its use meets the objectively reasonable and otherwise complies with this directive
   2. Appropriate Agency approved weapons, are not immediately accessible or available.
C. Officers shall request the appropriate medical personnel to respond or transport the subject to the hospital if the subject or the Officer is injured during the incident and/or if the subject complains of injury.
D. As with all use of force, the required reports should be completed, and the incident investigated by an on duty Supervisor in accordance with General Orders 1.3.13.

**1.3.13    Reporting and Investigating Firearms Discharges (CALEA 4.2.1a, 41.2.4, 83.2.6) (KACP 1.11, 1.12)**

A. Officers are required to report any deliberate or accidental discharge of a firearm.
   1. This directive does not apply to firearms that are discharged as part of normal training, practice, or recreational use unless the discharge results in personal injury or property damage.
   2. The shift Supervisor shall be notified and an appropriate incident report shall be completed.
   3. When circumstances dictate, a Use of Force Report shall be completed in accordance with section 1.3.13 of this General Order.
B. A complete investigation will be conducted into any deliberate or accidental discharge of a firearm.
   1. This directive does not apply to the discharge of firearms as part of normal training, practice, recreational use or for the purpose of destroying an animal for humane purposes unless injury results to the Officer or other individual as a result of the discharge.
   2. The Criminal Investigations Bureau or an outside Agency, to be selected by the Chief of Police, will conduct a complete investigation into any Officer-involved shootings where injury results to an individual or if there is reason to believe a crime may have been committed. The investigation by the Criminal Investigations Bureau or outside Agency shall be conducted as a criminal investigation.
      a. Incidents occurring outside the jurisdiction of this Agency will be criminally investigated by the Agency with jurisdiction.
      b. The interview of the Officer shall not be conducted until a minimum of 72 hours has elapsed from the time of the incident.
   3. All employees will cooperate fully with investigators of any such incident.

**1.3.14    Use of Force Report (CALEA 4.1.5, 4.2.1, 4.2.2, 41.2.4, 83.2.1a, 83.2.6)**

COV000070

**(KACP 1.11, 1.12)**

A. Whenever an employee must physically compel another person to submit to his/her authority regardless of the means employed, the employee shall:
1. Notify the On-Duty Shift Supervisor and complete a signed Use of Force Report. This report is to be forwarded to the Chief of Police, via the employee's chain of command, detailing the circumstances surrounding the use of force and/or any injury or death to another person or injury or death alleged to have resulted from actions by an employee.

B. This report requirement applies to all use of deadly force incidents occurring on or off duty when the employee is acting under the color of law. It also includes the unintentional use of deadly force such as an unintentional discharge of a service or other firearm. This report requirement would not include the normal use of a firearm in training, practice, recreational situations, or for the humane destruction of a sick or injured animal unless it results in injury to the Officer or another individual.

C. This report requirement applies to all incidents occurring on or off duty when an Officer, acting under the color of law, uses or is alleged to have used:
1. Use of baton,
2. Use of OC and/or Chemical Agents,
3. Use of Specialty Impact Munitions,
4. Use of the CEW
5. Use of force which causes any visible or apparent physical injury, or which results in the subject saying they were injured.
6. An Officer uses any other type of less-lethal/weaponless (i.e., elbow/fist) object to strike a blow to a subject or uses physical force to force a subject to the ground.
7. Any other incident that the on-scene supervisor determines a use of force report is necessary.
8. Against an attacking or aggressive animal for defensive purposes.

D. This report requirement does not apply to routine handcuffing, escort techniques where no weapons, force or injury occurred, and incidental contact in the course of affecting an arrest.

E. Officers shall photograph any involved person (i.e. Officer, suspect, or witness) for their protection.
1. These photographs will be taken of the front and rear body of the person and any area impacted by the force application.
2. Once photographs are taken they are to be turned in as evidence.
3. Officers are to photograph and clearly state in their reports the existence of any previously existing injury to any person in custody.

F. The notification to the Supervisor and the Use of Force Report shall be completed as soon as is practical after the incident occurs.
1. In the event that the employee involved is unable to complete the report due to injury or other circumstance the on-duty Supervisor shall complete the Use of Force Report.
2. Completed Use of Force Reports are to be sent to the employee's immediate Supervisor for review.

COV000071

G. The Chief of Police or his designee shall maintain a file of these reports and shall routinely evaluate the number or types of reports being filed. The reports should be evaluated for indications of training needs, discipline problems or developing patterns of abuse.

