1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2                    AT COVINGTON
              CASE NO. 2:21-CV-00137-DBL-CJS
3

4                 * * * * * * * *            **COPY**

5    _____
                                    )
6    ANTHONY MARIO WYNN,            )  DEPOSITION TAKEN ON
                                    )  BEHALF OF PLAINTIFF
7              PLAINTIFF            )  BY:  NOTICE
                                    )
8    VS.                            )
                                    )
9    CITY OF COVINGTON, ET AL.,     )  WITNESS:
                                    )
10             DEFENDANTS            )  OFFICER ROBERT NADER
     _____)
11

12                * * * * * * * * *

13        DATE:      Monday, March 11, 2024

14        TIME:      9:04 a.m.

15                * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

1                     * * * * * * * *

2              The deposition of OFFICER ROBERT NADER was

3    taken before Natalie R. Domanico, Registered

4    Professional Reporter and Notary Public in and for the

5    State of Kentucky at Large, at the offices of Hon. Jeff

6    Mando, ADAMS LAW, PLLC, 40 W. Pike Street, Covington,

7    Kentucky, on Monday, March 11, 2024, commencing at the

8    approximate hour of 9:04 a.m.  Said deposition was

9    taken pursuant to Notice, heretofore filed, for the

10   purposes of discovery on behalf of Plaintiff, and for

11   all other purposes as permitted by the Federal Rules of

12   Civil Procedure.

13                     * * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

2

1  APPEARANCES:

2          Hon. Jamir Davis
           J. DAVIS LAW FIRM, PLLC
3          P.O. Box 122123
           Covington, Kentucky  41011
4          jdavis@jdaviscounsel.com

5          ATTORNEYS FOR PLAINTIFF,
           ANTHONY MARIO WYNN
6

7

8

9          Hon. Jennifer Langen
           ADAMS LAW, PLLC
           40 W. Pike Street
10         Covington, Kentucky 41011
           jmando@adamsattorneys.com
11

12         ATTORNEYS FOR DEFENDANT,
           CITY OF COVINGTON, ET AL.

13

14         Hon. Sheree E. Weichold
           LEGAL DEPARTMENT
15         Assistant City Solicitor
           ABC Administrator
16         20 Pike Street
           Covington, Kentucky  41011
17         Main:  (859) 292-2311
           Direct:  (859)292-2318
18         sheree.weichold@covingtonky.gov

19         ATTORNEYS FOR DEFENDANT,
           CITY OF COVINGTON
20

21

22

23

24

25

INDEX

WITNESS:  OFFICER ROBERT NADER                    PAGE

DIRECT EXAMINATION ...........................5
By Mr. Davis
REPORTER'S CERTIFICATE ......................83
REPORTER'S CERTIFICATE ......................84
INDEX PAGES.................................85-96

EXHIBIT INDEX

PLAINTIFF'S EXHIBIT    INTRODUCTION                PAGE

Exhibit No. 1     Nader's Deposition Transcript,    9
                  Pages 78-80

Exhibit No. 2     Covington Police Department      14
                  Suspension Order for Doug
                  Ullrich

Exhibit No. 3     Addendum                         16

Exhibit No. 4     Orders for Traffic Violations,   24
                  Pages 11 of 23

Exhibit No. 5     Page 66 of Use of Force Policy   38

Exhibit No. 6     Covington Police Department      64
                  Suspension Order for Doug
                  Ullrich

Exhibit No. 7     One-day Suspension Order         65

Exhibit No. 8     Covington Police Department      66
                  Official Letter of Reprimand

Exhibit No. 9     Memorandum dated 3/11/2016,      66
                  Re: Request for Formal
                  Discipline - Officer Ullrich

Exhibit No. 10    Covington Police Department      67
                  Official Letter of Reprimand
                  for Officer Doug Ullrich

Exhibit No. 11    Memo dated 6/30/2014             73

Exhibit No. 12    Memo dated 6/29/2014             77

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

4

09:04:30   1          The witness, OFFICER ROBERT NADER, after

           2   first being duly sworn, was examined and testified as

           3   follows:

           4                   DIRECT EXAMINATION

09:04:30   5   By Mr. Davis:

           6    1        Q    So this deposition is about to begin.

           7   My name is Jamir Davis, and I'm here on behalf of the

           8   plaintiff, Anthony Wynn.  We were previously in a

           9   deposition before that ended short -- a little short,

09:04:42  10   so we're continuing on -- onto that.  Just for the

          11   sake of the court reporter, I'm going to go over a few

          12   rules, just so that we're all on the same page.  To

          13   start, just please make sure to answer any questions

          14   verbally, yes or no, just so that they're on the

09:04:59  15   record.  Also, you can take a break at any time that

          16   you feel a need to take a break.  I just ask that you

          17   finish answering any question that I've put forth

          18   before taking a break.  Also, for the sake of the

          19   court reporter if you'll allow me to finish any

09:05:19  20   question that I ask prior to you responding.  That way

          21   the record is clean.  For the record, can you please

          22   state your name.

          23          A    Robert Nader.

          24    2        Q    And can you spell your last name for --

09:05:32  25   for the record?

```
09:05:33    1              A    N-A-D-E-R.

            2    3    Q    So during this deposition I'll ask you

            3    questions that you are required to answer truthfully.

            4    Unless your attorney tells you not to answer, please

09:05:51    5    answer all of my questions.  Although a judge is not

            6    present, this is a legal proceeding, and you are under

            7    the same obligation as you would be in a court of law.

            8    Are you okay with that?

            9              A    Yes.

09:06:02   10    4    Q    Okay.  Before we begin, I need to also

           11    know if you're currently under the influence of any

           12    drugs or alcohol or any medication that would impair

           13    your judgment today?

           14              A    No.

09:06:12   15    5    Q    Okay.  Are you under the influence of

           16    anything that would keep you from responding to my

           17    questions accurately?

           18              A    No.

           19    6    Q    Did you prepare for today's deposition?

09:06:25   20              A    Yes.

           21    7    Q    And how did you prepare?

           22              A    I met with the attorney on Friday.

           23    8    Q    And when you say "the attorney," are you

           24    referring to Mr. Mando?

09:06:35   25              A    Yes.
```

09:06:38   1   9    Q    Did you review any documents?

           2        A    Yes.

           3   10   Q    And which documents did you review?

           4        A    IA.

09:06:45   5   11   Q    Okay.  And when you say "IA," that is

           6   the Internal Affairs report?

           7        A    Yes.

           8   12   Q    And did you review the initial report

           9   that you sent to the county or their response?

09:07:10  10        A    Their response.

          11   13   Q    Their response.  Okay.  Did you review

          12   any body-worn camera footage?

          13        A    No.

          14   14   Q    And just for the record, so we're clear,

09:07:32  15   so when I mention the January 1st incident of 2021 and

          16   I refer to that as Incident 1, you're familiar with

          17   that incident?

          18        A    I am now, from the last deposition.

          19   15   Q    Okay.  And then when I refer to the

09:07:48  20   January 16th incident as Incident No. 2, you are

          21   familiar with that --

          22        A    (Interrupting) Yes.

          23   16   Q    -- incident?  On the January 1st

          24   incident, 2021, are you aware if there was a use of

09:08:15  25   force during that incident?

| | | | |
|---|---|---|---|
| 09:08:19 | 1 | A | I am not aware. |
| | 2 | 17 Q | So you do not know if there was use of |
| | 3 | | force during the January 1st, 2021, incident? |
| | 4 | A | No. |
| 09:08:33 | 5 | 18 Q | Okay.  And you remember your deposition |
| | 6 | | of the last time that we were here? |
| | 7 | A | I remember having a deposition. |
| | 8 | 19 Q | And do you remember the answer that you |
| | 9 | | gave to the question whether there was use of force on |
| 09:08:56 | 10 | | January 1st, 2021? |
| | 11 | MS. LANGEN: | Are you asking him if he remembers |
| | 12 | | specific questions and answers that |
| | 13 | | he gave in his previous deposition? |
| | 14 | MR. DAVIS: | I'm asking did he -- does he |
| 09:09:09 | 15 | | remember if there was a use of |
| | 16 | | force; his answer to when I asked |
| | 17 | | him if there was use of force of |
| | 18 | | January 1st, 2021 -- |
| | 19 | MS. LANGEN: | (Interrupting) Okay. |
| 09:09:19 | 20 | MR. DAVIS: | -- in his last deposition. |
| | 21 | MS. LANGEN: | Can you just show it to him?  Maybe |
| | 22 | | that would help. |
| | 23 | MR. DAVIS: | No, I will prefer for him to |
| | 24 | | answer. |
| 09:09:31 | 25 | MS. LANGEN: | Answer, if you remember. |

09:09:32   1              A    I don't recall.  I remember that was the

           2    first time I heard it, January 1st, and I think that's

           3    what I stated.

           4    20    Q    Okay.  Will you take a look at this.

09:09:54   5    This is Page 78 through Pages 80 of your deposition

           6    I'd like to mark these.  Here's the one that's marked.

           7              (REPORTER MARKS NADER'S DEPOSITION

           8              TRANSCRIPT, PAGES 78-80 AS PLAINTIFF'S

           9              EXHIBIT NO. 1 FOR THE PURPOSES OF

09:10:35  10              IDENTIFICATION, AND THE SAME IS ATTACHED

          11              HERETO AND FILED HEREWITH)

          12    21    Q    So do you recall this?

          13              A    Yes.

          14    22    Q    Okay.  And do you recall stating that,

09:11:14  15    "So they may have taken him down to the ground."

          16    Correct, on Page 80?

          17    MS. LANGEN:         Okay.  So what's the question?  Is

          18                        it just -- did you just ask him

          19                        just does he recall saying that

09:11:42  20                        during his deposition?

          21    MR. DAVIS:          Yes.

          22              A    Which part was it?

          23    23    Q    Where you answered at the top of

          24    Page 80, "So they might have taken him down to the

09:11:55  25    ground, correct?"

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

9

```
09:11:56   1   MS. LANGEN:          And so was the question, does he

           2                        specifically remember saying that

           3                        or does he acknowledge that that's

           4                        what this transcript says?

09:12:03   5   24     Q    Do you acknowledge that that's what the

           6   transcripts says?

           7          A    Yes.

           8   25     Q    And then do you acknowledge where I say,

           9   "And there was no use of force report written on this,

09:12:14  10   to your knowledge; is that correct?"

          11          A    Yes.

          12   26     Q    And then you -- then you responded, "No,

          13   I didn't even know about it again until a couple

          14   of weeks ago."

09:12:25  15          A    Yes.

          16   27     Q    Okay.  And you recall watching the video

          17   that I presented to you, and it's marked at 2427?

          18          A    You did show me clips of the video, yes.

          19   28     Q    Okay.  All right.  And it's still

09:12:54  20   your -- so is it your testimony today that there was

          21   or was not use of force on January 1, 2021?

          22          A    There was not a Use of Force report.

          23   29     Q    Did the -- did the officers use force on

          24   January 1st, 2021?

09:13:10  25   MS. LANGEN:          Are you asking him -- I'm not --
```

| | | |
|---|---|---|
| 09:13:12 | 1 | I'm not sure from what perspective |
| | 2 | you're asking him.  Are you asking |
| | 3 | him, did he see something on the |
| | 4 | video he thought was use of force, |
| 09:13:18 | 5 | or are you asking him was he there |
| | 6 | and he saw use of force, or what -- |
| | 7 | can you be a little more specific |
| | 8 | about the question or the context |
| | 9 | in which you're asking it? |
| 09:13:27 | 10 | MR. DAVIS:        I'm asking him, based on the video |
| | 11 | that he saw the last time that we |
| | 12 | were here and his testimony that |
| | 13 | the officers took him to the |
| | 14 | ground, was there use of force on |
| 09:13:41 | 15 | January 1, 2021. |
| | 16 | MS. LANGEN:       So based on the video, I think is |
| | 17 | what he's asking, do you recall |
| | 18 | that happening? |
| | 19 | A    I recall them taking him to the ground, |
| 09:13:51 | 20 | yes. |
| | 21 | 30    Q    And is it your testimony today that that |
| | 22 | was use of force or was it not use of force? |
| | 23 | A    Again, I said that -- I remember this |
| | 24 | part of the deposition -- my job as the chief is to |
| 09:14:04 | 25 | watch all evidence before making a decision.  And you |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

11

09:14:06  1    never showed me the entire video from start to finish.

2    You were showing me clips.  And I -- I have to look at

3    the totality of circumstances.

4    31      Q    Okay.  So I think it's a yes-or-no

09:14:18  5    question.  Was there use of force or was there not use

6    of force on January 1, 2021, based on your -- your

7    knowledge today?

8            A    Today.  I would say no.

9    32      Q    Okay.

09:14:39  10   MS. LANGEN:        Are you finished with this?  Should

11                            we move it aside --

12   MR. DAVIS:         (Interrupting) Yeah.

13   MS. LANGEN:        -- for the next one?  Can I have

14                            this copy?

09:14:43  15   MR. DAVIS:         Yes, you can have it.

16   MS. LANGEN:        Thank you.  Do you know what number

17                            exhibit we're on?  Are we starting

18                            over with this?

19   COURT REPORTER:    He said 1.

09:15:04  20   MS. LANGEN:        Okay.  Yeah, I just didn't know if

21                            we were going to continue with

22                            whatever number from the last

23                            deposition.

24   33      Q    Are you aware of any disciplinary action

09:15:44  25   that you took against Officer John Murphy while you

```
09:15:50    1   were the chief?

            2           A    Yes.

            3   34      Q    Are you aware of any disciplinary action

            4   that you took against Doug Ullrich --

09:16:00    5           A    (Interrupting) Yes.

            6   35      Q    -- while you were the chief?

            7           A    Yes.

            8   36      Q    Okay.  Was it your job, as the chief of

            9   police, to implement all of the policies and

09:16:07   10   procedures of the department when you were the chief?

           11           A    Yes.

           12   37      Q    From what years were you the chief of

           13   police?

           14           A    September 1, 2017 to September 1, 2022.

09:16:33   15   38      Q    And do you remember how many times that

           16   you had to discipline Doug Ullrich while you were the

           17   chief of police?

           18           A    I don't recall the number of times.

           19   39      Q    Would you say more than five?

09:16:51   20   MS. LANGEN:        If you remember, you can answer

           21                       that.

           22           A    I don't believe it was more than five.

           23   40      Q    Okay.  Would you say it was -- do you

           24   have a -- an estimate on how many times?

09:17:05   25           A    Twice at the most, I believe.  It could
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

13

```
09:17:07    1   be more, but twice I can recall.

            2   41      Q    And do you remember what the discipline

            3   was for?

            4           A    No, I don't.

09:17:19    5   42      Q    You don't recall what the discipline was

            6   for?

            7           A    No.

            8   43      Q    And did you have to discipline John

            9   Murphy while you were the chief of police?

09:17:32   10           A    Yes.

           11   44      Q    And do you remember what you disciplined

           12   him for?

           13           A    I don't know the specific rule, no.

           14   MR. DAVIS:        I would like to enter this in as

09:17:53   15                     Exhibit 2.

           16           (REPORTER MARKS COVINGTON POLICE DEPARTMENT

           17           SUSPENSION ORDER FOR DOUG ULLRICH AS

           18           PLAINTIFF'S EXHIBIT NO. 2 FOR THE PURPOSES OF

           19           IDENTIFICATION, AND THE SAME IS ATTACHED

09:17:53   20           HERETO AND FILED HEREWITH)

           21   45      Q    Are you familiar with this document?

           22           A    Yes.

           23   46      Q    And do you -- do you know what it was --

           24   can you tell me what it is?

09:18:51   25           A    It was for Rule 138(A), operating
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

14

| | | | |
|---|---|---|---|
| 09:18:55 | 1 | | vehicles. |
| | 2 | 47 | Q    And can you describe what the document |
| | 3 | | is? |
| | 4 | | A    It is a suspension order. |
| 09:19:07 | 5 | 48 | Q    And who were you suspending? |
| | 6 | | A    Douglas Ullrich. |
| | 7 | 49 | Q    And what were you suspending him for? |
| | 8 | | A    For an at-fault accident. |
| | 9 | 50 | Q    Okay.  Do you know how many at-fault |
| 09:19:20 | 10 | | accidents he was in while a member of the Covington |
| | 11 | | Police Department? |
| | 12 | | A    He had -- according to this paperwork, |
| | 13 | | he had seven previous accidents.  Four of the |
| | 14 | | accidents were at fault. |
| 09:19:39 | 15 | 51 | Q    And how did you know that he had seven |
| | 16 | | previous accidents? |
| | 17 | | A    They're kept on file. |
| | 18 | | MR. DAVIS:       I would like to enter this one in, |
| | 19 | | too. |
| 09:19:56 | 20 | | MS. LANGEN:      Are you finished with 2? |
| | 21 | | MR. DAVIS:       Yeah, for now. |
| | 22 | | MS. LANGEN:      Okay. |
| | 23 | | MR. DAVIS:       I may come back to it.  Exhibit 3, |
| | 24 | | please. |
| 09:20:36 | 25 | | MS. LANGEN:      Oh, is this the only copy you have? |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

15

```
09:20:36   1              Should I give -- if it is, I want
           2              to give it back to the court --
           3  COURT REPORTER:    Let me mark it first.
           4          (REPORTER MARKS ADDENDUM AS PLAINTIFF'S
09:20:36   5          EXHIBIT NO. 3 FOR THE PURPOSES OF
           6          IDENTIFICATION, AND THE SAME IS ATTACHED
           7          HERETO AND FILED HEREWITH)
           8  52    Q    Are you familiar with what this document
           9  is?
09:21:24  10          A    Yes.
          11  53    Q    And can you describe to me what it is?
          12          A    It's an addendum to the original
          13  discipline where he -- appears he worked the Traffic
          14  Grant overtime --
09:21:43  15  COURT REPORTER:    (Interrupting) The traffic what?
          16          A    Traffic Grant.  Overtime grant.  On
          17  Monday, April 30th.
          18  54    Q    Of what year?
          19          A    2018.
09:21:53  20  55    Q    And so Exhibit -- with Exhibit 2, did
          21  you draft Exhibit 2?
          22          A    Can I see it again?  Yes.
          23  56    Q    And did you draft Exhibit 3?
          24          A    Yes.
09:22:12  25  57    Q    And so you were directly responsible for
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

16

09:22:19   1   supervising Doug Ullrich?  Were you directly

           2   responsible for supervising Doug Ullrich?

           3          A    I don't know how to answer that.  He

           4   reports to a sergeant, who reports to a lieutenant,

09:22:37   5   and he reports to a captain, who reports to the

           6   assistant chief.  In that chain of command, I have

           7   overall management over all of the employees.

           8   58      Q    Okay.  And so you were -- overall, you

           9   were responsible for making sure that policies were

09:22:56  10   followed by officers; is that correct?

          11          A    Overall, over my management team,

          12   correct.

          13   59      Q    Correct.  Okay.  Were you ever aware of

          14   Doug Ullrich's comments about not following policies?

09:23:25  15          A    I think not at this time, during this

          16   time period.  There was a time period where he did say

          17   something, and I don't recall when that was, on an

          18   off-cuff comment.

          19   60      Q    Do you recall what he said?

09:23:41  20          A    Something about violating policies, but

          21   I don't remember exactly what word that was or how it

          22   was phrased.

          23   61      Q    Do you remember the context of that

          24   policy?

09:23:53  25          A    I do not.

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

17

```
09:23:58   1   62      Q    Do you remember if he was saying, oh,

           2   I -- I follow all the policies, or do you -- or was he

           3   saying that I don't follow policies?

           4           A    It was not sent directly to me, so I

09:24:09   5   don't recall exactly how it was said.

           6   63      Q    Okay.  And you never reviewed his -- his

           7   personnel file while you were the chief of police?

           8           A    I would review every evaluation as it

           9   moves up.  Or prior to discipline, I would look in his

09:24:25  10   personnel file.

          11   64      Q    Okay.  So you drafted that one, correct?

          12           A    Correct.

          13   65      Q    In 2018.

          14   MS. LANGEN:        You're pointing to 3, Exhibit 3.

09:24:33  15   MR. DAVIS:         Exhibit 3.

          16           A    Correct.

          17   66      Q    Is that correct?

          18           A    Uh-huh (affirmative).

          19   67      Q    And you drafted Exhibit 2; is that

09:24:38  20   correct?

          21           A    Correct.

          22   68      Q    And so prior to writing -- and you -- so

          23   prior to writing both Exhibit 2 and Exhibit 3, did you

          24   review his personnel file?

09:24:51  25           A    I would look in there for discipline,
```

```
09:24:53   1    yes, and prior evaluations.

           2    69      Q    Okay.  And did you look at his

           3    disciplinary record at that time?

           4            A    That's customary practice.  I don't

09:25:03   5    recall exactly when or how I did it.

           6    70      Q    Okay.  Do you remember reviewing any

           7    disciplinary file in which Doug Ullrich stated that he

           8    would not follow department policies?

           9            A    I don't recall.

09:25:26  10    71      Q    Okay.  Did you ever discipline John

          11    Murphy?

          12            A    Yes.

          13    72      Q    And do you recall what you disciplined

          14    him for?

09:25:49  15            A    Yes.

          16    73      Q    And what did you discipline him for?

          17            A    For being involved in an off-duty

          18    infraction with another officer.

          19    74      Q    And based on your understanding of that

09:26:05  20    incident, what occurred?

          21            A    I'd have to review it.  I don't remember

          22    exactly.  So are you asking just my opinion of what I

          23    think I recall?

          24    75      Q    Yes.

09:26:15  25            A    Sorry.
```

| | | |
|---|---|---|
| 09:26:15 | 1 | 76      Q    Uh-huh (affirmative). |
| | 2 |              A    Him and another officer -- I think |
| | 3 | Officer Murphy was dating his sister, Officer Tipton, |
| | 4 | and they went out.  Neither of them was driving. |
| 09:26:28 | 5 | Thank goodness.  That was the big one.  They got in an |
| | 6 | argument because Officer Tipton wanted to go back to |
| | 7 | his vehicle and drive.  Officer Murphy -- I think it |
| | 8 | was Tipton's sister driving -- wanted to make sure he |
| | 9 | just got home.  They got in a verbal argument about |
| 09:26:46 | 10 | such, to where Officer Tipton jumped out of the car. |
| | 11 | And then they were trying to get him back in.  Then |
| | 12 | Officer Tipton broke off the truck handle to the |
| | 13 | truck, and then they got into a physical altercation |
| | 14 | where the police were called.  Well, by the time the |
| 09:27:04 | 15 | police got there, it was -- I don't know what |
| | 16 | happened.  They were gone or the Murphy party was |
| | 17 | gone.  It was just Tipton.  I don't remember exactly |
| | 18 | the facts.  It came to my attention, so I put them |
| | 19 | both on admin leave until we did an IA on it. |
| 09:27:20 | 20 | Internal Affairs.  Sorry. |
| | 21 | 77      Q    Okay.  And there was an Internal Affairs |
| | 22 | report regarding that? |
| | 23 |              A    I believe so, or either the captain's |
| | 24 | investigation.  I don't recall.  I don't have that |
| 09:27:32 | 25 | paperwork, but there was an investigation. |

09:27:35  1    78    Q    Okay.  And were there ever any charges

          2    brought against those officers, criminal charges?

          3          A    No.  They did not press charges on each

          4    other.

09:27:49  5    79    Q    Was there ever a police report taken on

          6    that incident?

          7          A    I don't recall.  It was in a different

          8    jurisdiction.

          9    80    Q    So there were no charges for disorderly

09:28:56  10   conduct as a result of that incident brought against

          11   the officers?

          12         A    Not that I recall.  Again, a different

          13   jurisdiction.

          14   81    Q    Do you remember -- do you recall the

09:29:13  15   extent of the physical altercation between the two

          16   officers?

          17         A    No.

          18   82    Q    And did you interview the two officers?

          19         A    Personally?  Or through my

09:29:48  20   administration?

          21   83    Q    Personally.

          22         A    No.

          23   84    Q    Did your administration interview the

          24   two officers?

09:29:55  25         A    Yes.

09:29:56  1   85   Q   And was that captured via video

2   recording?

3        A   I don't recall.  I would imagine

4   recording.

09:30:08  5   86   Q   And are interviews of that nature

6   typically recorded?

7        A   Internal Affairs?

8   87   Q   Yes.

9        A   Yes.

09:30:26  10  88   Q   Would that be a part of an officer's

11  personnel file?

12       A   If I used it.

13  89   Q   What do you mean, if you used it?

14       A   When I do the discipline, discipline

09:30:40  15  becomes official record.  There is an investigation,

16  and they choose to use the investigation or not.

17  90   Q   Did you choose to use the investigation?

18       A   I don't recall.

19  91   Q   Did you ever discipline Officer Elsbernd

09:31:21  20  while you were the chief of police?

21       A   Not that I recall.

22  92   Q   All right.  We're going to move to the

23  Incidents 1 and 2 now.

24       A   May I move this to there?

09:31:45  25  93   Q   Yeah, that's fine.  We're actually going

09:32:22    1    to start with Incident No. 2, the January 16th, 2021

            2    incident.  Did you review this incident, the body-worn

            3    camera recorded for this incident?

            4    MS. LANGEN:          When?

09:32:39    5    94      Q    At any time?

            6            A    After I -- after January 16th I did, but

            7    not since then.

            8    95      Q    And what do you recall from the

            9    incident?

09:32:46   10            A    A traffic stop where Mr. Wynn used his

           11    brother's name, but then the brother had a warrant,

           12    and Mr. Wynn resisted getting out of the car,

           13    arrested -- arrest.  I don't remember if he actually

           14    had a warrant when they found out it was him, too.  I

09:33:08   15    don't recall.  It became a rather long fight.  One or

           16    both officers were on the ground.  And they had to hit

           17    their panic button to call more officers because there

           18    was a crowd gathering.  And they were eventually able

           19    to arrest Mr. Wynn.

09:33:30   20    96      Q    Okay.  And at the time of that traffic

           21    stop, was there a general order in place for the

           22    traffic stop procedures?

           23            A    Yes.

           24    97      Q    And you -- were you responsible for

09:33:47   25    making sure that your department carried out that --

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

23

09:33:49    1    those general orders?

            2              A    Yes.

            3    MR. DAVIS:         I'd like to mark this as Exhibit

            4                  No. 4.

09:33:58    5              (REPORTER MARKS ORDERS FOR TRAFFIC VIOLATIONS

            6              AS EXHIBIT NO. 4 FOR THE PURPOSES OF

            7              IDENTIFICATION, AND THE SAME IS ATTACHED

            8              HERETO AND FILED HEREWITH)

            9    98    Q    Do you want to take a look through the

09:34:31   10    three or four pages there and make sure that

           11    they're...  And does Exhibit 4 look like the general

           12    order that was in place for traffic violations at the

           13    time of the incident on January 16th, 2021?

           14              A    Yes.

09:34:58   15    99    Q    Does this general order lay out the

           16    policy and procedure for entering -- for going through

           17    a traffic stop for an officer?

           18              A    Yes.

           19    100    Q    And is this the policy that officers

09:35:29   20    were supposed to follow?

           21              A    Yes.

           22    101    Q    To your recollection, did John Murphy

           23    follow this policy when he stopped the vehicle that

           24    Anthony Wynn was in on January 16th, 2021?

09:35:51   25              A    To my recollection, all I can recall is

| | | | |
|---|---|---|---|
| 09:35:54 | 1 | | the legal stop. |
| | 2 | 102 Q | Do you remember what the stop was for? |
| | 3 | A | No, I don't recall.  It was a traffic |
| | 4 | | infraction.  I know that. |
| 09:36:03 | 5 | 103 Q | Okay.  Your officers -- do your officers |
| | 6 | | stop a lot of vehicles in the course of a year? |
| | 7 | A | Yes. |
| | 8 | 104 Q | And would you say it's important for |
| | 9 | | them to make sure that they document each traffic stop |
| 09:36:22 | 10 | | appropriately when there's some type of citation |
| | 11 | | issued? |
| | 12 | A | I don't understand the question. |
| | 13 | 105 Q | The question is, is they perform a lot |
| | 14 | | of traffic stops, correct? |
| 09:36:38 | 15 | A | Correct. |
| | 16 | 106 Q | And so would it be hard to remember |
| | 17 | | every traffic stop that you perform as an officer? |
| | 18 | A | Yes. |
| | 19 | 107 Q | And so is it important that every |
| 09:36:49 | 20 | | traffic stop is documented when there's a citation |
| | 21 | | issued? |
| | 22 | A | It is documented if a citation is |
| | 23 | | issued. |
| | 24 | 108 Q | Yeah, but is it important that the |
| 09:36:59 | 25 | | documentation on the citation is clear and |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

25

| | | | |
|---|---|---|---|
| 09:37:02 | 1 | | understandable so that you can go back and refresh |
| | 2 | | your memory because you perform so many traffic stops? |
| | 3 | A | Yes.  You talking about the narrative? |
| | 4 | 109   Q | Yes. |
| 09:37:10 | 5 | A | Yes. |
| | 6 | 110   Q | Okay.  And so is it a -- at the time of |
| | 7 | | the traffic stop, was it a requirement of the -- of |
| | 8 | | the department that officers ID everyone that's in the |
| | 9 | | vehicle? |
| 09:37:32 | 10 | A | No. |
| | 11 | 111   Q | Was that ever a policy of Covington |
| | 12 | | Police Department? |
| | 13 | A | Not that I know of. |
| | 14 | 112   Q | Okay.  So do you know on this date if -- |
| 09:37:45 | 15 | | if John Murphy ID'd everyone that was in the vehicle? |
| | 16 | A | I don't recall, but I believe he did. |
| | 17 | 113   Q | Okay.  Do you believe that -- |
| | 18 | MS. LANGEN: | (Interrupting) Don't speculate. |
| | 19 | A | Oh, sorry. |
| 09:37:56 | 20 | MS. LANGEN: | Just answer what you recall. |
| | 21 | A | I'm sorry.  Yeah. |
| | 22 | MS. LANGEN: | If you don't recall it, don't say, |
| | 23 | | well, maybe you're -- |
| | 24 | A | (Interrupting) Sorry. |
| 09:38:01 | 25 | MS. LANGEN: | Don't speculate. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

26

| | | | |
|---|---|---|---|
| 09:38:01 | 1 | A | Sorry. |
| | 2 | 114 Q | So you don't recall? |
| | 3 | A | I don't recall. |
| | 4 | 115 Q | Okay.  And you said that he -- that you |
| 09:38:10 | 5 | | do recall, though, Anthony Wynn providing John Murphy |
| | 6 | | with information, correct? |
| | 7 | A | Correct. |
| | 8 | 116 Q | Do you know if Anthony Wynn was the |
| | 9 | | driver of that vehicle? |
| 09:38:22 | 10 | A | He was not. |
| | 11 | 117 Q | Okay.  So Officer Murphy asked Anthony |
| | 12 | | Wynn for his identification, correct? |
| | 13 | A | Correct. |
| | 14 | 118 Q | And Anthony Wynn was not the driver of |
| 09:38:34 | 15 | | the vehicle; is that correct? |
| | 16 | A | Correct. |
| | 17 | 119 Q | All right.  Was it a policy of Covington |
| | 18 | | Police Department to ID individuals that were not |
| | 19 | | drivers of the vehicle? |
| 09:38:46 | 20 | A | No. |
| | 21 | 120 Q | Okay.  So did John Murphy just implement |
| | 22 | | that policy randomly? |
| | 23 | MS. LANGEN: | Objection. |
| | 24 | MR. DAVIS: | I'm asking him. |
| 09:39:02 | 25 | MS. LANGEN: | And I'm objecting. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

27

```
09:39:04    1   MR. DAVIS:          What's your objection?

