**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 21-137-DLB-CJS**

**ANTHONY MARIO WYNN**                                                      **PLAINTIFF**

**v.**                             **MEMORANDUM OPINION AND ORDER**

**CITY OF COVINGTON, et al**                                            **DEFENDANTS**

**\*\*\* \*\*\* \*\*\* \*\*\***

Defendants City of Covington; Robert Nader, individually and in his official capacity as Chief of the Covington Police Department; and Doug Ullrich, John Murphy, and Danny Elsbernd, individually and in their official capacities as police officers for the City of Covington ("Defendants"), have filed a Motion for Summary Judgment. (Doc. # 56). Plaintiff Anthony Mario Wynn has filed his Response (Doc. # 73), and Defendants have filed their Reply (Doc. # 83). This matter is now ripe for review. For the reasons stated below, Defendants' Motion for Summary Judgment (Doc. # 56) is **granted**.

**I.       FACTUAL AND PROCEDURAL BACKGROUND**

The instant action revolves around three arrests of Plaintiff by officers of the Covington Police Department that occurred from August 2020 to January 2021. The Court has previously dismissed claims related to the August 2020 arrest on statute of limitations grounds. (*See* Doc. # 21). Therefore, the Court will focus on the January 1, 2021 and the January 16, 2021 arrests and subsequent developments.

### A.    January 1, 2021 Arrest[1]

In the early morning hours of January 1, 2021, Covington Police Officers Joshua Durairaj and Steven Kreiger were dispatched to Cambridge Square Apartments to assist with a domestic dispute.  (Doc. # 26-1 at 3-5).  The officers first attempted to knock on the door to no response, and Officer Durairaj went around to the outside patio door to gain entrance.  (Doc. # 26-4 at 2:20-2:38).  Officer Kreiger joined him.  (Doc. # 26-4 at 4:06-4:09).  The occupants of the apartment were ordered to come out from the bedrooms and three complied.  (Doc. # 26-3 at 3:29-4:35).  Plaintiff was one of the occupants and remained in the bedroom despite the Officers' instructions.  (*Id.*).  Officers Krieger and Warner, who had later responded to the scene, entered the hallway with their weapons drawn and ordered Plaintiff and another occupant to put their hands above their heads and come into the hallway.  (*Id.* at 4:50-4:53).

When Plaintiff came into the hallway, he did not immediately cooperate with the officers' instructions to place his hands on his head.  Officer Durairaj grabbed him to escort him into the living room, and Plaintiff resisted the officer's efforts to place him in a seated position.  (*Id.* at 4:50-5:39).  Eventually Officer Durairaj managed to cuff Plaintiff and seat him against the wall while the officers continued their investigation into the 911 call.  (*Id.* at 4:57-5:46).

At the conclusion of their investigation, the officers determined to take Plaintiff into custody and began to escort him out of the apartment.  (Doc. # 26-3 at 27:00-27:32).  He began to argue with the officers about what his charges were and physically resisted an

---

[1]    As explained more thoroughly in the analysis, Defendants Murphy, Elsbrend, and Ullrich were not present for this arrest.  Thus, the Court will relay only the most basic facts of the arrest that occurred.  *See infra*, II.B.

attempt by Officer Durairaj to remove him from the apartment.  (*Id.* at 28:04-31:30; Doc. # 26-2 at 25:50-27:23).  In the struggle, Officer Durairaj's body camera was knocked off, and Plaintiff was taken to the ground.  (*Id.*).  At various points, additional officers had arrived and assisted in the arrest, including Officers West, Griswold, and Gilliland.  (Doc. # 26-3 at 10:58-11:02; Doc. # 26-4 at 11:05, 11:13).  Defendants have submitted as evidence the body worn camera footage from Officers Griswold, Durairaj, and Kreiger. (Docs. # 26-2, 26-3, and 26-4).  The footage depicts various angles and rooms of the apartment, and Defendants Officers Murphy, Elsbrend, and Ullrich do not appear on any video at any point.

Following the struggle, Plaintiff was arrested and booked on charges of menacing and disorderly conduct.  He ultimately pled guilty to the charge of disorderly conduct.  *See Commonwealth v. Wynn*, No. 21-M-00012, Kenton Circuit Court, Kenton County, Kentucky.

**B.    January 16, 2021 Arrest**

On January 16, 2021, Plaintiff had another encounter with law enforcement. Plaintiff was traveling in a vehicle with a female driver when Officer Murphy pulled the vehicle over for failing to signal and turn on its headlights.  (Doc. # 56-3 at 1:55).  While performing the traffic stop, Officer Murphy questioned the other passengers and asked for their identification.  (*Id.* at 5:41).  Plaintiff questioned Officer Murphy about why he was being questioned when he was not driving the car.  (*Id.* at 6:30).  Officer Murphy indicated to Plaintiff, who had yet to identify himself, that he was permitted to do so, and advised Plaintiff that he could be cited for not wearing a seatbelt.  (*Id.* at 7:00).  Plaintiff then identified himself to Officer Murphy as Ronnie Wynn, Plaintiff's brother.  (*Id.* at 7:16; Doc.

# 58 at 36). Plaintiff gave his brother's biographical details to Officer Murphy, and when he stumbled over the spelling of his brother's middle name, he told Officer Murphy it was because he was drunk. (Doc. # 56-3 at 7:48-8:40). Officer Murphy advised Plaintiff that because he had not produced an identification card, it was a crime to give false information to the police. (*Id.* at 9:51).