**1.3.15   Use of Force Report Review (CALEA 4.2.2, 4.2.4) (KACP 1.7)**

A. All Use of Force Reports shall be reviewed by each Supervisor in the reporting employee's chain of command and by the Training Supervisor.
   1. Reviewers shall examine each Use of Force Report to ensure detailed documentation of the incident.
   2. The review shall consist of an examination and evaluation of elements which include but are not limited to:
      a. Complete identifying information for all involved parties
      b. Reasonableness and necessity of the force used
      c. Compliance with local, state, and federal laws
      d. Compliance with Agency policy
      e. Effectiveness of force utilized
      f. Documentation of injuries sustained as a result of the force applied.
B. When judging the reasonableness of a particular use of force it must be judged from the perspective of a reasonable Officer and in light of the facts and circumstances confronting that employee at the time the force was used. 20/20 hindsight is not permitted in this review.
C. Reviewers shall submit their findings with recommendations through the chain of command to the Chief of Police who shall decide if any further action is warranted.
D. Use of Forces Analysis
   1. Ongoing – The Training Supervisor will review all Use of Force reports.
      a. He will record identifying data into a spread sheet for analysis, recording the type and resulting effectiveness/ineffectiveness of the force used, as well as compliance with this policy.
      b. He will review each report looking for trends, problems, best practices, training and/or equipment deficiencies
   2. Annual
      a. The Training Supervisor or Accreditation Office will annually prepare an analysis of each Use of Force report.
      b. The analysis will focus on patterns which may identify any training deficiencies, such as improper methods in the application of the force, i.e. incorrect handcuffing, hand holds, etc., and will make recommendations for additional training or to discontinue a particular method of force being used by the Agency. This report will be forwarded to the Chief of Police, all Executive Staff, and trainers.
      c. Annual data and statistical analysis, at a minimum, shall include the following,
         a. Comparison to previous years totals
         b. Types of force applied and compared to previous years

*Page 21 of 28*

      c. Force incidents by race and gender and compared to previous years
      d. Trends or patterns in forced used that results in injuries, including to employees, to include race, gender and compared to previous years
      e. Suspect age and suspect actions
      f. Reason for force being used
      g. Assaults or attacks on Officers
      h. Date, time, and location of incidents
      i. Types of encounters that resulted in force being used
      j. Impact of data analysis on Agency policies, practices, equipment and training

**1.3.16   Chief's Review of Use of Force Reports (CALEA 4.2.2, 4.2.4)
(KACP 1.7)**

A. The Chief of Police shall review the facts of the incident and the recommendations of the reviewers.
B. If it is determined by the Chief of Police that further review is needed the incident may be assigned to the Internal Affairs for further investigation.
C. Circumstances may exist that necessitate the investigation of the incident by an outside police agency. Under such circumstances, the Chief of Police may request an investigation of the incident by an independent investigative body.
D. If it is determined by the Chief of Police that the incident is not within Agency policy the Chief shall take appropriate action.

**1.3.17   Critical Incidents (CALEA 4.2.1, 4.2.2, 4.2.3, 11.3.3, 41.2.4)
(KACP 1.1a-b, 1.7, 1.12, 10.2a)**

A. Definition - Critical Incident: The use of force and/or any action taken by an employee of this agency that does, or potentially could, result in death or serious physical injury of employees or civilians
B. Policy - It is the policy of this Agency to provide a thorough investigation and review of all critical incidents involving employees of this Agency
C. Units Responsible for Critical Incident Investigation
    1. Per G.O. 1.3.12 Reporting and Investigating Firearms Discharges, Criminal Investigations Bureau (CIB) will conduct a complete investigation into any Officer-involved shootings where injury results to an individual or if there is reason to believe a crime may have been committed.

COV000073

2. Criminal Investigations shall be responsible for investigating incidents where an employee's actions result, or potentially could have resulted, in death or serious physical injury to the public or to another police employee.
3. The Traffic Section shall investigate all traffic deaths, or serious physical injuries, resulting from police pursuits or other employee-involved traffic collisions.  They may be assisted by other Bureaus or agencies.
4. Officers with special investigative knowledge or experience may be called upon to assist the investigators in a specific investigation.  Officers assisting the unit shall report all findings and conclusions of the investigation directly to the CIB Commander. All information shall be held in the strictest of confidence.
5. The CIB shall be responsible for the investigation of incidents resulting in death, or serious physical injury, to Agency employees.
6. Administrative Review will be conducted by the Chief of Police (G.O. 1.3.15 Removal from Duty and Administrative Review of Incidents Involving Serious Physical Injury or Death)
7. At the request of the Chief of Police, outside agencies may be asked to conduct investigations involving the actions of an employee.