            2   MS. LANGEN:         Because how is he supposed to know

            3                       if Murphy did something randomly or

            4                       for a reason when he's not Murphy?

09:39:10    5   MR. DAVIS:          Because he interviewed Murphy --

            6                       they interviewed Murphy, and there

            7                       was an Internal Affairs

            8                       investigation.

            9   MS. LANGEN:         Well, then you need to ask him what

09:39:19   10                       did Murphy say about that or what

           11                       did you observe about --

           12   MR. DAVIS:          (Interrupting) I'm asking him based

           13                       off his knowledge of working with

           14                       John Murphy.

09:39:25   15   MS. LANGEN:         If you can get in John Murphy's

           16                       mind and -- and explain and

           17                       understand, you know, why he did

           18                       something, you can answer that

           19                       question.

09:39:32   20   MR. DAVIS:          And on -- can I say something on

           21                       the record?  Your objections are

           22                       not formal objections for

           23                       deposition.  For deposition

           24                       purposes, you can make formal

09:39:44   25                       objections on the record.  And I'm
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

28

```
09:39:46    1                          not trying to lecture you because

            2                          you know this.  But he still has to

            3                          answer the question, and the judge

            4                          can make the decision at a later

09:39:54    5                          date on whether there was a -- a

            6                          proper objection.

            7    MS. LANGEN:           Well, you are lecturing me.  But

            8                          you've asked me what was the basis

            9                          for my objection, so I explained

09:40:02   10                          why -- the basis --

           11    MR. DAVIS:            (Interrupting) And that --

           12    MS. LANGEN:           (Interrupting) -- for my objection.

           13    MR. DAVIS:            And that's not a -- an objection

           14                          that's allowable during deposition.

09:40:10   15    MS. LANGEN:           That is an objection.  When you're

           16                          not being clear about the question,

           17                          that is an allowable objection.

           18    MR. DAVIS:            He can still answer the question.

           19    MS. LANGEN:           If he has a basis for answering the

09:40:20   20                          question, he can answer the

           21                          question.  I never told him not to.

           22    121    Q    Okay.  Go ahead and --

           23           A    (Interrupting) What was the question

           24    again?

09:40:27   25    122    Q    The -- the question was:  Did John
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

29

09:40:31  1   Murphy -- do you know if John Murphy acted on his

2   behalf or the department's behalf when he implemented

3   the policy to -- to question and ask Anthony Wynn for

4   his ID?

09:40:52  5   MS. LANGEN:          Objection.  Form.  You can answer.

6                          If you know.

7            A    I just know he's legally allowed to ask

8   all passengers for their IDs.

9   123     Q    Okay.  So he's legally allowed to, but

09:41:04  10  that was not a policy of the department at the time to

11  do that?

12           A    It's -- no, there's not a specific

13  policy.

14  124     Q    Okay.  Do you know if John Murphy asked

09:41:20  15  for -- let me ask this:  Do you know if John Murphy

16  asked all of the cars that he stopped, while the time

17  you were a police officer, did he ask every vehicle

18  that he stopped, did he ask every individual for their

19  ID?

09:41:41  20           A    I do not know.

21  125     Q    Okay.  Do you know if John Murphy

22  implemented the same policy on individuals that were

23  not African American?

24           A    I do not know.

09:42:34  25  126     Q    Based on the policies and -- policies

```
09:42:35    1    and procedures of the department, would it have been

            2    illegal for John Murphy only to ask black citizens for

            3    theirs IDs and not ask white citizens for their IDs?

            4    MS. LANGEN:          Object to form.  You can answer

09:42:49    5                         that question.

            6              A    I'm sorry?

            7    MS. LANGEN:          You can answer that question.  I'm

            8                         just entering an objection.

            9              A    Yes, it would be against our original

09:42:56   10    bias and discrimination policy.

           11    127    Q    Is that policy -- is a part of that

           12    policy, the racial discrimination policy, found in

           13    this part of the general order?

           14              A    Is it referred to?

09:43:26   15    128    Q    Yes.

           16              A    It's not referred to.  I don't see it

           17    by -- it has its own general order number.

           18    129    Q    Okay.  There would be other video --

           19    body-worn camera footage of John Murphy making other

09:43:52   20    traffic stops; is that correct?

           21              A    Yes.

           22    130    Q    And how long are those traffic stops

           23    stored on -- in -- in the data that you guys -- the

           24    Department keeps?

09:44:05   25              A    Which data?  The body cam or the --
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

31

| | | |
|---|---|---|
| 09:44:07 | 1 | 131      Q      (Interrupting) The body cam. |
| | 2 | A      Okay.  That's all by the library book of |
| | 3 | archived records.  We have a records specialist there, |
| | 4 | and she sets all those parameters for misdemeanor, |
| 09:44:17 | 5 | felony, traffic stop, all by Kentucky state law. |
| | 6 | 132      Q      Okay.  Do you know if any other officers |
| | 7 | were asking everyone in -- in vehicles when they made |
| | 8 | traffic stops for their ID while you were the chief of |
| | 9 | police?  I'm sorry.  Do you know if any other officers |
| 09:44:51 | 10 | were asking everyone in vehicles for their ID during |
| | 11 | traffic stops? |
| | 12 | A      Yes. |
| | 13 | 133      Q      And that was a practice that you knew |
| | 14 | about? |
| 09:45:03 | 15 | A      Yes. |
| | 16 | 134      Q      And you allowed -- you didn't discipline |
| | 17 | any officers for doing that? |
| | 18 | A      No. |
| | 19 | 135      Q      So even though it wasn't in the policies |
| 09:45:33 | 20 | and procedures, you allowed officers to do it? |
| | 21 | A      Yes.  It's by the law. |
| | 22 | 136      Q      We're going to stay on Incident 2.  In |
| | 23 | your review of Incident 2, was there use of force -- |
| | 24 | A      (Interrupting) Yes. |
| 09:46:42 | 25 | 137      Q      -- by -- |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

32

| | | | |
|---|---|---|---|
| 09:46:43 | 1 | | A    (Interrupting) Oh, sorry.  I'm sorry. |
| | 2 | 138 | Q    That's fine.  Did John Murphy use force |
| | 3 | during that incident? |
| | 4 | | A    Yes. |
| 09:46:55 | 5 | 139 | Q    Did any other officer use force during |
| | 6 | the incident? |
| | 7 | | A    I believe Officer Elsbernd did, too. |
| | 8 | 140 | Q    And from your observations, what type of |
| | 9 | force was used? |
| 09:47:19 | 10 | | A    Physical force.  Hands.  Hands, arms, |
| | 11 | legs.  I don't believe any tools were used. |
| | 12 | 141 | Q    Okay.  And during that use of force, |
| | 13 | were there ever any punches thrown? |
| | 14 | | A    Yes. |
| 09:47:39 | 15 | 142 | Q    And do you remember who threw the |
| | 16 | punches? |
| | 17 | | A    I do not recall. |
| | 18 | 143 | Q    So when you initially reviewed -- |
| | 19 | reviewed the body-worn camera footage and the punches |
| 09:48:02 | 20 | that were thrown, you -- did you feel it necessary to |
| | 21 | have this incident further investigated? |
| | 22 | | A    Not due to the punches thrown. |
| | 23 | 144 | Q    What -- what -- why did you feel that |
| | 24 | there needed to be further investigation of the |
| 09:48:19 | 25 | incident? |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

33

09:48:20  1           A    I was contacted the next morning by

2      members of the public.  There was a clip that went

3      viral about Officer Murphy and Mr. Wynn on the ground

4      fighting.  And I believe it showed Mr. Murphy -- or,

09:48:34  5      I'm sorry, Officer Murphy with his punches.  And there

6      was a part with the headlock, and it made a lot of

7      people very upset.  This is off the heels of the

8      George Floyd protest and everything.  So I was

9      contacted by -- I know Commissioner Williams, I

09:48:51 10      believe Commissioner Washington, I believe the Mayor

11      even called me.  And then on my voicemail at my desk,

12      I was getting phone calls from the public that were

13      very upset about all this.  So I had to jump on that

14      immediately.

09:49:12 15      145     Q    And so did you send the incident to

16      Internal Affairs because of the request of the Mayor

17      and Commissioner Washington, or did you send the

18      incident to Internal Affairs for review because of

19      what you reviewed in the body camera footage?

09:49:35 20              A    Well, not because of the Commissioners.

21      It was a -- well, it's not so long ago, but it's

22      three years.  It was very -- a time of mistrust of all

23      police.  And, actually, I was enjoying a pretty good

24      relationship with our public.  And when this came out,

09:49:50 25      I think that's why so many people contacted me.  And I

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

34

| | | |
|---|---|---|
| 09:49:53 | 1 | knew just me making a decision on my own, even though |
| | 2 | I saw -- I watched the video and I saw that was a |
| | 3 | brawl, a fight where use of force was necessary, I |
| | 4 | thought that would not be sufficient for the public, |
| 09:50:07 | 5 | so I ordered an Internal Affairs investigation. |
| | 6 | 146   Q   Okay.  In your time as a chief of |
| | 7 | police, how many body-worn camera videos have you |
| | 8 | reviewed where officers punched a citizen on -- on |
| | 9 | camera? |
| 09:50:42 | 10 | A   I don't know the number. |
| | 11 | 147   Q   Would you say that it's more than ten? |
| | 12 | A   If -- if you're saying just walked up |
| | 13 | and punched a citizen, no, I have never seen any of |
| | 14 | those. |
| 09:50:58 | 15 | 148   Q   No, I'm saying where a police officer |
| | 16 | has had to use a punch as a part of restraining or |
| | 17 | using force to restrain a citizen. |
| | 18 | A   Yes, I've seen plenty use of force where |
| | 19 | a person is resisting, where a strike was used. |
| 09:51:21 | 20 | 149   Q   A punch or a -- |
| | 21 | A   (Interrupting) A punch.  We can use the |
| | 22 | word punch, yes. |
| | 23 | 150   Q   Where a punch was used? |
| | 24 | A   Uh-huh (affirmative). |
| 09:51:30 | 25 | 151   Q   And how many of those incidents did you |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

35

| | | |
|---|---|---|
| 09:51:34 | 1 | send to Internal Affairs for further investigation? |
| | 2 | A    I don't recall any at this point. |
| | 3 | 152    Q    Okay.  Have you, in your time as chief |
| | 4 | of police with the City of Covington, reviewed body -- |
| 09:51:54 | 5 | body-worn camera footage where an individual was |
| | 6 | choked by a police officer? |
| | 7 | A    This particular use of force. |
| | 8 | 153    Q    Were there any others that you can |
| | 9 | recall viewing? |
| 09:52:12 | 10 | A    I don't recall. |
| | 11 | 154    Q    Okay.  Do you recall sending any use of |
| | 12 | force investigation reports for choking to Internal |
| | 13 | Affairs in your time as chief of police? |
| | 14 | A    I don't recall at this time.  At that |
| 09:52:51 | 15 | point that was new to the policy, the mandibular -- |
| | 16 | whatever you want to call it.  The chokehold.  Again, |
| | 17 | on the heels of George Floyd, there was a lot of |
| | 18 | changes.  And CALEA, our accreditation -- our national |
| | 19 | changed their accreditation standard to enter that |
| 09:53:09 | 20 | language.  So that was relatively new at that time. |
| | 21 | 155    Q    Do you recall if John Murphy had ever |
| | 22 | punched or struck a citizen prior to this incident? |
| | 23 | A    I don't recall. |
| | 24 | 156    Q    How about Doug Ullrich? |
| 09:53:38 | 25 | A    I don't recall. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

36

09:53:47  1    157     Q    Okay.  Do you know if Doug Ullrich is

2    currently under any sort of investigation for striking

3    or restraining a citizen?

4            A   I don't work there anymore, so I don't

09:54:12  5  know what he's currently under.

6    158     Q    Okay.  Do you know if there are any

7    civil actions against John Murphy for -- besides this

8    one, any civil actions against John Murphy for

9    striking of citizens prior?

09:54:38  10  MS. LANGEN:       Objection.  Just relevance, but go

11               ahead.

12            A   Not that I know of.

13    159     Q    Okay.  How about, do you know if there

14    are any civil actions against Doug Ullrich for use of

09:54:49  15  force or striking citizens of -- of Covington?

16    MS. LANGEN:      Same objection.

17            A   I don't know at this time.

18    160     Q    Okay.  Do you recall watching any

19    body-worn camera footage of -- of a -- of a white

09:55:19  20  Covington citizen being placed in a chokehold

21    restraint of any kind?

22            A   I don't recall.

23    161     Q    Okay.  Do you recall viewing any

24    body-worn camera footage of a white Covington citizen

09:55:47  25  being punched in the face by a Covington police

| | | |
|---|---|---|
| 09:55:50 | 1 | officer? |
| | 2 | A    I don't recall. |
| | 3 | 162    Q    And, for the record, are you required to |
| | 4 | review body-worn camera footage for any member of the |
| 09:56:26 | 5 | public that files a complaint for excessive force? |
| | 6 | A    Yes. |
| | 7 | 163    Q    All right. |
| | 8 | MR. DAVIS:      Do you mind if we take short break? |
| | 9 | MS. LANGEN:      Not at all. |
| 09:56:55 | 10 | (OFF THE RECORD) |
| | 11 | 164    Q    All right.  Before we left, we were |
| | 12 | discussing the -- the policies and procedures are |
| | 13 | related to the second incident, and we were also |
| | 14 | discussing use of force.  I would like to enter this, |
| 10:15:36 | 15 | I believe, as Exhibit 5.  This is Page 66 of the Use |
| | 16 | of Force policy. |
| | 17 | (REPORTER MARKS PAGE 66 OF USE OF FORCE |
| | 18 | POLICY AS PLAINTIFF'S EXHIBIT NO. 5 FOR THE |
| | 19 | PURPOSES OF IDENTIFICATION, AND THE SAME IS |
| 10:15:50 | 20 | ATTACHED HERETO AND FILED HEREWITH) |
| | 21 | 165    Q    Please take a look at that and, you |
| | 22 | know, let me know if that looks like the Use of Force |
| | 23 | policy that was in place on January 16th, 2021. |
| | 24 | MS. LANGEN:      Or at least an excerpt of it. |
| 10:16:14 | 25 | MR. DAVIS:      Yes. |

| | | |
|---|---|---|
| 10:16:16 | 1 | A    Yes. |
| | 2 | 166    Q    Okay.  And that policy that's in front |
| | 3 | of you identifies the limitations that should be used |
| | 4 | when implementing chokeholds; is that correct? |
| 10:16:36 | 5 | A    Yes. |
| | 6 | 167    Q    And that's -- that's all in there.  I |
| | 7 | don't need that anymore.  So what was the result of |
| | 8 | the Internal Affairs investigation? |
| | 9 | A    That he did use the vascular -- that |
| 10:17:48 | 10 | word -- vascular chokehold, but they found that in |
| | 11 | that circumstance that it was lawful. |
| | 12 | 168    Q    Okay.  And so were any officers |
| | 13 | disciplined as a result of the second incident? |
| | 14 | A    Not that I recall. |
| 10:18:36 | 15 | 169    Q    All right.  Moving to Incident No. 1, |
| | 16 | the January 1st, 2021 incident.  What do you recall |
| | 17 | about that incident? |
| | 18 | A    The clips that you showed me from the |
| | 19 | last deposition. |
| 10:19:13 | 20 | 170    Q    And what did those clips depict? |
| | 21 | A    Mr. Wynn struggling with the officers |
| | 22 | and screaming at them, yelling at them and throwing a |
| | 23 | fit. |
| | 24 | 171    Q    Okay.  Did those clips depict officers |
| 10:19:30 | 25 | entering into the home that Mr. Wynn was in? |

10:19:34  1          A    The clips you showed me, they were

2    already inside the home, that I recall.

3    172    Q    Okay.  And so the officers were inside

4    the home from what I showed you; is that correct?

10:19:48  5          A    It was in an apartment.  That's all I

6    recall.

7    173    Q    Okay.  And do you recall if there was

8    any warrant in regard to that incident?

9          A    I don't recall.  It's -- again, your

10:20:06 10    deposition is the first time I was told about it.  Or

11    prior to the week before, when I found out I was

12    getting sued.

13    174    Q    Okay.  So none of your officers

14    mentioned this incident to you previously?

10:20:24 15          A    Not that I recall.

16    175    Q    When there is a warrantless entry into a

17    home, did your policies and procedures require that

18    you be notified?

19          A    The chief?  No.

10:20:44 20    176    Q    No?  So officers could perform a

21    warrantless entry into a home and the chief not be

22    notified of it?

23          A    Correct.

24    177    Q    Okay.  If a warrant was issued, was the

10:20:57 25    chief notified of it?

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

40

| | | | |
|---|---|---|---|
| 10:20:59 | 1 | A | What kind of warrant? |
| | 2 | 178 Q | For entering into a home. |

          3        A     There was a supervisor always notified.

          4  The only thing I can recall right now is, like, when

10:21:16    5  detectives would do a warrant search of a house or

          6  something.

          7  179     Q    And were you notified that the warrant

          8  search was happening?

          9        A    Not always.  If it needed a S.W.A.T.,

10:21:27  10  then I was notified.

      11  180     Q    According to the policies and

      12  procedures, do you know when a warrantless entry was

      13  allowable?

      14        A    I don't recall exactly what the policy

10:21:55  15  states, but with the law, it's exigent circumstances.

      16  181     Q    Okay.  And you -- do you know if there

      17  were exigent circumstances on the night of Jan -- or

      18  the early morning of January 1st, 2021?

      19        A    No.

10:22:31  20  182     Q    What is your definition of -- or what

      21  was the definition of exigent circumstances while you

      22  were the chief of police for the City of Covington?

      23        A    I don't recall the exact law, but it's

      24  to preserve evidence for the safety of others.

10:22:47  25  There's also the disorderly conduct at that time.  I

```
10:22:51   1   don't know what law switched -- Supreme Court -- if

           2   the noise is loud and nobody is answering, you can go

           3   in and cease that noise just because -- especially in

           4   an apartment complex.

10:23:02   5   183     Q     So it was your understanding that at the

           6   time of this incident officers were allowed to enter a

           7   home if noise was loud?

           8           A     Again, I don't know why they were

           9   dispatched.  I didn't know about this.  There was no

10:23:18  10   complaint on this until I got sued.  So you keep on

          11   bringing up the case.  I knew very little about.

          12   184     Q     Well, I'm asking more about the general

          13   policies of the police department at the time, not

          14   necessarily your specific knowledge of the incident.

10:23:34  15   Because as the chief of police, you were responsible,

          16   correct, for making sure that the general orders were

          17   implemented, correct?

          18           A     Correct.

          19   185     Q     Okay.  So my questions to you are more

10:23:49  20   about the policies that were in place and the policies

          21   that were being implemented.  So at the time of

          22   January 1, 2021, it's your understanding that a police

          23   officer could enter into a home if there was a noise

          24   disturbance; is that correct?

10:24:21  25           A     Every situation's different.  This --
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

42

10:24:23  1    depends on the noise disturbance.

2    186     Q    Okay.  Can you give me an example of

3    what you mean by that?

4         A    There's thousands of examples.  I knock

10:24:34  5    on the door, and music's blaring, nobody's answering,

6    and you can hear it from a long way.  And you keep on

7    knocking.  You make different ways to get contact.

8    I've been there myself, where you go in and you turn

9    off the music, but you can't do any further than that;

10:24:53  10   searching or anything.

11   187     Q    Okay.  So it was the policy of the

12   department at the time was, is that if there was a

13   noise disturbance, that the officer could enter the

14   home and -- and try to end the noise disturbance

10:25:17  15   without a warrant.

16        A    I don't recall what the policy says

17   about that.  Again, that reflects back on law.  The

18   policies are guidelines.  We still have to stay within

19   the law.

10:25:29  20   188     Q    Okay.  Do you know what your officers

21   were taught about warrantless searches for noise

22   disturbance at the time that you were the chief of

23   police?

24        A    Whatever was based on the law at the

10:25:48  25   time.

```
10:25:49    1   189      Q     Okay.  Do you know how often officers

            2   entered homes without warrants for noise disturbances

            3   while you were the chief of police?

            4           A     I would say I don't know.  I don't know

10:26:20    5   the number.

            6   190      Q     Did you ever review any body-worn camera

            7   footage of officers entering into homes without

            8   warrants while you were the chief of police?

            9           A     I reviewed many body cams, so I could

10:26:41   10   have, but I don't recall.

           11   191      Q     Do you ever recall officers entering the

           12   home of a white citizen of Covington for noise

           13   disturbance without -- without a warrant?

           14           A     My -- myself, I've done that.  The lady

10:27:09   15   that lived at 5th and Garrard, she would leave her

           16   Elvis music up pretty darn loud, and sometimes she

           17   wouldn't answer the door, and you could hear it from

           18   blocks away.  So my own experience.

           19   192      Q     In your own experience you would -- you

10:27:24   20   would enter the --

           21           A     (Interrupting) And she was a female,

           22   white.

           23   193      Q     And what would happen?

           24           A     I'd turn down the music and give her a

10:27:30   25   warning.
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

44

10:27:30  1    194    Q    And you would enter into the home -- how

2    would you enter into the home?

3           A    Usually the door was open.  I'd knock

4    about 14 times, and she wouldn't answer.  I'd yell --

10:27:37  5    I don't remember her name.  The place has been rebuilt

6    and everything.  Not 5th and Garrard.  5th and

7    Greenup.  It's all been redone.  And she had Elvis

8    stuff everywhere.  But that's one, early in my career

9    that came on, but I can't recall anything past that.

10:27:53  10   195    Q    Okay.  Would you ever search her?

11          A    Her person?

12   196    Q    Yeah.

13          A    No.

14   197    Q    Would you ever place her in handcuffs?

10:28:01  15         A    Unless I was arresting her for

16   disorderly conduct.

17   198    Q    Did you arrest her for disorderly

18   conduct?

19          A    At the time, no.

10:28:11  20   199    Q    Okay.  So you never searched her or you

21   never placed her in handcuffs for a noise disturbance;

22   is that correct?

23          A    For those couple instances?

24   200    Q    (Nods head affirmatively).

10:28:24  25         A    No.

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

45

| | | |
|---|---|---|
| 10:28:24 | 1 | 201    Q    No, okay.  Can you recall of any |
| | 2 | incidents where an officer or yourself entered into a |
| | 3 | home for a noise disturbance and arrested and searched |
| | 4 | the individuals? |
| 10:28:42 | 5 | A    There's -- now, we're doing noise. |
| | 6 | Under noise, you know, you have the domestic screaming |
| | 7 | for help stuff.  So I've been involved in those, where |
| | 8 | you ask the supervisor for entry, and then you go in. |
| | 9 | And then you make sure everybody is safe. |
| 10:28:56 | 10 | 202    Q    No, I'm not talking -- I'm not talking |
| | 11 | about that -- |
| | 12 | A    (Interrupting) Domestic situation -- |
| | 13 | 203    Q    -- I'm just talking about for the noise. |
| | 14 | A    I don't recall.  60,000 calls a year.  I |
| 10:29:07 | 15 | don't recall. |
| | 16 | 204    Q    Okay.  And do you -- typically, when |
| | 17 | there's a noise disturbance, someone calls the police, |
| | 18 | is that how that happens, and says, hey, there's noise |
| | 19 | over here, can you guys come out and check it out and |
| 10:29:38 | 20 | get them to the turn the music down or something?  Is |
| | 21 | that how it works, typically? |
| | 22 | A    Yes, that's how it can happen.  Yes. |
| | 23 | 205    Q    Okay.  Yeah.  Do you recall how it |
| | 24 | happened here? |
| 10:29:45 | 25 | A    No.  Again, I didn't know anything about |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

46

```
10:29:48    1   it.

            2   206     Q     Okay.  And do you know if there was ever

            3   a 911 call produced to us through discovery?

            4           A     I do not know.

10:30:00    5   207     Q     Okay.

            6   MS. LANGEN:        Did you make a specific request for

            7                      that?

            8   MR. DAVIS:         I'm pretty sure I -- I did.

            9   MS. LANGEN:        I'll go back and look at your

10:30:23   10                      written discovery request, because

           11                      I don't recall that, but, yeah,

           12                      I'll check.

           13   MR. DAVIS:         Okay.  Thank you.

           14   MS. LANGEN:        And if there was one, I don't know

10:30:29   15                      that -- if that would be with

           16                      Covington or Kenton County.

           17   MS. WEICHOLD:      Covington is not the custodian.

           18   208     Q     Do you know if there was a general order

           19   in place for the process to arrest a citizen without

10:30:58   20   a -- without a warrant while you were the chief of

           21   police for the City of Covington?

           22           A     I don't recall.  I believe there is --

           23   209     Q     (Interrupting) Okay.

           24           A     -- a general order on arrests, and

10:31:12   25   citations.
```

| | | |
|---|---|---|
| 10:31:14 | 1 | 210    Q    Okay.  And the general order -- in the |
| | 2 | general order for arrests and citations, do you recall |
| | 3 | if there was a requirement for officers to explain to |
| | 4 | citizens why they were being arrested? |
| 10:31:32 | 5 | A    I don't recall what it exactly says. |
| | 6 | 211    Q    Okay.  So you -- you don't know if |
| | 7 | officers had to tell citizens why they were being |
| | 8 | arrested? |
| | 9 | A    I don't recall exactly what it says.  I |
| 10:31:48 | 10 | believe it's more about timing; when -- when the |
| | 11 | proper time is. |
| | 12 | 212    Q    Okay.  Okay.  When you were the chief of |
| | 13 | police, do you recall if there were any policies or |
| | 14 | procedures or general orders related to detaining a |
| 10:32:22 | 15 | citizen? |
| | 16 | A    I don't recall exactly what it says, but |
| | 17 | I believe it's covered under the general orders. |
| | 18 | 213    Q    Okay.  And do you recall, generally, how |
| | 19 | long a citizen could be detained prior to an official |
| 10:32:46 | 20 | arrest being made? |
| | 21 | A    I don't recall exactly what it said. |
| | 22 | That's determined by the courts. |
| | 23 | 214    Q    Okay.  You don't recall the law on that |
| | 24 | either? |
| 10:32:55 | 25 | A    I believe it's reasonable. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

48

| | | | |
|---|---|---|---|
| 10:32:57 | 1 | 215 | Q    Just reasonable? |
| | 2 | | A    (Nods head affirmatively). |
| | 3 | 216 | Q    Okay.  Did you train your officers ever |
| | 4 | | what the definition of reasonable was? |
| 10:33:08 | 5 | | A    Personally, I did not. |
| | 6 | 217 | Q    Okay.  And what is your understanding of |
| | 7 | | reasonable? |
| | 8 | | A    While you're conducting the |
| | 9 | | investigation, there is no time limit. |
| 10:33:21 | 10 | 218 | Q    Okay.  So if an investigation takes |
| | 11 | | two hours, you can detain an individual for two hours? |
| | 12 | | A    A judge would determine that afterwards, |
| | 13 | | if that was unreasonable. |
| | 14 | 219 | Q    Okay. |
| 10:33:34 | 15 | | A    But if there is reason for that. |
| | 16 | 220 | Q    And was it a policy and procedure of the |
| | 17 | | department to detain citizens as long as necessary to |
| | 18 | | complete an investigation while you were the chief of |
| | 19 | | police? |
| 10:34:02 | 20 | | A    As you are completing an investigation, |
| | 21 | | you can detain them, but could not be excessive. |
| | 22 | 221 | Q    And what is the definition of excessive? |
| | 23 | | A    It would be determined by the case.  For |
| | 24 | | example, law only allows two hours for juveniles. |
| 10:34:23 | 25 | 222 | Q    Okay. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

49

```
10:34:23    1              A    So that's the only law that's specific.

            2   223    Q    And from our last view of the body-worn

            3   camera footage of Mr. Wynn, do you remember how long

            4   he was detained prior to being formally placed under

10:34:45    5   arrest?

            6              A    I have no idea.

            7   224    Q    Do you recall what the policy was for

            8   citizens receiving medical attention when in custody?

            9              A    I do not recall the exact wording.

10:35:50   10   225    Q    Do you know if it was a policy that

           11   citizens should receive medical attention when they

           12   complain of injury?

           13              A    Yes.

           14   226    Q    Do you know if on January 1, 2021,

10:36:17   15   Anthony Wynn complained of injury?

           16              A    I do not know.

           17   227    Q    Do you know on January 16th, 2021, if

           18   Anthony Wynn complained of injury?

           19              A    I do not know.

10:36:36   20   228    Q    Do you know on January 1, 2021, if

           21   Anthony Wynn received any medical attention?

           22              A    I do not know.

           23   229    Q    Do you know if on January 16th, 2021, if

           24   Anthony Wynn received any medical attention?

10:36:51   25              A    I do not know.
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

50

```
10:36:52    1    230    Q    Whose responsibility would it have been

            2    for a citizen to receive medical attention if they

            3    complained of injury during or after an incident?