While this was ongoing, Officer Cook, who is not a named defendant in this action, arrived for backup. (Doc. # 56-4 at 0:57). Officer Elsbrend arrived at the scene, replacing Officer Cook to stand by the opposite side of the vehicle while Officer Murphy collected information from Plaintiff. (*Id.* at 1:10-2:43). Officer Murphy then returned to his police cruiser to process the traffic ticket and run the credentials provided to him through dispatch, while Officer Elsbrend remained at his side of the vehicle. (Doc. # 56-3 at 9:45-23:34 and Doc. # 56-4 at 2:44).

When Officer Murphy returned to the vehicle, he asked Plaintiff to step out of the car. (Doc. # 56-3 at 23:41). Plaintiff initially questioned this, telling Officer Murphy that he would not exit the vehicle until he was told why he was being asked to exit. (*Id.* at 23:51-23:56). Officer Murphy explained to Plaintiff, believing that he was Ronnie Wynn, that he had an outstanding traffic warrant and advised Plaintiff to step out of the vehicle and place his hands on the top of it. (*Id.* at 23:56-24:19).

Plaintiff exited the vehicle slowly and did not immediately comply with Officer Murphy's demands to place his hands on the vehicle, instead turning to Officer Murphy to argue. (*Id.* at 24:20-24:30). Officer Murphy then pushed Plaintiff up against the vehicle and Plaintiff resisted him, telling Officer Murphy that he was on the car, and he did not have to push him. (Doc. # 56-4 at 17:40-17:42). Officer Murphy then attempted to bring

4

Plaintiff's arms down to put handcuffs on him.  (*Id.* at 17:43-17:46).  Plaintiff stiffened his hands and as Officer Murphy tried to grab Plaintiff's arm, Plaintiff jerked it away until they were both physically struggling against each other.  (*Id.* at 17:46-17:52).

At this, Officer Murphy exclaimed, "He's fighting!" and took Plaintiff down to the ground with the assistance of Officer Elsbrend.  (*Id.* at 17:54-18:50).  The female passenger can be heard screaming throughout the incident and visible in certain frames while she streamed the incident to her Facebook account.  (*See id.* at 18:10; *see generally* Doc. # 56-7).  At various points in the struggle, both Officer Murphy and Plaintiff can be seen trying to place their hands around each other's necks.  (Doc. # 56-4 at 18:07-18:12).  Officer Murphy eventually succeeded in placing Plaintiff in a vascular restraint, though Plaintiff struggled back and tried to get free throughout.  (*See* Doc. # 56-4 at 18:35-18:45; Doc. # 56-7 at 0:50-0:56).  The Facebook video from the female passenger, though shaky, provides the clearest view of the vascular restraint.  (*See* Doc. # 56-7).  In the video, Officer Murphy appeared to release Plaintiff from the hold at the timestamp 0:59 as soon as he was turned over to face the ground.  (*Id.*).

After Plaintiff was subdued in a prone position, the camera shows Officer Murphy kneeling over him with his leg and boot resting on Plaintiff's neck and head while Officer Elsbrend and Officer Martin worked to secure Plaintiff's handcuffs.  (Doc. # 56-4 at 19:10-19:20).  Officers Lusardi and Martin responded to the scene once Plaintiff was subdued on the ground.  (Docs. # 56-8 at 2:11 and # 56-9 at 2:32).  After the handcuffs were secure, both Officers Murphy and Elsbrend removed themselves from Plaintiff and can be heard panting and out of breath.  (Doc. # 56-4 at 19:21-19:32). Officer Murphy sustained a head laceration that can be seen bleeding in Officer Elsbrend's video.  (Doc.

# 56-4 at 19:03; *see also* Doc. # 56-12 at 2, 4).  Plaintiff did not appear to be injured or out of breath following the struggle.  (Doc. # 56-4 at 21:19-21:30).

After the officers placed handcuffs on Plaintiff, they raised him up and stood him near one of the police vehicles with Officer Martin while other officers dealt with another passenger's arrest.  (Doc. # 56-4 at 19:40-19:42).  Officer Elsbrend moved to the driver's side of the vehicle while Plaintiff continued to yell that he did not do anything and that he was not resisting.  (*Id.* at 21:08-21:30).  Officer Elsbrend then decided to arrest the driver and the female passenger for disorderly conduct, as they were yelling and recording the interaction on their phones.[2]  (*Id.* at 23:29-23:38).

Plaintiff began yelling again that the two did not do anything, before pulling away from Officer Martin and attempting to run to the other side of the vehicle where the officers were trying to make the arrest.  (Doc. # 56-9 at 7:03).  Plaintiff was tackled to the ground almost immediately.  (*Id.* at 7:05-7:09).  Plaintiff was then lifted to the ground and escorted to another police vehicle, where Plaintiff resisted efforts to put him in the back seat.  (*Id.* at 7:14-8:11).

Officer Ullrich arrived at the scene only after Plaintiff had been placed in the police vehicle.  (Doc. # 56-16 at 3:43).  He had a brief interaction with Plaintiff, where he approached the vehicle Plaintiff was in and opened the door.  (*Id.* at 14:20).  He said that he did not realize there was someone in the car with all of the lights from surrounding police vehicles, and when Plaintiff said something inaudible to him, Officer Ullrich responded, "Man I wasn't here, I don't have any idea what's going on."  (*Id.* at 14:27-

---

[2]     As the driver and passenger are not parties or otherwise connected to this action, the Court need not make any determination about whether their arrests were proper. This information is included only to give context to Plaintiff's subsequent actions.