D. Procedure General:
1. The agency shall conduct a critical incident review of all firearm discharges, in-custody deaths or serious injuries, and all uses of force/response to resistive suspects when the injury results in hospitalization. This review shall result in a written critique and specifically address the following issues and make a specific determination whether:
   a. The force, control and/or restraint was consistent with the agency policy
   b. There are any issues requiring a re-evaluation of agency policy and/or procedures
   c. There are any training needs identified
   d. The equipment provided by the agency was adequate, and Supervisory involvement was reasonable.
2. Initial Response:
   a. First Officer on Scene:
      1) Neutralize scene- Ensure that the scene has reached a level of control such that there is no longer a threat of harm to citizens, Officers or suspects.
      2) Provide for the immediate medical attention of all persons injured.
      3) Secure the scene(s) of the event(s); to the extent possible use crime scene tape to secure any area that may contain evidence pertinent to the events being investigated.
      4) Assign sufficient employees to ensure that the scene perimeter is not breached.
      5) Remove the involved employee from the center of the scene to a discreet area such as a police vehicle (do not place the Officer in the backseat).

COV000074

    6) Secure and segregate all witnesses to the event. This would include segregation of the employee(s) to avoid allegations of corroboration. For officers involved in the security of the scene or active involvement in the investigation, segregation must be accomplished in a reasonable timeframe. Primary responsibility should be given to ensuring safety of all, as well as efficacy of the investigation.

    7) Record the names and addresses of all witnesses on the scene and attempt to obtain a statement. Photographs of the witnesses should be attempted also. A statement should also be obtained from ambulance and emergency room personnel, where applicable.

    8) Note all weather, lighting, traffic conditions, route of any pursuits, use of emergency response equipment, and other relevant information within the report.

  b. First Responding Supervisor:

    1) Check on the well-being of involved employees.

    2) Allow/Assist employee in calling family members. Ensure notifications made to employee's family.

    3) Immediately assume role of incident commander and utilize the incident command concept until otherwise relieved of incident command. NOTE: The arrival of a higher ranking Officer does not necessarily in and of itself result in the relinquishing of command/control.

    4) Ensure that the first responders have completed the above listed duties.

    5) Notify hospital of incoming injured.

    6) Determine resources necessary for circumstances i.e. community unrest etc.

    7) Assign an Officer to maintain the crime scene egress log.

    8) Assign Officer(s) to accompany injured employees; suspects and victims to hospital.

    9) Notifications to Chain of Command.

    10) Brief arriving investigators and ranking Officers.

    11) Review all initial reports and supplements.

    12) Consider notifying Commonwealth or County Attorney for on-scene response

E. Procedures for Involved Employees

  1. Employees involved in use of force actions or motor vehicle collisions, which result in death or serious physical injury, shall immediately be placed on administrative leave or administrative duties, pending an administrative investigation (refer to G.O. 1.3.17 Removal from Duty and Administrative Review of Incidents Involving Serious Physical Injury or Death).

  2. The involved employee shall be allowed to obtain sleep before making any statements and compiling any reports. The involved employee's statements

*Page 21 of 28*

COV000075

and reports should be scheduled 72 hours after the incident. The interview location and time should be coordinated with the employee and their attorney.

    a. At the discretion of the Chief, employees may be allowed to review any video/audio recording of the incident before making statements.

    b. The Officer may be required to submit a written statement for administrative purposes only.  This will be done with the Officer receiving a Garrity warning as part of the statement.

3. Each employee involved shall be assigned an escort Officer at the scene by their Supervisor. The escort Officer shall not have been involved in the critical incident and should remain with the employee throughout the entire initial investigation. The escort Officer is responsible for:

    a.  Assisting the employee in contacting their private attorney, friends or family members, as requested

    b. Assist the employee in contacting their Union representation

    c. Ensuring that the employee is isolated from all non-essential individuals for the remainder of the initial investigation

    d. Transporting the employee home at the conclusion of the initial investigation

4. The Evidence Collection Unit or CIB investigators shall photograph the employee involved.

5. The CIB shall secure, and place into evidence, all recorded information surrounding event: video/audio Recordings, Mobile Data Terminal (MDT) communication, dispatch tapes, Computer Aided Dispatch (CAD) log, 911 phone calls, photographs, diagrams, bullet trajectory including those that missed, witness Officers' equipment, consider light meter (illuminometer) to measure lighting conditions.