            4          A    Any incident?  The officer.

10:37:27    5    231    Q    The arresting officer?

            6          A    Well, you're talking about an arrest.  I

            7    thought you were talking about anything.

            8    232    Q    Or, yeah, any incident.  So the

            9    officer -- which officer, I guess is my question?

10:37:37   10          A    Well, if you came up to me from the

           11    street, and I'm the officer you walked up to and said

           12    I need a squad, it would be my responsibility to call

           13    you a squad.

           14    233    Q    Okay.  Was there a direct supervisor

10:37:59   15    responsible for following up on use-of-force

           16    incidents?

           17          A    What do you mean by "direct"?

           18    234    Q    So if an officer is involved in the use

           19    of force, is there a next-line supervisor who's to be

10:38:20   20    notified?

           21          A    Correct.  A sergeant.

           22    235    Q    Okay.  Is that sergeant responsible for

           23    making sure that an office -- that the citizen

           24    receives medical attention if -- if they complain of

10:38:41   25    injury?
```

10:38:42  1           A     Yes.

2   236    Q     Who was the sergeant on duty on the

3   January 16th, 2021, incident?

4           A     I have no idea.

10:39:08  5   237    Q     When was -- at what point was an officer

6   or sergeant required to notify you of injury of a

7   citizen?

8           A     Serious injury, such as if we used our

9   firearm or one that related into death, you know,

10:39:34 10  somebody might have died, I would get notified.

11  238    Q     Uh-huh (affirmative).

12          A     But on a standard use of force where

13  it's just an injury that occurred to the officer,

14  and -- unless it's serious to the officer, him- or

10:39:45 15  herself, or death, it goes to the shift lieutenant.

16  Shift lieutenant gets all the paperwork, where it goes

17  to the captain.  The captain reviews it, goes to the

18  training supervisor, goes to the assistant chief up.

19  But that's how the standard use of force is.

10:40:07 20  239    Q     So you, as the chief, are only notified

21  if there was a death?

22          A     Or a serious injury.

23  240    Q     Okay.  And what defines a serious

24  injury, when you were the chief of police?

10:40:21 25          A     It could be the opinion of that

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

52

10:40:23  1   supervisor, but most of the time it was, you know,

2   hospitalization overnight.  The good thing is on the

3   watch report we were always -- it said if the officer

4   was injured.  I would know that the next morning at

10:40:36  5   6 a.m.

6   241     Q    Okay.

7   COURT REPORTER:    Did you say the locks report?

8           A    It's called a watch report.  So all the

9   highlights of the day.  So any crimes or, again, as he

10:40:50  10  put it, officer injured or use of force goes on that

11  to tell us every -- every 24 hours.

12  242     Q    If we can go back to Exhibit 1.  And if

13  you look here -- let me turn to the page.  You can see

14  the third page here.

10:41:55  15          A    Okay.

16  MS. LANGEN:       So for the record, are you talking

17                    about Page 80, Lines 15 through --

18  MR. DAVIS:        (Interrupting) Through the end of

19                    the --

10:42:10  20  MS. LANGEN:       (Interrupting) -- through the end

21                    of the page?

22  MR. DAVIS:        -- Page 24.

23  243     Q    So according to your statement, no one

24  ever notified you of Anthony's injury as a result of

10:42:25  25  the January 1, 2021, incident?

| | | | |
|---|---|---|---|
| 10:42:28 | 1 | A | I knew nothing of it, no. |
| | 2 | 244 Q | And according to you, did anyone notify |
| | 3 | | you of injuries to Anthony Wynn as a result of the |
| | 4 | | January 16th, 2021, injury -- incident? |
| 10:43:10 | 5 | A | No. |
| | 6 | 245 Q | No one in the department notified you? |
| | 7 | A | Not that I recall.  Unless it was on the |
| | 8 | | use-of-force report, which I can't recall. |
| | 9 | 246 Q | So the first time that you heard about |
| 10:43:29 | 10 | | the incident, it came from the mayor's office? |
| | 11 | A | No.  From phone calls from the public |
| | 12 | | and the commissioners texting me, showing me a video |
| | 13 | | from Facebook.  I think it was Facebook, some social |
| | 14 | | media. |
| 10:43:47 | 15 | 247 Q | So no one in the department thought it |
| | 16 | | was necessary to notify you of that incident at all? |
| | 17 | A | No. |
| | 18 | 248 Q | Do you believe that someone within the |
| | 19 | | department should have notified you about that |
| 10:44:10 | 20 | | incident? |
| | 21 | A | No. |
| | 22 | 249 Q | They shouldn't have? |
| | 23 | A | I didn't see a reason for it at that |
| | 24 | | time. |
| 10:44:23 | 25 | 250 Q | So you are ultimately responsible for |

10:44:29   1    all of the policies and procedures that are

           2    implemented within the department, correct?

           3            A    Correct.

           4    251    Q    And if there's a potential violation of

10:44:42   5    those policies and procedures, should you be notified

           6    of those?

           7            A    Of a violation?

           8    252    Q    Yes.

           9            A    Yes.

10:44:58  10    253    Q    Okay.  And so in this -- on January 1st,

          11    2021, you weren't -- you weren't notified of any

          12    potential violations of the policies; is that correct?

          13            A    Correct.

          14    254    Q    And on January 16th, 2021, you weren't

10:45:17  15    notified of any potential violations; is that correct?

          16            A    By the public I was and what they

          17    perceived as a violation.

          18    255    Q    But not by anyone within the department.

          19            A    I don't recall if it was on the watch

10:45:28  20    report or not.  I'm sure it was, because it was a use

          21    of force.  I would have saw that the next morning when

          22    I got up, which I believe was a Sunday.

          23    256    Q    Okay.  But based on what you saw on the

          24    watch report, you didn't think that there was any

10:45:49  25    reason for further investigation of the incident at

10:45:52   1    all?

2               A    I don't recall how it was written.

3    257   Q    Well, based on what was written, you did

4    not feel it necessary to look into the incident any

10:46:06   5    further; is that correct?

6               A    I can't say that.  And Sunday it states

7    something, a use of force, officer injured.  I didn't

8    get notified, so it's limited information at that

9    time.  It's a 24/7/365 business, so I -- I don't

10:46:23   10   recall if I did receive an email stating this is what

11   happened.  I don't recall.  I don't even recall if it

12   was on the watch report, but I have good inclination

13   to believe it may have been.

14   258   Q    There are things that come on the watch

10:46:39   15   report that catch your attention, though; is that

16   correct?

17              A    Everything is the highlights of the

18   night before.  Or the shifts before, 24 hours before.

19   259   Q    Right.  I understand that.  My question

10:46:51   20   was:  Is some time -- when you were the chief of

21   police, there were things that were on the watch

22   report that would catch your attention and maybe spark

23   for you to further investigate; is that correct?

24              A    That's correct.

10:47:08   25   260   Q    And so what you're saying today is, is

10:47:11  1    that the way that the incident was written in the

2    watch report, Incident 2 was written in the watch

3    report, did not spark anything or catch your attention

4    to where you deemed it necessary to further

10:47:29  5    investigate; is that correct?

6         A    I don't recall.  It was three years ago.

7    All I can remember is emotions and people calling me

8    the next morning, showing me a video.  That's all I

9    recall.  That's what I recall from that time period,

10:47:42  10   that I watched a video and start an investigation.

11   That's --

12   261    Q    (Interrupting) So when --

13        A    (Interrupting) -- my recall.

14   262    Q    When did you receive the first phone

10:47:51  15   call?

16        A    That Sunday morning.  I just know I was

17   with my wife somewhere shopping, right after church.

18   I don't recall exactly where I was.  But the phone

19   kept ringing.  And I told my wife, "Look at all these

10:48:04  20   text messages, I better look into this, so I need to

21   go to work."

22   263    Q    Got you.  So have you ever had to

23   investigate something that your officers missed or you

24   found out later about that wasn't on the watch report?

10:48:27  25        A    Oh, yes.

10:48:30  1   264    Q    And how often did that happen when you

2   were the chief of police?

3          A    Seldom.

4   265    Q    In a year, how many times would you say

10:48:41  5   that that occurred?

6          A    I don't know.  It could be a missed

7   burglary report that we did not follow up on.

8   266    Q    Uh-huh (affirmative).

9          A    That's what comes up to mind first.  And

10:48:52  10  I get a call from the complainant and asking why the

11  detective didn't call them back.

12  267    Q    Could we go back to Exhibit No. 2.

13         A    Okay.  That goes with that one.  I think

14  that goes with 2.  That's 3.  You want 2 and 3?

10:49:26  15  268    Q    Two and 3, yes.  So on Exhibit 2, you

16  wrote this disciplinary action for Doug Ullrich; is

17  that correct?

18         A    That's correct.

19  269    Q    And you had to write an addendum to it;

10:49:39  20  is that correct?

21         A    That's correct.

22  270    Q    Why did you have to write an addendum to

23  it?

24         A    I believe it was brought to my attention

10:49:53  25  that he worked at the Traffic Grant while being

10:49:56   1   suspended.

2   271      Q     And Exhibit 2 specifically stated that

3   he wasn't supposed to do that; is that correct?

4          A     It says, "No off-duty details nor shift

10:50:13   5   overtime the week of and after the suspension day."

6   272      Q     Okay.  And so -- and what does --

7          A     (Interrupting) He worked the Traffic

8   Grant, which was something separate.

9   273      Q     It was something separate.  Explain that

10:50:27  10   to me.

11          A     Traffic Grant is reimbursed by the

12   Federal Highway Safety through the State Highway

13   Safety, and this said "No shift overtime."

14   274      Q     Okay.  So why did you write that

10:50:39  15   addendum?

16          A     Because it was brought to my attention

17   by my captains that he just worked this.  And so I

18   called him in and found out -- and he said, "Well,

19   that wasn't in there."  So I wrote the addendum to be

10:50:50  20   more clear.

21   275      Q     Okay.  So from your initial conversation

22   with Mr. Ullrich, it was your understanding that he

23   wasn't supposed to work the Traffic Grant.

24          A     That's correct.

10:51:07  25   276      Q     But he did not know that?  Or what was

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

59

| | | |
|---|---|---|
| 10:51:14 | 1 | the -- the issue? |
| | 2 | A   I don't recall exactly what was the |
| | 3 | conversation. |
| | 4 | 277   Q   Uh-huh (affirmative). |
| 10:51:19 | 5 | A   But I wanted to make it clear, and |
| | 6 | that's why I did the addendum. |
| | 7 | 278   Q   Okay.  So there were specific times in |
| | 8 | your -- while you were the chief of police when there |
| | 9 | were rules and regulations and/or policies and |
| 10:51:53 | 10 | procedures that were supposed to be implemented by |
| | 11 | your officers, but they -- they weren't; is that |
| | 12 | correct? |
| | 13 | A   Correct.  And I disciplined for that, |
| | 14 | which this shows. |
| 10:52:09 | 15 | 279   Q   Okay.  Who was responsible for making |
| | 16 | final decisions on suspension and termination while |
| | 17 | you were with the Covington Police Department in the |
| | 18 | role of chief? |
| | 19 | A   Myself. |
| 10:53:09 | 20 | 280   Q   And at any time, did you see it |
| | 21 | necessary to terminate any officers while you were the |
| | 22 | chief of police? |
| | 23 | A   I have terminated officers while I was |
| | 24 | the chief of police. |
| 10:53:23 | 25 | 281   Q   Okay.  Do you recall the officers that |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

60

```
10:53:26    1   you terminated?

            2   MS. LANGEN:           Objection.  Relevance.  You can

            3                         answer.

            4           A     I recall officers I terminated.

10:53:35    5   282     Q     Okay.  And which officers did you

            6   terminate?

            7           A     I don't recall their names, because a

            8   lot of them were out of their first year.

            9   283     Q     Okay.  Do you recall generally what they

10:53:47   10   were terminated for?

           11           A     There was all kinds of reasons.  I can't

           12   say it's just one.

           13   284     Q     Okay.  Do you recall any specific

           14   reasons?

10:53:57   15   MS. LANGEN:           And just an objection to the entire

           16                         line of questioning about officers

           17                         who were terminated, not involved

           18                         in this lawsuit.

           19   MR. DAVIS:            It generally goes to the

10:54:06   20                         negligent --

           21   MS. LANGEN:           (Interrupting) I'm not wanting to

           22                         argue the point with you.  I'm just

           23                         objecting on the basis of relevance

           24                         to preserve my objection.

10:54:15   25   MR. DAVIS:            No problem.
```

10:54:15  1  285    Q    Go ahead.

2          A    I don't recall.  It's -- it's been a few

3  years.  I don't know exactly why.  If it was

4  termination, of course, I'd have to run it by the city

10:54:22  5  manager, because if a person is trying to fight

6  termination above my -- me, it goes to the city

7  commission.

8  286    Q    Okay.  When did you first become aware

9  of the personnel files of John Murphy?

10:54:46  10         A    I'm always aware that everybody has a

11  personnel file locked in the chief's office.

12  287    Q    Okay.  When you first started, did you

13  review the personnel file for your officers?

14         A    No.

10:55:03  15  288    Q    And when was the first time that you

16  reviewed John Murphy's personnel file?

17         A    I don't know.  It was probably prior to

18  his discipline, because that's when I would look

19  through his file.

10:55:24  20  289    Q    Okay.  And the same question for Doug

21  Ullrich.  When was the first time that you reviewed

22  his personnel file?

23         A    Again, it would have been when I

24  disciplined him.  I don't know if I looked at it

10:55:37  25  before or after.

```
10:55:41   1    290    Q    Okay.  Is there -- is there a series of,

           2    like, progressive discipline with officers?

           3           A    Yes.  And that's why we check their

           4    personnel file.

10:55:54   5    291    Q    And -- and prior -- and when you checked

           6    Doug Ullrich's personnel file, did you see prior

           7    writeups?

           8           A    I don't recall what I saw in there.  It

           9    would have been the basis for my discipline, though.

10:56:11  10    292    Q    Okay.  Do you know if Doug Ullrich had

          11    been suspended prior to you suspending him?

          12           A    I don't recall.

          13    293    Q    Okay.  Do you recall if he was suspended

          14    for comments related to not following police policies?

10:56:30  15           A    I don't recall.

          16    294    Q    Would that have been something important

          17    for you to review --

          18           A    (Interrupting) Yes.

          19    295    Q    -- as a chief of police?

10:56:37  20           A    Yes.

          21    296    Q    Do you ever recall reviewing a

          22    suspension for Doug Ullrich for not properly handling

          23    evidence?

          24           A    I don't recall.

10:57:26  25    297    Q    Okay.
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

63

```
10:57:27    1    MR. DAVIS:          Enter this in as Exhibit No. 6.

            2              (REPORTER MARKS COVINGTON POLICE DEPARTMENT

            3              SUSPENSION ORDER FOR DOUG ULLRICH AS

            4              PLAINTIFF'S EXHIBIT NO. 6 FOR THE PURPOSES OF

10:57:30    5              IDENTIFICATION, AND THE SAME IS ATTACHED

            6              HERETO AND FILED HEREWITH)

            7    298    Q    If you would have reviewed Doug

            8    Ullrich's file, would this have been in his file?

            9           A    Yes.

10:58:23   10    299    Q    And can you identify what the document

           11    is that I just handed over to you?

           12           A    It's a one day of suspension without pay

           13    from Chief Carter for Rule 117, insubordination.

           14    300    Q    And was that insubordination related to

10:58:40   15    the handling of evidence?

           16           A    It's for -- I'm sorry.  I'm confused the

           17    way it's written.  It sounds like he didn't obey a --

           18    an order from a sergeant about evidence.

           19    301    Q    Correct.  All right.

10:59:08   20           A    But I don't know what it refers to.

           21    COURT REPORTER:    I'm sorry.  I didn't hear you.

           22           A    I don't know what it refers to; which

           23    case.

           24    302    Q    Did you at all look into what that

10:59:20   25    referred to when you reviewed this?
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

64

| | | | |
|---|---|---|---|
| 10:59:24 | 1 | A | No. |
| | 2 | 303 Q | Okay. |
| | 3 | MR. DAVIS: | I'd like to mark the next one as |
| | 4 | | Exhibit 7. |
| 10:59:30 | 5 | | (REPORTER MARKS ONE-DAY SUSPENSION ORDER AS |
| | 6 | | PLAINTIFF'S EXHIBIT NO. 7 FOR THE PURPOSES OF |
| | 7 | | IDENTIFICATION, AND THE SAME IS ATTACHED |
| | 8 | | HERETO AND FILED HEREWITH) |
| | 9 | 304 Q | Can you identify what that is for the |
| 10:59:54 | 10 | record. | |

10:59:24    1        A    No.

         2    303    Q    Okay.

         3    MR. DAVIS:        I'd like to mark the next one as

         4                     Exhibit 7.

10:59:30    5            (REPORTER MARKS ONE-DAY SUSPENSION ORDER AS

         6            PLAINTIFF'S EXHIBIT NO. 7 FOR THE PURPOSES OF

         7            IDENTIFICATION, AND THE SAME IS ATTACHED

         8            HERETO AND FILED HEREWITH)

         9    304    Q    Can you identify what that is for the

10:59:54   10    record.

        11        A    A one-day suspension order.

        12    305    Q    And the date on that one?

        13        A    It's not signed.  It says it was for an

        14    at-fault accident, operating vehicles, and it happened

11:00:13   15    on the -- well, the Accident Review Board found him at

        16    fault on January 9th, 2017.

        17    306    Q    Okay.  And this document would have been

        18    in his file at the time you review it -- reviewed his

        19    personnel file; is that correct?

11:00:32   20        A    That's correct.

        21    MR. DAVIS:        I would like to mark the next one

        22                     as Exhibit 8.

        23

        24

        25

| | | |
|---|---|---|
| 11:00:53 | 1 | (REPORTER MARKS COVINGTON POLICE DEPARTMENT |
| | 2 | OFFICIAL LETTER OF REPRIMAND AS PLAINTIFF'S |
| | 3 | EXHIBIT NO. 8 FOR THE PURPOSES OF |
| | 4 | IDENTIFICATION, AND THE SAME IS ATTACHED |
| 11:00:53 | 5 | HERETO AND FILED HEREWITH) |

307 Q  Can you identify that for the record?

A  I'm still reading it.

COURT REPORTER:   I'm sorry.  Say it again?  I didn't
hear you.

11:01:18  10  A  I'm still reading it.

COURT REPORTER:   Oh, okay.

A  Yeah, it's an official letter of
reprimand from Chief Jones.

308 Q  And would this document -- would have
11:02:23  15 been -- would this document would have been in
Ullrich's personnel file at time that you reviewed it?

A  Yes.

MR. DAVIS:     I would like to mark this as
Exhibit 9.

11:02:41  20     (REPORTER MARKS MEMORANDUM DATED 3/11/2016,
RE: REQUEST FOR FORMAL DISCIPLINE - OFFICER
ULLRICH AS PLAINTIFF'S EXHIBIT NO. 9 FOR THE
PURPOSES OF IDENTIFICATION, AND THE SAME IS
ATTACHED HERETO AND FILED HEREWITH)

11:03:21  25  309  Q   Can you identify what that is for the

```
11:03:23   1   record?

           2           A     After I review.  Yes, this is the memo

           3   that goes with -- oh, Exhibit 6.

           4   310     Q     Okay.  And what does that memo state?

11:05:19   5           A     It states the request for formal

           6   discipline against Officer Ullrich.

           7   311     Q     Okay.

           8           A     Which the chief did.

           9   312     Q     And that was in the personnel file at

11:05:29  10   the time that you reviewed Doug Ullrich's personnel --

          11           A     (Interrupting) I'm also the author, yes.

          12   313     Q     Okay.  You drafted that?

          13           A     Yes.

          14   314     Q     Okay.

11:05:36  15   MR. DAVIS:         I would like to mark that as

          16                      Exhibit 10.

          17              (REPORTER MARKS COVINGTON POLICE DEPARTMENT

          18              OFFICIAL LETTER OF REPRIMAND FOR OFFICER DOUG

          19              ULLRICH AS PLAINTIFF'S EXHIBIT NO. 10 FOR THE

11:05:38  20              PURPOSES OF IDENTIFICATION, AND THE SAME IS

          21              ATTACHED HERETO AND FILED HEREWITH)

          22   315     Q     Can you identify what that is?

          23           A     Official Letter of Reprimand for

          24   accidents from Chief Jones in 2014.

11:06:33  25   316     Q     And who are they -- who are they for?
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com
67

11:06:37    1          A    Officer Ullrich.

            2    317    Q    All right.  And that was in

            3    Officer Ullrich's file at the time that you reviewed

            4    it as well, correct?

11:06:49    5          A    Yes.

            6    318    Q    Was Officer Ullrich ever promoted while

            7    you were the chief of police?

            8          A    No.

            9    319    Q    Was he ever given a pay raise?

11:07:16   10          A    He's under the FOP, so yes.

           11    320    Q    To your knowledge, has he ever received

           12    anything longer than a two-day suspension?

           13          A    Not that I recall.  Whatever is the last

           14    order is all I would know.

11:07:55   15    321    Q    Was there also an incident that's not

           16    found in the exhibits where Officer Ullrich stated

           17    that he wasn't going to follow any policies?

           18          A    It is in the packets.

           19    322    Q    It's in there?  Which -- which --

11:08:10   20          A    (Interrupting) It doesn't state that.

           21    It states -- oh, it's in 14, I believe.  "He sent an

           22    empty T-chat to other officers stating, 'I violate

           23    every policy.'"

           24    323    Q    And you were at the department at the

11:08:34   25    time that that happened?

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

68

| | | | |
|---|---|---|---|
| 11:08:35 | 1 | A | Yes. |
| | 2 | 324  Q | And what was the discipline that he |
| | 3 | received for -- for stating that -- that in -- |
| | 4 | A | (Interrupting) Sorry. |
| 11:08:46 | 5 | 325  Q | -- in chats to the other officers? |
| | 6 | A | There was one chat -- sorry.  This is |
| | 7 | under Chief Jones, 2014.  He was charged with |
| | 8 | Rule 111, unsatisfactory performance, and he got an |
| | 9 | official letter of reprimand.  I think it's his first |
| 11:09:14 | 10 | one. |
| | 11 | 326  Q | Was he suspended for that? |
| | 12 | A | No, official letter of reprimand. |
| | 13 | 327  Q | Does it say who he sent that chat to? |
| | 14 | A | No. |
| 11:09:28 | 15 | 328  Q | Do you know how many people he sent that |
| | 16 | chat to? |
| | 17 | A | I have no idea. |
| | 18 | 329  Q | What was your role in the department at |
| | 19 | the time that he sent that chat? |
| 11:09:37 | 20 | A | 2014.  Administrative Captain. |
| | 21 | 330  Q | And you are aware that he -- did you |
| | 22 | become aware that he sent that chat? |
| | 23 | A | I would -- it wouldn't be under my -- he |
| | 24 | wasn't under my chain of command.  I was |
| 11:09:54 | 25 | administration.  I was doing accreditation. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

69

```
11:09:56    1   331      Q    Okay.

            2            A    I'm sorry.  I don't -- I think I was in

            3   administration then.  '15, I was the patrol commander.

            4   No, I was the assistant chief.  I'm sorry.  I would --

11:10:14    5   I don't recall where I was.  I'm trying to think

            6   the years.

            7   332      Q    No problem.

            8            A    I was actually captain of patrol.  So he

            9   would have been under me then.

11:10:31   10   COURT REPORTER:    So he would have what?

           11            A    He would have been under me then.  I was

           12   captain of -- I got my years mixed up.  2012 through

           13   2015.  And then I became assistant chief.

           14   333      Q    So you -- you were supervising Ullrich.

11:10:57   15   Do you think that the statement that he made in that

           16   chat was true?

           17            A    No.  I think that's why we addressed it.

           18   It's addressed amongst other things, like completing

           19   paperwork.  Non-duty accident or policy was violated.

11:11:10   20   Poor care and maintenance of the vehicle.  It was

           21   everything that could have been documented in that --

           22   in the evaluation, but, instead, I don't recall, but

           23   Lieutenant Steffen was under me.  We took it a step

           24   larger [sic] and gave it to the chief.

11:11:27   25   334      Q    And so that -- was that Ullrich's first
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

70

| 11:11:31 | 1 | reprimand? |
|---|---|---|
| | 2 | A    I -- if you gave me all of the |
| | 3 | paperwork.  I don't have it all.  This one is from the |
| | 4 | 14th of July.  We're again -- sorry, out of order. |
| 11:11:50 | 5 | That's 18.  And then, yes, that would have been his |
| | 6 | first one.  And then his second one was for another |
| | 7 | at-fault accident in December of '14; both from |
| | 8 | Chief Jones. |
| | 9 | 335    Q    Okay.  So after Ullrich made that |
| 11:12:09 | 10 | statement, he went on and -- and violated policies at |
| | 11 | least four more times; is that correct? |
| | 12 | A    Mostly car wrecks, yeah. |
| | 13 | 336    Q    But after he made that statement, did |
| | 14 | Ullrich go ahead -- go on to violate policies at least |
| 11:12:26 | 15 | four more times; is that correct? |
| | 16 | A    I don't -- I don't think he violated |
| | 17 | that policy anymore, or rule.  I didn't look through |
| | 18 | all -- through them all. |
| | 19 | 337    Q    I'm not specifically talking about that |
| 11:12:35 | 20 | policy.  I'm saying, did he -- after making that |
| | 21 | comment about not following policies, did |
| | 22 | Officer Ullrich proceed to violate policies? |
| | 23 | A    Yes, different ones.  And that's why you |
| | 24 | examine the old ones to see if the corrective action |
| 11:12:54 | 25 | worked.  And if it didn't -- if it carried on to a |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

71

| | | |
|---|---|---|
| 11:12:56 | 1 | different area, then you would punish higher for that. |
| | 2 | 338      Q     Okay. |
| | 3 |          A     So accidents are usually every |
| | 4 | two years.  Two at-fault.  Hence, why you'll see |
| 11:13:06 | 5 | there's breaks in between on the punishments for the |
| | 6 | cars. |
| | 7 | 339      Q     Uh-huh (affirmative).  But there were |
| | 8 | other violations, just not accidents; is that correct? |
| | 9 |          A     Let's see.  This one was the one from -- |
| 11:13:17 | 10 | can I put them in order, because they weren't given to |
| | 11 | me in order? |
| | 12 |           (OFF THE RECORD). |
| | 13 |          A     So this was the unsatisfactory in '14. |
| | 14 | And then '14 again, the operating vehicles were the |
| 11:13:56 | 15 | second one. |
| | 16 | 340      Q     Leave that out.  That's not relevant. |
| | 17 |          A     Then '16 was insubordination.  And '16 |
| | 18 | was operating vehicles again, which was two years from |
| | 19 | the '14s. |
| 11:14:21 | 20 | 341      Q     And as the chief of police, you also |
| | 21 | wrote Ullrich up; is that correct? |
| | 22 |          A     I didn't write all these.  These were |
| | 23 | the other chiefs'. |
| | 24 | 342      Q     No.  When you became chief of police, |
| 11:14:30 | 25 | you also wrote Ullrich up; is that correct? |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

72

```
11:14:33    1             A     That is correct.

            2    343      Q     And what were those for?

            3             A     I have no idea.  I don't recall.

            4    344      Q     Okay.

11:14:44    5    MR. DAVIS:          I think we can take a little

            6                       five-minute break and then I have

            7                       just maybe a couple more questions,

            8                       and we can wrap up.

            9    MS. LANGEN:        Okay.

11:14:55   10    COURT REPORTER:    Off the record at 11:14 a.m.

           11           (OFF THE RECORD).

           12    COURT REPORTER:    I'm back on record.  The time is

           13                       11:24 a.m.

           14    MR. DAVIS:          I think this will be marked as

11:24:50   15                       Exhibit 11.

           16           (REPORTER MARKS MEMO DATED 6/30/2014 AS

           17           PLAINTIFF'S EXHIBIT NO. 11 FOR THE PURPOSES

           18           OF IDENTIFICATION, AND THE SAME IS ATTACHED

           19           HERETO AND FILED HEREWITH)

11:25:10   20    345      Q     If you will please take a look at that,

           21    and then once you've a chance to review it, let me

           22    know what the document is.

           23             A     Okay.

           24    346      Q     Can you let me know what that is?

11:26:18   25             A     Yes.  It looks like it's the memo for --
```

```
11:26:25    1   let's see.  Which one is this?  The unsatisfactory

            2   performance for this discipline on Exhibit 8.

            3   347      Q      Okay.  And at the bottom of that memo,

            4   can you identify all of the areas of unsatisfactory

11:26:55    5   performance that there were?  It should be listed one

            6   to six or seven, I believe.

            7            A      Yeah.  There's one through six.

            8   348      Q      Okay.  And what are they for?

            9            A      He violated -- it says, "Officer Ullrich

11:27:11   10   was counseled by Lieutenant Steffen, June 14

           11   regarding --"

           12   COURT REPORTER:      I'm sorry.  Could you slow down a

           13                        little bit, please.  I'm having a

           14                        hard time understanding you.

11:27:19   15            A      "-- regarding a defensive action report

           16   where he violated the Use of Force policy."

           17   349      Q      Okay.