14:30).   Plaintiff told him that he got attacked and Officer Ullrich replied, "Ah shit, that sucks."  (*Id.* at 14:31-14:35).   That is the extent of the interaction between Officer Ullrich and Plaintiff at the scene of his arrest.

Plaintiff was ultimately charged with alcohol intoxication, disorderly conduct in the second degree, assault in the third degree, and resisting arrest.  (Doc. # 56-17).   The charges from this arrest remain pending in state court while Plaintiff faces federal charges in connection with his August 28, 2020 arrest.  *See Commonwealth v. Wynn*, No. 21-F-00103, Kenton Circuit Court, Kenton County, Kentucky; *see also United States v. Wynn*, No. 22-cr-51-DCR (E.D. Ky. 2022).

C.     **Internal Affairs Investigation**

 Following the January 16, 2021 arrest, Chief Nader requested that the Internal Affairs Division of the Covington Police Department conduct a review of the use of force deployed during Plaintiff's arrest, specifically Officer Murphy's use of a vascular restraint. (Doc. # 56-18).   The division conducted interviews of Officer Elsbrend and Officer Murphy (Docs. # 56-5 and 56-6).   The Court does not take the statements made by the officers as fact but includes the statements for the overall context they provide to the January 16, 2021 arrest.

During his interview, Officer Murphy mentioned his head laceration and recounted that he was ordered to go to the hospital following Plaintiff's arrest.  (Doc. # 56-6 at 16:50-16:54).   He was given a pill for his head pain and cleared to return to work to finish his reports.   (Doc. # 64 at 71-73; Doc. # 56-6 at 56:39).   Officer Murphy did not recall what type of pill he took, only that it was some kind of combination of ibuprofen and narcotic. (Doc. # 64 at 77).   Later the next day, his head was still hurting so he left work and

returned to the hospital where he was diagnosed with a concussion.  (Doc. # 64 at 80-81; Doc. # 56-13).

He explained that before the arrest, there was a fight at a bar in the area which led to a large gathering near the traffic stop.  (Doc. # 56-6 at 23:50-23:59).  Officer Murphy testified at the hearing that he was concerned about the number of people surrounding the scene, as well as Plaintiff's size, and effectuated the neck restraint to subdue him enough to be handcuffed.  (*Id.* at 55:55).  It was later determined that his taser holster was damaged which prevented him from deploying it.  (*See* Doc. # 56-12).  He also stated that he felt like he was losing the fight and was disoriented and "gassed" after he had been struck in the head.  (Doc. # 56-6 at 14:24-14:38).

The Internal Affairs Division concluded that given the circumstances of Murphy's head injury, Plaintiff's continued resistance, and the gathering crowd of people approaching, Officer Murphy's use of force was justified.  (Doc. # 56-19 at 3-4). Additionally, the Commonwealth's Attorney for Kenton County reviewed the incident and declined to prosecute.  (*See* Doc. # 56-20).

### D.    The Instant Lawsuit

On November 1, 2021, Plaintiff filed the instant Complaint in this Court against Defendants.  (Doc. # 1).  In his Complaint, he alleges constitutional violations and related tort claims against Defendants for their conduct in three separate arrests of his person on August 28, 2020, January 1, 2021, and January 16, 2021.  (*See generally* Doc. # 1).

Upon service of the Complaint and filing an Answer (Doc. # 13), Defendants filed a Motion for Partial Dismissal, arguing that the claims related to the August 28, 2020 arrest should be dismissed because they were outside of the statute of limitations.  (Doc.

# 14).   The Court agreed and granted the Motion on September 20, 2022, dismissing the claims stemming from the August 28, 2020 arrest with prejudice.  (Doc. # 21).

The parties proceeded to discovery on the remaining claims.  On April 14, 2023, Defendants moved for partial summary judgment, arguing that during discovery it was revealed that Defendants Ullrich, Murphy, and Elsbernd were not present at the January 1, 2021 arrest and were therefore not liable for any of Plaintiff's presented claims.  (Doc. # 26 at 8).  Parties agreed at multiple intervals to extend the response and reply deadlines for the partial Motion for Summary Judgment, as well as additional discovery extensions. (*See* Docs. # 29, 34, 41, 44, 49).

Eventually, Magistrate Judge Candace J. Smith administratively denied the partial Motion for Summary Judgment, reasoning that given the length of time that the Motion was pending and the multiple extensions of the briefing deadlines, the proposed extension would closely coincide with the dispositive motion deadline set by the Scheduling Order.  (Doc. # 50 at 2).  The parties received two more extensions of the discovery deadlines (*see* Docs. # 50 and 52) before the filing of the instant Motion on April 15, 2024 (Doc. # 56).

Following the Motion for Summary Judgment (Doc. # 56), Plaintiff Wynn filed a Motion to Mediate with a judicial officer pursuant to Local Rule 16.2.  (Doc. # 61). Defendants responded in opposition, arguing that they did not believe mediation would be fruitful until after the adjudication of the Motion for Summary Judgment.  (Doc. # 66). Magistrate Judge Smith denied the Motion without prejudice, noting that it is not unusual for parties such as the Defendants to consider mediation only *after* dispositive motions are adjudicated.  (Doc. # 67).

Following that Order, Plaintiff filed his Response (Doc. # 73), and the Defendants filed their Reply (Doc. # 83).  The matter is now ripe for the Court's review.

## II.   ANALYSIS

### A.   Standard of Review

A motion for summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, no genuine dispute exists where no reasonable jury could return a verdict for the nonmoving party.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).  The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).