6. The Officer's weapon, magazines, and any other evidence shall be collected at the CIB office, by the Evidence Collection Unit, as directed by investigators. The weapon is not to be unloaded, cleared, magazines removed, jams cleared, etc.  The Officer should immediately be issued a replacement weapon.

7. An employee may have access to the following, prior to being interviewed:

    a. FOP attorney and/or FOP representative

    b. Union attorney and/or representative

    c. Private attorney

    d. Chaplain or a peer support Officer

8. Upon release by the investigators, the employee shall be transported home.

F. Post Incident Procedures

1. It is recommended that KCCRB (The Kentucky Community Crisis Response Board) 888-522-7228 (available 24 hours) be contacted. See G.O. 94.5 Kentucky Community Crisis Response Board

COV000076

2. Family Counseling -- The Agency strongly encourages the families and significant others of the involved employees to take advantage of available counseling services.
3. Investigation Timeliness -- Any Agency investigation of the incident shall be conducted as soon and as quickly as practical.
4. Agency Debriefing - The Chief of Police may sponsor an Agency-wide debriefing concerning the incident so that rumors are kept to a minimum.
5. Agency employees are encouraged to show the involved employee(s) their concern. Employees should not discuss the incident with the involved employees.
6. Daily Stress Recognition
    a. Stress disorders may not arise immediately, or the employees may attempt to hide the problem, each Supervisor is responsible for monitoring the behavior of employees for changes in behavior that may be disrupting the employee's job performance.
    b. A Supervisor shall report any noted changes in the employee's job performance through the chain of command, at which time any further action will be at the discretion of the Chief of Police.
7. The Chief of Police, or his/her designee, shall authorize a return to duty on a case-by-case basis. This decision shall be based on the following:
    a. Release by the Commander of the CIB, after receiving Commonwealth's Attorney review of incident
    b. Release by physician (if the employee has been physically injured)
    c. Release by the Agency mental health professional
8. Commonwealth's Attorney Review - the Office of the Commonwealth's Attorney reviews the incident to decide if any charges should be filed against the employee as a result of their actions. If the employee is cleared of any wrongdoing or indictments, the Office of the Commonwealth's Attorney will send a letter of confirmation to the Agency. .
9. If an Officer is returning to duty after being on administrative leave and is issued a temporary or loaned firearm, they shall successfully qualify with this firearm prior to returning to duty.

## 1.3.18       Critical Incident Investigations

A. Critical incidents, as defined by this policy, will have two investigations.
    1. Administrative – The Internal Affairs Unit, or an outside Agency selected by the Chief of Police, will conduct an investigation of the incident to determine if the actions of the Officer(s) involved were within Agency policy.
    2. Criminal – The Criminal Investigations Bureau or an outside Agency, determined by the Chief of Police, will conduct the criminal investigation to determine if the Officer(s) involved violated any local or federal laws.
B. These two investigations are to run independent of each other as they have separate goals.  The outcome of either does not affect the outcome of the other investigation, e.g. an Officer's actions may be a policy violation but may still be legal

COV000077

according to statute.

### 1.3.19    Removal from Duty and Administrative Review of Incidents Involving Serious Physical Injury or Death (CALEA 4.2.3, 22.2.1a) (KACP 1.12)