           18            A      "In June 2014, Officer Gangwish sent an

           19   email to Sergeant Kelly regarding the lack of

11:27:33   20   cleanliness and maintenance as it pertains to

           21   Unit 906, which is shared by Officer Gangwish and

           22   Ullrich.  In June 2014, Michelle Robinson sent an

           23   email to Lieutenant Steffen requesting Officer Ullrich

           24   correct a report number.  On May 26th, 2014, I

11:27:53   25   conducted an in-depth informal discussion with
```

```
11:27:57    1    Officer Ullrich regarding performance issues as it
            2    relates to his patrol duties on Power Shift (attached
            3    paperwork regarding discussion.)"  No. 5.  "On -- or
            4    May 28th, 2014, Dawn Bayless sent an email to
11:28:15    5    Lieutenant Steffen regarding Officer Ullrich's failure
            6    to submit evidence properly.  This occurred just days
            7    after speaking with Officer Ullrich in person
            8    regarding his performance."  No. 6, "On May 22nd,
            9    2014, Officer Ullrich was involved in an on-duty
11:28:33   10    accident where he violated policy."
           11    350    Q    And so at -- at the time that this was
           12    written, were you aware of this document?
           13           A    I'm sorry?
           14    351    Q    At the time this was written, were you
11:28:47   15    aware of the document?
           16    MS. LANGEN:        Which document?
           17    352    Q    Exhibit 11.
           18    MS. LANGEN:        Oh, so you're -- okay.  So you're
           19                       asking him if on June 30th of 2014,
11:28:58   20                       when this document was written, he
           21                       was aware of this document?
           22    MR. DAVIS:         Yes.
           23    MS. LANGEN:        The same document we're talking
           24                       about?
11:29:03   25    MR. DAVIS:         Yes.
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

75

| | | |
|---|---|---|
| 11:29:03 | 1 | MS. LANGEN:        Okay. |
| | 2 | A    I don't recall. |
| | 3 | 353    Q    Did any of those statements come from |
| | 4 | you that were listed in there, one through six? |
| 11:29:24 | 5 | A    I don't see my name. |
| | 6 | 354    Q    Okay.  Did you become aware of this |
| | 7 | document when you disciplined Officer Ullrich in 2017, |
| | 8 | or after? |
| | 9 | A    I would have looked at the discipline |
| 11:29:40 | 10 | sheet.  This should have been with it, but I don't |
| | 11 | know if I would have looked at this memo.  I would |
| | 12 | have looked at what he was disciplined for. |
| | 13 | 355    Q    Okay.  So you did -- you don't know if |
| | 14 | as the chief of police you ever reviewed that |
| 11:29:51 | 15 | document? |
| | 16 | A    I don't recall.  Again, I would have |
| | 17 | been a captain, so that would have moved through me, |
| | 18 | to the assistant chief, to the chief at the time. |
| | 19 | 356    Q    Okay.  And so you should have seen this |
| 11:30:01 | 20 | document -- |
| | 21 | A    (Interrupting) That is correct. |
| | 22 | 357    Q    -- in 2014?  And you should have |
| | 23 | reviewed it again in 2017? |
| | 24 | A    That is correct. |
| 11:30:05 | 25 | 358    Q    Okay. |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

76

```
11:30:08    1    MR. DAVIS:          And this is going to be Exhibit 12,

            2                        please.

            3               (REPORTER MARKS MEMO DATED 6/29/2014 AS

            4               PLAINTIFF'S EXHIBIT NO. 12 FOR THE PURPOSES

11:30:11    5               OF IDENTIFICATION, AND THE SAME IS ATTACHED

            6               HERETO AND FILED HEREWITH)

            7    359    Q    If you would please take a look at that

            8    document and let me know what it is once you've had

            9    time -- a chance to review it.

11:31:28   10               A    I've read it.

           11    360    Q    Can you tell us what that document is?

           12               A    Yes.  It's another memo that goes with

           13    the memo, Exhibit 11, for the discipline.  They're

           14    together.  They're dated one day apart.  They would

11:31:42   15    have been the two sergeants underneath Lieutenant

           16    Steffen.

           17    361    Q    Okay.  And as a captain -- were you a

           18    captain at this time?

           19               A    I believe so, yes.

11:31:52   20    362    Q    Okay.  So you should have seen this

           21    document come through your office as the captain of

           22    the chief of police?

           23               A    Correct.  And forwarded up to the chief

           24    for the discipline, yes.

11:32:01   25    363    Q    Okay.  And you should have also reviewed
```

```
11:32:03   1   this document as the chief of police, when you looked

           2   in Ullrich's personnel file; is that correct?

           3        A    That's correct.

           4   364   Q    All right.  And in this document, is it

11:32:11   5   stating that Ullrich failed to admit or to log

           6   evidence?

           7        A    He left the evidence in the car when it

           8   was towed, instead of logging it.

           9   365   Q    Okay.  So -- but he didn't log it.

11:32:32  10        A    Correct.  He believed he didn't have to

          11   take it out of the car for some reason.

          12   366   Q    Okay.  And so that was -- and that was

          13   $800 in cash; is that correct?

          14        A    "While I was inventorying the

11:32:42  15   vehicle --" this in Sergeant Rose "-- I located in the

          16   center console a wallet that contained an Ohio OL,

          17   PNC Bank card, SSN card, CCDW license, and various

          18   other papers.  Also located in the center console was

          19   $800 cash.  I took all items and logged them in

11:33:01  20   property in the Covington Police Department evidence

          21   room.  Sometime later I received a call from

          22   Officer Ullrich.  During our conversation I asked him

          23   why he did not remove the items and log them.  He

          24   stated that he did not know that he needed to."

11:33:20  25   367   Q    Does he also state that he wasn't
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

78

| | | |
|---|---|---|
| 11:33:23 | 1 | trained to do that in there? |
| | 2 | A    Let's see.  "I asked him why he did not |
| | 3 | remove --"  "I asked him --" this is Sergeant Rose "-- |
| | 4 | if anyone had taught him when he was in training that |
| 11:33:33 | 5 | we do not leave items of value in vehicles when we tow |
| | 6 | them.  Officer Ullrich stated no.  Officer Ullrich |
| | 7 | then stated that Sergeant Bohman was there while he |
| | 8 | searched the vehicle and never said anything about |
| | 9 | it." |
| 11:33:46 | 10 | 368    Q    Okay.  Earlier in your description -- |
| | 11 | and I don't want to misrepresent anything that you've |
| | 12 | said.  But there were statements regarding an |
| | 13 | Incident 1, Anthony Wynn's verbal -- the verbal words |
| | 14 | or verbal remarks that he was making towards officers. |
| 11:34:28 | 15 | And in Incident 2, there were also verbal remarks that |
| | 16 | were made towards the officers.  Can you describe, |
| | 17 | from your perspective, what those remarks were or |
| | 18 | how -- the tone of those remarks? |
| | 19 | A    I have no idea what the exact words |
| 11:34:45 | 20 | were.  They were an aggression. |
| | 21 | 369    Q    Okay.  You identify those as aggressive? |
| | 22 | A    Words of aggression or somebody thinking |
| | 23 | about fight or flight. |
| | 24 | 370    Q    Uh-huh (affirmative).  And how about |
| 11:34:56 | 25 | the -- the -- the tone of the words?  Were they |

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

79

| | | | |
|---|---|---|---|
| 11:34:58 | 1 | | high pitched?  Lower?  What do you recall? |
| | 2 | | A    I don't recall. |
| | 3 | 371 | Q    Uh-huh (affirmative). |
| | 4 | | A    I watched the video with you the first |
| 11:35:05 | 5 | | time.  It was snips, and I don't recall the body cam |
| | 6 | | at all, from -- I just know it was a fight.  It was... |
| | 7 | 372 | Q    Okay.  Yeah.  Prior to there being any |
| | 8 | | physical altercation, do you remember there being any |
| | 9 | | words or things stated? |
| 11:35:22 | 10 | | A    I don't recall what was stated. |
| | 11 | 373 | Q    Okay.  And you -- you do -- do you |
| | 12 | | recall the tone of any of those words? |
| | 13 | | A    Aggression. |
| | 14 | 374 | Q    Okay, aggression.  I would like to |
| 11:35:33 | 15 | | introduce -- I think the (UNINTELLIGIBLE) procedures. |
| | 16 | | Yeah, if you go back to Exhibit 1, it should be the |
| | 17 | | traffic stop procedures.  Yep, that's it. |
| | 18 | | MS. LANGEN:      I think 1 is the transcript from |
| | 19 | | last depo. |
| 11:36:08 | 20 | | A    It's 4. |
| | 21 | 375 | Q    Oh, 4.  You're correct.  Traffic...  Do |
| | 22 | | you have that? |
| | 23 | | A    Yes. |
| | 24 | 376 | Q    And if you look at No. 8 on Page 13. |
| 11:36:18 | 25 | | A    Yes. |

| 11:36:23 | 1 | 377    Q    Do you know what that section is in |
| | 2 | regards to? |
| | 3 | A    Special Considerations. |
| | 4 | 378    Q    And what -- and what are Special |
| 11:36:29 | 5 | Considerations, based on your understanding of the |
| | 6 | policies? |
| | 7 | A    Understanding everybody's differences. |
| | 8 | They could be deaf, they could be blind, they could be |
| | 9 | from another country, and they could be a different |
| 11:36:41 | 10 | culture. |
| | 11 | 379    Q    Okay.  All right.  And during your time |
| | 12 | as a chief of police, did you train your officers on |
| | 13 | how to manage different cultures or people from |
| | 14 | different backgrounds? |
| 11:36:55 | 15 | A    I can't remember when the -- it's |
| | 16 | through our regular training, through our power DMS, |
| | 17 | through video, and through the city.  But there's |
| | 18 | also -- the human rights commission leader would come |
| | 19 | in, John, and he would do a presentation, but I don't |
| 11:37:10 | 20 | remember what year that was. |
| | 21 | 380    Q    Okay.  And to be clear, there was |
| | 22 | supposed to be some cultural awareness and |
| | 23 | differences.  The way people may talk from other |
| | 24 | cultures, may talk more loudly than other cultures and |
| 11:37:26 | 25 | things of that nature.  Is that in the policy? |

| | | |
|---|---|---|
| 11:37:29 | 1 | A    Yes. |
| | 2 | 381    Q    Okay. |
| | 3 | COURT REPORTER:    Did you say indifferences or and |
| | 4 | differences? |
| 11:37:41 | 5 | MR. DAVIS:    And -- and -- and differences. |
| | 6 | COURT REPORTER:    Okay. |
| | 7 | MR. DAVIS:    All right.  I don't have any other |
| | 8 | questions at this time. |
| | 9 | MS. LANGEN:    I don't have any questions for you |
| 11:37:44 | 10 | at all.  Okay.  We're good. |
| | 11 | COURT REPORTER:    I'm going off the record at |
| | 12 | 11:37 a.m. |
| | 13 | * * * * * * * * * |
| | 14 | THEREUPON, the taking of the deposition of |
| 11:37:50 | 15 | OFFICER ROBERT NADER concluded at 11:37 a.m. |
| | 16 | * * * * * * * * * |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1  STATE OF KENTUCKY )
                      )
 2  COUNTY OF FAYETTE )

 3           I, NATALIE R. DOMANICO, the undersigned

 4  Notary Public in and for the State of Kentucky at

 5  Large, do hereby certify that OFFICER ROBERT NADER, the

 6  aforesaid deponent, was by me first duly sworn to

 7  testify the truth, the whole truth, and nothing but the

 8  truth in the case of ANTHONY MARIO WYNN, Plaintiff, vs.

 9  CITY OF COVINGTON, ET AL., Defendant,

10  No. 2:21-CV-00137-DBL-CJS, now pending in the United

11  States District Court for the Eastern District of

12  Kentucky at Covington.

13           That the foregoing deposition was taken down

14  in stenotype by me and afterwards reduced to

15  computer-aided transcription under my direction, and

16  the typewritten transcript is a true record of the

17  testimony given by said witness.

18           Defendant to said action and counsel for the

19  deponent requested in writing that said deposition be

20  signed by the testifying witness.

21            I further certify that said deposition

22  was submitted to the witness by email to his counsel

23  for his reading and signature on or about the 3rd day

24  of April, 2024.

25           That the Defendants, were represented by
```

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

83

1  their counsel, Hon. Jennifer Langen and Hon. Sheree E.

2  Weichold, at the taking of said deposition; that the

3  Plaintiff was represented by his counsel, Hon. Jamir

4  Davis; that there were no other appearances.  That said

5  deposition was taken on behalf of the Plaintiff

6  pursuant to Notice, and pursuant to the Federal Rules

7  of Civil Procedure for the District Courts of the

8  United States.

9          Pursuant to KRS 454.280, I certify that I am

10  not related to nor employed by, nor do I have any

11  contractual or any other financial relationship with

12  any person or entity interested in the outcome of this

13  litigation or their respective counsel and have no

14  interest whatsoever in this litigation.  I further

15  certify that Domanico Reporting, Inc. is independently

16  owned and operated.  We do not cost shift or contract

17  services.

18          My commission expires:  February 13, 2028.

19  IN TESTIMONY WHEREOF, I have hereunto set my

20  hand and seal of office on this the 29th day of March

21  2024.

22  ____\S:\Natalie R. Domanico_____
    NOTARY ID KYNP1983 NATALIE R. DOMANICO, CCR-KY, RPR

23

24

25

DOMANICO REPORTING, INC.
Natalie R. Domanico, RPR CCR(KY)
565 Madison Point Drive
Lexington, Kentucky  40515
www.domanicoreporting.com

84

COURT REPORTER: [14]
12/19 16/3 16/15 53/7
64/21 66/8 66/11 70/10
73/10 73/12 74/12 82/3
82/6 82/11
MR. DAVIS: [41]  8/14 8/20
8/23 9/21 11/10 12/12
12/15 14/14 15/18 15/21
15/23 18/15 24/3 27/24
28/1 28/5 28/12 28/20
29/11 29/13 29/18 38/8
38/25 47/8 47/13 53/18
53/22 61/19 61/25 64/1
65/3 65/21 66/18 67/15
73/5 73/14 75/22 75/25
77/1 82/5 82/7
MS. LANGEN: [53]  8/11
8/19 8/21 8/25 9/17 10/1
10/25 11/16 12/10 12/13
12/16 12/20 13/20 15/20
15/22 15/25 18/14 23/4
26/18 26/20 26/22 26/25
27/23 27/25 28/2 28/9
28/15 29/7 29/12 29/15
29/19 30/5 31/4 31/7 37/10
37/16 38/9 38/24 47/6 47/9
47/14 53/16 53/20 61/2
61/15 61/21 73/9 75/16
75/18 75/23 76/1 80/18
82/9
MS. WEICHOLD: [1]  47/17

$
$800 [2]  78/13 78/19
$800 cash [1]  78/19
$800 in [1]  78/13

'
'14 [3]  71/7 72/13 72/14
'14s [1]  72/19
'15 [1]  70/3
'16 [2]  72/17 72/17
'16 was [1]  72/17
'I [1]  68/22

-
-- I [1]  78/15

1
10 [2]  67/16 67/19
11 [7]  1/13 2/7 4/13 73/15
73/17 75/17 77/13
111 [1]  69/8
117 [1]  64/13
11:14 a.m [1]  73/10
11:24 a.m [1]  73/13
11:37 [1]  82/15
11:37 a.m [1]  82/12
12 [2]  77/1 77/4
122123 [1]  3/3
13 [2]  80/24 84/18
138 [1]  14/25
14 [3]  45/4 68/21 74/10
14th [1]  71/4
15 [1]  53/17
16th [11]  7/20 23/1 23/6
24/13 24/24 38/23 50/17
50/23 52/3 54/4 55/14

18 [4]  71/5
1st [10]  7/16 7/23 8/3 8/10
8/18 9/2 10/24 39/16 41/18
55/10

2
20 [1]  3/16
2012 [1]  70/12
2014 [14]  4/24 4/25 67/24
69/7 69/20 73/16 74/18
74/22 74/24 75/4 75/9
75/19 76/22 77/3
2015 [1]  70/13
2016 [2]  4/20 66/20
2017 [4]  13/14 65/16 76/7
76/23
2018 [2]  16/19 18/13
2021 [25]  7/15 7/24 8/3
8/10 8/18 10/21 10/24
11/15 12/6 23/1 24/13
24/24 38/23 39/16 41/18
42/22 50/14 50/17 50/20
50/23 52/3 53/25 54/4
55/11 55/14
2022 [1]  13/14
2024 [4]  1/13 2/7 83/24
84/21
2028 [1]  84/18
22nd [1]  75/8
23 [1]  4/13
2311 [1]  3/17
2318 [1]  3/17
24 [1]  53/22
24 hours [2]  53/11 56/18
24/7/365 [1]  56/9
2427 [1]  10/17
26th [1]  74/24
28th [1]  75/4
292-2311 [1]  3/17
292-2318 [1]  3/17
29th [1]  84/20
2:21-CV-00137-DBL-CJS [1]
1/2

3
3/11/2016 [2]  4/20 66/20
30th [2]  16/17 75/19
365 [1]  56/9
3rd [1]  83/23

4
40 [2]  2/6 3/9
41011 [3]  3/3 3/10 3/16
454.280 [1]  84/9

5
5th [3]  44/15 45/6 45/6

6
6 a.m [1]  53/5
6/29/2014 [2]  4/25 77/3
6/30/2014 [2]  4/24 73/16
60,000 [1]  46/14
66 [3]  4/14 38/15 38/17

7
78 [1]  9/5
78-80 [2]  4/9 9/8

8
80 [6]  4/9 9/5 9/8 9/16 9/24
53/17
859 [2]  3/17 3/17

9
906 [1]  74/21
911 [1]  47/3
96 [1]  4/5
9:04 [2]  1/14 2/8
9th [1]  65/16

A
a.m [7]  1/14 2/8 53/5 73/10
73/13 82/12 82/15
ABC [1]  3/15
able [1]  23/18
about [43]  5/6 10/13 11/8
17/14 17/20 20/9 26/3
28/10 28/11 29/16 32/14
34/3 34/13 36/24 37/13
39/17 40/10 42/9 42/11
42/12 42/20 43/17 43/21
45/4 46/11 46/13 46/25
48/10 51/6 51/7 53/17 54/9
54/19 57/24 61/16 64/18
71/19 71/21 75/24 79/8
79/23 79/24 83/23
above [1]  62/6
accident [6]  15/8 65/14
65/15 70/19 71/7 75/10
accidents [7]  15/10 15/13
15/14 15/16 67/24 72/3
72/8
according [4]  15/12 41/11
53/23 54/2
accreditation [3]  36/18
36/19 69/25
accurately [1]  6/17
acknowledge [3]  10/3 10/5
10/8
acted [1]  30/1
action [6]  12/24 13/3 58/16
71/24 74/15 83/18
actions [3]  37/7 37/8 37/14
actually [4]  22/25 23/13
34/23 70/8
ADAMS [2]  2/6 3/9
adamsattorneys.com [1]
3/10
addendum [8]  4/12 16/4
16/12 58/19 58/22 59/15
59/19 60/6
addressed [2]  70/17 70/18
admin [1]  20/19
administration [4]  21/20
21/23 69/25 70/3
Administrative [1]  69/20
Administrator [1]  3/15
admit [1]  78/5
Affairs [11]  7/6 20/20 20/21
22/7 28/7 34/16 34/18 35/5
36/1 36/13 39/8
affirmative [9]  18/18 20/1
35/24 52/11 58/8 60/4 72/7
79/24 80/3
affirmatively [2]  45/24 49/2
aforesaid [1]  83/6
African [1]  30/23

after [13]  5/1 23/6 23/6 51/3
57/17 59/5 60/25 67/2 71/9
71/13 71/20 75/7 76/8
afterwards [2]  49/12 83/14
again [18]  10/13 11/23
16/22 21/12 29/24 36/16
40/9 42/8 43/17 46/25 53/9
62/23 66/8 71/4 72/14
72/18 76/16 76/23
against [9]  12/25 13/4 21/2
21/10 31/9 37/7 37/8 37/14
67/6
aggression [4]  79/20 79/22
80/13 80/14
aggressive [1]  79/21
ago [3]  10/14 34/21 57/6
ahead [4]  29/22 37/11 62/1
71/14
aided [1]  83/15
AL [3]  1/9 3/12 83/9
alcohol [1]  6/12
all [50]  2/11 5/12 6/5 10/19
11/25 13/9 17/7 18/2 22/22
24/25 27/17 30/8 30/16
32/2 32/4 32/5 34/13 34/22
38/7 38/9 38/11 39/6 39/15
40/5 45/7 52/16 53/8 54/16
55/1 56/1 57/7 57/8 57/19
61/11 64/19 64/24 68/2
68/14 71/3 71/13 71/18
71/18 72/22 74/4 78/4
78/19 80/6 81/11 82/7
82/10
allow [1]  5/19
allowable [3]  29/14 29/17
41/13
allowed [5]  30/7 30/9 32/16
32/20 42/6
allows [1]  49/24
already [1]  40/2
also [14]  5/15 5/18 6/10
38/13 41/25 67/11 68/15
72/20 72/25 77/25 78/18
78/25 79/15 81/18
altercation [3]  20/13 21/15
80/8
Although [1]  6/5
always [4]  41/3 41/9 53/3
62/10
am [3]  7/18 8/1 84/9
American [1]  30/23
amongst [1]  70/18
another [5]  19/18 20/2 71/6
77/12 81/9
answer [21]  5/13 6/3 6/4
6/5 8/8 8/16 8/24 8/25
13/20 17/3 26/20 28/18
29/3 29/18 29/20 30/5 31/4
31/7 44/17 45/4 61/3
answered [1]  9/23
answering [4]  5/17 29/19
42/2 43/5
answers [1]  8/12
ANTHONY [16]  1/6 3/5 5/8
24/24 27/5 27/8 27/11
27/14 30/3 50/15 50/18
50/21 50/24 54/3 79/13
83/8
Anthony's [1]  53/24
any [59]  5/13 5/15 5/17

## A

any... [56]  5/19 6/11 6/12
7/1 7/12 12/24 13/3 19/6
21/1 23/5 32/6 32/9 32/17
33/5 33/11 33/13 35/13
36/2 36/8 36/11 37/2 37/6
37/8 37/14 37/18 37/21
37/23 38/4 39/12 40/8 43/9
44/6 46/1 48/13 50/21
50/24 51/4 51/8 53/9 55/11
55/15 55/24 56/4 60/20
60/21 61/13 68/17 76/3
80/7 80/8 80/12 82/7 82/9
84/10 84/11 84/12
anymore [3]  37/4 39/7
71/17
anyone [3]  54/2 55/18 79/4
anything [9]  6/16 43/10 45/9
46/25 51/7 57/3 68/12 79/8
79/11
apart [1]  77/14
apartment [2]  40/5 42/4
appearances [2]  2/18 84/4
appears [1]  16/13
appropriately [1]  25/10
approximate [1]  2/8
April [2]  16/17 83/24
April 30th [1]  16/17
archived [1]  32/3
are [41]  6/3 6/6 6/8 6/15
6/23 7/20 7/24 8/11 10/25
11/2 11/5 12/10 12/17
12/24 13/3 14/21 15/20
16/8 19/22 22/5 28/21 29/7
31/22 37/6 37/14 38/3
38/12 42/19 43/18 49/20
52/20 53/16 54/25 55/1
56/14 67/25 67/25 69/21
72/3 74/8 81/4
area [1]  72/1
areas [1]  74/4
argue [1]  61/22
argument [2]  20/6 20/9
arms [1]  33/10
arrest [2]  23/13 23/19 45/17
47/19 48/20 50/5 51/6
arrested [4]  23/13 46/3 48/4
48/8
arresting [2]  45/15 51/5
arrests [2]  47/24 48/2
as [57]  2/11 5/2 6/7 7/16
7/20 9/8 11/24 13/8 14/14
14/17 16/4 18/8 21/10 24/3
24/6 25/17 35/6 35/16 36/3
36/13 38/15 38/18 39/13
42/15 49/17 49/17 49/20
52/8 52/20 53/9 53/24 54/3
55/17 63/19 64/1 64/3 65/3
65/5 65/22 66/2 66/18
66/22 67/15 67/19 68/4
72/20 73/14 73/16 74/20
75/1 76/14 77/3 77/17
77/21 78/1 79/21 81/12
aside [1]  12/11
ask [13]  5/16 5/20 6/2 9/18
28/9 30/3 30/7 30/15 30/17
30/18 31/2 31/3 31/3 46/8
asked [8]  8/16 27/11 29/8
30/14 30/16 78/22 79/2

79/3
asking [17]  8/11 8/14 10/25
11/2 11/2 11/5 11/9 11/10
11/17 19/22 27/24 28/12
32/7 32/10 42/12 58/10
75/19
assistant [6]  3/15 17/6
52/18 70/4 70/13 76/18
at [88]
at-fault [5]  15/8 15/9 64/14
71/7 72/4
attached [13]  9/10 14/19
16/6 24/7 38/20 64/5 65/7
66/4 66/24 67/21 73/18
75/2 77/5
attention [12]  20/18 50/8
50/11 50/21 50/24 51/2
51/24 56/15 56/22 57/3
58/24 59/16
attorney [3]  6/4 6/22 6/23
ATTORNEYS [3]  3/5 3/11
3/19
author [1]  67/11
aware [13]  7/24 8/1 12/24
13/3 17/13 62/8 62/10
69/21 69/22 75/12 75/15
75/21 76/6
awareness [1]  81/22
away [1]  44/18

## B

back [12]  15/23 16/2 20/6
20/11 26/1 43/17 47/9
53/12 58/11 58/12 73/12
80/16
backgrounds [1]  81/14
Bank [1]  78/17
based [10]  11/10 11/16
12/6 19/19 28/12 30/25
43/24 55/23 56/3 81/5
basis [5]  29/8 29/10 29/19
61/23 63/9
Bayless [1]  75/4
be [35]  6/7 11/7 14/1 22/10
25/16 31/9 31/18 33/24
35/4 39/3 40/18 40/21
47/15 48/19 49/21 49/23
51/12 51/19 52/25 55/5
58/6 59/19 60/10 69/23
73/14 74/5 77/1 80/16 81/8
81/8 81/8 81/9 81/21 81/22
83/19
became [3]  23/15 70/13
72/24
because [18]  20/6 23/17
26/2 28/2 28/5 29/1 34/16
34/18 34/20 42/3 42/15
47/10 55/20 59/16 61/7
62/5 62/18 72/10
become [2]  62/8 69/22 76/6
becomes [1]  22/15
been [23]  31/1 43/8 45/5
45/7 46/7 51/1 56/13 62/2
62/23 63/9 63/11 63/16
64/8 65/17 66/15 66/15
70/9 70/11 70/21 71/5
76/10 76/17 77/15
before [11]  2/3 5/9 5/18
6/10 11/25 38/11 40/11
56/18 56/18 56/18 62/25

begin [2]  5/6 6/10
behalf [6]  2/6 2/16 3/7 30/2
30/2 84/5
being [13]  5/2 19/17 29/16
37/20 37/25 42/21 48/4
48/7 48/20 50/4 58/25 80/7
80/8
believe [22]  13/22 13/25
20/23 26/16 26/17 33/7
33/11 34/4 34/10 34/10
38/15 47/22 48/10 48/17
48/25 54/18 55/22 56/13
58/24 68/21 74/6 77/19
believed [1]  78/10
besides [1]  37/7
better [1]  57/20
between [2]  21/15 72/5
bias [1]  31/10
big [1]  20/5
bit [1]  74/13
black [1]  31/2
blaring [1]  43/5
blind [1]  81/8
blocks [1]  44/18
Board [1]  65/15
body [17]  7/12 23/2 31/19
31/25 32/1 33/19 34/19
35/7 36/4 36/5 37/19 37/24
38/4 44/6 44/9 50/2 80/5
body-worn [11]  7/12 23/2
31/19 33/19 35/7 36/5
37/19 37/24 38/4 44/6 50/2
Bohman [1]  79/7
book [1]  32/2
both [4]  18/23 20/19 23/16
71/7
bottom [1]  74/3
Box [1]  3/3
brawl [1]  35/3
break [5]  5/15 5/16 5/18
38/8 73/6
breaks [1]  72/5
bringing [1]  42/11
broke [1]  20/12
brother [1]  23/11
brother's [1]  23/11
brought [4]  21/2 21/10
58/24 59/16
burglary [1]  58/7
business [1]  56/9
but [44]  14/1 17/20 20/25
23/6 23/11 25/24 26/16
29/2 29/7 30/9 34/21 37/10
39/10 41/15 41/23 43/9
44/10 45/8 45/9 47/11
48/16 49/15 49/21 52/12
52/19 53/1 55/18 55/23
56/12 57/18 59/25 60/5
60/11 64/20 70/22 70/22
71/13 72/7 76/10 78/9
79/12 81/17 81/19 83/7
button [1]  23/17

## C

CALEA [1]  36/18
call [8]  23/17 36/16 47/3
51/12 57/15 58/10 58/11
78/21
called [4]  20/14 34/11 53/8
59/18

calling [1]  57/7
calls [4]  34/12 46/14 46/17
54/11
cam [3]  31/25 32/1 80/5
came [5]  20/18 34/24 45/9
51/10 54/10
camera [1]  7/12 23/3
31/19 33/19 34/19 35/7
35/9 36/5 37/19 37/24 38/4
44/6 50/3
cams [1]  44/9
can [52]  5/15 5/21 5/24
8/21 11/7 12/13 12/15
13/20 14/1 14/24 15/2
16/11 16/22 24/25 26/1
28/15 28/18 28/20 28/24
29/4 29/18 29/20 30/5 31/4
31/7 35/21 36/8 41/4 42/2
43/2 43/6 46/1 46/19 46/22
49/11 49/21 53/12 53/13
57/7 61/2 64/10 65/9 66/6
66/25 67/22 72/10 73/5
73/8 73/24 74/4 77/11
79/16
can't [6]  43/9 45/9 54/8 56/6
61/11 81/15
captain [10]  17/5 52/17
52/17 69/20 70/8 70/12
76/17 77/17 77/18 77/21
captain's [1]  20/23
captains [1]  59/17
captured [1]  22/1
car [5]  20/10 23/12 71/12
78/7 78/11
card [2]  78/17 78/17
care [1]  70/20
career [1]  45/8
carried [2]  23/25 71/25
cars [2]  30/16 72/6
Carter [1]  64/13
case [5]  1/2 42/11 49/23
64/23 83/8
cash [2]  78/13 78/19
catch [3]  56/15 56/22 57/3
CCDW [1]  78/17
CCR [1]  84/22
CCR-KY [1]  84/22
cease [1]  42/3
center [2]  78/16 78/18
certify [4]  83/5 83/21 84/9
84/15
chain [2]  17/6 69/24
chance [2]  73/21 77/9
changed [1]  36/19
changes [1]  36/18
charged [1]  69/7
charges [4]  21/1 21/2 21/3
21/9
chat [7]  68/22 69/6 69/13
69/16 69/19 69/22 70/16
chats [1]  69/5
check [4]  46/19 47/12 63/3
checked [1]  63/5
chief [55]  11/24 13/1 13/6
13/8 13/10 13/12 13/17
14/9 17/6 18/7 22/20 32/8
35/6 36/3 36/13 40/19
40/21 40/25 41/22 42/15
44/3 44/3 44/8 47/20
48/12 49/18 52/18 52/20