Once the movant has satisfied its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  It must produce evidence showing that a genuine factual issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational fact finder could not find for the non-moving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty

to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Lastly, the Court must draw all reasonable inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

### B.    January 1, 2021 Arrest

#### 1.    Officers Ullrich, Murphy, and Elsbrend

As is the case here, where "there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)). So, "[a]lthough ordinarily the plaintiffs' version of the facts must be accepted as true when deciding the defendant's motion for summary judgment, a video that contradicts a nonmovant's version of the facts can support a grant of summary judgment." *Lee v. City of Norwalk*, 529 F. App'x 778, 782 (6th Cir. 2013).

It is for this reason that the Court grants summary judgment to Defendants Ullrich, Murphy, and Elsbrend on Plaintiff's claims related to the January 1, 2021 arrest. Defendants provided multiple exhibits of body camera footage from the angles of Officers Griswold, Durairaj, and Krieger. (*See* Docs. # 26-2, 26-3, and 26-4). Defendants painstakingly detail each timestamp where the present officers are identified, and rule out the possibility that Officers Murphy, Elsbrend, and Ullrich could have been standing out of frame. (*See* Doc. # 56 at 11-15). Defendants also provide the written citations from the evening and a "Call for Service Detail Report" from the Kenton County Emergency Communications 911 Center that displays which officers were dispatched to the arrest. (Docs. # 56-1 and 26-1). Additionally, Defendants provide the "daily call logs" from the

Covington Police Department that demonstrate that Officers Murphy, Elsbrend, and Ullrich[3] were not even on duty that evening. (*See* Doc. # 56-2).

Plaintiff disputes this version of the facts. He points to his deposition testimony where he was "pretty sure" he saw Officer Elsbrend and Ullrich at the scene and challenges the accuracy of the documents due to his belief that they are inaccurate. (Doc. # 73 at 12) (quoting Doc. # 73-13 at 99). The Court is not convinced, and Plaintiff does not provide any credible evidence to dispute the video evidence that Officers Murphy, Elsbrend, and Ullrich were not present on the evening of January 1, 2021. (*See* Docs. # 26-2, 26-3, and 26-4). The video evidence is sufficient on its own to support the granting of summary judgment, and it is further bolstered by the numerous documents, including external documents from the 911 Center, that indicate Officers Murphy, Elsbrend, and Ullrich were not present or even on duty that evening. *See Lee*, 529 F. App'x at 782; (*see also* Docs. # 26-1, 56-1, and 56-2).

In addition to suing officers that were not present, Plaintiff does not even detail what constitutional rights were violated at his January 1, 2021 arrest. Defendants point out that during Plaintiff's deposition, he could not recall anything that the officers did that he believed to be a violation of his rights. (Doc. # 73-13 at 86-92, 98-99). Plaintiff argues here that it does not matter, and Plaintiff "should not be required to identify what specific actions or inactions deprived [Plaintiff] of his constitutional rights, as [Plaintiff] is not fully aware of the extent of his constitutional rights." (Doc. # 73 at 14). While Plaintiff himself

---

[3]     Defendants also argue against Plaintiff's assertions that Chief Nader responded, demonstrating that he was also not on duty that evening and did not arrive at the scene of the arrest. (Doc. # 56 at 15-18). However, the only claim that Plaintiff names Chief Nader in the Complaint is for supervisory liability. (*See* Doc. # 1 at 19-20). Plaintiff concedes that it is not likely that Chief Nader was at the arrest on January 1, 2021 (Doc. # 73 at 13), but it does not matter for the Court's analysis because Chief Nader is not named in any of Plaintiff's § 1983 or tort claims.

may not be fully apprised of his constitutional rights, his counsel should either articulate for the Court how officers that were not present at the scene could have violated Plaintiff's constitutional rights or concede the claim.

Put simply, Officers Murphy, Elsbrend, and Ullrich could not violate any of Plaintiff's constitutional rights or commit torts against him if they were not on the scene on January 1, 2021. Plaintiff points to no evidence that disputes the video footage, only his own self-serving claims that he was "pretty sure" Officer Elsbrend was present, he "remember[s] seeing" the officers, and the situation was so escalating so quickly that he was unable to differentiate between the officers present. (Doc. # 73 at 12-13) (citing Doc. # 73-13 at 91-95, 99-100). That is insufficient to create a genuine issue of material fact.

While self-serving statements can be *part* of the evidence that creates a genuine issue of material fact, they cannot be the only evidence, especially when specifically contradicted by the record. *See Davis v. Gallagher*, 951 F.3d 743, 749-50 (6th Cir. 2020) ("[W]here self-serving testimony is blatantly and demonstrably false, it understandably may not create a *genuine* issue of material fact, thereby allowing a court to grant summary judgment."). The comprehensive video footage and supporting documents contradict Plaintiff's claims that they were present at the time of his arrest. Plaintiff's argument that the supporting documents were falsified and cannot be trusted is equally unavailing. (Doc. # 73 at 11-12).

Defendants have met their burden to demonstrate that there is no dispute of material fact, and Plaintiff has not produced specific evidence showing that a genuine factual issue remains. *Plant*, 212 F.3d at 934. Therefore, Officers Murphy, Elsbrend, and

Ullrich are entitled to summary judgment on all claims related to the January 1, 2021 arrest.

### 2. City of Covington

Because Officers Murphy, Elsbrend, and Ullrich were not present on the night of the January 1, 2021 arrest, and Plaintiff has not named any other officers from January 1, 2021 arrest despite the voluminous discovery available to him, there are no actions that the City of Covington could be vicariously liable for.