A. In the event that the use of force and/or any action taken by an employee of this Agency that does, or potentially could, result in death or serious physical injury., the employee, as soon as is practical, shall be removed from duty and placed on administrative leave or administrative duties pending administrative review of the incident.
   1. The administrative review of the incident will be conducted by the Chief.
   2. Based on the findings of the administrative review the employee may be returned to regular duty, assigned to duty within the Headquarters building, or continued on administrative leave.
   3. Administrative leave will be without loss of pay or benefits, and such leave or assignment to duties within the headquarters building shall not be interpreted to imply or indicate that the employee has acted improperly.
   4. The length of time an employee is assigned to duty in the headquarters building or on administrative leave in compliance with this General Order will be determined by the Chief of Police.
B. In all cases where a person has been seriously injured or killed as the result of action by an employee, the employee will be required to undergo a debriefing with an Agency psychologist as soon as possible. The purpose of this debriefing will be to allow the employee to express his feelings and to deal with the moral, ethical, and/or psychological aftereffects of the incident. In addition, the Agency will receive professional assurance that the employee is fit to return to regular duty.
   1. This debriefing will not be related to any Agency investigation of the incident and nothing discussed in the debriefing will be reported to the Agency without the voluntary permission of the involved employee. The debriefing session will be privileged communication protected by the physician-patient relationship.
   2. The administrative review of the incident will involve at minimum a review of the facts of the incident for compliance with Agency policy and a recommendation from the Agency psychologist on the employee's ability to return to regular duty.

### 1.3.20    Use of Deadly Force upon Animals (CALEA 4.2.1a, c)

A. Officers may utilize deadly force on animals in the following circumstances:
   1. To prevent substantial harm to the Officer or other individuals.  The destruction of vicious animals shall be guided by the same rules set forth for self-defense and the defense and safety of others.

COV000078

2.  When the animal is so sick or badly injured that humanity requires its relief from further suffering:
    a.  The animal is so badly injured that humanity requires its relief from further suffering.
    b.  When possible the local game or animal warden should be notified to determine if the animal can be saved or should be destroyed in a safer manner.
    c.  In the event an Officer determines that a sick or injured animal needs to be destroyed, the Supervisor on duty shall be notified and give approval. Supervisors should, unless deemed unreasonable, respond to the scene prior giving authorization.

B.  Reporting
    1.  If deadly force is used on an animal to prevent harm to the Officer or other individuals, e.g. vicious dog, a Use of Force report is required.
    2.  When force is used to relieve the suffering of an injured animal, a KYOPS E-Call Response is to be completed.

**Form Links:**

Use of Force Master
https://powerdms.com/client/DocumentViewer.aspx?DocumentID=415231

Supplemental Use of Force
https://powerdms.com/docs/2404079?q=use%20of%20force

Use of Force Supplement – Chemical Agent
https://powerdms.com/docs/415218

Use of Force Supplement – Impact, TASER, Projectile
https://powerdms.com/client/DocumentViewer.aspx?DocumentID=415234

Page 28 of 28



**J. Davis Law Firm, PLLC**

THERE IS PROTECTION IN COUNSEL

JDAVISCOUNSEL.COM | LAW@JDAVISCOUNSEL.COM
P.O. BOX 122132, COVINGTON, KY 41011
(859) 750-5023

September 21, 2023

**VIA CERTIFIED MAIL**

Jeffrey C. Mando, Esq.
Jennifer L. Langen, Esq.
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY 41011

Re: _**DISCOVERY IN ANTHONY MARIO WYNN V. CITY OF COVINGTON**_

Dear Jeffrey and Jennifer,

I am writing in response to your responses to our the First Set of Interrogatories and Requests for Production of Documents. Prior to sending a second set of interrogatories and requests for production, we would like to confirm that your responses to Request for Production #7 and Interrogatory #3 are accurate. Your objection to the latter, which is cited by the former, states that

_**"this Interrogatory requests information about the officers who were involved in the incident that occurred on August 28, 2020."**_

However, we are alleging that all three officers were present at the January 1, 2021 and January 16, 2021 incidents, as well. If there are any disciplinary records that exist, either written or oral, either formal or informal that have been made against any of the responding officers to these incidents, Federal Rules of Civil Procedure 33 and 34 require you respond accordingly. Please let me know if you would like to meet and confer concerning this issue. We would also like to confirm whether a use of force and incident report exists for the January 1, 2021 incident, and whether an incident report exists for the January 16, 2021 incident.

Additionally, we are requesting that you consent to our motion to amend our complaint. We are amending to include additional officers that were previously unidentified in the January 1, 2021 incident but later confirmed via the body cam footage provided in response to our discovery request. Please respond by close of business, **September 28.**

CONTRACTS, GOVERNMENT AFFAIRS, PERSONAL INJURY and EMPLOYMENT LAW
COVINGTON, LEXINGTON, SAN FRANCISCO and LOS ANGELES

Sincerely,

/s/Jamir Davis
Jamir Davis
P.O. Box 122123
Covington, KY 41011
(859) 750-5033
Jdavislawky@gmail.com
www.Jdavislawky.com