## C

chief... [27]  52/24 56/20
 58/2 60/8 60/18 60/22
 60/24 63/19 64/13 66/13
 67/8 67/24 68/7 69/7 70/4
 70/13 70/24 71/8 72/20
 72/24 76/14 76/18 76/18
 77/22 77/23 78/1 81/12
Chief Jones [2]  67/24 71/8
chief's [1]  62/11
chiefs' [1]  72/23
choked [1]  36/6
chokehold [3]  36/16 37/20
 39/10
chokeholds [1]  39/4
choking [1]  36/12
choose [2]  22/16 22/17
church [1]  57/17
circumstance [1]  39/11
circumstances [4]  12/3
 41/15 41/17 41/21
citation [4]  25/10 25/20
 25/22 25/25
citations [2]  47/25 48/2
citizen [14]  35/8 35/13
 35/17 36/22 37/3 37/20
 37/24 44/12 47/19 48/15
 48/19 51/2 51/23 52/7
citizens [9]  31/2 31/3 37/9
 37/15 48/4 48/7 49/17 50/8
 50/11
city [11]  1/9 3/12 3/15 3/19
 36/4 41/22 47/21 62/4 62/6
 81/17 83/9
civil [5]  2/12 37/7 37/8
 37/14 84/7
CJS [2]  1/2 83/10
clean [1]  5/21
cleanliness [1]  74/20
clear [6]  7/14 25/25 29/16
 59/20 60/5 81/21
clip [1]  34/2
clips [6]  10/18 12/2 39/18
 39/20 39/24 40/1
come [6]  15/23 46/19 56/14
 76/3 77/21 81/18
comes [1]  58/9
command [2]  17/6 69/24
commander [1]  70/3
commencing [1]  2/7
comment [2]  17/18 71/21
comments [2]  17/14 63/14
commission [1]  62/7 81/18
 84/18
Commissioner [3]  34/9
 34/10 34/17
commissioners [2]  34/20
 54/12
complain [2]  50/12 51/24
complainant [1]  58/10
complained [3]  50/15 50/18
 51/3
complaint [2]  38/5 42/10
complete [1]  49/18
completing [2]  49/20 70/18
complex [1]  42/4
computer [1]  83/15
computer-aided [1]  83/15
concluded [1]  82/15

## conduct

conduct [4]  21/10 41/25
 45/16 45/18
conducted [1]  74/25
conducting [1]  49/8
confused [1]  64/16
Considerations [2]  81/3
 81/5
console [1]  78/16 78/18
contact [1]  43/7
contacted [3]  34/1 34/9
 34/25
contained [1]  78/16
context [2]  11/8 17/23
continue [1]  12/21
continuing [1]  5/10
contract [1]  84/16
contractual [1]  84/11
conversation [3]  59/21 60/3
 78/22
copy [2]  12/14 15/25
correct [67]  9/16 9/25 10/10
 17/10 17/12 17/13 18/11
 18/12 18/16 18/17 18/20
 18/21 25/14 25/15 27/6
 27/7 27/12 27/13 27/15
 27/16 31/20 39/4 40/4
 40/23 42/16 42/17 42/18
 42/24 45/22 51/21 55/2
 55/3 55/12 55/13 55/15
 56/5 56/16 56/23 56/24
 57/5 58/17 58/18 58/20
 58/21 59/3 59/24 60/12
 60/13 64/19 65/19 65/20
 68/4 71/1 71/15 72/8
 72/21 72/25 73/1 74/24
 76/21 76/24 77/23 78/2
 78/3 78/10 78/13 80/21
corrective [1]  71/24
cost [1]  84/16
could [17]  13/25 40/20
 42/23 43/13 44/9 44/17
 48/19 49/21 52/25 58/8
 58/12 70/21 74/12 81/8
 81/8 81/8 81/9
counsel [5]  83/18 83/22
 84/1 84/3 84/13
counseled [1]  74/10
country [1]  81/9
county [3]  7/9 47/16 83/2
couple [3]  10/13 45/23 73/7
course [2]  25/6 62/4
court [7]  1/1 5/11 5/19 6/7
 16/2 42/1 83/11
courts [2]  48/22 84/7
covered [1]  48/17
COVINGTON [33]  1/2 1/9
 2/6 3/3 3/10 3/12 3/16 3/19
 4/10 4/15 4/18 4/22 14/16
 15/10 26/11 27/17 36/4
 37/15 37/20 37/24 37/25
 41/22 44/12 47/16 47/17
 47/21 60/17 64/2 66/1
 67/17 78/20 83/9 83/12
covingtonky.gov [1]  3/18
crimes [1]  53/9
criminal [1]  21/2
crowd [1]  23/18
cuff [1]  17/18
cultural [1]  81/22
culture [1]  81/10

## cultures

cultures [3]  81/13 81/24
 87/21
currently [3]  6/11 37/2 37/5
custodian [1]  47/17
custody [1]  50/8
customary [1]  19/4
CV [2]  1/2 83/10

## D

darn [1]  44/16
data [2]  31/23 31/25
date [4]  1/13 26/14 29/5
 65/12
dated [7]  4/20 4/24 4/25
 66/20 73/16 77/3 77/14
dating [1]  20/3
Davis [5]  3/2 3/2 5/5 5/7
 84/4
Dawn [1]  75/4
day [10]  4/17 53/9 59/5
 64/12 65/5 65/11 68/12
 77/14 83/23 84/20
days [1]  75/6
DBL [2]  1/2 83/10
deaf [1]  81/8
death [3]  52/9 52/15 52/21
December [1]  71/7
decision [3]  11/25 29/4 35/1
decisions [1]  60/16
deemed [1]  57/4
DEFENDANT [4]  3/11 3/19
 83/9 83/18
DEFENDANTS [1]  1/10
 83/25
defensive [1]  74/15
defines [1]  52/23
definition [4]  41/20 41/21
 49/4 49/22
department [31]  3/14 4/10
 4/15 4/18 4/22 13/10 14/16
 15/11 19/8 23/25 26/8
 26/12 27/18 30/10 31/1
 31/24 42/13 43/12 49/17
 54/6 54/15 54/19 55/2
 55/18 60/17 64/2 66/1
 67/17 68/24 69/18 78/20
department's [1]  30/2
depends [1]  43/1
depict [2]  39/20 39/24
depo [1]  80/19
deponent [2]  83/6 83/19
deposition [29]  1/6 2/2 2/8
 4/8 5/6 5/9 6/2 6/19 7/18
 8/5 8/7 8/13 8/20 8/25 9/7
 9/20 11/24 12/23 28/23
 28/23 29/14 39/19 40/10
 82/14 83/13 83/19 83/21
 84/2 84/5
depth [1]  74/25
describe [3]  15/2 16/11
 79/16
description [1]  79/10
desk [1]  34/11
details [1]  59/4
detain [3]  49/11 49/17
 49/21
detained [2]  48/19 50/4
detaining [1]  48/14
detective [1]  58/11
detectives [1]  41/5

## determine

determine [1]  49/12
determined [2]  48/22 49/23
did [89]
Did the [1]  10/23
didn't [17]  10/13 12/20
 32/16 42/9 46/25 54/23
 55/24 56/7 58/11 64/17
 64/21 66/8 71/17 71/25
 72/22 78/9 78/10
died [1]  52/10
differences [4]  81/7 81/23
 82/4 82/5
different [9]  21/7 21/12
 42/25 43/7 71/23 72/1 81/9
 81/13 81/14
direct [4]  3/17 5/4 51/14
 51/17
direction [1]  83/15
directly [3]  16/25 17/1 18/4
disciplinary [5]  12/24 13/3
 19/3 19/7 58/16
discipline [24]  4/21 13/16
 14/2 14/5 14/8 16/13 18/9
 18/25 19/10 19/16 22/14
 22/14 22/19 32/16 62/18
 63/2 63/9 66/21 67/6 69/2
 74/2 76/9 77/3 77/24
disciplined [7]  14/11 19/13
 39/13 60/13 62/24 76/7
 76/12
discovery [3]  2/10 47/3
 47/10
discrimination [2]  31/10
 31/12
discussing [2]  38/12 38/14
discussion [2]  74/25 75/3
disorderly [4]  21/9 41/25
 45/16 45/17
dispatched [1]  42/9
DISTRICT [5]  1/1 1/1 83/11
 83/11 84/7
disturbance [9]  42/24 43/1
 43/13 43/14 43/22 44/13
 45/21 46/3 46/17
disturbances [1]  44/2
DMS [1]  81/16
do [106]
document [23]  14/21 15/2
 16/8 25/9 64/10 65/17
 66/14 66/15 73/22 75/12
 75/15 75/16 75/20 75/21
 75/23 76/7 76/15 76/20
 77/8 77/11 77/21 78/1 78/4
documentation [1]  25/25
documented [3]  25/20
 25/22 70/21
documents [2]  7/1 7/3
does [10]  8/14 9/19 10/1
 10/3 24/11 24/15 59/6 67/4
 69/13 78/25
doesn't [1]  68/20
doing [3]  32/17 46/5 69/25
Domanico [5]  2/3 83/3
 84/15 84/22 84/22
domestic [2]  46/6 46/12
don't [106]
done [1]  44/14
door [3]  43/5 44/17 45/3
Doug [22]  4/10 4/16 4/23
 13/4 13/16 14/17 17/1 17/2

# D

Doug... [14] 17/14 19/7 36/24 37/1 37/14 58/16 62/20 63/6 63/10 63/22 64/3 64/7 67/10 67/18
Douglas [1] 15/6
down [6] 9/15 9/24 44/24 46/20 74/12 83/13
draft [2] 16/21 16/23
drafted [3] 18/11 18/19 67/12
drive [1] 20/7
driver [2] 27/9 27/14
drivers [1] 27/19
driving [2] 20/4 20/8
drugs [1] 6/12
due [1] 33/22
duly [2] 5/2 83/6
during [13] 6/2 7/25 8/3 9/20 17/15 29/14 32/10 33/3 33/5 33/12 51/3 78/22 81/11
duties [1] 75/2
duty [5] 19/17 52/2 59/4 70/19 75/9

# E

each [2] 21/3 25/9
Earlier [1] 79/10
early [2] 41/18 45/8
EASTERN [2] 1/1 83/11
either [2] 20/23 48/24
Elsbernd [2] 22/19 33/7
Elvis [2] 44/16 45/7
email [5] 56/10 74/19 74/23 75/4 83/22
emotions [1] 57/7
employed [1] 84/10
employees [1] 17/7
empty [1] 68/22
end [3] 43/14 53/18 53/20
ended [1] 5/9
enjoying [1] 34/23
enter [11] 14/14 15/18 36/19 38/14 42/6 42/23 43/13 44/20 45/1 45/2 64/1
entered [2] 44/2 46/2
entering [6] 24/16 31/8 39/25 41/2 44/7 44/11
entire [2] 12/1 61/15
entity [1] 84/12
entry [4] 40/16 40/21 41/12 46/8
especially [1] 42/3
estimate [1] 13/24
ET [3] 1/9 3/12 83/9
evaluation [2] 18/8 70/22
evaluations [1] 19/1
even [5] 10/13 32/19 34/11 35/1 56/11
eventually [1] 23/18
ever [21] 17/13 19/10 21/1 21/5 22/19 26/11 33/13 36/21 44/6 44/11 45/10 45/14 47/2 49/3 53/24 57/22 63/21 68/6 68/9 68/11 76/14
every [10] 18/8 25/17 25/19 30/17 30/18 42/25 53/11

53/11 68/23 72/3
every policy [1] 68/23
everybody [2] 46/9 62/16
everybody's [1] 81/7
everyone [2] 26/8 26/15 32/7 32/10
everything [4] 34/8 45/6 56/17 70/21
everywhere [1] 45/8
evidence [9] 11/25 41/24 63/23 64/15 64/18 75/6 78/6 78/7 78/20
exact [3] 41/23 50/9 79/19
exactly [13] 17/21 18/5 19/5 19/22 20/17 41/14 48/5 48/9 48/16 48/21 57/18 60/2 62/3
EXAMINATION [1] 5/4
examine [1] 71/24
examined [1] 5/2
example [2] 43/2 49/24
examples [1] 43/4
excerpt [1] 38/24
excessive [3] 38/5 49/21 49/22
exhibit [45] 4/6 4/7 9/9 12/17 14/15 14/18 15/23 16/5 16/20 16/20 16/21 16/23 18/14 18/15 18/19 18/23 18/23 24/3 24/6 24/11 38/15 38/18 53/12 58/12 58/15 59/2 64/1 64/4 65/4 65/6 65/22 66/3 66/19 66/22 67/3 67/16 67/19 73/15 73/17 74/2 75/17 77/1 77/4 77/13 80/16
Exhibit 1 [2] 53/12 80/16
Exhibit 10 [1] 67/16
Exhibit 11 [3] 73/15 75/17 77/13
Exhibit 12 [1] 77/1
Exhibit 2 [7] 14/15 16/20 16/21 18/19 18/23 58/15 59/2
Exhibit 3 [5] 15/23 16/23 18/14 18/15 18/23
Exhibit 4 [1] 24/11
Exhibit 5 [1] 38/15
Exhibit 6 [1] 67/3
Exhibit 7 [1] 65/4
Exhibit 8 [2] 65/22 74/2
Exhibit 9 [1] 66/19
exhibits [1] 68/16
exigent [3] 41/15 41/17 41/21
experience [2] 44/18 44/19
expires [1] 84/18
explain [3] 28/16 48/3 59/9
explained [1] 29/9
extent [1] 21/15

# F

face [1] 37/25
Facebook [2] 54/13 54/13
facts [1] 20/18
failed [1] 78/5
failure [1] 75/5
familiar [4] 7/16 7/21 14/21 16/8
fault [7] 15/8 15/9 15/14

65/14 65/16 71/7 72/4 73/1 73/23 83/2
FAYETTE [1] 83/9
February [1] 84/18
Federal [3] 2/11 59/12 84/6
feel [4] 5/16 33/20 33/23 56/4
felony [1] 32/5
female [1] 44/21
few [2] 5/11 62/2
fight [5] 23/15 35/3 62/5 79/23 80/6
fighting [1] 34/4
file [21] 15/17 18/7 18/10 18/24 19/7 22/11 62/11 62/13 62/16 62/19 62/22 63/4 63/6 64/8 64/8 65/18 65/19 66/16 67/9 68/3 78/2
filed [13] 2/9 9/11 14/20 16/7 24/8 38/20 64/6 65/8 66/5 66/24 67/21 73/19 77/6
files [2] 38/5 62/9
final [1] 60/16
financial [1] 84/11
fine [2] 22/25 33/2
finish [3] 5/17 5/19 12/1
finished [2] 12/10 15/20
firearm [1] 52/9
FIRM [1] 3/2
first [57] 5/2 9/2 16/3 40/10 54/9 57/14 58/9 61/8 62/8 62/12 62/15 62/21 69/9 70/25 71/6 80/4 83/6
fit [1] 39/23
five [3] 13/19 13/22 73/6
five-minute [1] 73/6
flight [1] 79/23
Floyd [2] 34/8 36/17
follow [7] 18/2 18/3 19/8 24/20 24/23 58/7 68/17
followed [1] 17/10
following [4] 17/14 51/15 63/14 71/21
follows [1] 5/3
footage [10] 7/12 31/19 33/19 34/19 36/5 37/19 37/24 38/4 44/7 50/3
FOP [1] 68/10
force [43] 4/14 7/25 8/3 8/9 8/16 8/17 10/9 10/21 10/22 10/23 11/4 11/6 11/14 11/22 11/22 12/5 12/6 32/23 33/2 33/5 33/9 33/10 33/12 35/3 35/17 35/18 36/7 36/12 37/15 38/5 38/14 38/16 38/17 38/22 51/15 51/19 52/12 52/19 53/10 54/8 55/21 56/7 74/16
foregoing [1] 83/13
form [2] 30/5 31/4
formal [5] 4/20 28/22 28/24 66/21 67/5
formally [1] 50/4
forth [1] 5/17
forwarded [1] 77/23
found [8] 23/14 31/12 39/10 40/11 57/24 59/18 65/15 68/16
four [4] 15/13 24/10 71/11

71/15
Friday [1] 6/22
front [1] 39/2
further [10] 33/21 34/24 36/1 43/9 55/25 56/5 56/23 57/4 83/21 84/14

# G

Gangwish [2] 74/18 74/21
Garrard [2] 44/15 45/6
gathering [1] 23/18
gave [4] 8/9 8/13 70/24 71/2
general [14] 23/21 24/1 24/11 24/15 31/13 31/17 42/12 42/16 47/18 47/24 48/1 48/2 48/14 48/17
generally [3] 48/18 61/9 61/19
George [2] 34/8 36/17
get [7] 20/11 28/15 43/7 46/20 52/10 56/8 58/10
gets [1] 52/16
getting [3] 23/12 34/12 40/12
give [4] 16/1 16/2 43/2 44/24
given [3] 68/9 72/10 83/17
go [16] 5/11 20/6 26/1 29/22 37/10 42/22 43/8 46/8 47/9 53/12 57/21 58/12 62/1 71/14 71/14 80/16
goes [11] 52/15 52/16 52/17 52/18 53/10 58/13 58/14 61/19 62/6 67/3 77/12
going [9] 5/11 12/21 22/22 22/25 24/16 32/22 68/17 77/1 82/11
gone [2] 20/16 20/17
good [4] 34/23 53/2 56/12 82/10
goodness [1] 20/5
got [10] 20/5 20/9 20/9 20/13 20/15 42/10 55/22 57/22 69/8 70/12
grant [7] 16/14 16/16 16/16 58/25 59/8 59/11 59/23
Greenup [1] 45/7
ground [6] 9/15 9/25 11/14 11/19 23/16 34/3
guess [1] 51/9
guidelines [1] 43/18
guys [2] 31/23 46/19

# H

had [17] 13/16 15/12 15/13 15/15 23/11 23/14 23/16 34/13 35/16 36/21 45/7 48/7 57/22 58/19 63/10 77/8 79/4
hand [1] 84/20
handcuffs [2] 45/14 45/21
handed [1] 64/11
handle [2] 20/12
handling [2] 63/22 64/15
Hands [2] 33/10 33/10
happen [3] 44/23 46/22 58/1
happened [5] 20/16 46/24

**H**

happened... [3] 56/11 65/14 68/25
happening [2] 11/18 41/8
happens [1] 46/18
hard [2] 25/16 74/14
has [7] 29/2 29/19 31/17 35/16 45/5 62/10 68/11
have [69] 9/15 9/24 12/2 12/13 12/15 13/24 14/8 15/25 17/6 19/21 20/24 31/1 32/3 33/21 35/7 35/13 36/3 43/18 44/10 46/6 50/6 51/1 52/4 52/10 54/19 54/22 55/21 56/12 56/13 57/22 58/22 60/23 62/4 62/23 63/9 63/16 64/7 64/8 65/17 66/14 66/15 69/17 70/9 70/10 70/11 70/21 71/3 71/5 73/3 73/6 76/9 76/10 76/11 76/12 76/16 76/17 76/19 76/22 77/15 77/20 77/25 78/10 79/19 80/22 82/7 82/9 84/10 84/13 84/19
having [2] 8/7 74/13
he [98]
he's [6] 11/17 28/4 30/7 30/9 37/5 68/10
head [2] 45/24 49/2
headlock [1] 34/6
hear [4] 43/6 44/17 64/21 66/9
heard [2] 9/2 54/9
heels [2] 34/7 36/17
help [2] 8/22 46/7
Hence [1] 72/4
her [10] 44/15 44/24 45/5 45/10 45/11 45/14 45/15 45/17 45/20 45/21
here [7] 5/7 8/6 11/12 46/19 46/24 53/13 53/14
Here's [1] 9/6
hereby [1] 83/5
HERETO [12] 9/11 14/20 16/7 24/8 38/20 64/6 65/8 66/5 66/24 67/21 73/19 77/6
heretofore [1] 2/9
hereunto [1] 84/19
HEREWITH [12] 9/11 14/20 16/7 24/8 38/20 64/6 65/8 66/5 66/24 67/21 73/19 77/6
herself [1] 52/15
hey [1] 46/18
high [1] 80/1
high pitched [1] 80/1
higher [1] 72/1
highlights [2] 53/9 56/17
Highway [2] 59/12 59/12
him [35] 8/11 8/17 8/21 8/23 9/15 9/18 9/24 10/25 11/2 11/3 11/5 11/10 11/13 11/19 14/12 15/7 19/14 19/16 20/2 20/11 23/14 27/24 28/9 28/12 29/21 52/14 59/18 62/24 63/11 65/15 75/19 78/22 79/2

79/3 79/4
his [32] 8/18 8/16 8/20 9/20 11/12 18/6 18/6 18/9 18/22 19/2 20/3 20/7 23/10 27/12 28/13 30/1 30/4 34/5 62/18 62/19 62/22 64/8 65/18 65/18 69/9 71/5 71/6 75/2 75/8 83/22 83/23 84/3
hit [1] 23/16
home [14] 20/9 39/25 40/2 40/4 40/17 40/21 41/2 42/7 42/23 43/14 44/12 45/1 45/2 46/3
homes [2] 44/2 44/7
Hon [7] 2/5 3/2 3/8 3/14 84/1 84/1 84/3
hospitalization [1] 53/2
hour [1] 2/8
hours [5] 49/11 49/11 49/24 53/11 56/18
house [1] 41/5
how [31] 6/21 13/15 13/24 15/9 15/15 17/3 17/21 18/5 19/5 28/2 31/22 35/7 35/25 36/24 37/13 44/1 45/1 46/18 46/21 46/22 46/23 48/18 50/3 52/19 56/2 58/1 58/4 69/15 79/18 79/24 81/13
huh [9] 18/18 20/1 35/24 52/11 58/8 60/4 72/7 79/24 80/3
human [1] 81/18

**I**

I'd [8] 9/6 19/21 24/3 44/24 45/3 45/4 62/4 65/3
I'll [3] 6/2 47/9 47/12
I'm [44] 5/7 5/11 8/14 10/25 11/1 11/10 26/21 27/24 27/25 28/12 28/25 31/6 31/7 32/9 33/1 34/5 35/15 42/12 46/10 46/10 46/13 47/8 51/11 55/20 61/21 61/22 62/10 64/16 64/16 64/21 66/7 66/8 66/10 67/11 70/2 70/4 70/5 71/19 71/20 73/12 74/12 74/13 75/13 82/11
I've [6] 5/17 35/18 43/8 44/14 46/7 77/10
IA [3] 7/4 7/5 20/19
ID [7] 26/8 27/18 30/4 30/19 32/8 32/10 84/22
ID'd [1] 26/15
idea [5] 50/6 52/4 69/17 73/3 79/19
identification [13] 9/10 14/19 16/6 24/7 27/12 38/19 64/5 65/7 66/4 66/23 67/20 73/18 77/5
identifies [1] 39/3
identify [7] 64/10 65/9 66/6 66/25 67/22 74/4 79/21
IDs [3] 30/8 31/3 31/3
if [94]
illegal [1] 31/2
imagine [1] 22/3
immediately [1] 34/14
impair [1] 6/12

implement [2] 13/9 27/21
implemented [6] 39/2 39/20 42/17 42/21 55/2 60/10
implementing [1] 39/4
important [4] 25/8 25/19 25/24 63/16
in [131]
in-depth [1] 74/25
Inc [1] 84/15
incident [54] 7/15 7/16 7/17 7/20 7/20 7/23 7/24 7/25 8/3 19/20 21/6 21/10 23/1 23/2 23/2 23/3 23/9 24/13 32/22 32/23 33/3 33/6 33/21 33/25 34/15 34/18 36/22 38/13 39/13 39/15 39/16 39/17 40/8 40/14 42/6 42/14 51/3 51/4 51/8 52/3 53/25 54/4 54/10 54/16 54/20 55/25 56/4 57/1 57/2 68/15 79/13 79/15
Incident 1 [1] 79/13
incidents [4] 22/23 35/25 46/2 51/16
inclination [1] 56/12
independently [1] 84/15
INDEX [3] 3/21 4/5 4/6
indifferences [1] 82/3
individual [3] 30/18 36/5 49/11
individuals [3] 27/18 30/22 46/4
influence [2] 6/11 6/15
informal [1] 74/25
information [2] 27/6 56/8
infraction [2] 19/18 25/4
initial [2] 7/8 59/21
initially [1] 33/18
injured [3] 53/4 53/10 56/7
injuries [1] 54/3
injury [12] 50/12 50/15 50/18 51/3 51/25 52/6 52/8 52/13 52/22 52/24 53/24 54/4
inside [2] 40/2 40/3
instances [1] 45/23
instead [2] 70/22 78/8
insubordination [3] 64/13 64/14 72/17
interest [1] 84/14
interested [1] 84/12
Internal [11] 7/6 20/20 20/21 22/7 28/7 34/16 34/18 35/5 36/1 36/12 39/8
Interrupting [29] 7/22 8/19 12/12 13/5 16/15 26/18 26/24 28/12 29/11 29/12 29/23 32/1 32/24 33/1 35/21 44/21 46/12 47/23 53/18 53/20 57/12 57/13 59/7 61/21 63/18 67/11 68/20 69/4 76/21
interview [2] 21/18 21/23
interviewed [2] 28/5 28/6
interviews [1] 22/5
into [14] 20/13 39/25 40/16 40/21 41/2 42/23 44/7 45/1 45/2 46/2 52/9 56/4 57/20 64/24

introduce [1] 80/15
INTRODUCTION [1] 4/7
inventorying [1] 78/14
investigate [3] 56/23 57/5 57/23
investigated [1] 33/21
investigation [18] 20/24 20/25 22/15 22/16 22/17 28/8 33/24 35/5 36/1 36/12 37/2 39/8 49/9 49/10 49/18 49/20 55/25 57/10
involved [5] 19/17 46/7 51/18 61/17 75/9
is [142]
issue [1] 60/1
issued [4] 25/11 25/21 25/23 40/24
issues [1] 75/1
it [176]
it's [40] 10/17 10/19 12/4 16/12 25/8 30/12 31/16 32/21 34/21 34/21 35/11 40/9 41/15 41/23 42/22 45/7 48/10 48/17 48/25 52/13 52/14 53/8 56/8 56/9 61/12 62/2 62/2 64/12 64/16 64/17 65/13 66/12 68/19 68/21 69/9 70/18 73/25 77/12 80/20 81/15
items [3] 78/19 78/23 79/5
its [1] 31/17

**J**

Jamir [3] 3/2 5/7 84/3
Jan [1] 41/17
January [29] 7/15 7/20 7/23 8/3 8/10 8/18 9/2 10/21 10/24 11/15 12/6 23/1 23/6 24/13 24/24 38/23 39/16 41/18 42/22 50/14 50/17 50/20 50/23 52/3 53/25 54/4 55/10 55/14 65/16
January 1 [7] 10/21 11/15 12/6 42/22 50/14 50/20 53/25
January 16th [11] 7/20 23/1 23/6 24/13 24/24 38/23 50/17 50/23 52/3 54/4 55/14
January 1st [10] 7/15 7/23 8/3 8/10 8/18 9/2 10/24 39/16 41/18 55/10
January 9th [1] 65/16
jdavis [1] 3/4
jdaviscounsel.com [1] 3/4
Jeff [1] 2/5
Jennifer [2] 3/8 84/1
jmando [1] 3/10
job [2] 11/24 13/8
John [23] 12/25 14/8 19/10 24/22 26/15 27/5 27/21 28/14 28/15 29/25 30/1 30/14 30/15 30/21 31/2 31/19 33/2 36/21 37/7 37/8 62/9 62/16 81/19
Jones [2] 66/13 67/24 69/7 71/8
judge [3] 6/5 29/3 49/12
judgment [1] 6/13
July [1] 71/4

**J**
jump [1] 34/13
jumped [1] 20/10
June [4] 74/10 74/18 74/22 75/19
June 14 [1] 74/10
June 30th [1] 75/19
jurisdiction [2] 21/8 21/13
just [35] 5/10 5/12 5/13 5/14 5/16 7/14 8/21 9/18 9/18 9/19 12/20 19/22 20/9 20/17 26/20 27/21 30/7 31/8 35/1 35/12 37/10 42/3 46/13 49/1 52/13 57/16 59/17 61/12 61/15 61/22 64/11 72/8 73/7 75/6 80/6
juveniles [1] 49/24

**K**
keep [3] 6/16 42/10 43/6
keeps [1] 31/24
Kelly [1] 74/19
Kenton [1] 47/16
KENTUCKY [10] 1/1 2/5 2/7 3/3 3/10 3/16 32/5 83/1 83/4 83/12
kept [2] 15/17 57/19
kind [2] 37/21 41/1
kinds [1] 61/11
knew [4] 32/13 35/1 42/11 54/1
knock [2] 43/4 45/3
knocking [1] 43/7
know [85]
knowledge [5] 10/10 12/7 28/13 42/14 68/11
KRS [1] 84/9
KY [1] 84/22
KYNP1983 [1] 84/22