Additionally, cities cannot be held liable for a § 1983 claim simply because one of its employees may have violated the constitutional rights of a plaintiff. *Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017). Instead, Plaintiff must pursue a *Monell* claim. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiff alleges both in his Complaint. (*See* Doc. # 1 at 13-14). Thus, to the extent Plaintiff claims that the City of Covington violated his rights under the Fourth, Fifth, and Fourteenth Amendments on January 1, 2021 and he is entitled to relief under § 1983, the City of Covington is entitled to summary judgment.

### C. January 16, 2021 Arrest

### 1. Officer Ulrich

Before evaluating each claim separately, the Court will address Officer Ullrich's involvement (or lack thereof) in the arrest that occurred on January 16, 2021. As noted by both parties and documented in the video, Officer Ullrich did not arrive on the scene until after Plaintiff was arrested. (Doc. # 56-16 at 3:43; Doc. # 73 at 20). When the Defendants point out that Officer Ullrich had limited involvement with this arrest, Plaintiff counters that though Officer Ullrich was not involved in the "assault and battery" of the

Plaintiff, he is liable for intentional infliction of emotional distress ("IIED") because he took part in the booking of Plaintiff and trained his fellow officers.  (Doc. # 73 at 20).  Plaintiff further asserts that Ullrich "was present and oversaw the evidence collection used for [Plaintiff's] case and report, and was personally involved in booking [Plaintiff] at the police station.  As a result, he is liable for any injuries [Plaintiff] obtained." (*Id.*) (citation omitted).  Plaintiff does not cite any case law for that proposition.

Plaintiff did not bring a claim for supervisory liability against Officer Ullrich, and his Complaint does not allege that any excessive force or injury occurred during the booking process that Officer Ullrich participated in.  (*See* Doc. # 1).  Without Plaintiff identifying specific facts that demonstrate Officer Ullrich violated Plaintiff's rights or otherwise committed a tort action against him, Officer Ullrich is entitled to summary judgment on each of Plaintiff's claims against him for the January 16, 2021 arrest.

### 2.     1983 Violations

42 U.S.C. § 1983 provides that any "person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  To make out a claim under § 1983, a plaintiff must show: "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).  Here, Plaintiff asserts that he was deprived of his Fourth, Fifth, and Fourteenth Amendment rights because the Defendants racially discriminated against him and used excessive force during his arrest.

15

### a.     Officers Murphy and Elsbrend

### i.     Racial Discrimination

Plaintiff alleges that Officers Murphy and Elsbrend "administered police services in a discriminatory manner."  (Doc. # 73 at 17).   However, his Complaint does not contain any specific allegations that Officers Murphy and Elsbrend violated his rights under the Equal Protection Clause of the Fourteenth Amendment, or his rights under the Fifth Amendment.  (*See* Doc. # 1).  His claim under § 1983 is entirely focused on the alleged use of excessive force, which is evaluated under the Fourth Amendment and discussed in full in the next section.  *See infra*, II.C.2.a.ii.  Quoting directly from the Complaint, Plaintiff alleges:

> 116.  Defendants' above described conduct violates PLAINTIFF'S right, as provided for under the Fourth[,] Fifth[,] and Fourteenth Amendment to the United States Constitution, *to be free from excessive and or arbitrary and or unreasonable force against him*."
>
> . . .
>
> 119.  Defendants acted under color of law by viciously beating PLAINTIFF without lawful justification and subjecting PLAINTIFF to excessive force thereby depriving PLAINTIFF of certain constitutionally protected rights, including, but not limited to:
>
>> a.     The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the United States constitution.

(Doc. # 1 at ¶¶ 115, 119) (emphasis added)

There is one mention in the factual background of the Complaint that Covington Police Department officers "have a pattern, and a practice of discriminating against African Americans and [Chief Nader] knows of the practice and has failed to properly train and discipline officers."  (*Id.* at ¶ 109).  Plaintiff also notes that he is a recognizable African

16

American.  (*Id.* at ¶ 110).  But this does not sufficiently allege that Officers Murphy and Elsbrend violated Plaintiff's rights under the Fifth and Fourteenth Amendments during the January 16, 2021 traffic stop.

In his Response, Plaintiff cites the standard of the Fifth Amendment's right against self-incrimination and the Fourteenth Amendment's Equal Protection Clause.  (Doc. # 73 at 24-25).  However, he also states that he will not "provide further analysis for the Fifth and Fourteenth Amendments because the Defendants have neglected to address the entirety of the claims made."  (*Id.* at 23).  Unfortunately for Plaintiff, his failure to include specific allegations of this conduct or develop his argument in his Response is fatal to the claims.  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir.1995)).  It is the Plaintiff's burden to demonstrate that a violation occurred to make out a successful claim under § 1983.  *See Robertson*, 753 F.3d at 614.

While it is possible that Plaintiff is arguing that his Fifth Amendment rights were violated when Officer Murphy asked him to provide identification, it is not for the Court to assume Plaintiff's argument.  *Id.*  Furthermore, the Sixth Circuit has consistently held that police officers do not violate a passenger's constitutional rights by asking them for their identification, even when there is no reasonable suspicion of wrongdoing by that passenger.  *See United States v.* Alexander, 467 Fed. App'x 355, 362 (6th Cir. 2012)

(citing *United States v. Smith*, 601 F.3d 530 (6th Cir. 2010)).  Thus, Officers Murphy and Elsbrend did not violate his Fifth Amendment rights during the January 16, 2021 arrest.