**L**
lack [1] 74/19
lady [1] 44/14
Langen [2] 3/8 84/1
language [1] 36/20
Large [2] 2/5 83/5
larger [1] 70/24
last [10] 5/24 7/18 8/6 8/20 11/11 12/22 39/19 50/2 68/13 80/19
later [3] 29/4 57/24 78/21
law [15] 2/6 3/2 3/9 6/7 32/5 32/21 41/15 41/23 42/1 43/17 43/19 43/24 48/23 49/24 50/1
lawful [1] 39/11
lawsuit [1] 61/18
lay [1] 24/15
leader [1] 81/18
least [3] 38/24 71/11 71/14
leave [4] 20/19 44/15 72/16 79/5
lecture [1] 29/1
lecturing [1] 29/7
left [2] 38/11 78/7
legal [3] 3/14 6/6 25/1
legally [2] 30/7 30/9
legs [1] 33/11
let [7] 16/3 30/15 38/22

53/13 73/21 73/24 77/8
let's [3] 72/6 74/1 79/2
letter [8] 4/19 4/22 66/6 66/12 67/18 67/23 69/9 69/12
library [1] 32/2
license [1] 78/17
lieutenant [1] 17/4 52/15 52/16 70/23 74/10 74/23 75/5 77/15
Lieutenant Steffen [3] 70/23 74/10 74/23
like [17] 9/6 14/14 15/18 24/3 24/11 38/14 38/22 41/4 63/2 64/17 65/3 65/21 66/18 67/15 70/18 73/25 80/14
limit [1] 49/9
limitations [1] 39/3
limited [1] 56/8
line [2] 51/19 61/16
Lines [1] 53/17
listed [2] 74/5 76/4
litigation [2] 84/13 84/14
little [5] 5/9 11/7 42/11 73/5 74/13
lived [1] 44/15
located [2] 78/15 78/18
locked [1] 62/11
locks [1] 53/7
log [3] 78/5 78/9 78/23
logged [1] 78/19
logging [1] 78/8
long [7] 23/15 31/22 34/21 43/6 48/19 49/17 50/3
longer [1] 68/12
look [19] 9/4 12/2 18/9 18/25 19/2 24/9 24/11 38/21 47/9 53/13 56/4 57/19 57/20 62/18 64/24 71/17 73/20 77/7 80/24
looked [5] 62/24 76/9 76/11 76/12 78/1
looks [2] 38/22 73/25
lot [5] 25/6 25/13 34/6 36/17 61/8
loud [3] 42/2 42/7 44/16
loudly [1] 81/24
Lower [1] 80/1

**M**
made [7] 32/7 34/6 48/20 70/15 71/9 71/13 79/16
Main [1] 3/17
maintenance [2] 70/20 74/20
make [10] 5/13 20/8 24/10 25/9 28/24 29/4 43/7 46/9 47/6 60/5
making [10] 11/25 17/9 23/25 31/19 35/1 42/16 51/23 60/15 71/20 79/14
manage [1] 81/13
management [2] 17/7 17/11
manager [1] 62/5
mandibular [1] 36/15
Mando [2] 2/6 6/24
many [10] 13/15 13/24 15/9 26/2 34/25 35/7 35/25 44/9 58/4 69/15

many body [1] 44/9
March [3] 2/13 2/18 64/20
MARIO [3] 1/6 3/5 83/8
mark [7] 9/6 16/3 24/3 65/3 65/21 66/18 67/15
marked [3] 9/6 10/17 73/14
MARKS [12] 9/7 14/16 16/4 24/5 38/17 64/2 65/5 66/1 66/20 67/17 73/16 77/3
may [9] 9/15 15/23 22/24 56/13 74/24 75/4 75/8 81/23 81/24
May 22nd [1] 75/8
May 26th [1] 74/24
May 28th [1] 75/4
maybe [4] 8/21 26/23 56/22 73/7
Mayor [2] 34/10 34/16
mayor's [1] 54/10
me [37] 5/19 10/18 12/1 12/2 14/24 16/3 16/11 18/4 29/7 29/8 30/15 34/11 34/25 35/1 38/22 39/18 40/1 43/2 51/10 53/13 54/12 54/12 57/7 57/8 59/10 62/6 70/9 70/11 70/23 71/2 72/11 73/21 73/24 76/17 77/8 83/6 83/14
mean [3] 22/13 43/3 51/17
media [1] 54/14
medical [6] 50/8 50/11 50/21 50/24 51/2 51/24
medication [1] 6/12
member [2] 15/10 38/4
members [1] 34/2
memo [11] 4/24 4/25 67/2 67/4 73/16 73/25 74/3 76/11 77/3 77/12 77/13
Memorandum [2] 4/20 66/20
memory [1] 26/2
mention [1] 7/15
mentioned [1] 40/14
messages [1] 57/20
met [1] 6/22
Michelle [1] 74/22
might [2] 9/24 52/10
mind [3] 28/16 38/8 58/9
minute [1] 73/6
misdemeanor [1] 32/4
misrepresent [1] 79/11
missed [2] 57/23 58/6
mistrust [1] 34/22
mixed [1] 70/12
Monday [3] 1/13 2/7 16/17
more [14] 11/7 13/19 13/22 14/1 23/17 35/11 42/12 42/19 48/10 59/20 71/11 71/15 73/7 81/24
morning [6] 34/1 41/18 53/4 55/21 57/8 57/16
most [2] 13/25 53/1
Mostly [1] 71/12
move [2] 12/11 22/22 22/24
moved [1] 76/17
moves [1] 18/9
Moving [1] 39/15
Mr [1] 5/5
Mr. [10] 6/24 23/10 23/12

23/19 34/3 34/4 39/21 39/25 50/3 83/2
Mr. Mando [1] 6/24
Mr. Murphy [1] 34/4
Mr. Ullrich [1] 59/22
Mr. Wynn [7] 23/10 23/12 23/19 34/3 39/21 39/25 50/3
Murphy [32] 12/25 14/9 19/11 20/3 20/7 20/16 24/22 26/15 27/5 27/11 27/21 28/3 28/4 28/5 28/6 28/10 28/14 30/1 30/1 30/14 30/15 30/21 31/2 31/19 33/2 34/3 34/4 34/5 36/21 37/7 37/8 62/9
Murphy's [2] 28/15 62/16
music [4] 43/9 44/16 44/24 46/20
music's [1] 43/5
my [37] 5/7 6/5 6/16 11/24 17/11 19/22 20/18 21/9 24/25 29/9 29/12 34/11 34/11 35/1 42/19 44/14 44/18 45/8 51/9 51/12 56/19 57/13 57/17 57/19 58/24 59/16 59/17 61/24 62/6 63/9 69/23 69/24 70/12 76/5 83/15 84/18 84/19
myself [3] 43/8 44/14 60/19

**N**
N-A-D-E-R [1] 6/1
NADER [6] 1/10 2/2 5/1 5/23 82/15 83/5
Nader's [2] 4/8 9/7
name [6] 5/7 5/22 5/24 23/11 45/5 76/5
names [1] 61/7
narrative [1] 26/3
Natalie [3] 2/3 83/3 84/22
national [1] 36/18
nature [2] 22/5 81/25
necessarily [1] 42/14
necessary [7] 33/20 35/3 49/17 54/16 56/4 57/4 60/21
need [6] 5/16 6/10 28/9 39/7 51/12 57/20
needed [3] 33/24 41/9 78/24
negligent [1] 61/20
Neither [1] 20/4
never [7] 12/1 18/6 29/21 35/13 45/20 45/21 79/8
new [2] 36/15 36/20
next [8] 12/13 34/1 51/19 53/4 55/21 57/8 65/3 65/21
next-line [1] 51/19
night [2] 41/17 56/18
no [76] 1/2 5/14 6/14 6/18 7/13 8/4 8/23 9/9 10/9 10/12 12/4 12/8 14/4 14/7 14/13 14/18 16/5 21/3 21/9 21/17 21/22 24/6 25/3 26/10 27/20 30/12 32/18 35/13 35/15 38/18 40/19 40/20 41/19 42/9 45/13 45/19 45/25 46/1 46/10

**N**

no... [37]  46/25 49/9 50/6
52/4 53/23 54/1 54/5 54/6
54/11 54/15 54/17 54/21
59/4 59/13 61/25 62/14
64/4 65/1 65/6 66/3 66/22
67/19 68/8 69/12 69/14
69/17 70/4 70/7 70/17
72/24 73/3 73/17 77/4 79/6
79/19 84/4 84/13
No. [10]  7/20 23/1 24/4
39/15 58/12 64/1 75/3 75/8
80/24 83/10
No. 1 [1]  39/15
No. 2 [3]  7/20 23/1 58/12
No.
2:21-CV-00137-DBL-CJS
[1]  83/10
No. 4 [1]  24/4
No. 5 [1]  75/3
No. 6 [2]  64/1 75/8
No. 8 [1]  80/24
nobody [1]  42/2
nobody's [1]  43/5
Nods [2]  45/24 49/2
noise [17]  42/2 42/3 42/7
42/23 43/1 43/13 43/14
43/21 44/2 44/12 45/21
46/3 46/5 46/6 46/13 46/17
46/18
Non [1]  70/19
Non-duty [1]  70/19
none [1]  40/13
nor [3]  59/4 84/10 84/10
not [85]
Notary [3]  2/4 83/4 84/22
nothing [2]  54/1 83/7
NOTICE [3]  1/7 2/9 84/6
notified [16]  40/18 40/22
40/25 41/3 41/7 41/10
51/20 52/10 52/20 53/24
54/6 54/19 55/5 55/11
55/15 56/8
notify [3]  52/6 54/2 54/16
now [6]  7/18 15/21 22/23
41/4 46/5 83/10
number [7]  12/16 12/22
13/18 31/17 35/10 44/5
74/24

**O**

obey [1]  64/17
Object [1]  31/4
objecting [2]  27/25 61/23
objection [15]  27/23 28/1
29/6 29/9 29/12 29/13
29/15 29/17 30/5 31/8
37/10 37/16 61/2 61/15
61/24
objections [3]  28/21 28/22
28/25
obligation [1]  6/7
observations [1]  33/8
observe [1]  28/11
occurred [4]  19/20 52/13
58/5 75/6
off [12]  17/18 19/17 20/12
28/13 34/7 38/10 43/9 59/4
72/12 73/10 73/11 82/11

off-cuff [1]  17/18
on-duty [2]  19/17 75/9 67
office [5]  51/23 54/10 62/11
77/21 84/20
officer [63]  1/10 2/2 4/21
4/23 5/1 12/25 19/18 20/2
20/3 20/3 20/6 20/7 20/10
20/12 22/19 24/17 25/17
27/11 30/17 33/5 33/7 34/3
34/5 35/15 36/6 38/1 42/23
43/13 46/2 51/4 51/5 51/9
51/9 51/11 51/18 52/5
52/13 52/14 53/3 53/10
56/7 66/21 67/6 67/18 68/1
68/3 68/6 68/16 71/22 74/9
74/18 74/21 74/23 75/1
75/5 75/7 75/9 76/7 78/22
79/6 79/6 82/15 83/5
Officer Elsbernd [2]  22/19
33/7
Officer Gangwish [2]  74/18
74/21
Officer John [1]  12/25
Officer Murphy [5]  20/3
20/7 27/11 34/3 34/5
Officer Tipton [4]  20/3 20/6
20/10 20/12
Officer Ullrich [14]  67/6
68/1 68/6 68/16 71/22 74/9
74/23 75/1 75/7 75/9 76/7
78/22 79/6 79/6
Officer Ullrich's [2]  68/3
75/5
officer's [1]  22/10
officers [48]  10/23 11/13
17/10 21/2 21/11 21/16
21/18 21/24 23/16 23/17
24/19 25/5 25/5 26/8 32/6
32/9 32/17 32/20 35/8
39/12 39/21 39/24 40/3
40/13 40/20 42/6 43/20
44/1 44/7 44/11 48/3 48/7
49/3 57/23 60/11 60/21
60/23 60/25 61/4 61/5
61/16 62/13 63/2 68/22
69/5 79/14 79/16 81/12
offices [1]  2/5
official [10]  4/19 4/22 22/15
48/19 66/2 66/12 67/18
67/23 69/9 69/12
often [2]  44/1 58/1
oh [10]  15/25 18/1 26/19
33/1 57/25 66/11 67/3
68/21 75/18 80/21
Ohio [1]  78/16
okay [147]
OL [1]  78/16
old [1]  71/24
on [109]
on-duty [1]  75/9
once [2]  73/21 77/8
one [35]  4/17 9/6 12/13
15/18 18/11 20/5 23/15
37/8 45/8 47/14 52/9 53/23
54/6 54/15 58/13 61/12
64/12 65/3 65/5 65/11
65/12 65/21 69/6 69/10
71/3 71/6 71/6 72/9 72/9
72/15 74/1 74/5 74/7 76/4
77/14

one day [3]  4/17 65/5 65/11
ones [2]  7/23 7/23
only [6]  15/25 31/2 41/4
49/24 50/1 52/20
onto [1]  5/10
open [1]  45/3
operated [1]  84/16
operating [4]  14/25 65/14
72/14 72/18
opinion [2]  19/22 52/25
or [80]  5/14 6/12 6/12 7/9
10/3 10/21 11/5 11/6 11/8
11/22 12/4 12/5 17/21 18/2
18/2 18/9 19/5 20/16 20/23
21/19 22/16 23/15 24/10
28/3 28/10 30/2 31/25 34/4
34/17 35/16 35/20 36/22
37/3 37/15 38/24 40/10
41/5 41/17 41/20 43/10
45/20 46/2 46/20 47/16
48/13 48/14 51/3 51/8 52/6
52/9 52/14 52/15 52/22
53/9 53/10 55/20 56/18
57/3 57/23 59/25 60/9
62/25 70/19 71/17 74/6
75/3 76/8 78/5 79/14 79/17
79/22 79/23 80/9 81/13
82/3 83/23 84/11 84/12
84/13 84/16
order [22]  4/10 4/16 4/17
5/7 15/4 23/21 24/12
24/15 31/13 31/17 47/18
47/24 48/1 48/22 64/3 64/18
65/5 65/11 68/14 71/4
72/10 72/11
ordered [1]  35/5
orders [6]  4/13 24/1 24/5
42/16 48/14 48/17
original [2]  16/12 31/9
other [18]  2/11 21/4 31/18
31/19 32/6 32/9 33/5 68/22
69/5 70/18 72/8 72/23
78/18 81/23 81/24 82/7
84/4 84/11
others [2]  36/8 41/24
our [9]  31/9 34/24 36/18
36/18 50/2 52/8 78/22
81/16 81/16
out [16]  20/4 20/10 23/12
23/14 23/25 24/15 34/24
40/11 46/19 46/19 57/24
59/18 61/8 71/4 72/16
78/11
outcome [1]  84/12
over [6]  5/11 12/18 17/7
17/11 46/19 64/11
overall [3]  17/7 17/8 17/11
overnight [1]  53/2
overtime [4]  16/14 16/16
59/5 59/13
own [4]  31/17 35/1 44/18
44/19
owned [1]  84/16

**P**

P.O [1]  3/3
packets [1]  68/18
page [15]  4/2 4/7 4/14 5/12
9/5 9/16 9/24 38/15 38/17
53/13 53/14 53/17 53/21

53/22 80/24
Page 13 [1]  80/24
Page 24 [1]  53/22
Page 66 [1]  38/15
Page 78 [1]  9/5
Page 80 [3]  9/16 9/24 53/17
pages [5]  4/9 4/13 9/5 9/8
24/10
Pages 80 [1]  9/5
PAGES............................
...85 [1]  4/5
PAGES............................
...85-96 [1]  4/5
panic [1]  23/17
papers [1]  78/18
paperwork [6]  15/12 20/25
52/16 70/19 71/3 75/3
parameters [1]  32/4
part [7]  9/22 11/24 22/10
31/11 31/13 34/6 35/16
particular [1]  36/7
party [1]  20/16
passengers [1]  30/8
past [1]  45/9
patrol [3]  70/3 70/8 75/2
pay [2]  64/12 68/9
pending [1]  83/10
people [6]  34/7 34/25 57/7
69/15 81/13 81/23
perceived [1]  55/17
perform [4]  25/13 25/17
26/2 40/20
performance [2]  69/8 74/2
74/5 75/1 75/8
period [3]  17/16 17/16 57/9
permitted [1]  2/11
person [5]  35/19 45/11 62/5
75/7 84/12
Personally [3]  21/19 21/21
49/5
personnel [16]  18/7 18/10
18/24 22/11 62/9 62/11
62/13 62/16 62/22 63/4
63/6 65/19 66/16 67/9
67/10 78/2
perspective [2]  11/1 79/17
pertains [1]  74/20
phone [4]  34/12 54/11
57/14 57/18
phrased [1]  17/22
physical [4]  20/13 21/15
33/10 80/8
Pike [3]  2/6 3/9 3/16
pitched [1]  80/1
place [7]  23/21 24/12 38/23
42/20 45/5 45/14 47/19
placed [3]  37/20 45/21 50/4
plaintiff [8]  1/6 1/7 2/10 3/5
5/8 83/8 84/3 84/5
PLAINTIFF'S [12]  4/7 9/8
14/18 16/4 38/18 64/4 65/6
66/2 66/22 67/19 73/17
77/4
please [9]  5/13 5/21 6/4
15/24 38/21 73/20 74/13
77/2 77/7
plenty [1]  35/18
PLLC [3]  2/6 3/2 3/9
PNC [1]  78/17
PNC Bank [1]  78/17

P

point [4]  36/2 36/15 52/5 61/22
pointing [1]  18/14
police [57]  4/10 4/15 4/18 4/22 13/9 13/13 13/17 14/9 14/16 15/11 18/7 20/14 20/15 21/5 22/20 26/12 27/18 30/17 32/9 34/23 35/7 35/15 36/4 36/6 36/13 37/25 41/22 42/13 42/15 42/22 43/23 44/3 44/8 46/17 47/21 48/13 49/19 52/24 56/21 58/2 60/8 60/17 60/22 60/24 63/14 63/19 64/2 66/1 67/17 68/7 72/20 72/24 76/14 77/22 78/1 78/20 81/12
policies [29]  13/9 17/9 17/14 17/20 18/2 18/3 19/8 30/25 30/25 32/19 38/12 40/17 41/11 42/13 42/20 42/20 43/18 48/13 55/1 55/5 55/12 60/9 63/14 68/7 71/10 71/14 71/21 71/22 81/6
policy [33]  4/14 17/24 24/16 24/19 24/23 26/11 27/17 27/22 30/3 30/10 30/13 30/22 31/10 31/11 31/12 31/12 36/15 38/16 38/18 38/23 39/2 41/14 43/11 43/16 49/16 50/7 50/10 70/19 71/17 71/20 74/16 75/10 81/25
policy.' [1]  68/23
Poor [1]  70/20
potential [3]  55/4 55/12 55/15
power [2]  75/2 81/16
practice [2]  19/4 32/13
prefer [1]  8/23
prepare [2]  6/19 6/21
present [1]  6/6
presentation [1]  81/19
presented [1]  10/17
preserve [2]  41/24 61/24
press [1]  21/3
pretty [3]  34/23 44/16 47/8
previous [3]  8/13 15/13 15/16
previously [2]  5/8 40/14
prior [15]  5/20 18/9 18/22 18/23 19/1 36/22 37/9 40/11 48/19 50/4 62/17 63/5 63/6 63/11 80/7
probably [1]  62/17
problem [2]  61/25 70/7
procedure [4]  2/12 24/16 49/16 84/7
procedures [13]  13/10 23/22 31/1 32/20 38/12 40/17 41/12 48/14 55/1 55/5 60/10 80/15 80/17
proceed [1]  71/22
proceeding [1]  6/6
process [1]  47/19
produced [1]  47/3
Professional [1]  2/4

progressive [1]  63/2
promoted [1]  68/6
proper [2]  29/6 48/17
properly [2]  63/22 75/6
property [1]  78/20
protest [1]  34/8
providing [1]  27/5
public [9]  2/4 34/2 34/12 34/24 35/4 38/5 54/11 55/16 83/4
punch [5]  35/16 35/20 35/21 35/22 35/23
punched [4]  35/8 35/13 36/22 37/25
punches [5]  33/13 33/16 33/19 33/22 34/5
punish [1]  72/1
punishments [1]  72/5
purposes [15]  2/10 2/11 9/9 14/18 16/5 24/6 28/24 38/19 64/4 65/6 66/3 66/23 67/20 73/17 77/4
pursuant [4]  2/9 84/6 84/6 84/9
put [4]  5/17 20/18 53/10 72/10

Q

question [23]  5/17 5/20 8/9 9/17 10/1 11/8 12/5 25/12 25/13 28/19 29/3 29/16 29/18 29/20 29/21 29/23 29/25 30/3 31/5 31/7 51/9 56/19 62/20
questioning [1]  61/16
questions [9]  5/13 6/3 6/5 6/17 8/12 42/19 73/7 82/8 82/9

R

racial [1]  31/12
raise [1]  68/9
randomly [2]  27/22 28/3
rather [1]  23/15
Re [2]  4/20 66/21
read [1]  77/10
reading [3]  66/7 66/10 83/23
reason [5]  28/4 49/15 54/23 55/25 78/11
reasonable [4]  48/25 49/1 49/4 49/7
reasons [2]  61/11 61/14
rebuilt [1]  45/5
recall [113]
receive [4]  50/11 51/2 56/10 57/14
received [5]  50/21 50/24 68/11 69/3 78/21
receives [1]  51/24
receiving [1]  50/8
recollection [2]  24/22 24/25
record [21]  5/15 5/21 5/21 5/25 7/14 19/3 22/15 28/21 28/25 38/3 38/10 53/16 63/10 66/6 67/1 72/12 73/10 73/11 73/12 82/11 83/16
recorded [2]  22/6 23/3
recording [2]  22/2 22/4

records [2]  32/3 32/3
redone [1]  45/7
reduced [1]  83/14
refer [2]  7/16 7/19
referred [3]  31/14 31/16 64/25
referring [1]  6/24
refers [2]  64/20 64/22
reflects [1]  43/17
refresh [1]  26/1
regard [1]  40/8
regarding [9]  20/22 74/11 74/15 74/19 75/1 75/3 75/5 75/8 79/12
regards [1]  81/2
Registered [1]  2/3
regular [1]  81/16
regulations [1]  60/9
reimbursed [1]  59/11
related [6]  38/13 48/14 52/9 63/14 64/14 84/10
relates [1]  75/2
relationship [2]  34/24 84/11
relatively [1]  36/20
relevance [3]  37/10 61/2 61/23
relevant [1]  72/16
remarks [4]  79/14 79/15 79/17 79/18
remember [29]  8/5 8/7 8/8 8/15 8/25 9/1 10/2 11/23 13/15 13/20 14/2 14/11 17/21 17/23 18/1 19/6 19/21 20/17 21/14 23/13 25/2 25/16 33/15 45/5 50/3 57/7 80/8 81/15 81/20
remembers [1]  8/11
remove [2]  78/23 79/3
report [21]  7/6 7/8 10/9 10/22 20/22 21/5 53/3 53/7 53/8 54/8 55/20 55/24 56/12 56/16 56/22 57/2 57/3 57/24 58/7 74/15 74/24
reporter [15]  2/4 5/11 5/19 9/7 14/16 16/4 24/5 38/17 64/2 65/5 66/1 66/20 67/17 73/16 77/3
Reporting [1]  84/15
reports [5]  17/4 17/4 17/5 17/5 36/12
represented [2]  83/25 84/3
reprimand [9]  4/19 4/22 66/2 66/13 67/18 67/23 69/9 69/12 71/1
request [6]  4/20 34/16 47/6 47/10 66/21 67/5
requested [1]  83/19
requesting [1]  74/23
require [1]  40/17
required [3]  6/3 38/3 52/6
requirement [2]  26/7 48/3
resisted [1]  23/12
resisting [1]  35/19
respective [1]  84/13
responded [1]  10/12
responding [2]  5/20 6/16
response [3]  7/9 7/10 7/11
responsibility [2]  51/1 51/12
responsible [9]  16/25 17/2

17/9 23/24 42/15 51/15 51/22 54/23 68/15
restrain [1]  35/17
restraining [2]  35/16 37/3
restraint [1]  37/21
result [5]  21/10 39/7 39/13 53/24 54/3
review [19]  7/1 7/3 7/8 7/11 18/8 18/24 19/21 23/2 32/23 34/18 38/4 44/6 62/13 63/17 65/15 65/18 67/2 73/21 77/9
reviewed [18]  18/6 33/18 33/19 34/19 35/8 36/4 44/9 62/16 62/21 64/7 64/25 65/18 66/16 67/10 68/3 76/14 76/23 77/25
reviewing [2]  19/6 63/21
reviews [1]  52/17
right [14]  10/19 22/22 27/17 38/7 38/11 39/15 41/4 56/19 57/17 64/19 68/2 78/4 81/11 82/7
rights [1]  81/18
ringing [1]  57/19
ROBERT [6]  1/10 2/2 5/1 5/23 82/15 83/5
Robinson [1]  74/22
role [2]  60/18 69/18
room [1]  78/21
Rose [2]  78/15 79/3
RPR [1]  84/22
rule [5]  14/13 14/25 64/13 69/8 71/17
Rule 111 [1]  69/8
Rule 117 [1]  64/13
rules [4]  2/11 5/12 60/9 84/6
run [1]  62/4

S

S.W.A.T [1]  41/9
safe [1]  46/9
safety [3]  41/24 59/12 59/13
said [19]  2/8 11/23 12/19 17/19 18/5 27/4 48/21 51/11 53/3 59/13 59/18 79/8 79/12 83/17 83/18 83/19 83/21 84/2 84/4
sake [2]  5/11 5/18
same [18]  5/12 6/7 9/10 14/19 16/6 24/7 30/22 37/16 38/19 62/20 64/5 65/7 66/4 66/23 67/20 73/18 75/23 77/5
saw [7]  11/6 11/11 35/2 35/2 55/21 55/23 63/8
say [20]  6/23 7/5 10/8 12/8 13/19 13/23 17/16 25/8 26/22 28/10 28/20 35/11 44/4 53/7 56/6 58/4 61/12 66/8 69/13 82/3
saying [8]  9/19 10/2 18/1 18/3 35/12 35/15 56/25 71/20
says [10]  10/4 10/6 43/16 46/18 48/5 48/9 48/16 59/4 65/13 74/9
screaming [2]  39/22 46/6
seal [1]  84/20

**S**

search [3]  41/5 41/8 45/10
searched [3]  45/20 46/3 79/8
searches [1]  43/21
searching [1]  43/10
second [4]  38/13 39/13 71/6 72/15
section [1]  81/1
see [13]  11/3 16/22 31/16 53/13 54/23 60/20 63/6 71/24 72/4 72/9 74/1 76/5 79/2
seen [4]  35/13 35/18 76/19 77/20
Seldom [1]  58/3
send [3]  34/15 34/17 36/1
sending [1]  36/11
sent [10]  7/9 18/4 68/21 69/13 69/15 69/19 69/22 74/18 74/22 75/4
separate [2]  59/8 59/9
September [2]  13/14 13/14
September 1 [2]  13/14 13/14
sergeant [10]  17/4 51/21 51/22 52/2 52/6 64/18 74/19 78/15 79/3 79/7
Sergeant Bohman [1]  79/7
Sergeant Kelly [1]  74/19
Sergeant Rose [2]  78/15 79/3
sergeants [1]  77/15
series [1]  63/1
serious [4]  52/8 52/14 52/22 52/23
services [1]  84/17
set [1]  84/19
sets [1]  32/4
seven [3]  15/13 15/15 74/6
shared [1]  74/21
she [6]  32/4 44/15 44/16 44/21 45/4 45/7
sheet [1]  76/10
Sheree [2]  3/14 84/1
sheree.weichold [1]  3/18
shift [6]  52/15 52/16 59/4 59/13 75/2 84/16
shifts [1]  56/18
shopping [1]  57/17
short [3]  5/9 5/9 38/8
should [13]  12/10 16/1 39/3 50/11 54/19 55/5 74/5 76/10 76/19 76/22 77/20 77/25 80/16
shouldn't [1]  54/22
show [2]  8/21 10/18
showed [5]  12/1 34/4 39/18 40/1 40/4
showing [3]  12/2 54/12 57/8
shows [1]  60/14
sic [1]  70/24
signature [1]  83/23
signed [2]  65/13 83/20
since [1]  23/7
sister [2]  20/3 20/8
situation [1]  46/12
situation's [1]  42/25
six [3]  74/6 74/7 76/4

slow [1]  74/12
snips [1]  80/5
so [107]
social [1]  54/13
Solicitor [1]  3/15
some [5]  25/10 54/13 56/20 78/11 81/22
somebody [2]  52/10 79/22
someone [2]  46/17 54/18
something [13]  11/3 17/17 17/20 28/3 28/18 28/20 41/6 46/20 56/7 57/23 59/8 59/9 63/16
Sometime [1]  78/21
sometimes [1]  44/16
somewhere [1]  57/17
sorry [21]  19/25 20/20 26/19 26/21 26/24 27/1 31/6 32/9 33/1 33/1 34/5 64/16 64/21 66/8 69/4 69/6 70/2 70/4 71/4 74/12 75/13
sort [1]  37/2
sounds [1]  64/17
spark [2]  56/22 57/3
speaking [1]  75/7
Special [2]  81/3 81/4
specialist [1]  32/3
specific [9]  8/12 11/7 14/13 30/12 42/14 47/6 50/1 60/7 61/13
specifically [3]  10/2 59/2 71/19
speculate [2]  26/18 26/25
spell [1]  5/24
squad [2]  51/12 51/13
SSN [1]  78/17
standard [3]  36/19 52/12 52/19
start [4]  5/13 12/1 23/1 57/10
started [1]  62/12
starting [1]  12/17
state [9]  2/5 5/22 32/5 59/12 67/4 68/20 78/25 82/18 83/4
stated [9]  9/3 19/7 59/2 68/16 78/24 79/6 79/7 80/9 80/10
statement [4]  53/23 70/15 71/10 71/13
statements [2]  76/3 79/12
states [7]  1/1 41/15 56/6 67/5 68/21 83/11 84/8
stating [5]  9/14 56/10 68/22 69/3 78/5
stay [2]  32/22 43/18
Steffen [5]  70/23 74/10 74/23 75/5 77/16
stenotype [1]  83/14
step [1]  70/23
still [6]  10/19 29/2 29/18 43/18 66/7 66/10
stop [13]  23/10 23/21 23/22 24/17 25/1 25/2 25/6 25/9 25/17 25/20 26/7 32/5 80/17
stopped [3]  24/23 30/16 30/18
stops [6]  25/14 26/2 31/20 31/22 32/8 32/11

stored [1]  31/23
street [4]  2/6 3/9 38/6 51/11
strike [1]  35/19
striking [3]  37/2 37/9 37/15
struck [1]  36/22
struggling [1]  39/21
stuff [2]  45/8 46/7
submit [1]  75/6
submitted [1]  83/22
such [2]  20/10 52/8
sued [2]  40/12 42/10
sufficient [1]  35/4
Sunday [3]  55/22 56/6 57/16
supervising [3]  17/1 17/2 70/14
supervisor [6]  41/3 46/8 51/14 51/19 52/18 53/1
supposed [6]  24/20 28/2 59/3 59/23 60/10 81/22
Supreme [1]  42/1
sure [12]  5/13 11/1 17/9 20/8 23/25 24/10 25/9 42/16 46/9 47/8 51/23 55/20
suspended [4]  59/1 63/11 63/13 69/11
suspending [3]  15/5 15/7 63/11
suspension [13]  4/10 4/16 4/17 14/17 15/4 59/6 60/16 63/22 64/3 64/12 65/5 65/11 68/12
switched [1]  42/1
sworn [2]  5/2 83/6