Next, assuming Plaintiff included specific allegations of an Equal Protection claim in his Complaint, he does not explain how Officers Murphy and Elsbrend racially targeted him during the traffic stop.  He makes incendiary claims that the Covington Police Department has a practice of violating the rights of African American citizens, but points to no other pending lawsuits or examples of such behavior.  Plaintiff mischaracterizes a statement from the deposition of Chief Nader to say that African Americans were treated differently than white citizens, when in reality, Chief Nader only stated that he could not recall another specific incident where a similar use of force was performed on a white citizen.  (Doc. # 73 at 4-5; Doc. # 73-3 at 37-38).  The Court hardly considers this evidence of department-wide racial discrimination, especially when connected with the events of the traffic stop.

And though Plaintiff argues he had the right not to answer Officer Murphy's questions, instead of declining to provide his information, Plaintiff provided a false name, Ronnie Wynn, that had a warrant attached to it.  (Doc. # 56-3 at 7:16-8:40).  This warrant permitted Officer Murphy to conduct an arrest.  *See United States v. Cox*, No. 1:20-cr-14-GNS-1, 2021 WL 7185220, at *3 (W.D. Ky. 2021) ("[T]he existence of the active arrest warrant for [Defendant] provided law enforcement with probable cause to seize [Defendant's] person and in so doing they did not violate his rights under the Fourth Amendment.  No suspicion of criminal activity was needed.").

Without more from Plaintiff supporting his allegations, it appears Plaintiff is simply arguing that because he is African American, and the Defendants are white, the arrest

was racially motivated.  This alone does not show that Defendants were motivated to discriminate against him on the basis of his race or ethnicity.  *See Saalmin v. Walmart, Inc.*, 97 F.4th 995, 1010 (6th Cir. 2024) (citing *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009)).  After all, it was Plaintiff's use of a false name for someone who happened to have an active traffic warrant which led to the officers placing him under arrest.

Further, to state a claim of racial discrimination, "a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'"  *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citation omitted).   Plaintiff has not done so here. Because Plaintiff has not adequately alleged a violation of his rights under the Fifth and Fourteenth Amendments, nor demonstrated a dispute of material fact, Officers Murphy and Elsbrend are entitled to summary judgment on Plaintiff's racial discrimination claims.

## ii.    Excessive Force

"When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances."  *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Thus, because Plaintiff was subject to an arrest and seizure on January 16, 2021, Plaintiff may only bring a § 1983 claim under the Fourth Amendment, and the Court will analyze his claims as such.

"In order to comply with the Fourth Amendment, an officer's use of force must be objectively reasonable under the totality of the circumstances."  *Smith*, 874 F.3d at 943.

"In evaluating whether a police officer used excessive force on a particular occasion, the court must view the situation from the perspective of a reasonable officer on the scene at the time and without the benefit of 20/20 hindsight." *Id.* at 943-44.  The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.

In adjudicating excessive-force claims, courts must consider the facts and circumstances of each case, including "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Burgess v. Fischer*, 735 F.3d 462, 472-73 (6th Cir. 2013) (internal brackets omitted) (quoting *Graham*, 490 U.S. 396).

As both parties note, the severity of the crime at issue weighs in favor of Plaintiff. (*See* Doc. # 56 at 34; Doc. # 73 at 25).  Officer Murphy was conducting a traffic stop of the female driver, and the name Plaintiff gave Officer Murphy returned a "traffic warrant." (Doc. # 56-3 at 23:56).  There was nothing violent or serious about this crime that would lend itself to a use of force.

However, the remaining two factors weigh heavily against Plaintiff.  Plaintiff posed an immediate threat to the safety of the officers, and he actively resisted arrest and attempted to evade arrest by flight.  The Sixth Circuit has held that active resistance includes "physically struggling with, threatening, or disobeying officers," as well as a defendant refusing to move his hands to be handcuffed.  *Rudlaff v. Gillispie*, 791 F.3d

638, 641 (6th Cir. 2015) (quoting *Cockrell v. Cty. of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)).  Plaintiff did all of those things to Officers Murphy and Elsbrend.

Due to Plaintiff's resistance, Plaintiff and Officers Murphy and Elsbrend were brought to the ground in a skirmish in the middle of the road, jeopardizing their safety. (Doc. # 56-3 at 17:54-18:50; Doc. # 56-4 at 19:10-19:20).  Officer Murphy testified that he could not deploy his taser, which was later determined to be broken.  (Doc. # 56-12). Officer Murphy even received a concussion during the interaction.  (Doc. # 56-6 at 16:50-16:54).  Additionally, after the struggle had ended, Plaintiff tried to charge at the officers who were attempting to conduct an arrest of the other vehicle passengers.  (Doc. # 56-9 at 7:03-7:09).

Based on this record, the Court finds that Officer Murphy's use of a vascular restraint to subdue Plaintiff until he could be handcuffed was reasonable and narrowly tailored to the situation.  Each of Plaintiff's allegations of excessive force are plainly contracted by the video evidence.  Plaintiff was not remotely compliant with Officer Murphy's instructions.  He steadfastly and actively resisted the officers' efforts to handcuff him.  In fact, he was belligerent and confrontational throughout the entirety of the encounter.  Plaintiff was not visibly injured following the restraint, and even afterwards, he continued to resist his arrest and interfere with the arrest of the other vehicle passengers.  (*See* Doc. # 56-9 at 7:03-7:09).

The video plainly establishes that Officers Murphy and Elsbrend did not use excessive force against Plaintiff and precludes any argument that a genuine issue of material fact remains.  A reasonable jury applying Sixth Circuit law could conclude only that the officers were constitutionally able to use the force they did to subdue him.  As

such, Officers Murphy and Elsbrend are entitled to summary judgment on Plaintiff's § 1983 excessive force claims.