**T**

T-chat [1]  68/22
take [10]  5/15 5/16 9/4 24/9 38/8 38/21 73/5 73/20 77/7 78/11
taken [8]  1/6 2/3 2/9 9/15 9/24 21/5 83/13 84/5
takes [1]  49/10
taking [4]  5/18 11/19 82/14 84/2
talk [2]  81/23 81/24
talking [9]  26/3 46/10 46/10 46/13 51/6 51/7 53/16 71/19 75/23
taught [2]  43/21 79/4
team [1]  17/11
tell [4]  14/24 48/7 53/11 77/11
tells [1]  6/4
ten [1]  35/11
terminate [2]  60/21 61/6
terminated [5]  60/23 61/1 61/4 61/10 61/17
termination [3]  60/16 62/4 62/6
testified [1]  5/2
testify [1]  83/7
testifying [1]  83/20
testimony [5]  10/20 11/12 11/21 83/17 84/19
text [1]  57/20
texting [1]  54/12
than [6]  13/19 13/22 35/11 43/9 68/12 81/24

Thank [3]  12/16 20/5 47/13
that [346]
that's [42]  9/2 9/6 10/3 10/5 19/4 22/25 26/8 29/13 29/14 32/2 33/2 34/25 39/2 39/6 39/6 40/5 45/8 46/22 48/22 50/1 52/5 52/19 56/24 57/8 57/9 57/11 58/9 58/14 58/18 58/21 59/24 60/6 62/18 63/3 65/20 68/15 70/17 71/5 71/23 72/16 78/3 80/17
their [15]  7/9 7/10 7/11 23/17 30/8 30/18 31/3 32/8 32/10 36/19 61/7 61/8 63/3 84/1 84/13
theirs [1]  31/3
them [15]  11/19 20/4 20/18 25/9 39/22 39/24 46/20 49/21 58/11 61/8 71/18 72/10 78/19 78/23 79/6
then [26]  7/19 10/8 10/12 10/12 20/11 20/11 20/13 23/7 23/11 28/9 34/11 41/10 46/8 46/9 70/3 70/9 70/11 70/13 71/5 71/6 72/1 72/14 72/17 73/6 73/21 79/7
there [83]  7/24 8/2 8/9 8/15 8/17 10/9 10/20 10/22 11/5 11/14 12/5 12/5 17/16 18/25 20/15 20/21 20/25 21/1 21/5 21/9 22/15 22/24 23/17 23/21 24/10 28/6 29/5 31/18 32/3 32/23 33/13 33/24 34/2 34/5 36/8 36/17 37/4 37/6 37/13 39/6 40/7 40/16 41/3 41/16 42/9 42/23 43/8 43/12 47/2 47/14 47/18 47/22 48/3 48/13 49/9 49/15 51/14 51/19 52/21 55/24 56/14 56/21 59/19 60/7 60/8 61/11 63/1 63/1 63/8 68/15 68/19 69/6 72/7 74/5 76/4 79/1 79/7 79/12 79/15 80/7 80/8 81/21 84/4
there's [12]  25/10 25/20 30/12 41/25 43/4 46/5 46/17 46/18 55/4 72/5 74/7 81/17
THEREUPON [1]  82/14
these [4]  9/6 57/19 72/22 72/22
they [41]  9/15 9/24 20/4 20/5 20/9 20/11 20/13 20/16 21/3 22/16 23/14 23/16 23/18 25/9 25/13 28/6 32/7 39/10 40/1 42/8 48/4 48/7 50/11 51/2 51/24 54/22 55/16 60/11 60/11 61/9 67/25 67/25 72/10 74/8 77/14 79/20 79/25 81/8 81/8 81/8 81/9
they're [5]  5/14 15/17 24/11 77/13 77/14
thing [2]  41/4 53/2
things [5]  56/14 56/21 70/18 80/9 81/25
think [21]  9/2 11/16 12/4

## T

think... [18]  17/15 19/23
20/2 20/7 34/25 54/13
55/24 58/13 69/9 70/2 70/5
70/15 70/17 71/16 73/5
73/14 80/15 80/18
thinking [1]  79/22
third [1]  53/14
this [92]
those [18]  21/2 24/1 31/22
32/4 35/14 35/25 39/20
39/24 45/23 46/7 55/5 55/6
73/2 76/3 79/17 79/18
79/21 80/12
though [5]  27/5 32/19 35/1
56/15 63/9
thought [4]  11/4 35/4 51/7
54/15
thousands [1]  43/4
three [3]  24/10 34/22 57/6
three years [2]  34/22 57/6
threw [1]  33/15
through [21]  9/5 21/19 24/9
24/16 47/3 53/17 53/18
53/20 59/12 62/19 70/12
71/17 71/18 74/7 76/4
76/17 77/21 81/16 81/16
81/17 81/17
throwing [1]  39/22
thrown [3]  33/13 33/20
33/22
time [59]  1/14 5/15 8/6 9/2
11/11 17/15 17/16 17/16
19/3 20/14 23/5 23/20
24/13 26/6 30/10 30/16
34/22 35/6 36/3 36/13
36/14 36/20 37/17 40/10
41/25 42/6 42/13 42/21
43/12 43/22 43/25 45/19
48/11 49/9 53/1 54/9 54/24
56/9 56/20 57/9 60/20
62/15 62/21 65/18 66/16
67/10 68/3 68/25 69/19
73/12 74/14 75/11 75/14
76/18 77/9 77/18 80/5
81/11 82/8
times [8]  13/15 13/18 13/24
45/4 58/4 60/7 71/11 71/15
timing [1]  48/10
Tipton [5]  20/3 20/6 20/10
20/12 20/17
Tipton's [1]  20/8
today [6]  6/13 10/20 11/21
12/7 12/8 56/25
today's [1]  6/19
together [1]  77/14
told [3]  29/21 40/10 57/19
tone [3]  79/18 79/25 80/12
too [3]  15/19 23/14 33/7
took [5]  11/13 12/25 13/4
70/23 78/19
tools [1]  33/11
top [1]  9/23
totality [1]  12/3
tow [1]  79/5
towards [2]  79/14 79/16
towed [1]  78/8
traffic [28]  4/13 16/13 16/15
16/16 23/10 23/20 23/22

24/5 24/12 24/17 25/3 25/9
25/14 25/17 25/20 26/5
26/7 31/20 31/22 32/5 32/8
32/11 58/25 59/7 59/11
59/23 80/17 80/21
train [2]  49/3 81/12
trained [1]  79/1
training [3]  52/18 79/4
81/16
transcript [5]  4/8 9/8 10/4
80/18 83/16
transcription [1]  83/15
transcripts [1]  10/6
truck [2]  20/12 20/13
true [2]  70/16 83/16
truth [3]  83/7 83/7 83/8
truthfully [1]  6/3
try [1]  43/14
trying [4]  20/11 29/1 62/5
70/5
turn [4]  43/8 44/24 46/20
53/13
twice [2]  13/25 14/1
two [12]  21/15 21/18 21/24
49/11 49/11 49/24 58/15
68/12 72/4 72/4 72/18
77/15
two hours [3]  49/11 49/11
49/24
two years [2]  72/4 72/18
two-day [1]  68/12
type [2]  25/10 33/8
typewritten [1]  83/16
typically [3]  22/6 46/16
46/21

## U

Uh [9]  18/18 20/1 35/24
52/11 58/8 60/4 72/7 79/24
80/3
Uh-huh [9]  18/18 20/1
35/24 52/11 58/8 60/4 72/7
79/24 80/3
Ullrich [43]  4/11 4/16 4/21
4/23 13/4 13/16 14/17 15/6
17/1 17/2 19/7 36/24 37/1
37/14 58/16 59/22 62/21
63/10 63/22 64/3 66/22
67/6 67/19 68/1 68/6 68/16
70/14 71/9 71/14 71/22
72/21 72/25 74/9 74/22
74/23 75/1 75/7 75/9 76/7
78/5 78/22 79/6 79/6
Ullrich's [9]  17/14 63/6 64/8
66/16 67/10 68/3 70/25
75/5 78/2
ultimately [1]  54/25
under [16]  6/6 6/11 6/15
37/2 37/5 46/6 48/17 50/4
68/10 69/7 69/23 69/24
70/9 70/11 70/23 83/15
under Chief Jones [1]  69/7
underneath [1]  77/15
undersigned [1]  83/3
understand [3]  25/12 28/17
56/19
understandable [1]  26/1
understanding [8]  19/19
42/5 42/22 49/6 59/22
74/14 81/5 81/7

UNINTELLIGIBLE [1]  80/15
Unit [1]  74/21
Unit 906 [1]  74/21
UNITED [3]  1/1 83/10 84/8
unless [4]  6/4 45/15 52/14
54/7
unreasonable [1]  49/13
unsatisfactory [4]  69/8
72/13 74/1 74/4
until [3]  10/13 20/19 42/10
up [16]  18/9 35/12 42/11
44/16 51/10 51/11 51/15
52/18 55/22 58/7 58/9
70/12 72/21 72/25 73/8
77/23
upset [2]  34/7 34/13
us [3]  47/3 53/11 77/11
use [44]  4/14 7/24 8/2 8/9
8/15 8/17 10/9 10/21 10/22
10/23 11/4 11/6 11/14
11/22 11/22 12/5 12/5
22/16 22/17 32/23 33/2
33/5 33/12 35/3 35/16
35/18 35/21 36/7 36/11
37/14 38/14 38/15 38/17
38/22 39/9 51/15 51/18
52/12 52/19 53/10 54/8
55/20 56/7 74/16
used [9]  22/12 22/13 23/10
33/9 33/11 35/19 35/23
39/3 52/8
using [1]  35/17
usually [2]  45/3 72/3

## V

value [1]  79/5
various [1]  78/17
vascular [2]  39/9 39/10
vehicle [11]  20/7 24/23 26/9
26/15 27/9 27/15 27/19
30/17 70/20 78/15 79/8
vehicles [8]  15/1 25/6 32/7
32/10 65/14 72/14 72/18
79/5
verbal [5]  20/9 79/13 79/13
79/14 79/15
very [4]  34/7 34/13 34/22
42/11
via [1]  22/1
video [14]  10/16 10/18 11/4
11/10 11/16 12/1 22/1
31/18 35/2 54/12 57/8
57/10 80/4 81/17
videos [1]  35/7
view [1]  50/2
viewing [2]  36/9 37/23
violate [3]  68/22 71/14
71/22
violated [6]  70/19 71/10
71/16 74/9 74/16 75/10
violating [1]  17/20
violation [3]  55/4 55/7 55/17
violations [6]  4/13 24/5
24/12 55/12 55/15 72/8
viral [1]  34/3
voicemail [1]  34/11

## W

walked [2]  35/12 51/11

wallet [1]  78/16
want [5]  16/24 34/9 36/16
58/14 79/11
wanted [3]  20/6 20/8 60/5
wanting [1]  61/21
warning [1]  44/25
warrant [10]  23/11 23/14
40/8 40/24 41/1 41/5 41/7
42/13 45/14 43/17 47/20
warrantless [4]  40/16 40/21
41/12 43/21
warrants [2]  44/2 44/8
was [222]
Washington [2]  34/10 34/17
wasn't [8]  32/19 57/24 59/3
59/19 59/23 68/17 69/24
78/25
watch [11]  11/25 53/3 53/8
55/19 55/24 56/12 56/14
56/21 57/2 57/2 57/24
watched [3]  35/2 57/10 80/4
watching [2]  10/16 37/18
way [5]  5/20 43/6 57/1
64/17 81/23
ways [1]  43/7
we [28]  5/8 6/10 8/6 11/11
12/11 12/17 12/21 20/19
32/3 35/21 38/8 38/11
38/11 38/13 43/18 52/8
53/3 53/12 58/7 58/12 63/3
70/17 70/23 73/5 73/8 79/5
79/5 84/16
we're [11]  5/10 5/12 7/14
12/17 22/22 22/25 32/22
46/5 71/4 75/23 82/10
We're again [1]  71/4
week [2]  40/11 59/5
weeks [1]  10/14
Weichold [2]  3/14 84/2
well [13]  20/14 26/23 28/9
29/7 34/20 34/21 42/12
51/6 51/10 56/3 59/18
65/15 68/4
went [3]  20/4 34/2 71/10
were [103]
weren't [5]  55/11 55/11
55/14 60/11 72/10
what [101]
what years [1]  13/12
what's [2]  9/17 28/11
whatever [4]  12/22 36/16
43/24 68/13
whatsoever [1]  84/14
when [55]  6/23 7/5 7/15
7/19 8/16 13/10 17/17 19/5
22/14 23/4 23/14 24/23
25/10 25/20 28/4 29/15
30/2 32/7 33/18 34/24 39/4
40/11 40/16 41/4 41/12
46/16 48/10 48/10 48/12
50/8 50/11 52/5 52/24
55/21 56/20 57/12 57/14
58/1 60/8 62/8 62/12 62/15
62/18 62/21 62/23 63/5
64/25 72/24 75/20 76/7
78/1 78/7 79/4 79/5 81/15
where [25]  9/23 10/8 16/13
17/16 20/10 20/14 23/10
35/3 35/8 35/15 35/18
35/19 35/23 36/5 43/8 46/2

**W**

where... [9]  46/7 52/12
52/16 57/4 57/18 68/16
70/5 74/16 75/10
WHEREOF [1]  84/19
whether [2]  8/9 29/5
which [19]  7/3 9/22 11/9
19/7 31/25 51/9 54/8 55/22
59/8 60/14 61/5 64/22 67/8
68/19 68/19 72/18 74/1
74/21 75/16
while [23]  12/25 13/6 13/16
14/9 15/10 18/7 22/20
30/16 32/8 41/21 44/3 44/8
47/20 49/8 49/18 58/25
60/8 60/16 60/21 60/23
68/6 78/14 79/7
white [5]  31/3 37/19 37/24
44/12 44/22
who [10]  15/5 17/4 17/5
33/15 52/2 60/15 61/17
67/25 67/25 69/13
who's [1]  51/19
whole [1]  83/7
Whose [1]  51/1
why [18]  28/17 29/10 33/23
34/25 42/8 48/4 48/7 58/10
58/22 59/14 60/6 62/3 63/3
70/17 71/23 72/4 78/23
79/2
wife [2]  57/17 57/19
will [4]  8/23 9/4 73/14 73/20
Williams [1]  34/9
within [4]  43/18 54/18 55/2
55/18
without [8]  43/15 44/2 44/7
44/13 44/13 47/19 47/20
64/12
witness [5]  1/9 5/1 83/17
83/20 83/22
word [3]  17/21 35/22 39/10
wording [1]  50/9
words [6]  79/13 79/19
79/22 79/25 80/9 80/12
work [3]  37/4 57/21 59/23
worked [5]  16/13 58/25
59/7 59/17 71/25
working [1]  28/13
works [1]  46/21
worn [11]  7/12 23/2 31/19
33/19 35/7 36/5 37/19
37/24 38/4 44/6 50/2
would [75]  6/7 6/12 6/16
8/22 12/8 13/19 13/23
14/14 15/18 18/8 18/9
18/25 19/8 22/3 22/10 25/8
25/16 31/1 31/9 31/18 35/4
35/11 38/14 41/5 44/4
44/15 44/19 44/20 44/23
45/1 45/2 45/10 45/14
47/15 49/12 49/23 51/1
51/12 52/10 53/4 55/21
56/22 58/4 62/18 62/23
63/9 63/16 64/7 64/8 65/17
65/21 66/14 66/14 66/15
66/15 66/18 67/15 68/14
69/23 70/4 70/9 70/10
70/11 71/5 72/1 76/9 76/11
76/11 76/16 76/17 77/7

77/14 80/14 81/18 81/19
wouldn't [3]  44/17 45/4
69/23
wrap [1]  73/8
wrecks [1]  71/12
write [4]  58/19 58/22 59/14
72/22
writeups [1]  63/7
writing [3]  18/22 18/23
83/19
written [10]  10/9 47/10 56/2
56/3 57/1 57/2 64/17 75/12
75/14 75/20
wrote [4]  58/16 59/19 72/21
72/25
WYNN [22]  1/6 3/5 5/8
23/10 23/12 23/19 24/24
27/5 27/8 27/12 27/14 30/3
34/3 39/21 39/25 50/3
50/15 50/18 50/21 50/24
54/3 83/8
Wynn's [1]  79/13

**Y**

yeah [15]  12/12 12/20
15/21 22/25 25/24 26/21
45/12 46/23 47/11 51/8
66/12 71/12 74/7 80/7
80/16
year [6]  16/18 25/6 46/14
58/4 61/8 81/20
years [8]  13/12 34/22 57/6
62/3 70/6 70/12 72/4 72/18
yell [1]  45/4
yelling [1]  39/22
Yep [1]  80/17
yes [87]
yes-or-no [1]  12/4
you [400]
you'll [2]  5/19 72/4
you're [14]  6/11 7/16 11/2
11/9 18/14 26/23 29/15
35/12 49/8 51/6 56/25
75/18 75/18 80/21
you've [4]  29/8 73/21 77/8
79/11
your [57]  5/22 5/24 6/4 6/13
8/5 9/5 10/10 10/20 10/20
11/21 12/6 12/6 13/8 19/19
21/23 23/25 24/22 25/5
25/5 26/2 28/1 28/21 32/23
33/8 35/6 36/3 36/13 40/9
40/13 40/17 41/20 42/5
42/14 42/22 43/20 44/19
47/9 49/3 49/6 53/23 56/15
56/22 57/3 57/23 59/21
59/22 60/8 60/11 62/13
68/11 69/18 77/21 79/10
79/17 81/5 81/11 81/12
yourself [1]  46/2

**\**

\S:\Natalie [1]  84/22

1       A.   I don't understand your question.

2       Q.   The way that you implemented police policies in

3    2021, this is considered a routine escort techniques being

4    used on Anthony Wynn?

5       A.   They were trying to get him to the car, yes.  He

6    was amping it up way high, so...

7       Q.   Yeah.

8       A.   Okay.  Yeah.  It was getting to the point, I'm

9    surprised that OC is not getting deployed or any other kind

10   of -- you know, like you said, the use of forces because

11   he's escalating it by the use of force himself.  I don't

12   know what it goes on to.  Maybe it gets worse or it gets

13   better.  I don't know.

14      Q.   So Anthony is escalating as far as the use of

15   force continuing --

16      A.   Yes, in his actions.

17      Q.   But you're saying officers aren't using any use of

18   force?

19      A.   I don't know if they tripped him.  I can't tell

20   from the video.  If they did and took him down, yes, that

21   would be use of force because they forced him to the ground.

22      Q.   Okay.

23      A.   I don't know if he went down to the ground.  I

24   can't tell from this.  All I know from the part of the



1    apartment so far is he kept on pulling away from the

2    officers, and they just kept on trying to control him.  They

3    get him to the car without any blows, strikes, batons,

4    weapons or anything else.  They kept on saying, "Let's just

5    go to the car" over and over and over.

6         Q.    Okay.  Let's watch it one more time.

7                            (WHEREUPON, a video recording is

8    played.)

9         Q.    I heard when the officers said "pull him down."

10   Did you hear that?

11        A.    I did want to correct one part.  He said, "Look

12   how they've got my wrist."  He never says his wrist is

13   injured there.

14        Q.    That's not what I was asking.

15        A.    But I just wanted to go back on that earlier part.

16        Q.    Yeah.  Did you see where the officer said, "Pull

17   him down"?

18        A.    Yeah.

19        Q.    Yeah.

20        A.    I heard it.

21        Q.    Huh?

22        A.    I heard it.

23        Q.    So then Anthony -- after that, Anthony Wynn is on

24   the ground, correct?

1      A.    So they might have took him down to the ground,

2  correct.

3      Q.    That's at 24:27, correct?

4      A.    Correct.

5      Q.    And there was no use-of-force report written on

6  this, to your knowledge, correct?

7      A.    No.  I didn't even know about it, again, until a

8  couple weeks ago.

9      Q.    All right.

10                    MR. DAVIS:  We'll take a break.

11                    (WHEREUPON, a break was taken in the

12  proceedings.)

13

14                    MR. DAVIS:

15     Q.    So do you know if Anthony Wynn suffered a rotator

16  cuff injury as a result of the January 1, 2021, incident?

17     A.    Not until the lawsuit.

18     Q.    Not until the lawsuit was filed?

19     A.    Uh-huh.

20     Q.    Okay.  Were any officers disciplined as a result

21  of the January 1st, 2021, event?

22     A.    No.

23     Q.    So let's move to the January 16th, 2021, incident.

24     A.    Okay.



# COVINGTON POLICE DEPARTMENT

## SUSPENSION ORDER

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON
CITY OF COVINGTON

On the day of November 27th, 2017, the officer whose name appears here:

**Douglas Ullrich**

committed the following act(s) in violation of the policies and procedures of the Covington Police Department:

On November 27th, 2017, Officer Douglas Ullrich was operating a police vehicle and attempted to follow a vehicle leaving Promontory Drive and lost control of his police vehicle and hit a guardrail. The impact caused minor damage to the front passenger quarter panel, front passenger headlight assembly, and bent the front passenger wheel rim (Report # 17-057800). On March 4th, 2018, the Accident/Pursuit Review Board found Officer Ullrich at fault and recommended official discipline. Officer Ullrich was hired September 5th, 2011, and has had seven previous accidents involving police vehicles, four of the accidents were at fault. On January 23rd, 2017, Officer Ullrich received a suspension day, in which a vacation day was forfeited, and a recommendation of driver training for the previous accidents.

The above-listed action(s) by the charged officer is against the best interests of both the Department, and the citizens in which it serves, and is in violation of <u>Rule 138 (A)- Operating Vehicles,</u> of the Covington, Kentucky Police Department, which states:

Employees of the Police Department shall operate official vehicles in a careful and prudent manner and shall obey all laws and all Agency



PLAINTIFF'S
EXHIBIT
2 Nader
ND. 3/11/24
PENGAD 800-631-6989

COV001451

procedures pertaining to such operation.    Any employee having an accident involving a Police Department vehicle shall summon a superior Officer to the scene to investigate the accident.

It is further acknowledged by the above-named officer that pursuant to KRS 15.520, any officer charged with misconduct which justifies dismissal or punishment has a right to have a hearing before the city legislative body for hearing within sixty (60) days after the charges has been filed.   Chief Robert Nader, as the Department Head, has the authority to suspend said officer from duty/or pay until these charges are heard, and that pursuant to KRS 95.450(5), the above-named officer may not be reinstated to duty and/or pay until such time as these charges are heard.

By order of:

Colonel Robert Nader
Chief of Police

By signing this document, the above-named police officer acknowledges his/her awareness of the charges being asserted against him/her and further acknowledges that he/she has read and fully understands his/her rights under KRS 15.520, the Police Officer's Bill of Rights.

By signing this document, the above-named police officer acknowledges that he/she desires to avoid a formal hearing on the charges being asserted; and/or suspension/termination from duty and/or pay for an indefinite period of time, and voluntarily, of his/her own free will, consents to receiving discipline under the following terms: **One (1) day suspension without pay, no off duty details nor shift overtime the week of and after the suspension day, loss of Safe Driving Day, must attend Driver Training within the next year.**

COV001452



The above-named officer acknowledges and consents to this suspension/termination order being made a part of his/her personnel file.

ACCEPTED AND ACKNOWLEDGED ON THIS ___17th___ DAY OF ___April___, 20 18 .

_____
Defendant Officer

Commonwealth of Kentucky
Kenton County

Subscribed and sworn before me, a Notary Public, by _____ on this __17th__ day of ___April___, 20 18 .

_____
NOTARY PUBLIC
My commission expires: __3/19/2022__

THIS SECTION RESERVED FOR COMMENTS BY THE OFFICER: _____

_____

_____

_____

_____

_____

COV001453



## ADDENDUM

Officer Douglas Ullrich violated the discipline agreed upon - *"One (1) day suspension without pay, no off duty details nor shift overtime the week of and after the suspension day, loss of Safe Driving Day, must attend Driver Training within the next year"* – by working five (5) hours of Traffic Grant overtime on Monday, April 30th, 2018. This was within the week of the Suspension Day that was scheduled for Thursday, May 3rd, 2018.   On Wednesday, May 9th, 2018, Officer Douglas Ullrich asked for permission to speak with Chief Robert Nader about the incident.  During the meeting, Officer Douglas Ullrich apologized for working the Traffic Grant on April 30th, 2018, and stated that he believed that he was not allowed off duty details nor shift overtime for two weeks after the Suspension Day and realized the error when he re-read the original administered discipline.  The discipline has been revised to *"no off duty details nor shift overtime until after June 3rd, 2018."*

The above-named officer acknowledges and consents to this suspension/termination order being made a part of his/her personnel file.

ACCEPTED   AND   ACKNOWLEDGED   ON   THIS   _____4TH_____  DAY   OF _____

_____May_____ , 20 _18_ .

_____
Defendant Officer

Commonwealth of Kentucky
Kenton County

Subscribed   and   sworn   before   me,   a   Notary   Public,   by ____DOUG  ULLRICH_____  on   this   ___9th___   day   of ____MAY_____ , 20 _18_ .

_____
NOTARY PUBLIC
My commission expires: 3/9/2022

THIS SECTION RESERVED FOR COMMENTS BY THE OFFICER: _____


PLAINTIFF'S EXHIBIT
3 Nader
NO. 3/11/24

COV001454

COV001455

*General Order Traffic-JU*

    f.  In the event of a sobriety checkpoint, it is recommended that the contact Officer utilizes a statement or question similar to the following upon contact with the driver of a stopped vehicle: *"Good evening. This is a sobriety checkpoint aimed at deterring impaired driving. Have you consumed any alcohol or drugs today?"*

    g.  Motorists should not be detained any longer than is necessary to perform a cursory examination to look for signs of intoxication or check for license and registration.

    h.  During the conversation with the driver, the contact law enforcement Officer will establish if reasonable suspicion exists to warrant further investigation.

    i.  The contact Officer shall pay particular attention to any symptoms or indicators of impairment to include but not limited to:

6. Contingency Planning - Any deviation from the predetermined guidelines must thoroughly document the reason for the deviation. (I.e. traffic congestion, intermittent inclement weather.)

7. Data collection and evaluation- To monitor and ensure standardization and consistency of the traffic safety checkpoint program a systematic method of data collection will be incorporated.

    a.  After action report may include, but is not limited to:
        1)  Time, date, and location of checkpoint.
        2)  Weather conditions.
        3)  Number of vehicles passing through checkpoint.
        4)  Average time delay to motorists.
        5)  Predetermined order of selecting motorists
        6)  Number and types of arrests.
        7)  Number of motorists detained for field sobriety testing.
        8)  Identification of unusual incidents such as safety problems/other concerns.

    b.  To assist in determining the effectiveness of a checkpoint operation, a periodic impact analysis will include the following types of information.
        1)  Crash rate reduction.
        2)  Impaired driving offenses.
        3)  Other traffic related incidents.
        4)  Public opinion survey to determine increased perception of detection and apprehension of impaired drivers.