### b.    City of Covington

For the same reasons listed above, Plaintiff must pursue a *Monell* claim against the City of Covington to assert his rights under § 1983.  See *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).  To the extent Plaintiff claims that the City of Covington violated his rights under the Fourth, Fifth, and Fourteenth Amendments on January 16, 2021 and he is entitled to relief under § 1983, the City of Covington is entitled to summary judgment on those claims.

### 3.    *Monell* Claim against City of Covington

*Monell* and its progeny allow plaintiffs to pursue § 1983 claims against municipal governments when they suffer constitutional injuries resulting from a municipality's established policies or procedures.  *See id.*  The requirement of a policy or custom underscores that "municipalities are not, however, liable for every misdeed of their employees and agents." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 363 (6th Cir. 1993).  In other words, "municipalities are not vicariously liable in Section 1983 actions merely because they employ someone who has committed a constitutional violation." *Arrington-Bey v. City of Arlington Heights*, 858 F.3d 988, 994 (6th Cir. 2017).

However, in some cases, a legally actionable municipal policy "does not have to be written law; it can be created 'by those whose acts or edicts may fairly be said to represent official policy.'" *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell*, 436 U.S. at 694).  "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or

legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478 (citing *Thomas v. Cty. of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiff alleges in his Complaint that the City of Covington is liable under *Monell* because it had "a duty to adequately train, supervise, and discipline their deputy officers in order to protect members of the public . . . from being harmed by police officers unnecessarily." (Doc. # 1 at ¶ 121). He alleges that the City of Covington was "deliberately indifferent" to those duties and caused Plaintiff's injury, as well as implemented unconstitutional policies. (*Id.* at ¶ 122).

Here, the record does not establish that the City of Covington is liable under *Monell*. As discussed above, no constitutional violations were committed by Officers Murphy and Elsbrend during the January 16, 2021 arrest, and thus, Officers Murphy and Elsbrend's actions do not give rise to *Monell* liability for the City of Covington. Plaintiff has generally suggested that the Covington Police Department has a policy of discriminating against African American citizens, but as discussed, he points to no specific allegations of such discrimination apart from his claim that he was an African American man that was arrested, and that the arresting officers were white.

Plaintiff includes bombastic claims in his Response about different policy violations that Covington Police Department officers committed but fails to connect any of those allegations to his arrest. (*See* Doc. # 73 at 5-7). Perhaps the only allegation that is connected to one of Plaintiff's arrests in any way is his allegation that Officer Murphy

"return[ed] to work after taking a narcotic . . . to then write a false report against [Plaintiff]." (*Id.* at 7).  It is true that Officer Murphy returned to the station after his hospital visit after Plaintiff's arrest, and that Officer Murphy was given a pill at the hospital that he remembers to be a combination of ibuprofen and some narcotic.  (Doc. # 64 at 71-73).  However, it requires a substantial leap of logic to infer that Officer Murphy was too intoxicated to complete the report, or that it must be falsified for that reason.  Plaintiff does not provide any information about the specific prescription or dosage, nor does he provide any evidence that Officer Murphy was intoxicated while he prepared the report in the hours after his hospital visit.  Nothing in the record supports the claim that anything in Officer Murphy's report was false, or that it was a pattern or practice for the City of Covington to require officers to write their reports while intoxicated.  Further, the Court did not rely on Officer Murphy's report to make any judgment about the appropriateness of his use of force, instead relying on the multiple angles of video footage of the incident in the record.

But most importantly, Plaintiff does not connect this claim to a constitutional violation that he suffered.  Evidence from the body camera footage indicates that there was probable cause to support each of Plaintiff's charges for alcohol intoxication, disorderly conduct in the second degree, assault in the third degree, and resisting arrest. (*See generally* Docs. # 56-3 and 56-4).  There is no evidence before the Court that the arrest on January 16, 2021 was an effort to target Plaintiff with false charges or punish him because of his race.  Any arguments suggesting otherwise are not grounded in reality.

For each of these reasons, Plaintiff has not demonstrated a dispute of material fact and the City of Covington is entitled to summary judgment on Plaintiff's *Monell* claim.

### 4.   Officers Murphy and Elsbrend are Entitled to Qualified Immunity on the State Law Tort and Negligence Claims

Kentucky's qualified immunity doctrine shields officers from state-law liability. Qualified immunity in Kentucky protects officers from liability for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Public employees enjoy qualified official immunity for (1) discretionary acts; (2) performed in good faith; and (3) within the employee's scope of authority. *Id.* Actions taken within the scope of one's authority as a police officer constitute discretionary acts. *See Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008).

The doctrine of qualified immunity applies to negligence actions and intentional torts as long as they are performed in good faith. *Gati v. W. Ky. Univ.*, 762 F. App'x 246, 253 (6th Cir. 2019); *Martin v. O'Daniel*, 507 S.W.3d 1, 6 (Ky. 2016). "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.2d at 523.

As previously stated, the actions by Officers Murphy and Elsbrend on January 16, 2021 were not considered excessive force that would violate Plaintiff's rights under the Fourth Amendment. *See supra*, II.C.2.a.ii. Instead, their use of force was a reasonable method of restraining an arrestee that was actively resisting. Plaintiff provides no evidence, direct or circumstantial, that Officers Murphy and Elsbrend acted in bad faith. He has not met his burden to convince the Court that Officers Murphy and Elsbrend are not entitled to qualified immunity on the tort and negligence claims. Thus, Officers Murphy

and Elsbrend are entitled to summary judgment on Plaintiff's claims of assault, battery,[4] intentional infliction of emotional distress,[5] negligence, and negligent infliction of emotional distress.