## 61.1.6    Traffic Stop Procedures (CALEA 61.1.7) (KACP 22.5)

A. Each time an Officer conducts a traffic stop; there is an unknown risk of danger. For the Officer and violator, safety is of paramount importance. Therefore, adequate precautions must be taken. No two traffic stops are exactly alike. The



PLAINTIFF'S EXHIBIT 4 Nader NO 3/11/24

following guidelines are provided for Officers while conducting stops of traffic violators:

1. The Officer should choose the location for the vehicle stop carefully, considering the following:
   a. Traffic congestion
   b. Pedestrian presence
   c. Road conditions
   d. Surrounding terrain
   e. Street lighting, illumination
   f. Available cover
   g. Visibility to traffic
2. The Officer shall inform dispatch of the location, vehicle license plate state and number, vehicle description, the number of occupants in the vehicle and the location of the stop a second time.
3. The Officer should activate his emergency lights to alert the driver to stop and, if necessary, use the siren to get the driver's attention. For safety, especially at night, the emergency lights should remain activated during the course of the stop. At a minimum, the rear of the emergency lights shall remain activated.
4. If conducting a traffic stop at night, the Officer should also use the patrol vehicle's takedown lights and spotlight to illuminate the interior of the vehicle after the vehicle has stopped.
5. The Officer should position the patrol car about 15 feet behind and about 3 feet to the left of the stopped vehicle, with the front wheels of the patrol vehicle turned sharply to the left.
6. Before exiting the patrol car, the Officer should observe the interior of the stopped vehicle for any unusual movement or activity, be aware of roadway traffic, and exercise caution when exiting the patrol vehicle.
7. While approaching the vehicle the Officer should:
   a. Approach the stopped vehicle cautiously, staying close to the side of the vehicle, and taking care to not expose himself to any possible acts of aggression from the driver or the occupants.
   b. Be observant of all parts of the vehicle, as well as the vehicle's occupants, their movements, and their hands.
   c. For the safety of the Officer, it is permissible for the Officer to order all occupants out of the vehicle and briefly detain them during the stop. Although permissible, the Officer should carefully consider all safety issues arising from the removal of the occupants from the confinement of the vehicle.
   d. If the driver of the stopped vehicle exits the vehicle prior to the Officer making his approach, or exits the vehicle as the Officer is approaching, the Officer should instruct the driver to return to the stopped vehicle. The Officer should be prepared to take evasive action in case the driver makes threatening advances upon the Officer.
   e. The Officer should make contact with the driver of the vehicle,

1) The Officer shall greet the violator and identify himself/herself by name.
2) The Officer should explain the reason for the stop.
3) The Officer shall ask the operator of the vehicle if there was a legitimate reason for doing what he/she did.
4) The Officer shall ask where the driver's license, insurance and registration information is located before asking him/her to retrieve any of them.
5) The Officer shall give instructions to the violator to follow (e.g. remain in the vehicle and buckle up) as he/she reviews documentation and decides what action to take.
6) The Officer shall issue the appropriate warning or citation and let the violator know that the traffic stop is over.

f. Officers should strive to make each contact educational, leaving the violator with the impression that the Officer has performed a necessary task in a fair, impartial and courteous manner using one of the following methods:

g. The Officer should indicate a return to service to dispatch upon completing the traffic stop

8. Special Considerations
   a. Reassure children and other occupants in the vehicle who may be frightened by the presence of an Officer.
   b. Have cards written in English, and in other appropriate languages, or know how to ask in that language, that indicates the officer's request for the driver license, registration and proof of insurance.
   c. Be aware of cultural differences. In some cultures, persons may talk softly, while in other cultures, person may talk loudly. Some persons my use less eye contact, stand close to the person they're talking to or, on the other hand, feel uncomfortable if the officer is standing too close.
   d. Avoid stating the specific fine, number of points, court costs. This could increase tension. If you are asked the amount of the fine respond accordingly.
   e. ***NEVER base the stop or post-stop actions on race, gender, religion, disabilities, national or ethnic origin, sexual orientation, or socioeconomic status.***

B. Felony Traffic Stops - The felony vehicle stop is the most dangerous type of stop a police Officer makes. This type of stop should always be conducted by two or more police Officers, using at least two patrol cars. Officers should use the steps for regular stop and should attempt the following, whenever possible:
   1. Prior to initiating a felony vehicle stop, Officers should ensure that backup Officers and patrol cars are on the scene.
   2. Before exiting the vehicle, the Officer should attempt to determine the number of occupants of the stopped vehicle and inform the dispatch of such.
   3. The Officer should position his patrol vehicle about 20 feet to the rear and

*Page 13 of 23*

at about a 45-degree angle to the stopped vehicle, with the front wheels turned sharply to the left. The Officer should occupy a position using the cover provided by the patrol car.

4. The Officer initiating the stop shall be the Officer in charge of the stop. The backup Officer should position his patrol vehicle about three feet to the right of the rear of the initiating Officer's patrol vehicle, facing the stopped vehicle and offset slightly toward the right side. The backup Officer should occupy a position using the cover provided by the patrol cars. The backup Officer should be the Officer to apply handcuffs.

5. The initiating Officer should control the occupants of the stopped vehicle by issuing commands to the driver and then the occupants, using the patrol vehicle's public address system when practicable. The initiating Officer should direct the driver and occupants out of the car and back to a backup Officer to be searched and secured.

6. The commands should be kept simple, clear, and direct.

7. Under no circumstances should Officers approach an occupied vehicle during a felony stop. If the occupant/s refuse to exit the vehicle or comply with instructions from the initiating Officer, the situation should then be handled as a barricaded suspect incident and appropriate procedures followed.

8. At the conclusion of the felony vehicle stop, the initiating Officer shall inform dispatch of the disposition of the stop and the status of all Officers involved in the stop.

### 61.1.7    DUI Procedures (CALEA 1.2.4, 61.1.10)

A. Policy – The Covington Police Department by means of procedures and uniformity of enforcement is dedicated to maintaining proficiency in the detection, apprehension and processing of persons who drive under the influence of alcohol and/or drugs.

B. Definitions

1. Acetone – As used referring to a diabetic's reaction to insulin is a "fruity" smell on the diabetic's breath.

2. Alcohol Concentration – Either grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath (KRS 189.005(1))

3. Driving Under The Influence – KRS 189A.010 Operating motor vehicle with alcohol concentration of or above 0.08, or of or above 0.02 for persons under age twenty-one, or while under the influence of alcohol or other substance which impairs driving ability prohibited.

4. Refusal – Declining to submit to any test or tests pursuant KRS 189A.103. Declining may be either by word or by the act of refusal. If the breath testing instrument for any reason shows an insufficient breath sample and the alcohol concentration cannot be measured by the breath testing instrument, the law enforcement Officer shall then request the defendant to take a blood or urine test in lieu of the breath test. If the defendant then

3. When possible the local game or animal warden should be notified to determine if the animal can be saved or should be destroyed in a safer manner.
4. In the event an Officer determines that a sick or injured animal needs to be destroyed, the Supervisor on duty shall be notified and give approval. Supervisors should, unless deemed unreasonable, respond to the scene prior giving authorization.
5. If deadly force is used on an animal to prevent harm to the Officer or other individuals, e.g. vicious dog, a use of force report is required. When force is used to relieve the suffering of an injured animal, a KYOPS E-Call Response is to be completed.

E. Choke Holds/Vascular Neck Restrictions:
1. The use of any technique restricting the intake of oxygen and temporary blood flow to the brain for incapacitation (vascular neck restriction) for the purpose of gaining control of a subject is prohibited, unless deadly force would be considered reasonable.
2. Choke holds or any other use of force that relies on the restriction of oxygen intake has the potential to result in serious injury or death. Such applications can result in physical airway injuries that prevent successful medical interventions. This prohibition also relates to restricting airflow in an effort to recover ingested evidence.

### 1.3.3   Use of Deadly Force to Apprehend a Fleeing Felon or a Person Suspected of Being a Felon (CALEA 4.1.2) (KACP 1.3c)

A. The use of deadly force to prevent the escape of all felons or felony suspects, whatever the circumstances, is constitutionally unreasonable.
B. If an Officer has probable cause to believe that a suspect's actions demonstrate their capability to cause serious physical harm to either the Officer themselves, or to others, and that the threat of such harm is imminent, deadly force may be used.

### 1.3.4   Employee Training in Policies Required (CALEA 4.3.2, 4.3.4) (KACP 1.3e)

All employees issued weapons shall be issued a copy of this General Order and receive classroom instruction on its contents prior to being authorized to carry a weapon. A copy of the training record and the signed policy receipt shall be placed into the employee's training file.

### 1.3.5   Restrictions on the Use of Firearms (CALEA 4.1.2, 4.1.3) (KACP 1.3d)

A. Shoot to stop - Officers will fire their weapons not to kill but rather to <u>stop</u> an assailant from completing an act that would likely inflict serious injury or death to



PLAINTIFF'S
EXHIBIT
5 Nader
NO 3|11|24



# COVINGTON POLICE DEPARTMENT

## SUSPENSION ORDER

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON
CITY OF COVINGTON

On the 8th of March, 2016, the officer whose name appears here:

**Officer Doug Ullrich**

committed the following act(s) in violation of the policies and procedures of the Covington Police Department:

*Officer Ullrich was ordered to log evidence by Sgt. Bogard. As the case evolved (Rpt. # 16-009751), Officer Ullrich informed Sgt. Bohman of the additional information. Sgt. Bohman reaffirmed Sgt. Bogard's initial order of logging the evidence and instructed Officer Ullrich to ask for assistance for the evidence to be examined at a later time. Officer Ullrich did not follow such lawful order and further investigated the evidence himself.*

The above-listed action(s) by the charged officer is against the best interests of both the Department, and the citizens in which it serves, and is in violation of <u>Rule 117-Insubordination,</u> of the Covington, Kentucky Police Department, which states:

Employees shall promptly obey any lawful orders of a superior Officer. This will include orders relayed from a superior Officer by an Officer of the same or lesser rank.

It is further acknowledged by the above-named officer that pursuant to KRS 15.520, any officer charged with misconduct which justifies dismissal or punishment has a right to



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
6 Nader
NO 3/11/24

COV001473

have a hearing before the city legislative body for hearing within seventy-five (75) days after the charges have been filed.   Chief Bryan Carter, as the Department Head, has the authority to suspend said officer from duty/or pay until these charges are heard, and that pursuant to KRS 95.450(5), the above-named officer may not be reinstated to duty and/or pay until such time as these charges are heard.

By order of:

*Col BCarter*

Colonel Bryan Carter
Chief of Police

By signing this document, the above-named police officer acknowledges his/her awareness of the charges being asserted against him/her and further acknowledges that he/she has read and fully understands his/her rights under KRS 15.520, the Police Officer's Bill of Rights.

By signing this document, the above-named police officer acknowledges that he/she desires to avoid a formal hearing on the charges being asserted; and/or suspension from duty and/or pay for an indefinite period of time, and voluntarily, of his/her own free will, consents to receiving discipline in the form of an:   **One (1) day of suspension without pay.**

The above-named officer acknowledges and consents to this **letter of suspension** being made a part of his/her personnel file.

ACCEPTED   AND   ACKNOWLEDGED   ON   THIS   24th   DAY   OF
_____March_____, 20_26_ .

_____ 0265
Defendant Officer

**COV001474**

Commonwealth of Kentucky
Kenton County

Subscribed   and   sworn   before   me,   a   Notary   Public,   by
_Drig Ullrich_____ on  this  _24th_ day of
_March_____, 20 _16_ .

_Q.B. Umbarger #524686_____
NOTARY PUBLIC
My commission expires: _12/18/18_____

THIS SECTION RESERVED FOR COMMENTS BY THE OFFICER: _____

_____
_____
_____
_____
_____

COV001475

# COVINGTON POLICE DEPARTMENT

## SUSPENSION ORDER

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON
CITY OF COVINGTON

On the day of September 11th, 2016, the officer whose name appears here:

### Doug Ullrich

committed the following act(s) in violation of the policies and procedures of the Covington Police Department:

*On September 11th, 2016, Officer Ullrich was operating a police vehicle at the Kenton County Detention Center, 3000 Decker Crane Lane. Officer Ullrich was approaching a group of Deputies standing outside the jail when he misjudged the clearance to the building and struck the exterior door, causing moderate damage to the door (Report # 16-043186). On January 9th, 2017, the Accident/Pursuit Review Board found Officer Ullrich at fault and recommended official discipline. Officer Ullrich was hired September 5th, 2011, and has had six previous accidents involving police vehicles, three of the accidents were at fault. On November 11th, 2015, Officer Ullrich received an official letter of reprimand and a recommendation of driver training for the previous accidents.*

The above-listed action(s) by the charged officer is against the best interests of both the Department, and the citizens in which it serves, and is in violation of <u>Rule 138 (A)- Operating Vehicles,</u> of the Covington, Kentucky Police Department, which states:

Employees of the Police Department shall operate official vehicles in a careful and prudent manner and shall obey all laws and all Agency



PLAINTIFF'S
EXHIBIT
7 Nadin
NO 3/11/24

COV001470

procedures pertaining to such operation.   Any employee having an accident involving a Police Department vehicle shall summon a superior Officer to the scene to investigate the accident.

It is further acknowledged by the above-named officer that pursuant to KRS 15.520, any officer charged with misconduct which justifies dismissal or punishment has a right to have a hearing before the city legislative body for hearing within sixty (60) days after the charges has been filed.   Chief Bryan Carter, as the Department Head, has the authority to suspend said officer from duty/or pay until these charges are heard, and that pursuant to KRS 95.450(5), the above-named officer may not be reinstated to duty and/or pay until such time as these charges are heard.

By order of:


Colonel Bryan Carter
Chief of Police


By signing this document, the above-named police officer acknowledges his/her awareness of the charges being asserted against him/her and further acknowledges that he/she has read and fully understands his/her rights under KRS 15.520, the Police Officer's Bill of Rights.

By signing this document, the above-named police officer acknowledges that he/she desires to avoid a formal hearing on the charges being asserted; and/or suspension/termination from duty and/or pay for an indefinite period of time, and voluntarily, of his/her own free will, consents to receiving discipline under the following terms:  **One (1) day suspension.**

The above-named officer acknowledges and consents to this suspension/termination order being made a part of his/her personnel file.



# COVINGTON POLICE DEPARTMENT

# OFFICIAL LETTER OF REPRIMAND

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON
CITY OF COVINGTON

On multiple dates, the officer whose name appears here:

**Officer Doug Ullrich**

committed the following act(s) in violation of the policies and procedures of the Covington Police Department:

On May 17th, 2014, Officer Ullrich was involved in a use of force with his taser where the suspect was running, not showing active aggression towards the officer when tased.

On May 22nd, 2014, Officer Ullrich was involved in an on-duty accident where policy was violated.

On May 25th, 2014, Officer Ullrich improperly completed paperwork for evidence submitted in an assault case.

On June 10th, 2014, a notice was sent to Lt. Steffen regarding poor care and maintenance of the pool unit that Officer Ullrich had been utilizing.

On June 27th, 2014, Officer Ullrich sent an MDT chat message to several officer stating "I violate every policy."

On June 28th, 2014, Officer Ullrich failed to properly collect property from a vehicle during the execution of a search warrant.



PLAINTIFF'S
EXHIBIT
8 Naden
NO 3/11/24
PENGAD 800-631-6989

COV001456



The above-listed action(s) by the charged officer is against the best interests of both the Department, and the citizens in which it serves, and is in violation of <u>Rule 111- Unsatisfactory Performance,</u> of the Covington, Kentucky Police Department, which states:

Officers shall maintain sufficient competency to properly perform their duties and assume the responsibility of their positions. Officers shall perform their duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the department. Unsatisfactory performance may be demonstrated by a lack of knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to conform to work standards established for the officer's rank, grade, or position; the failure to take appropriate action on the occasion of a crime, disorder, or other condition deserving police attention; or absence without leave. In addition to other indicators of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance: repeated poor evaluations or a written record of repeated infractions of rules, regulations, directives or orders of the department.

It is further acknowledged by the above-named officer that pursuant to KRS 15.520, any officer charged with misconduct which justifies dismissal or punishment has a right to have a hearing before the city legislative body for hearing within sixty (60) days after the charges have been filed. Chief Spike Jones, as the Department Head, has the authority to suspend said officer from duty/or pay until these charges are heard, and that pursuant to KRS 95.450(5), the above-named officer may not be reinstated to duty and/or pay until such time as these charges are heard.

By order of:

Colonel M. Spike Jones
Chief of Police

COV001457



By signing this document, the above-named police officer acknowledges his/her awareness of the charges being asserted against him/her and further acknowledges that he/she has read and fully understands his/her rights under KRS 15.520, the Police Officer's Bill of Rights.

By signing this document, the above-named police officer acknowledges that he/she desires to avoid a formal hearing on the charges being asserted; and/or suspension from duty and/or pay for an indefinite period of time, and voluntarily, of his/her own free will, consents to receiving discipline in the form of an: **Official Letter of Reprimand**.

The above-named officer acknowledges and consents to this letter of reprimand being made a part of his/her personnel file.

ACCEPTED   AND   ACKNOWLEDGED   ON   THIS   _____14th_____   DAY   OF
_____July_____, 20 _14_ .

_____0265_____
Defendant Officer

Commonwealth of Kentucky
Kenton County

Subscribed   and   sworn   before   me,   a   Notary   Public,   by
_Douglas Ullrich_____ on   this   _14th_   day   of
_July_____, 20 _14_ .

_____ 449393
NOTARY PUBLIC
My commission expires: _8/27/2015_

THIS SECTION RESERVED FOR COMMENTS BY THE OFFICER: _____

_____
_____
_____
_____
_____



# Covington Police
### Chief's Office

1 Police Memorial Drive
Covington, KY 41014
Phone: (859) 292-2222
Fax: (859) 292-0333

### *Memorandum*

**TO:** Chief Carter
**FROM:** Lt. Col. Nader
**CC:** N/A
**DATE:** 3/11/2016
**RE:** Request for Formal Discipline- Officer Ullrich

Attached is a request from Captain Donelan for Officer Doug Ullrich to receive a 2 day suspension. This request stems from an insubordinate act by Officer Ullrich in which he did not obey the lawful order from a superior Officer, whom in this particular case is Sgt. Steve Bohman.

During an investigation of an accident with injuries (Report # 16-009751, 0353hrs, 3/8/16), the driver fled and was later apprehended. During the investigation, officers recovered a locked metal gun safe from the involved vehicle. At the time of the collision investigation, Sgt. Bogard instructed Officer Ullrich to log the locked gun safe as property until the actual owner could be determined. At approximately 0844hrs, Sgt. Bohman noticed that Officer Ullrich was still working on the report. Sgt. Bohman called Officer Ullrich and asked if First Shift Officers could assist. Officer Ullrich advised that he was at the jail to lodge his prisoner from the collision, later located by the shift, and had two items to log as evidence. Officer Ullrich advised that he would be completed with the call at approximately 1000hrs.

Officer Ullrich called back Sgt. Bohman at approximately 0932hrs to inform the supervisor of additional information. Officer Ullrich discovered that his arrestee was a convicted felon and that he could see what appeared to be a gun in the metal gun safe (prior damage allowed partial vision of contents). Officer Ullrich also took upon himself to call Assistant CAO Casey Burns and asked if he needed a search warrant to open the metal safe box, which the CAO responded that he did not. Officer Ullrich added that he wanted to pry the box open to charge the arrestee. Sgt. Bohman informed Officer Ullrich to log the evidence and to coordinate with the Crime Bureau and Crime Lab to open the box at a later time, since Officer Ullrich was aready working an hour and a half after the shift (overtime) and because the arrestee was already lodged for a felony (Theft of Identity) and could be charged via warrant on a later date. Officer Ullrich then expressed his concern about the possibility of the subject bonding out and leaving the area, due to the subject not residing locally. Sgt. Bohman informed Officer Ullrich that the warrant, if


PLAINTIFF'S
EXHIBIT
9 Nader
NO 3/11/24

COV001468

evidence supported the chages, would be issued and entered into NCIC and the subject would be eventually arrested. Their conversation ended there.

During a conversation on 3/9/16 with Sgt. Bogard, Sgt. Bohman was advised that Officer Ullrich asked the Crime Lab for assistance in opening the metal gun safe. The lab technicians were busy with their assignments, but supplied the tools for Officer Ullrich to complete the task. Officer Ullrich opened the box and discovered the "pistol" was a BB gun and he did not have evidence to charge his arrestee with Possession of a Handgun by a Convited Felon.

Sgt. Bohman called Officer Ullrich to ask him for the reason he opened the metal gun safe when he was already instructed to log the item. Officer Ullrich replied that Sgt. Bohman's orders were not clear and that he may have misunderstood him.

This is in violation of Rule 117- Insubordination, which states "Employees shall promptly obey any lawful orders of a superior officer." This is also in violation of a policy, which is similar to Rule 117, 11.2.4 Obedience to Orders, which states "Employees are required to obey any lawful order of a supervisor, including any order relayed from a supervisor by an employee of the same or lesser rank."

If Officer Ullrich was concerned about a conflict with the original order from Sgt. Bogard to log the metal gun safe before it was later determined that the fleeing subject, who was later apprehended, was a convicted felon, he was able to relay that information to Sgt. Bohman. After listening to the update, Sgt. Bohman advised the same original order from Sgt. Bogard, which was to log the metal gun safe. After receiving the order, Officer Ullrich was also able to advise his concern about the arrestee bonding out and leaving the area. Sgt. Bohman still did not waiver in his order. In this instance, Officer Ullrich also violated policy 11.2.5 Conflicting Orders, which states in part, "Employees who are given an otherwise proper order which is in conflict with a previous order or directive shall respectfully inform the person issuing the second order of the conflict…If the supervisor issuing the conflicting order does not alter or retract the order the employee will carry out the most recent order." Officer Ullrich did not carry out the most recent order.

I reviewed Officer Ullrich's personnel file and found two Official Letter of Reprimands. The first letter was dated 7/14/14 and was for violation of Rule 111- Unsatisfactory Performance and the second letter was dated 12/15/14 for violation of Rule 138- Operating Vehicles.

After review of the personnel file and Captain Donelan's request for 2 days suspension, I believe that 1 day of suspension applies in this particular case.

COV001469



# COVINGTON POLICE DEPARTMENT

# OFFICIAL LETTER OF REPRIMAND

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON
CITY OF COVINGTON

On November 15th, 2014, the officer whose name appears here:

**Officer Doug Ullrich**

committed the following act(s) in violation of the policies and procedures of the Covington Police Department:

*On November 15th, 2014, Officer Ullrich was found to be at-fault in a motor vehicle accident. This determination was made by the Accident Review Board of the Covington Police Department which met on 11/20/2014.*


The above-listed action(s) by the charged officer is against the best interests of both the Department, and the citizens in which it serves, and is in violation of <u>Rule 138-Operating Vehicles,</u> of the Covington, Kentucky Police Department, which states:


Members of the Police Department shall operate official vehicles in a careful and prudent manner and obey all laws and all departmental procedures pertaining to such operation. Any member having an accident involving a Police Department vehicle shall summon a superior officer to the scene to investigate the accident.


It is further acknowledged by the above-named officer that pursuant to KRS 15.520, any officer charged with misconduct which justifies dismissal or punishment has a right to have a hearing before the city legislative body for hearing within sixty (60) days after the



PLAINTIFF'S
EXHIBIT
10 Nader
NO 3/11/24
PENGAD 800-631-6989

COV001465



charges have been filed.   Chief Spike Jones, as the Department Head, has the authority to suspend said officer from duty/or pay until these charges are heard, and that pursuant to KRS 95.450(5), the above-named officer may not be reinstated to duty and/or pay until such time as these charges are heard.

By order of:

Colonel M. Spike Jones
Chief of Police

By signing this document, the above-named police officer acknowledges his/her awareness of the charges being asserted against him/her and further acknowledges that he/she has read and fully understands his/her rights under KRS 15.520, the Police Officer's Bill of Rights.

By signing this document, the above-named police officer acknowledges that he/she desires to avoid a formal hearing on the charges being asserted; and/or suspension from duty and/or pay for an indefinite period of time, and voluntarily, of his/her own free will, consents to receiving discipline in the form of an: **Official Letter of Reprimand**.

The above-named officer acknowledges and consents to this letter of reprimand being made a part of his/her personnel file.

ACCEPTED   AND   ACKNOWLEDGED   ON   THIS   _15_   DAY   OF _December_, 20 1 4 .

_____ 0265

Defendant Officer

Commonwealth of Kentucky
Kenton County

Subscribed   and   sworn   before   me,   a   Notary   Public,   by _____ on   this _16TH_   day   of _DECEMBER_, 20 14 .

_Anita M Schafer_
# 517447

COV001466

NOTARY PUBLIC
My commission expires: _8/31/18_____

THIS SECTION RESERVED FOR COMMENTS BY THE OFFICER: _____

_____

_____

_____

_____

_____

COV001467



*Covington Police 2nd Shift/Power Shift*

# Memo

**To:**   Lt. Steffen
**From:**  Sgt. Mears
**Date:**  6/30/2014
**Re:**    Officer Ullrich

---

    On 6/29/2014, after returning from three weeks of training in Richmond, Sgt. Rose advised me of two recent on-duty incidents that occurred involving Officer Ullrich. The first incident involved Officer Ullrich conducting a search warrant on a vehicle that was being secured in the garage at police headquarters. Officer Ullrich failed to remove a wallet in the center console of the searched vehicle containing an Ohio OL, PNC bank card, SSN card, CCDW license, and $800 cash. Sgt. Rose ultimately logged these items into evidence and completed the proper paperwork, but when Officer Ullrich was confronted by Sgt. Rose over the phone the reasoning for not logging these items of value, Ullrich replied that he was never trained. Furthermore, Officer Ullrich added that Sgt. Bohman was there during the search of the vehicle and never said anything about logging the money. Sgt. Rose contacted Sgt. Bohman regarding this allegation from Officer Ullrich, to which Sgt. Bohman stated the only part he played in the search of the vehicle was giving Officer Ullrich lockout equipment so he could open the vehicle. Sgt. Bohman stated that once the car door was open he did not watch Officer Ullrich search the vehicle until his search was complete. However, Sgt. Bohman stated he knew Officer Ullrich located the $800 cash but didn't know the money was not logged as evidence until Sgt. Rose notified him.

    The second incident involved Officer Ullrich making unprofessional comments while logged onto his MDT in the CHAT section. Sgt. Rose advised me that while he was having an informal conversation with Officers Auton and Williams in the Supervisor's office at headquarters on 6/28/14, Officer Auton made him aware of a particular conversation on the MDT chat room where Officer Ullrich made a comment about how he "violates all policies."

    In addition to the aforementioned incidents,  the following events have occurred while I have been Officer Ullrich's direct supervisor:

    1.) Officer Ullrich was counseled by Lt. Steffen in June 2014 regarding a Defensive Action Report where he violated the Use of Force Policy.

    2.) In June 2014 Officer Gangwish sent an email to Sgt. Kelley regarding the lack of cleanliness and maintenance as it pertains to Unit 906 which is shared by Officer Gangwish and Ullrich.

    3.) In June 2014 Michelle Robinson sent an email to Lt. Steffen requesting Officer Ullrich correct a report number.

    4.) On 5/26/2014 I conducted an in-depth informal discussion with Officer Ullrich regarding performance issues as it relates to his patrol duties on Power Shift (attached paperwork regarding discussion.)

1

**PLAINTIFF'S EXHIBIT**
*11 Nader*
*ND 3/11/24*

**COV001460**

5.) On 5/28/14 Dawn Bayless sent an email to Lt Steffen regarding Officer Ullrich's failure to submit evidence properly. This occurred just days after speaking with Officer Ullrich in person regarding his performance.

6.) On 5/22/2014 Officer Ullrich was involved in on-duty accident where he violated policy.

Attached you will find the all the documentation citing the above events concerning Officer Ullrich's conduct and performance.

Finally, I would like to add that it is troubling to see such a young officer with such potential continue to ignore the advice and counseling of senior officers and supervisors. It is my opinion as a supervisor that we must give each officer the chance to learn from mistakes, but when repeated efforts by numerous supervisors are blatantly ignored, then one can only believe the officer is acting negligently and that cannot be tolerated. That being said, it is my firm recommendation that disciplinary action be taken against Officer Ullrich for violating Covington Police Rule 111 which states:

**Unsatisfactory Performance**
Officers shall maintain sufficient competency to properly perform their duties and assume the responsibility of their positions. Officers shall perform their duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the Department. Unsatisfactory performance may be demonstrated by a lack of knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to conform to work standards established for the officer's rank, grade, or position; the failure to take appropriate action on the occasion of a crime, disorder, or other condition deserving police attention; or absence without leave. In addition to other indicators of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance: repeated poor evaluations or a written record of repeated infractions of rules, regulations, directives or orders of the Department.

Respectfully,

Sgt. Mears

2nd Shift Sergeant

● Page 2

COV001461



*Covington Police 2nd Shift/Power Shift*

# Memo

**To:**  Lt. B. Steffen

**From:**  Sgt. Rose

**Date:**  6/29/2014

**Re:**  Officer Ullrich

---

On 6/28/2014, I received a voicemail from Sgt. Kelley, stating the black 2015 Ford Fusion that was in the garage at police headquarters was ready to be towed to Jess & Sons. I then called Sgt. Kelley and she advised the search warrant had been served on the vehicle and it could be removed to Jess & Sons lot. I had Jess & Sons respond to tow the vehicle. Since I was unable to locate the tow log for the vehicle, I filled out a new one. While I was inventorying the vehicle, I located in the center console, a wallet that contained; a OH OL, PNC bank card, SSN card, CCDW license and various other papers. Also located in the center console was $800.00 cash. I took all items and logged them in property in the Covington Police Evidence Room. Sometime later I received a call from Officer Ullrich, during our conversation, I asked him why he did not remove the items and log them. Officer Ullrich stated that he did not know that he needed to. I asked him if anyone had ever taught him when he was in training, that we do not leave items of value in vehicles when we tow them. Officer Ullrich stated "no." Officer Ullrich then stated that Sgt. Bohman was there while he searched the vehicle and never said anything about it. I then informed Officer Ullrich, that in the future to make sure that he logs all items of great value.

I spoke with Sgt. Bohman, who advised me that he gave Officer Ullrich his lockout equipment to open the car in order to serve the search warrant. Sgt. Bohman further stated he did not stand and watch Officer Ullrich search the vehicle the entire time, however he did know that Officer Ullrich located the $800.00. Sgt. Bohman stated, he did not realize that Officer Ullrich hadn't logged the money until I notified him.

While in the office, I was talking to Officers Auton and Williams. I don't remember the entire conversation, but Officer Auton made a comment that there was a conversation on the MDT chat room where some joking around was going on. At some point during the conversation, Officer Ullrich made the comment that he "violates all policies," or something to that effect. Officer Auton sated at that point, he advised, via the chat room, to watch what was being said in the chat room, as your texts do not go away just because you end the conversation and delete it.

Sgt. Robert Rose



PLAINTIFF'S EXHIBIT
12 Nadiu
NO 3/11/24
PENGAD 800-631-6989

1

COV001459