### 5.    Negligent Hiring – City of Covington

Counties and municipalities "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). "*Respondeat superior* or vicarious liability will not attach under § 1983." *Id.*  Therefore, a plaintiff raising a municipal liability claim under § 1983 "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694).  As addressed earlier with Plaintiff's *Monell* claim, Plaintiff has not met that burden.  *See supra*, II.C.3.  The City of Covington is therefore entitled to summary judgment on Plaintiff's claim for negligent hiring.

### 6.    Supervisory Liability – Chief Nader

For personal liability against a supervisor, "liability must be based on more than *respondeat superior*."  *Phillips v. Roane Cty., Tenn*., 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).  "Nor can liability of

---

[4]    Even if Defendants were not entitled to qualified immunity, a battery claim under Kentucky law must fail where the officer's conduct was deemed objectively reasonable in the § 1983 context.  *Atwell v. Hart Cty.*, 122 F. App'x 215, 219 (6th Cir. 2005).  The Court has determined that the use of force was objectively reasonable, which defeats Plaintiff's battery claims.

[5]    Plaintiff's claims also fail because he has not presented expert medical or scientific proof to support his injuries.  A plaintiff cannot simply rely on his own testimony to demonstrate that his emotional injury was severe; he "must present expert medical or scientific proof to support the claimed injury or impairment."  *Osborne v. Keeney*, 399 S.W.3d 1, 18 (Ky. 2012).  No such proof of Plaintiff's injury or impairment has been submitted for the Court's consideration.

supervisors be based solely on the right to control employees" or "simple awareness of employees' misconduct." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) (internal citations omitted). Rather, "a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident or misconduct or in some other way directly participated in it.'" *Id.* (quoting *Shehee*, 199 F.3d at 300). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300. "A mere failure to act will not suffice to establish supervisory liability." *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) (citing *Gregory v. Cty. of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). Therefore, personal liability against a supervisor "must be based on active unconstitutional behavior." *Shehee*, 199 F.3d at 300.

First, Plaintiff is not entitled to relief because liability under a theory of *respondeat superior* can only exist when there is an underlying actionable tort. *Patterson v. Blair*, 172 S.W.3d 361, 363 (Ky. 2005). As discussed above, Officers Murphy and Elsbrend's use of force was reasonable under the circumstances, and they are both entitled to qualified immunity for Plaintiff's state law tort claims. Thus, there is no actionable claim that would extend liability to Chief Nader.

Second, despite the lack of evidence supporting his claims, Plaintiff's fatal flaw is his failure to connect any of these allegations to his arrest on January 16, 2021. There must be a direct causal link between the actions of Officer Murphy and Elsbrend, and Chief Nader's supervision for Chief Nader to be held liable. *See Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869 (6th Cir. 1982) (quoting *Rizzo v.* Goode, 423 U.S. 362, 370-71 (1976)).

As noted above, Officer Ulrich did not arrive until the end of Plaintiff's arrest and Plaintiff has made no allegations of misconduct on his part during his booking process. *See supra*, II.C.1.  Thus, Plaintiff's references to Officer Ullrich's disciplinary record from 2014 is not relevant to whether Chief Nader should be liable here, because there is not any allegation of misconduct by Officer Ullrich on January 16, 2021 that Chief Nader could be held liable for.

The same is true for Plaintiff's allegations that Officer Murphy has been involved in domestic violence disputes, a physical altercation with another officer, and takes steroids.  (*See* Doc. # 73 at 4-5).  The evidence presented to the Court includes investigations by Covington Police Department into this behavior, and Officer Murphy was ultimately cleared of any wrongdoing in documents submitted by Plaintiff himself.  (Doc. # 60 at 20-22; Doc. # 73-7 at 2).  Additionally, Officer Murphy tested negative for steroids. (Doc. # 73-7 at 2).  Plaintiff even concedes that the allegations of domestic violence "could not be confirmed or denied."  (Doc. # 73 at 6).  And more significantly, Plaintiff has not connected any of these allegations to the January 16, 2021 arrest.

Plaintiff generally claims that Chief Nader failed to enforce department policies related to training on racial profiling and maintaining a drug-free workplace.  Plaintiff alleges that there "is no evidence that such trainings occurred."  (Doc. # 73 at 6-7). Plaintiff throws in the fact that Officer Murphy "drafted a false police report while under the influence of opioids," (Doc. # 73 at 6), but as previously discussed in this Order, there is no evidence to suggest that Officer Murphy was high when he wrote the report or that the information in the report was fabricated.  *See supra*, II.C.3.  Thus, there is no misconduct on the part of Officer Murphy that Chief Nader should be held liable for.

28

It is not clear to the Court what impact any of these allegations have on Plaintiff's arrest. The Court already determined that the arrest of Plaintiff was not racially motivated, nor was Officer Murphy's use of force unreasonable under the circumstances. *See supra*, II.C.2.a. For all of these reasons, Plaintiff has not demonstrated a disputed issue of material fact, and Defendant Nader is entitled to summary judgment on Plaintiff's claim for supervisory liability.

## III.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)      Defendants' Motion Summary Judgment (Doc. # 56) is **GRANTED**;

(2)      This civil action is **DISMISSED with prejudice** and **STRICKEN** from the Court's active docket; and

(3)     The Court will enter a corresponding Judgment with this Order.

This 16th day of August, 2024.



**Signed By:**

***David L. Bunning***

**United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Cov2021\21-137 MOO Granting MSJ.Docx